Scott S. McKessy (SM-5479)
Casey D. Laffey (CL-1483)
REED SMITH LLP
599 Lexington Avenue
New York, New York 10022
Tel. (212) 521-5400
Fax. (212) 521-5450
Attorneys for Plaintiff
Wachovia Bank, National Association

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
WACHOVIA BANK, National Association,

          Plaintiff,

    - against -

CASA DE CAMBIO MAJAPARA S.A. de C.V. a/k/a
MAJAPARA CASA DE CAMBIO S.A. de C.V.,

          Defendant.
------------------------------------------------------------X

07 Civ. 11230 (BSJ)(RLE)

## DECLARATION OF CARLOS A. PEREZ

Carlos A. Perez, declares as follows:

1.     I am the Managing Director, Americas Group, Global Financial Institutions & Trade Services for Wachovia Bank, National Association ("Wachovia"). I am fully familiar with the facts set forth herein, and submit this declaration pursuant to 28 U.S.C. §1746, in opposition to Casa de Cambio Majapara S.A. de C.V. a/k/a Majapara Casa De Cambio S.A. de C.V.'s ("Majapara") instant application to, *inter alia*, vacate the Order of Attachment issued by this Court on December 20, 2007.

### Introduction

2.     As stated in my previous declaration to this Court, this is a case that arises out of foreign exchange spot transactions wherein Majapara agreed to deliver to Wachovia more than $38 million (US$) in exchange for Majapara delivering to Wachovia 26 million Euros. Wachovia transferred the Euros; Majapara, however, did not transfer the U.S. Dollars and then

- 2 -

absconded with Wachovia's Euros. Majapara refused to return the Euros, and then proceeded to come up with differing stories on when, if ever, it would pay Wachovia.

3. Consequently, Wachovia commenced this action to protect its rights and, in connection with this action, sought an order of attachment seeking to attach assets Wachovia believed Majapara had in New York. It is my understanding that this Court granted that application and now Majapara seeks to vacate that order by claiming this Court was not provided with all of the relevant facts.

4. This is simply not true. Indeed, the purported "factual" picture Majapara attempts to paint in its papers is misleading in certain parts, untrue in others, but, in any event, wholly unsupported by anyone with knowledge of the relevant events.

5. Moreover, based upon Majapara's conduct in transferring a significant amount of its funds out of Wachovia's reach, including transferring funds out of Majapara's Citibank account in New York in violation of this Court's prohibitions, the order of attachment was well deserved and Wachovia's fear that Majapara would remove funds from Wachovia's reach justified.

### Majapara's Relationship With Wachovia

6. Majapara had several accounts with Wachovia, as well as engaged in foreign exchange spot transactions with Wachovia. Foreign exchange spot transactions are to be settled within 48 hours and the settlement of those transactions is to be the exchange of the bought/sold currencies between the parties on the settlement date. Pursuant to the parties' FX Agreement, Wachovia was under no obligation to transfer the outgoing bought currency until after confirmation of receipt of the incoming sold currency. It is within Wachovia's sole discretion, however, to transfer the outgoing bought currency prior to confirmation of receipt of the incoming sold currency. For those transactions, banks, like Wachovia, establish settlement limits

(which establish daily limits on the volume of transactions in which an entity may engage) in order to manage settlement risk (the amount of bought currency the bank will transfer prior to confirming receipt of the sold currency). This is why, in order to set settlement limits and assess settlement risk, Wachovia required Majapara to provide statements regarding Majapara's financial health and well-being. These financial representations are to induce Wachovia to continue to transact business with Majapara.

7. Accordingly, settlement limits are established by banks to address, among other things, the risk inherent in transactions (like foreign exchange transactions) in which fund transfers are intended to occur on the same day but, due to the logistics of such arrangements and in order to honor its commitments to its customers, the bank may find it necessary to release funds into the system before it can confirm that it has actually received funds from its counterparty.

8. In this regard, when the sold currency is Euros, a bank usually sends out the bought currency in the morning of the settlement date. Wachovia, again like other banks, may not be able to determine with certainty the receipt of the incoming sold currency until the day after the settlement date. This delay is inherent in the system of electronic transfers and is one of the reasons for the establishment of settlement limits.

9. The driving reason for this procedure is operational. Wachovia engages in thousands of these transactions on a daily basis and employs an automated reconciliation program to process the confirmations. To reconcile this volume of transactions manually would require an incredible amount of man-hours. Accordingly, each day, the European banks provide Wachovia with a SWIFT 950 (containing data regarding the prior day's transactions) to allow for this automated reconciliation. Again, this delay in confirming an entity's "cover" of its intra-day obligations is considered the settlement risk. There is no charge or fee imposed upon Majapara, or any other foreign exchange customer of the bank, for Wachovia to incur this settlement risk.

There is no applicable interest rate; there is no agreement requiring Wachovia to incur this risk in this respect; this is a discretionary risk to which Wachovia may or may not choose to be exposed on any given transaction.

### December 5th Meeting With Majapara

10.     In December 2007, Wachovia decided to cease providing correspondent banking services to exchange companies outside the United States and went about notifying thirteen Casas de Cambio in Mexico and 50 other entities worldwide about this cessation of services. In this regard, Wachovia prepared a form letter to be delivered to these entities. This form letter listed a number of services that would be ending, but not all services listed in this letter applied to all customers.

11.     Majapara was one of the Casas de Cambio I visited the afternoon of December 5, 2007 to inform it of Wachovia's decision. The letter I provided to Majapara during that meeting, which is substantially in the same form as the letters provided to the other entities notified, is annexed hereto as Exhibit R. And while the December 5th form letter delivered to Majapara references "credit lines," this, again, was a mere form letter and included a laundry list of potential services that could be affected and not a recitation of the services each entity did, in fact, receive.

12.     I visited at least two other Casa de Cambios on December 5th before I visited with Mr. Jorge Ortiz Munoz at the offices of Majapara. During my meeting with Majapara, I gave Mr. Ortiz the letter and explained Wachovia's decision. As more fully detailed in the accompanying declaration of Andrew Gross, the cessation of services described in the December 5th form letter, however, did not cut-off Majapara from doing any further spot transactions with Wachovia, it just meant Wachovia would no longer incur any settlement risk in connection with those spot transactions and would transfer the sold currency only after the bought currency had been confirmed received by Wachovia – as set forth in the parties' FX Agreement.

13. And, as the accompanying declaration of Andrew Gross explains, the spot transactions Majapara entered into on or before December 5, 2007, were not subject to these new restrictions. There simply was no "abrupt cancellation of operating lines" as Majapara now claims. Indeed, the entire basis of Majapara's business is the international transfer of funds and it is well aware of the mechanics and logistics of such transfers. So Majapara's mischaracterization, in its motion papers, of the nature of its relationship with Wachovia is all the more difficult to understand.

### December 13 Communications

14. I have been informed that on December 10, 2007 (the Monday after Majapara defaulted), Wachovia's back office services contacted Majapara regarding the December 5th spot transactions and was told that the missing payment would be arriving shortly. No payment was received.

15. Thereafter, my department contacted Majapara to demand payment and to get an explanation why Majapara did not pay Wachovia as it was required to do. The morning of Thursday, December 13, 2007, I spoke by telephone with Mr. Ortiz. I asked him what Majapara did with Wachovia's money. As I stated in my prior declaration, Mr. Ortiz acknowledged and admitted that Majapara was obligated on its debt to Wachovia and owed Wachovia for the December 5th spot transactions. Mr. Ortiz then stated that Majapara had received Wachovia's Euros and used them for other purposes because Majapara was experiencing "a liquidity crisis."

16. This was the first I had heard of this and Mr. Ortiz explained that this liquidity crisis was caused because Majapara had been improperly lending money. I note that Majapara now blames Wachovia for its claimed "liquidity crisis" and apparently claims that it is permissible for it, a Mexican Casa de Cambio, to lend money. Neither of these new claims, however, has merit. First, none of the other twelve Mexican Casas de Cambio or 50 other entities worldwide that received the same December 5th form letter were unable to settle a

foreign exchange spot transaction with Wachovia due to Wachovia's cessation of services. Second, from my reading of the Mexican statute annexed to Majapara's motion papers, nothing in that provision states a Casa de Cambio may lend money: I do not recall any of the financial statements Majapara supplied to Wachovia or Majapara's Mexican regulator's (to the extent they are available to the public) disclosing the existence of any of these "loans."

17. I then asked Mr. Ortiz when Majapara would repay Wachovia. He said Majapara needed "two months" to collect the loans Majapara made and that, in lieu of payment, he would transfer to Wachovia two-thirds ownership of Majapara. Mr. Ortiz valued Majapara at $70,000,000 as a going concern to value the shares for such a proposition – this valuation, however, was wholly unsupported and ridiculously high given Majapara's then current financial condition. I declined this "offer" for several reasons, but primarily because something did not smell right with Majapara's business and its finances (*i.e.* Majapara admitted it was improperly issuing loans; Majapara's sudden and inexplicable dire financial straits, despite having provided Wachovia financial statements indicating it was a sound and financially healthy company). I simply did not want to get myself or Wachovia involved in whatever Majapara had gotten itself into. I note that Majapara's motion papers now claim that Majapara was worth $90 million, at the end of 2007, as a going concern. This statement seems a little disingenuous given Majapara's other "statements" and may explain why no one from Majapara – not even Mr. Rousseau, Majapara's Treasurer who submitted the lone declaration – was able to attest to such a valuation.

18. I then asked Mr. Ortiz when Majapara would repay Wachovia. He said Majapara needed "two months" to collect the loans Majapara made and that he would provide Wachovia with two-thirds of the shares in Majapara as security in the meantime. But given the fact that it was improper for Majapara to have issued loans in the first place, the fact that Majapara refused to return any of Wachovia's Euros, the fact that Majapara was in such dire financial straits, so suddenly and inexplicably, despite the financial statements Majapara provided to Wachovia, the

fact that Mr. Ortiz's claim of Majapara being worth $70 million as a going concern was completely unsupportable, this delay tactic by Majapara was not acceptable and I told him that.

19. Regardless, Wachovia then received a letter from Mr. Ortiz, dated December 13, 2007, wherein he confirmed Majapara's liability to Wachovia. But in the short time between when our telephone conversation ended and Mr. Ortiz wrote his letter, Majapara had already backed away from its claim to repay in "two months" and took the new position that it would try to repay sometime in the indefinite future.

20. The letter then claimed that the purported "liquidity" issue was caused by Wachovia's "abrupt cancellation of operating lines." There is no explanation of the "liquidity" issue in the December 13th letter, nor in Majapara's present motion papers. Moreover, no where in its papers does Majapara explain how this mysterious issue could arise only after December 5th and not before – other than Majapara's bare unsupported claim that Wachovia caused it. Indeed, if Majapara was experiencing "liquidity" issues after receiving a $38 million windfall by absconding with Wachovia's money, what was its true financial condition <u>prior</u> to receiving this misappropriated windfall?

21. And, as more fully detailed in the accompanying declaration of Andrew Gross, Wachovia did not abruptly cancel anything. Indeed, Wachovia continued to enter into foreign exchange spot transactions with Majapara after December 5th, but, for those transactions settling *after* December 7, 2007, Wachovia did not incur any settlement-risk exposure – meaning, as per the parties' written agreement, the sold currency had to be received by Wachovia before it would transfer out the bought currency.

22. But what Majapara attempts to have this Court overlook is that the December 5th spot transactions between Wachovia and Majapara were to be settled on December 7, 2007, with Wachovia being exposed to settlement risk. Accordingly, the only difference between the

settlement of the December 5th spot transactions and all prior spot transactions was that Majapara appears not to have intended to pay Wachovia for the December 5th spot transactions.

23.     Finally, Majapara's motion papers intimate that the parties had an agreement that Wachovia was going to allow Majapara an undefined amount of time within which to repay Wachovia. This is not supported by either the December 5th form letter or the December 13th letter, not true and contrary to my explicit conversation with Mr. Ortiz.

24.     But the bigger questions Majapara never answers are: Where are the Euros it took? Where are the US$ that Majapara was supposed to deliver to Wachovia? Where is the listing of this more than $38 million windfall on the purported "complete" listing of assets Majapara was to provide to Wachovia pursuant to Court orders?

25.     And despite Majapara's attempts to confuse the issues in this action, the basis of this dispute is quite simple. Majapara, whose business consisted almost entirely of currency exchange and transfer, who routinely exchanged hundreds of millions of dollars a day, who was extensively familiar with the customs, practices, and duties of participants in this daily process, accepted exchange currency from Wachovia, all the while apparently fully aware, prior to the settlement date, that it was not going to pay Wachovia and understanding that Wachovia would send its funds before it discovered what Majapara intended to do.

### Majapara's Account At Wachovia

26.     Majapara also tries to paint a picture that it had been steadily depositing funds into its account at Wachovia after December 11, 2007. This is not true. First Majapara makes no claim that it intended funds to be deposited therein nor that <u>it</u>, in fact, was the depositor of those funds. And, second, two large deposits made into the account on December 11, 2007, appear to have been by mistake because as soon as they hit, Majapara attempted to transfer them

out of the account using electronic means. And when that did not work, it then called Wachovia and requested immediate transfer of the money out of the account.

### Majapara's Business

27. On January 29, 2008, a Wachovia employee was dispatched to the offices of Majapara located in Mexico City in order to deliver a document Majapara had requested. When the messenger arrived, he noticed that furniture was being moved out of the premises and was informed that Majapara was closed. On the door of Majapara's offices was a notice, written in Spanish (I am fluent in Spanish), that translates as follows:

TO OUR CUSTOMERS

CASA DE CAMBIO MAJAPARA FULLY GUARANTEES YOU THAT IT WILL HONOR THE
OBLIGATIONS THAT IT HAS WITH YOU IN THE BRIEFEST POSSIBLE TIME.

DUE TO FORCE MAJEURE REASONS NOT ATTRIBUTABLE TO THIS CORPORATION, WE ARE
TEMPORARY UNABLE TO PERSONALLY ASSIST YOU WITH RESPECT TO PENDING TRANSACTIONS, THEREFORE IN ORDER TO CONTINUE ASSISTING YOU, PLEASE CONTACT:

PEDRO PATRICIO TORRES MARCO
JOSE VICTOR RODRIGUEZ

TELEPHONES: (55) 55116063 AND 55114346
BUSINESS HOURS: MONDAY TO FRIDAY FROM 9:00 TO 14:00.

A copy of the original notice is annexed hereto as Exhibit S.

### Majapara's Purported Counterclaim

28.     Majapara also indicates that it will be asserting counterclaims against Wachovia based upon Wachovia's conduct. While Majapara's papers do not set forth the basis for asserting any counterclaims, based upon the facts under this action, Wachovia denies that any such counterclaims will have any merit.

### Conclusion

29.     Based upon Majapara's conduct, Wachovia's Order of Attachment is appropriate, should be maintained, and the instant application denied in all respects.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed this 11th day of February, 2008.

_____
Carlos A. Perez