Scott S. McKessy (SM-5479)
Casey D. Laffey (CL-1483)
REED SMITH LLP
599 Lexington Avenue
New York, New York 10022
Tel. (212) 521-5400
Fax. (212) 521-5450
Attorneys for Plaintiff
Wachovia Bank, National Association

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

WACHOVIA BANK, National Association,     :

              Plaintiff,     :     07 Civ. 11230 (BSJ)(RLE)

             - against -     :

CASA DE CAMBIO MAJAPARA S.A. de C.V. a/k/a:
MAJAPARA CASA DE CAMBIO S.A. de C.V.,   :

             Defendant.     :

------------------------------------------------------------X

## DECLARATION OF ANDREW GROSS

Andrew Gross, declares as follows:

1.     I am the Head of Global Foreign Exchange for Wachovia Bank, National Association ("Wachovia"). I am fully familiar with the facts set forth herein, and submit this declaration pursuant to 28 U.S.C. §1746, in opposition to Casa de Cambio Majapara S.A. de C.V. a/k/a Majapara Casa De Cambio S.A. de C.V.'s ("Majapara") instant application to, *inter alia*, vacate the Order of Attachment issued by this Court on December 20, 2007.

### Foreign Exchange Spot Transactions

2.     I have been involved with Foreign Exchange Spot transactions for 23 years and am intimately familiar with how the industry, including Mexican Casas de Cambio, transact business. A Casa de Cambio, like Majapara, has customers with currency needs. A Casa de Cambio will act as an intermediary for a client that is in need of one currency and has Dollars or a second currency to exchange. In this regard, the Casa de Cambio would enter into Foreign

NYLIB-3993474.1

Exchange Spot transactions with a bank, like Wachovia, to fulfill the customer's needs. Those transactions must settle within two business days – in most cases a settlement beyond two business days is no longer considered a spot transaction and no longer a transaction in which a Casa de Cambio may enter.

3.      If the Casa de Cambio has a client in need of Euros, the client would transfer the U.S. Dollars (it may be other currencies) to the Casa de Cambio. The Casa de Cambio is then supposed to exchange the currency with the bank and then forward on the Euros (or whichever currency was requested) to its client. Indeed, pursuant to Majapara's FX Agreement, Wachovia is under no obligation to transfer the outgoing bought currency until after confirmation of receipt of the incoming sold currency. Wachovia, in its sole discretion, however, may transfer the outgoing bought currency prior to confirmation of receipt of the incoming sold currency. Under those circumstances, Wachovia establishes settlement limits on the volume of transactions in which an entity may engage to manage settlement risk (the amount of bought currency the bank will transfer prior to confirming receipt of the sold currency).

4.      Accordingly, settlement limits address the risk inherent in transactions (like foreign exchange transactions) in which fund transfers are intended to occur on the same day but, due to the logistics of such arrangements, the bank may find it necessary to release funds into the system before it can confirm that it has actually received funds from its counterparty.

5.      Banks that do not wish to incur any settlement-risk exposure settle the transaction by waiting to release the outgoing currency until receipt of the incoming currency's receipt is confirmed from the Casa de Cambio. This requires more effort as the transactions have to be performed manually.

**Majapara**

6.      As more fully detailed in the accompanying declaration of Carlos Perez, in December 2007, Wachovia decided to cease providing correspondent banking services to exchange companies outside of the United States. Majapara was one of the foreign exchange companies notified of this cessation of services. The cessation of services, however, was neither immediate, nor abrupt. Indeed, after December 5, 2007, Majapara could (and, in fact, did) enter into additional foreign exchange spot transactions with Wachovia.

7.      For spot transactions entered into <u>after</u> December 5, 2007, Wachovia would no longer incur any settlement risk and required the incoming sold currency to be confirmed received before Wachovia would transfer the outgoing bought currency.

8.      For the December 5th spot transactions underlying this action, however, Wachovia still exercised its discretion and incurred settlement risk with respect to Majapara: meaning, Wachovia transferred the outgoing bought currency, as per Majapara's instructions, prior to Wachovia confirming receipt of the incoming sold current. There was nothing different about the settlement of the December 5th spot transactions than all prior transactions.

9.      Consequently, if Majapara had been engaging in proper foreign exchange transactions, there would be no "liquidity" issue due to Wachovia's cessation of services. This is especially true for the transactions Majapara requested on December 5th as those were to proceed in the same manner as every other transaction Majapara had with Wachovia.

10.      Again, there was simply no abrupt termination of any "operating lines" nor could Wachovia's conduct have caused a "liquidity" crisis for a Casa de Cambio that engaged in proper business – none of the other twelve Mexican Casas de Cambio, nor other 50 entities worldwide were unable to settle foreign exchange spot transactions with Wachovia as a result of Wachovia's cessation of services.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this _11_th day of February, 2008.

Andrew Gross

Scott S. McKessy (SM-5479)
Casey D. Laffey (CL-1483)
REED SMITH LLP
599 Lexington Avenue
New York, New York 10022
Tel. (212) 521-5400
Fax. (212) 521-5450
Attorneys for Plaintiff
Wachovia Bank, National Association

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

WACHOVIA BANK, National Association,    :

                                            :     07 Civ. 11230 (BSJ)(RLE)

           Plaintiff,              :

                                             :

          - against -            :

                                             :

CASA DE CAMBIO MAJAPARA S.A. de C.V. a/k/a:
MAJAPARA CASA DE CAMBIO S.A. de C.V.,     :

                                             :

          Defendant.           :

-----------------------------------------------------------------X

 

**PLAINTIFF'S COMPENDIUM OF EXHIBITS
IN OPPOSITION TO DEFENDANT'S MOTION TO VACATE
<u>THE COURT'S PREJUDGMENT ORDER OF ATTACHMENT</u>**

**Part I of III**

**REED SMITH LLP**
599 Lexington Avenue, 29th Floor
New York, New York 10022
(212) 521-5400

*Attorneys for Plaintiff*
*Wachovia Bank, National Association*

EXHIBIT

| | | |
|---|---|---|
| A. | | Declaration of Carlos Perez dated December 13, 2007. |
| B. | | First Union Online FX Subscription Agreement. |
| C. | | Plaintiff's Amended Complaint dated December 17, 2007. |
| D. | | Wachovia's Terms & Conditions For Global Financial Institutions. |
| E. | | December 14, 2007 Order. |
| F. | | Certificate of Service dated December 17, 2007. |
| G. | | Federal Express Tracking Receipt. |
| H. | | December 20, 2007 Order of Attachment. |
| I. | | December 21, 2007 Order. |
| J. | | January 4, 2008 letter from Citibank, N.A. to Reed Smith LLP. |

Dated:    New York, New York
          February 12, 2008

REED SMITH LLP

By: _____

Scott S. McKessy (SM-5479)
Casey D. Laffey (CL-1483)
599 Lexington Avenue
New York, New York 10022
Tel. (212) 521-5400
Fax. (212) 521-5450

*Attorneys for Plaintiff*
*Wachovia Bank, National Association*

# EXHIBIT A

Scott S. McKessy (SM-5479)
Casey D. Laffey (CL-1483)
REED SMITH LLP
599 Lexington Avenue
New York, New York 10022
Tel. (212) 521-5400
Fax. (212) 521-5450
Attorneys for Plaintiff
Wachovia Bank, National Association

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
WACHOVIA BANK, National Association,      :
                                          :
                          Plaintiff,      :
                                          :        Civil Action No. __
            - against -                   :
                                          :
MAJAPARA CASA DE CAMBIO S.A. de C.V.,     :
                                          :
                          Defendants.     :
------------------------------------------------------------X

## DECLARATION OF CARLOS A. PEREZ

Carlos A. Perez, declares as follows:

1.     I am the Managing Director, Americas Group, Global Financial Institutions & Trade Services for Wachovia Bank, National Association ("Wachovia"). I am fully familiar with the facts set forth herein, and submit this declaration pursuant to 28 U.S.C. §1746, in support of Wachovia's instant application for the award of a pre-judgment attachment and temporary restraints.

### Introduction

2.     This is a case that arises out of foreign exchange spot transactions involving more than $70 million (US$) in currency being exchanged between Wachovia and defendant Majapara Casa De Cambio S.A. de C.V. ("Majapara"). The gist of the transaction was that Wachovia would deliver to Majapara 26 million Euros and in exchange Majapara would deliver more than $38 million (US$) to Wachovia's account here in New York. Wachovia delivered the 26 million Euros to Majapara's account, but Majapara never delivered the $38-plus million (US$) to

Wachovia. Not only did Majapara renege on the agreed upon transactions, but it then absconded with Wachovia's money. Thereafter, Majapara admitted to Wachovia that it was now illiquid, that it has engaged in illegal loans in relation to its foreign exchange transactions, and if Wachovia took any steps to enforce their rights, Wachovia would not recover a single dollar. As a result, Wachovia now commences this action to recover the money wrongfully taken by Majapara, as well as make the instant application for pre-judgment attachment of certain Majapara assets believed to be located here in New York.

3.      The instant application should be granted because Majapara is a non-domiciliary, has admitted it is illiquid, engaged in inappropriate business activities, and indicated that if Wachovia commences any action Majapara will ensure Wachovia will not be able to recover upon its judgment. Plus, there is an exceedingly strong likelihood that Wachovia will succeed on its claims herein: the deal was to exchange currencies – Wachovia did; Majapara did not.

### Foreign Currency Exchanges

4.      Wachovia provides a platform for its customers to trade foreign currencies. The amounts swapped are usually in significant amounts and the off-setting exchanges are done simultaneously. Foreign Exchange contracts are trading contracts that involve minimum documentation. It is the nature of foreign exchange contracts that each counterparty must transmit funds trusting the other to do so simultaneously. Such contracts therefore involve a great deal of trust on each side. A party to a foreign exchange transaction who fails to settle as required is thereby rendered untrustworthy and not deemed suitable for further transactions of this nature. Should such information become public, this party would be unable to engage in such transactions with any substantial institution. Given that foreign exchange is the foundation of Majapara's business, it would not have defaulted under its contract absent substantial economic difficulties, and its default is likely to spell its doom.

- 2 -

### The Majapara Relationship With Wachovia

5.      Majapara is a Mexican corporation and does not maintain any offices in New York. Majapara is in the business of retail and wholesale foreign exchange.

6.      In the late 1990's, Majapara and First Union National Bank ("First Union") (a predecessor to Wachovia) agreed to enter into foreign exchange transactions. As mentioned above, in these transactions, Majapara would agree to purchase from First Union a certain amount of one currency in exchange for Majapara selling to First Union an equivalent amount of another currency at the applicable exchange rate.

7.      In order to facilitate these exchange transactions, on or about April 6, 2000, Majapara and First Union entered into a First Union Online FX Subscription Agreement ("FX Subscription Agreement"), a copy of which is attached to the Complaint as Exhibit A. Pursuant to this FX Subscription Agreement, Majapara was permitted to execute foreign exchange transactions with First Union electronically through First Union's foreign exchange website. The FX Subscription Agreement was not the parties' exclusive method for entering into foreign exchange transactions.

8.      In 2002, First Union and Wachovia merged.

9.      In some of the foreign exchange transactions between Majapara and Wachovia, Wachovia would deliver currency to Majapara to an account designated by Majapara. On that same day, Majapara would transfer the agreed upon counter-currency into a Majapara account maintained by Wachovia in New York (the "Majapara NY Account"). Upon the opening of the Majapara NY Account, Wachovia's Terms & Conditions For Global Financial Institutions ("Wachovia's Terms & Conditions"), amongst other documents, governed all of the parties'

- 3 -

business relationships and dealings. A copy of Wachovia's Terms & Conditions is annexed hereto as Exhibit A.

10.    Wachovia would then debit the currency from the Majapara NY Account. The authorization for this procedure was documented in a December 10, 2003 letter, in Spanish, from Majapara to Wachovia. A copy of which is attached to the Complaint as Exhibit B. I speak and read Spanish fluently and the note translates as: "In relation to the transactions done with yourselves through Online FX; we authorize you to debit and credit our account number NY2000192304201 held with yourselves."

11.    In or about March 2006, Majapara signed a Debit and Netting Agreement that gave Wachovia the same authority to credit and debit the same Majapara Account. A copy of this document is attached to the Complaint as Exhibit C.

### The Foreign Exchange Transactions At Issue

12.    On or about December 5, 2007, Majapara and Wachovia agreed to do a series of seven (7) transactions, all of which were to be settled on December 7, 2007. Six (6) of those transactions were executed on Wachovia's foreign exchange internet website. One (1) of the transactions was executed through an interface system operated by Reuters to which both Majapara and Wachovia have access. A copy of wire transfer confirmations for each of these transactions is attached to the Complaint as Exhibit D. As detailed on those confirmations, Majapara was to deliver all of the counter-currency (US$) into its Majapara NY Account. Wachovia was to then simply debit that New York account.

13.    Pursuant to the parties' agreement, the seven (7) foreign exchange transactions were to close on December 7, 2007. Accordingly, on December 6, 2007, Wachovia sent 30,300,000 Euros, $112,900.03 and 7,000 Swiss Francs to Majapara's account in Munich,

Germany. Even though they had just entered into the deals the prior day (December 5, 2007), Majapara did not deliver the agreed upon $38,737,100, 127,000 Swiss Francs and $6,218.90 to Wachovia, as required, so that the transactions could settle on December 7, 2007.

14.     To date, Majapara has not transferred any amount owed pursuant to these exchange transactions.

15.     On December 11, 2007, however, as was its right under Wachovia's Terms & Conditions, Wachovia was able to secure, as an offset to the debt owed, $9,460,000 Majapara attempted to transfer out of Wachovia to a Majapara account located in Citibank in New York. Accordingly, the total debt owed by Majapara to Wachovia is reduced based upon this offset. Wachovia was also able to secure an additional $3,960,155.00 in offset funds against the amount owed by Majapara. The total debt owed from those transactions is $24,711.845.00.

**Majapara Is Illiquid And Intends to Frustrate Wachovia's Recovery Herein**

16.     After Majapara defaulted, my department made contact with Majapara to demand payment and to get an explanation why it did not pay Wachovia as it was required to do. On Thursday, December 13, 2007, at approximately 9:52 am Eastern, I spoke by telephone with Jorge Ortiz, Majapara's Chairman and CEO. I know Mr. Ortiz well and have met with him and spoken to him many times. I was joined in the telephone call by Juanita Gomez, a Vice President in my group who is our Mexico representative.

17.     I asked Mr. Ortiz in our call what Majapara did with Wachovia's money. Mr. Ortiz acknowledged and admitted that Majapara was obligated to provide the agreed upon currency to Wachovia and owed Wachovia over $30 million. He then stated that Majapara had received Wachovia's Euros and used them for other purposes because it was experiencing "a liquidity crisis."

- 5 -

18.    I then asked him if he lent the money to third parties.  He said "yes."  I said, "That's not legal."  He said:  "I recognize that we have done something that is not permitted" -- Majapara is a Mexican "Casa de Cambio," a company in the business of currency exchange, such as exchanging Mexican pesos for dollars, and as such, under Mexican law, is not permitted to make loans.

19.    I then asked Mr. Ortiz when Majapara would be able to repay Wachovia.  He said that he "needed time to collect the money from others who he had lent Wachovia's money to." He said Majapara "would need two months to collect."  Based on this conversation, it is my belief that Majapara engaged in a fraud with respect to the foreign exchange spot transactions Majapara engaged in with Wachovia.  Due to its "liquidity crisis," Majapara did not have sufficient funds to complete the exchange with Wachovia and to engage in the other lending or other activities.

20.    Based upon Majapara's recent statements, it knew of its condition prior to the Wachovia transactions closing, but, nonetheless, accepted Wachovia's funds, knowing that it would not have the funds to repay Wachovia at the close.  Majapara then used Wachovia's funds to engage in illegal lending transactions and otherwise dissipated the assets received from Wachovia, all the while failing to fulfill its immediate obligations to transfer over $38 million to Wachovia.

21.    Mr. Ortiz told me that if Wachovia took legal action against Majapara, Wachovia would end up with nothing.

### New York Bank Accounts

22.    Being the relationship manager for Majapara, I am aware of a bank account Majapara maintains (or did maintain) at Citibank located in New York City.  The account

- 6 -

number is 36254838. I also have a good faith belief that Majapara maintains (or maintained) bank accounts at other banks in New York as well. Those banks are JP Morgan Chase and Bayerische Hypo- und Vereinsbank, AG.

### Undertaking

23.     Wachovia stands ready to secure a bond (or any other acceptable undertaking to the Court) in an amount set by this Court. Wachovia respectfully requests that the amount of any undertaking be set upon identification of the actual amount to be attached and then in a reasonable amount.

24.     No prior application for the relief requested herein has been made to this or any Court

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 13th day of December, 2007.



Carlos A. Perez



- 7 -

# EXHIBIT B

*N. Japara* (handwritten)

## FIRST UNION ONLINE FX SUBSCRIPTION AGREEMENT

This First Union Online FX Subscription Agreement ("*Agreement*") sets forth the terms and conditions on which the party identified on the signature page hereof as the Subscriber ("*Subscriber*") may execute foreign exchange transactions with First Union National Bank ("*FUNB*") over the Internet ("*Online Transactions*") through FUNB's foreign exchange website currently operating at http://www.firstunion.com/capitalmarkets/fx ("*FX Website*"). This Agreement is not intended to preclude the parties from entering into foreign exchange transactions with each other in any other manner. Subject to the terms and conditions of this Agreement, Subscriber and FUNB agree as follows:

### 1. Internet Access

In order for Subscriber to communicate with FUNB through the FX Website, Subscriber shall be responsible for (i) arranging its own access to the Internet through such providers of telephonic, wireless, and/or Internet access services as it deems necessary or desirable, and (ii) all costs and expenses associated with such services, including connection charges. FUNB shall not be responsible for any acts or omissions of any of such Subscriber's service providers in the course of transmitting, receiving, handling or storing communications between Subscriber and FUNB or otherwise.

### 2. FX Website Access

(a) In order for Subscriber to communicate with FUNB through the FX Website, one or more of Subscriber's officers or employees designated by Subscriber (each, a "*User*") will be issued a unique digital certificate ("*Digital Certificate*") to be stored on the web browser of a personal computer intended to be used by the User to carryout his/her functions for Subscriber, together with a User identification number ("*ID*") and a unique personal password ("*Password*"). Each Digital Certificate is unique to the User, and if a User wishes to use more than one computer or browser to access the FX Website, the User must request an additional Digital Certificate for each such computer or browser. FUNB reserves the right to limit the number of Digital Certificates issued to Subscriber and its Users. Subscriber agrees that, before any User is provided with any Digital Certificate, that User will have (i) requested from the First Union National Bank Certificate Authority ("FunbCA"), and completed the process necessary to receive, a Digital Certificate (including the use of "shared secrets" with FUNB and any other security measures which the FunbCA may require to validate the User's identity) and (ii) accepted the terms and conditions of the Digital Certificate Documents. "*Digital Certificate Documents*" means the First Union National Bank Certificate Authority Subscriber Agreement ("FunbCA Subscriber Agreement"), which is presented to and agreed to by User during the online Digital Certificate application process, and each document that the FunbCA Subscriber Agreement incorporates by reference. The Digital Certificate Documents will govern each Digital Certificate and its use and be binding upon the Subscriber and that User in his/her individual capacity, and for that purpose the term "Subscriber" in the FunbCA Subscriber Agreement shall be deemed to refer to each of the Subscriber and the User, respectively. This Agreement is the "Master Agreement" referred to in the FunbCA Subscriber Agreement. Nothing in this Agreement is intended to supersede, modify, limit, or restrict anything contained in the Digital Certificate Documents, and in the event of any inconsistency between the provisions of this Agreement relating to the Digital Certificate and the provisions of the Digital Certificate Documents, the FunbCA Subscriber Agreement will prevail. The rights and obligations of Subscriber and FUNB under this Agreement and the Online Transactions (or any other transactions between the parties) are not conditioned on either party's compliance with anything contained in the Digital Certificate Documents.

(b) Subscriber acknowledges that, after a User has received a Digital Certificate, Password and ID from the FunbCA, anyone who uses the Digital Certificate belonging to that User together with that User's Password and ID will be able to access and use the FX Website on behalf of Subscriber as contemplated by this Agreement. Accordingly, Subscriber shall not allow anyone to use a Digital Certificate, Password or ID belonging to a User other than the User who has received the same from the FunbCA. Subscriber hereby authorizes FUNB to deliver a temporary password to each User for the initial login to the FX Website for the purposes of applying for a Digital Certificate and to establish a permanent Password and ID. The Subscriber shall inform FUNB immediately when a User is no longer authorized to use the FX Website. Subscriber shall be solely responsible for controlling, and preventing any unauthorized use of, each Digital Certificate, Password and ID, and Subscriber shall be liable for any and all Online Transactions and account debits, credits and transfers resulting from, or occurring in response to, any electronic transmission, instruction, signal, entry or other communication to FUNB through the FX Website made using any Digital Certificate, Password and ID, whether or not it was authorized by Subscriber, was initiated by a User or resulted from an error in entering any information or command, and all such communications shall be deemed to have been sent by Subscriber for purposes of this Agreement.

(c) FUNB reserves the right, at any time and from time to time, for any reason or no reason, and without notice, to upgrade, modify, suspend, discontinue, or terminate the FX Website or to revoke any Digital Certificate, Password or ID, or to deny Subscriber and its Users access to the FX Website or any part thereof, and the respective rights and obligations of Subscriber and FUNB under the Online Transactions (or any other transactions between the parties) shall not be impaired or otherwise affected by such action. In addition, FUNB may require Subscriber to replace or erase any Digital Certificate or change any Password or ID at any time.

1

**3. Procedures for Entering into Online Transactions**

(a) To initiate any Online Transaction with FUNB through the FX Website, Subscriber must make certain entries regarding the financial particulars of the proposed Online Transaction on the appropriate screen displays of the FX Website in accordance with instructions provided in FUNB's "Online FX User's Guide", including currency codes, currency amounts, and the side of the currency exchange Subscriber is taking. It shall be the responsibility of Subscriber that each User will have received, read and understood the Online FX User's Guide prior to that User using the FX Website. FUNB reserves the right to revise or replace the Online FX User's Guide without Subscriber's consent by delivering to Subscriber a copy of the revision or replacement.

(b) When the requisite entries have been made to initiate an Online Transaction, then the FX Website will display an exchange rate for the proposed Online Transaction ("*Exchange Rate*"), subject to a time-out function. Subscriber may accept or reject the Exchange Rate by making the appropriate entry on the FX Website before it is timed-out, or otherwise reject the Exchange Rate by allowing it to be timed-out. By entering its acceptance of the Exchange Rate before it is timed-out, Subscriber will be deemed to have made an offer to FUNB for the proposed Online Transaction at that Exchange Rate. Upon FUNB's issuance through the FX Website of a deal confirmation number for that Online Transaction, FUNB will be deemed to have accepted such offer and a contract for such Online Transaction shall be deemed to have been entered into by Subscriber and FUNB. If FUNB does not issue a confirmation number for the proposed Online Transaction through the FX Website, Subscriber's offer to enter into the proposed Online Transaction shall be deemed rejected and no contract for the proposed Online Transaction will have been formed. The FX Website Records shall be conclusive and binding on the parties with respect to the foregoing. "*FX Website Records*" means the books and records of FUNB (in electronic form or otherwise) as they relate to the FX Website, including any stored on or generated by any computer system, hardware or software or any other system, facility or service on which the FX Website directly or indirectly operates ("*Operating System*"), whether such Operating System is owned by FUNB or by any independent contractor or supplier engaged by FUNB (or an affiliate of FUNB) in order for the FX Website to operate ("*System Supplier*").

(c) Once a confirmation number for an Online Transaction has been issued by FUNB through the FX Website, Subscriber may not (i) withdraw, cancel, or amend its offer for that Online Transaction, or (ii) without the prior written consent of FUNB, amend the terms of that Online Transaction. Subscriber acknowledges that a confirmation number may be issued instantly when an Exchange Rate has been accepted, and that Online Transactions bind it as principal for its own account.

(d) Exchange Rates quoted to Subscriber may be different from those which FUNB may quote to any of its other customers, and no representation or warranty is made that any Exchange Rate is the best price available to Subscriber. FUNB reserves the right at any time, without notice, to not quote an Exchange Rate to Subscriber, or to not issue a confirmation number, for any proposed Online Transaction for any reason or no reason.

**4. Terms and Conditions of Online Transactions**

(a) The terms and conditions of each Online Transaction entered into by FUNB and Subscriber shall be evidenced by this Agreement and the FX Website Records. In addition, if Subscriber and FUNB are parties to any agreement governing any foreign exchange transactions (including any ISDA Master Agreement published by the International Swaps and Derivatives Association, Inc.), then this Agreement shall be supplemental to that agreement, and the Online Transactions shall be subject to its terms and conditions (except when they are contrary to the provisions hereof, this Agreement will govern, and for that purpose any procedures for executing or confirming transactions specified in that other agreement shall be disregarded with respect to the Online Transactions).

(b) Each Online Transaction involves the Subscriber's purchase from FUNB of one currency ("*Bought Currency*") in exchange for Subscriber's sale to FUNB of another currency ("*Sold Currency*") at the applicable exchange rate. For each Online Transaction, Subscriber shall deliver to FUNB the required amount of Sold Currency on the date the parties enter into that Online Transaction regardless of the value date specified for that Online Transaction. Upon FUNB's receipt of the required amount of Sold Currency, FUNB shall deliver to Subscriber the required amount of Bought Currency on the value date of that Online Transaction. For each Online Transaction, the delivery of any currency to either party shall be made to a reasonably acceptable bank account as such party shall have specified in delivery instructions for that Online Transaction either (i) on the FX Website, or (ii) if not so specified, then by written notice.

(c) If the delivery of any Bought Currency or Sold Currency cannot be made because the value date of the relevant Online Transaction is not a day on which banks in the relevant place of receipt settle foreign exchange in the relevant currency, the value date thereof shall be the next following day on which such settlement can be made. In addition, whenever the same currency is due by both parties on the same day under two or more foreign exchange transactions (whether or not any is an Online Transaction), then the delivery obligations of the parties on that day in that currency for those foreign exchange transactions will be discharged automatically, and if one party's delivery obligation in that currency would have been greater, replaced by an obligation of such party to deliver the difference to the other party.

2

(d) Subscriber acknowledges that currency exchange rates are highly volatile and impossible to predict, that the value of a currency relative to another currency can rise and fall substantially over short periods, that Subscriber understands those risks and the consequences of entering into the Online Transactions through the FX Website (whether financial, accounting, tax, legal, or otherwise) based upon its own evaluation of the Online Transactions or upon the advice of its professional advisors, that neither FUNB nor any of its affiliates is acting as an agent, broker, advisor or fiduciary of, or a joint venturer with, Subscriber in any respect in connection with the Online Transactions or the FX Website, regardless of whether FUNB acts as an advisor or fiduciary to Subscriber on other matters or provides Subscriber from time to time with market information, views or recommendations.

## 5. Confidentiality & Restriction on Use

(a) Subscriber acknowledges that the FX Website, the Operating System and all programs, files, data or other information stored, contained, or operating at, in or through, the FX Website or Operating System are the exclusive property of FUNB or a System Supplier, that other foreign exchange customers of FUNB will be using the FX Website to conduct their own transactions with FUNB, and that Subscriber agrees for the respective benefits of FUNB and each System Supplier that neither Subscriber nor any User will (i) access or use the FX Website or the Operating System for any purpose other than as a facility through which Online Transactions may be conducted; (ii) alter or interfere with the FX Website, the Operating System or any of the programs, files, data or other information stored, contained, or operating at, in or through, the FX Website or the Operating System; (iii) sell any information obtained from or through the FX Website or the Operating System, including any Exchange Rate; (iv) use any such information for any purpose other than to consider, evaluate, propose, enter into, review or otherwise conduct Online Transactions, or (v) disclose any such information to any third party, except Subscriber may make any such disclosure (1) to Associated Persons, (2) as required by law, or (3) pursuant to any legal or regulatory process, action or proceeding, whether Subscriber is responding thereto or has initiated the same to protect its interests or enforce its rights. "Associated Persons" means the affiliates, directors, officers, employees, agents, advisors, auditors, attorneys, and regulators of Subscriber and those of its affiliates.

(b) Subscriber further acknowledges and agrees that any Operating System owned by a System Supplier may capture any or all data generated by any electronic transmission, instruction, signal, entry or other communication to FUNB through the FX Website, that therefore such System Supplier will have access to information concerning Subscriber's Online Transactions and its FX Website activities, and that such System Supplier is authorized to disclose any or all data captured by the Operating System provided it does so without disclosing the names of FUNB's customers.

## 6. General Terms

This Agreement shall be binding upon and inure to the exclusive benefit of the parties hereto and their respective successors and permitted assigns, shall be governed by the law (and not the law of conflicts) of the State of New York, may be amended only by written agreement of the parties, and except as otherwise provided herein, is the entire agreement and understanding of the parties as to its subject matter. Rights and remedies hereunder are cumulative and not exclusive of any available either by law or under any other written agreement between the parties; any failure or delay in exercising any right or remedy is not a waiver thereof; a single or partial exercise of any right or remedy will not preclude any further exercise thereof; and any purported transfer of rights or obligations under this Agreement without the other party's written consent is void.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date hereof. This Agreement is dated as of APRIL 6, 2000.

SUBSCRIBER:

CASA DE CAMBIO MAJAPARA SA DE CV

[NAME OF PARTY]

FIRST UNION NATIONAL BANK

By: _Alicia Rodriguez_

By: _____

Name: Alicia Rodriguez

Name: _____

Title: Assistant Vice President

Title: _____

3

# EXHIBIT C

Scott S. McKessy (SM-5479)
Casey Laffey (CL-1483)
Reed Smith LLP
599 Lexington Avenue
New York, New York 10022
Tel. (212) 521-5400
Fax. (212) 521-5450

# ORIGINAL

Attorneys for Plaintiff Wachovia Bank, National Association

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

| | |
|---|---|
| WACHOVIA BANK, NATIONAL ASSOCIATION, | 07 Civ. 11230 (BSJ)(RLE) |
| Plaintiff, | |
| - against - | **AMENDED COMPLAINT** |
| CASA DE CAMBIO MAJAPARA S.A. de C.V a/k/a MAJAPARA CASA DE CAMBIO S.A. de C.V., | |
| Defendant. | |

------------------------------------------------------------------X

Plaintiff, Wachovia Bank, National Association ("Wachovia"), by its attorneys, Reed

Smith LLP, as and for its complaint against the defendant Case de Cambio Majapara S.A. de

C.V. a/k/a Majapara Casa de Cambio S.A. de C.V. ("Majapara"), alleges as follows:

## PRELIMINARY STATEMENT

1.      This action arises from Majapara's misappropriation of over $38 million (US$) of

Wachovia's money relating to a series of foreign exchange spot transactions between the parties.

Foreign exchange spot transactions, due to their frequency, the speed at which the transactions

are agreed and closed, and the manner in which funds are simultaneously exchanged, are

founded upon trust. Majapara, however, abused that trust -- a trust that was established through

years of currency trading with Wachovia -- to plunder more than $38 Million from Wachovia.

And this is not a mere renege on a multi-million dollar transaction wherein Majapara returned

Wachovia's property when it realized it could not complete the foreign currency exchange.

Subsequent conversations with Majapara make apparent that it never intended to honor its commitments but, instead, had decided to wrongfully keep Wachovia's money and abscond with it. In these after-the-fact conversations, Majapara admitted to Wachovia that it was illiquid, that it had engaged in illicit activities in relation to its foreign exchange transactions and threatened that, if Wachovia took any steps to enforce its rights, Wachovia's judgment would be uncollectible. Through this action, Wachovia seeks a judgment against Majapara, in an amount not less than $24,711,845.00, plus prejudgment interest.

## VENUE/JURISDICTION

2.      This Court has personal jurisdiction over Majapara pursuant to CPLR §§ 301 and 302(a) as Majapara has been transacting business in this State since 2000, the transactions being sued upon herein occurred in the State of New York, and defendant breached the parties' agreement here in New York by failing to wire the required funds, as agreed, to Wachovia's New York account. Defendant has also contractually agreed to be sued in this jurisdiction.

3.      Venue in this district is proper under 28 U.S.C. § 1391(a).

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because this action involves a controversy that exceeds $75,000, exclusive of interests and costs, and involves a citizen of a State and a citizen of a foreign state.

## PARTIES

5.      Wachovia is a national banking association, organized under the laws of the United States, with its principal place of business in Charlotte, North Carolina. Wachovia maintains offices in New York.

6.      Upon information and belief, Majapara is a Mexican corporation with its principal place of business in Mexico City, Mexico.

## FACTS COMMON TO ALL COUNTS

**The Majapara Relationship With Wachovia**

7.      In the late 1990's, Majapara and First Union National Bank ("First Union"), a predecessor to Wachovia, agreed to enter into foreign exchange transactions together. In these transactions, Majapara would agree to purchase from First Union a certain amount of one currency in exchange for Majapara selling to First Union a certain amount of another currency at the applicable exchange rate.

8.      In order to facilitate Majapara and First Union entering into these currency exchange transactions, on or about April 6, 2000, Majapara and First Union entered into a First Union Online FX Subscription Agreement (the "FX Subscription Agreement"), a copy of which is attached hereto as Exhibit A. Pursuant to the FX Subscription Agreement, Majapara was permitted to execute foreign exchange transactions electronically with First Union through First Union's foreign exchange website. This, however, was not the exclusive method for the parties to enter into these foreign exchange spot transactions. This FX Subscription Agreement is governed by New York law. See Exhibit A, ¶ 6.

9.      Effective April 1, 2002, Wachovia merged into and under the charter of First Union with the resulting title of Wachovia Bank, National Association. As a result of the merger, First Union changed its name to Wachovia Bank, National Association.

10.     In some of the foreign exchange transactions between Majapara and Wachovia, Wachovia would deliver currency to Majapara on the same day that Majapara transferred another currency into a Majapara account held at Wachovia's New York Branch ("Majapara NY Account"). Wachovia would then debit the currency from the Majapara NY Account. The authorization for this procedure was documented in a December 10, 2003 letter (in Spanish)

3

from Majapara to Wachovia Bank, a copy of which is attached as Exhibit B, which reads (as

translated into English): "In relation to the transactions done with yourselves through Online

FX; we authorize you to debit and credit our account number NY2000192304201 held with

yourselves." In or about March 2006, Majapara signed a Debit and Netting Agreement that gave

Wachovia the same authority to credit and debit the same Majapara NY Account held at

Wachovia's New York Branch. A copy of this document is attached as Exhibit C.

**The Foreign Exchange Transactions At Issue**

11.     On or about December 5, 2007, Majapara and Wachovia agreed to a series of

seven (7) transactions, all of which were to settle on December 7, 2007, whereby Wachovia

would deliver an aggregate 26 million Euros to Majapara and Majapara would deliver an

aggregate $38,132,700 to Wachovia. In a departure from the process described in paragraph 10

above, on these transactions, Majapara agreed to transfer dollars directly to a Wachovia account

located in New York. Six (6) of the transactions were executed on Wachovia's foreign exchange

internet website. One (1) of the transactions was executed over the telephone. Copies of the

confirmations for these transactions are attached hereto as Exhibit D.

12.     Pursuant to these seven (7) foreign exchange agreements, on December 7, 2007,

Wachovia delivered 26 million Euros to Majapara. Majapara failed to deliver the agreed upon

$38,132,700.00 to Wachovia, as required, on December 7, 2007.

13.     On or about December 11, 2007, the General Director of Majapara admitted that

Majapara had been obligated to provide the agreed upon currency to Wachovia.

14.     Wachovia was able to secure $13,420,155, which was in Majapara's accounts at

Wachovia, but has not been able to recover the remaining amount Wachovia is owed. Some of

the amount recovered represents conditional credit that may be subject to reduction by reason of

return of the items (in this case, checks) for which this credit was given (<u>see</u> Paragraph 15 below).

15.    Majapara also maintains five (5) U.S. dollar accounts at Wachovia.  As to each of these accounts, Wachovia has contingent residual exposure to cover returned items in the federal check clearing program.  Majapara is obligated to reimburse Wachovia for these amounts, but has now stated it is unable to and will not meet its financial obligations.  This liability has averaged $3.3 million per month for the last several months.

16.    By opening an account at Wachovia, Majapara agreed to Wachovia's Terms & Conditions for Global Financial Institutions, which, under its terms, is governed by and construed in accordance with the laws of New York and pursuant to which, Majapara agreed to submit to the jurisdiction of the courts located in Manhattan, New York.

**<u>COUNT I</u>**

**<u>(Breach of Contract)</u>**

17.    Plaintiff realleges and reincorporates the allegations in Paragraphs 1 through 16.

18.    As set forth above, Wachovia entered into a series of currency exchange agreements with Majapara.

19.    Majapara breached those agreements by failing to deliver the currency as agreed upon by the parties.

20.    Wachovia has fulfilled its obligations under the agreements.

21.    As a result of Majapara's breaches, Wachovia has suffered damage in the amount of not less than $24,711,845.00, plus interest.

## COUNT II

### (Promissory Estoppel – Alternate Count)

22.    Plaintiff realleges and reincorporates the allegations in Paragraphs 1 through 16.

23.    In the event it is found that no oral or written contract existed between Majapara and Wachovia in relation to the seven (7) foreign exchange spot transactions at issue here, equity requires Majapara to pay Wachovia not less than $24,711,845.00 in return for accepting currency from Wachovia.

24.    Majapara promised to deliver certain currency to Wachovia in return for Wachovia delivering certain currency to Majapara.

25.    In reliance on Majapara's agreement to deliver certain currency to Wachovia, Wachovia delivered approximately $38 million worth of currency to Majapara.

26.    Wachovia has requested the funds from Majapara.

27.    To date Majapara has not provided the required currency to Wachovia.

28.    Wachovia, however, has been able to obtain certain Majapara funds and offset the amount owed by $13,420,155.00 (subject to reduction for the reasons set forth in Paragraph 14 of the recitals above).

29.    Wachovia has no adequate remedy at law.

30.    As a result, Majapara has been unjustly enriched to the detriment of Wachovia.

## COUNT III

### (Unjust Enrichment – Alternate Count)

31.    Plaintiff realleges and reincorporates the allegations in Paragraphs 1 through 16.

32.    In the event it is found that no oral or written contract existed between Majapara and Wachovia in relation to the seven (7) foreign exchange transactions at issue here, equity

would still require Majapara to pay Wachovia an amount not less than $24,711,845.00 in return for accepting currency from Wachovia.

33.    Majapara promised to deliver certain currency to Wachovia in return for Wachovia delivering certain currency to Majapara.

34.    In reliance on Majapara's agreement to deliver certain currency to Wachovia, Wachovia delivered approximately $38 million worth of currency to Majapara.

35.    Majapara did not deliver any currency to Wachovia.

36.    Wachovia, however, has been able to obtain certain Majapara funds and offset the amount owed by $13,420,155.00 (subject to reduction for the reasons set forth in Paragraph 14 of the recitals above).

37.    Wachovia requested that Majapara deliver the currency it is owed.

38.    To date, Majapara has neither delivered the required currency to Wachovia, nor returned return the currency Wachovia sent to it.

39.    Majapara has unjustly retained this benefit to the detriment of Wachovia.

40.    Majapara's retention of this benefit violates fundamental principles of justice, equity and good conscience.

41.    Wachovia has no adequate remedy at law.

## COUNT IV

### (Fraud)

42.    Plaintiff realleges and reincorporates the allegations in Paragraphs 1 through 16.

43.    As set forth above, on or about December 5, 2007 Majapara and Wachovia entered into a series of seven (7) currency exchange transactions.

44.    Pursuant to the parties' agreement, in exchange for the receipt of 26 million Euros from Wachovia, Majapara agreed to deliver $38,132,700 to Wachovia.

45.    Upon information and belief, at the time Majapara entered into the December 5, 2007 agreement it knew it was illiquid and insolvent and incapable of performing its obligations under the parties' agreement.

46.    Notwithstanding its knowledge, Majapara represented to Wachovia that it would deliver $38,132,700.00 (US$) to Wachovia to settle the transactions.  Upon information and belief, at the time of the transaction, Majapara knew it would not deliver the required currency and was acting under a present intent to deceive Wachovia and abscond with its funds.  Its representations to Wachovia were false and materially misleading.

47.    Majapara's fraudulent intent was confirmed in conversations Wachovia subsequently had with representatives of Majapara.

48.    For example, on or about December 13, 2007, Carlos A. Perez, a Managing Director of Wachovia, spoke with Jorge Ortiz, the Chairman and CEO of Majapara by telephone, and Mr. Ortiz acknowledged that Majapara, prior to settlement of the transactions, knew that it was experiencing "a liquidity crisis."

49.    When Mr. Perez confronted Mr. Ortiz concerning the transaction and the illegality of Majapara's actions, Mr. Ortiz responded, "I recognize that I have done something that is not permitted."

50.    Overall, due to Majapara's "liquidity crisis" and other impermissible activities relating to its currency transactions, Majapara did not have sufficient funds to complete the exchange with Wachovia.  Majapara nonetheless accepted Wachovia's funds, knowing that it would be incapable of repaying the funds to Wachovia.

51.     Majapara then claimed to have used some or all of the Wachovia funds to engage in impermissible lending transactions and otherwise dissipated the assets received from Wachovia, all the while failing to fulfill its immediate obligations to transfer over $38 million to Wachovia.

52.     Wachovia entered into the transactions and delivered 26 million Euros to Majapara in reasonable reliance upon Majapara's representations that it was going to deliver the requisite currency.

53.     As a result of Majapara's fraud, Wachovia has been damaged in an amount to be determined at trial, but not less than $24,711,845.00.

## COUNT V

### (Breach of Contract/Anticipatory Breach)

54.     Plaintiff realleges and reincorporates the allegations in Paragraphs 1 through 16.

55.     As set forth above, Majapara also maintains five (5) US dollar accounts at Wachovia. Under these accounts, Wachovia has contingent residual exposure to cover returned items in the federal check clearing program -- this contingent liability is a continuing concern. In this regard, Wachovia is entitled to immediate reimbursement from Majapara for the amounts Wachovia is required to pay out.

56.     Over the last several months, this liability has averaged $3.3 million per month.

57.     So far this month, Wachovia has already had to cover certain residual liabilities for which Majapara, in breach of its agreements with Wachovia, has not reimbursed Wachovia. As a result, Majapara breached the parties' agreement and is indebted to Wachovia.

58.     Additionally, Majapara has already stated to Wachovia that it is illiquid and unable to satisfy its obligations owed to Wachovia.  Accordingly, Majapara has anticipatorily

breached its agreements with Wachovia by stating it will not be immediately reimbursing Wachovia for these obligations now or when they come due.

59.    Wachovia has performed all of its obligations under its agreements with Majapara.

60.    Consequently, Wachovia has been damaged by Majapara's breach of the parties' agreement and will continue to be damaged by Majapara's anticipatory breach of the parties' agreement in an amount to be determined at trial.

**WHEREFORE**, Plaintiff demands judgment as follows:

(i)    On the First, Second, Third, and Fourth Causes of Action, monetary damages in an amount to be determined at trial, but not less than $24,711,845.00, plus prejudgment interest;

(ii)    On the Fifth Cause of Action, monetary damages in an amount to be determined at trial, plus prejudgment interest;

(iii)    An award of costs, expenses and attorneys fees attendant to this action; and

(iii)    Such other further and different relief as this Court deems just and proper.

Dated:    New York, New York
           December 17, 2007

REED SMITH LLP

By: _____
     Scott S. McKessy (SM-5479)
     Casey Laffey (CL-1483)
     599 Lexington Avenue
     New York, NY 10022
     (212) 521-5400

*Attorneys for Plaintiff*
*Wachovia Bank, National Association*

10

# EXHIBIT D

Wachovia Bank, National Association

TERMS & CONDITIONS
FOR GLOBAL FINANCIAL
INSTITUTIONS





WACHOVIA

# Table of Contents

| | |
|---|---|
| Introduction | 1 |
| Account Services | 1 |
| Authorized Signatures | 1 |
| Facsimile Signatures | 1 |
| Statements | 1 |
| Review of Statements/Reconciliation | 1 |
| Availability of Funds | 2 |
| Setoff and Security Interest | 2 |
| Credit Interest | 2 |
| Overnight Investment of Excess Funds | 2 |
| Debit Interest | 3 |
| Payment Terms/Compensation Methods | 3 |
| Electronic Transfers | 3 |
| Authorization and Security Procedures | 3 |
| Payment Orders | 4 |
| Execution of Payment Orders | 4 |
| Cancellation and Amendment of Payment Orders | 4 |
| Payments in Currency | 4 |
| Cut-Off Times | 4 |
| Advice of Funds Transfers | 4 |
| ACH | 4 |
| Check Services | 5 |
| Check Disbursement Services | 5 |
| Advice of Issuance | 5 |
| Stop Payments | 5 |
| USD Cash Letter | 5 |
| Final Credit Service | 7 |
| Global Check Clearing | 7 |
| USD and Foreign Check Collection | 7 |

| | |
|---|---|
| Trade Services | 7 |
| Letters of Credit | 7 |
| Bank-to-Bank Reimbursements | 7 |
| Documentary Collections | 8 |
| Reimbursement Collections | 8 |
| Other Cash Management Services | 8 |
| Courier Services | 8 |
| Miscellaneous | 8 |
| Assignment of Terms & Conditions | 8 |
| Conflicts/Disputes Involving the Account | 8 |
| Confidentiality | 9 |
| Termination | 9 |
| Applicable Laws | 9 |
| Compliance with Law | 9 |
| Waiver of Jury Trial | 9 |
| Invalidity of Contract Provisions | 10 |
| Indemnification | 10 |
| Liability | 10 |
| Waiver | 10 |
| Legal Process | 10 |
| Correspondent's Representations, Warranties and Covenants | 10 |
| Entire Terms & Conditions | 11 |
| Use of Correspondent's Account | 11 |
| U.S. Legal Holidays | 11 |

# Introduction

These Terms & Conditions form an agreement ("Terms & Conditions") between Wachovia Bank, National Association ("Wachovia") and each customer ("Correspondent") maintaining one or more U.S. Dollar denominated demand deposit accounts with Wachovia (all such accounts are herein called the "Account") in the United States of America (U.S.). For the purpose of these Terms & Conditions, a Correspondent is defined as a bank or nonbank financial institution holding an Account on Wachovia's books. By accepting this documentation, or by using the Account, the Correspondent agrees to be legally bound by these Terms & Conditions, as amended from time to time. Other terms and conditions contained in a separate agreement or service description between Correspondent and Wachovia related to certain account services provided by Wachovia shall apply to the Account also. All prior general terms and conditions are superseded by this document.

Wachovia reserves the right to amend these Terms & Conditions, and shall provide prior notice of such changes. Changes to these Terms & Conditions required by law or regulation will be implemented immediately otherwise upon reasonable notice to Correspondent.

# Account Services

## Authorized Signatures

Correspondent may set forth in a document to be provided to Wachovia the names, signatures and titles of all persons duly authorized and who have complete authority to bind Correspondent (subject to any limits described by Correspondent) in all transactions involving the Account, including, without limitation: to sign checks, drafts, instruments, bills of exchange, acceptances and/or other similar documents from Correspondent's Account(s); to endorse checks, instruments, drafts, certificates of deposit, bonds, and/or other evidences of indebtedness and orders payable to, owned or held by Correspondent; to accept drafts, acceptances, instruments and/or other evidences of indebtedness payable at or through Wachovia; to initiate payment orders and other orders for the movement of funds; to waive presentment, demand, protest, and notice of protest or dishonor of any check(s), instrument(s), draft(s), acceptances, instruments or other evidences of indebtedness made, drawn or endorsed by Correspondent; to give instructions to Wachovia regarding any of the foregoing, and otherwise to deal with Wachovia in connection with the foregoing activities and all transactions involving the Account (each such person being hereinafter sometimes referred to as an "authorized signer" or as an "authorized representative"). Correspondent is responsible for notifying Wachovia of any changes to the authorized signers. Wachovia will not be bound by any changes until receipt of a revised document.

Alternatively, Correspondent may utilize authenticated SWIFT message formats or other agreed upon message formats to communicate with Wachovia and Wachovia shall be entitled to rely upon all such messages as authorized by Correspondent.

## Facsimile Signatures

If Correspondent uses a facsimile signature or endorsement, whether by machine, stamp or otherwise, that is not made by a handwritten signature on any checks, drafts, notes or other negotiable instruments with or without a designation of the party making such signature or endorsement, Correspondent agrees that Wachovia may pay and charge Correspondent's Account for checks, drafts, notes or other similar documents bearing or purporting to bear the facsimile signature or endorsement of any person or persons required to sign, regardless of by whom or by what means the actual or purported facsimile signature or endorsement may have been affixed (whether or not authorized), and regardless of by whom or by what means the check, draft, note or other similar document was created (whether or not authorized). Wachovia is not liable for any use of a facsimile signature or endorsement device. If Correspondent uses a facsimile signature or endorsement, Correspondent bears the risk of any unauthorized use of Correspondent's facsimile method.

## Statements

Wachovia will provide Correspondent with detailed transaction and balance information electronically, through SWIFT, telex, Wachovia's proprietary PC or Web-based systems, courier or mail.

In addition, debit and/or credit advices will be sent to Correspondent either electronically or by mail or courier, at Correspondent's request, depending upon the service and/or product.

## Review of Statements/Reconciliation

Correspondent is responsible to promptly and carefully examine all transaction and balance information and to immediately notify Wachovia as soon as possible of any irregularities, alterations, erroneous payments or credits or other problems which occur in connection with the Account. All Account information contained in such statements (mail or electronic), including balance and transaction information, is considered correct unless Correspondent delivers to Wachovia written notification regarding any problems within 30 calendar days of the closing date of the statement month. Such notification must specifically describe the transaction and include photocopies of any relevant documents along with: (1) Correspondent's Account title and Account number, (2) dollar amount of the transaction, (3) Wachovia transaction reference, if available, (4) Correspondent transaction reference and (5) the nature of the problem.

Wachovia's customer service units are available for inquiries on specific transactions regarding posted entries and/or transactions that were not entered in Correspondent's Account when expected. Wachovia abides by the rules and guidelines of the International Financial Services Association and the New York Clearing House Association L.L.C. and its subsidiary companies with regard to the payment of interbank compensation. Wachovia reserves the right to make a final reasonable determination, whether and in what amount an adjustment, if any, shall be made.

If Correspondent is able to prove that Wachovia failed to exercise ordinary care in paying any unauthorized transaction and that Wachovia's failure directly and substantially contributed to the loss, then the loss will be allocated between Wachovia and Correspondent based on the extent to which Wachovia's respective failure to exercise ordinary care contributed to the loss. In that regard, and as disclosed elsewhere in these Terms & Conditions, Wachovia processes checks and other items by automated means and does not visually examine or verify signatures on all checks or other items. Correspondent agrees that Wachovia does not fail to exercise ordinary care because Wachovia uses these automated procedures. Correspondent also agrees that Wachovia does not fail to exercise ordinary care if the items were forged or altered in such manner (as by unauthorized use of a facsimile machine, photocopy machine, computer equipment or otherwise) that a reasonable person would not detect the forgery or alteration.

If Correspondent fails to discover and report these or any other errors or discrepancies within the 30 calendar day period, Correspondent loses any and all rights it may have to assert the error or discrepancy against Wachovia, regardless of whether Wachovia has exercised ordinary care with respect to the transaction.

## Availability of Funds

Deposits are subject to verification as to dollar amount and number of items. Each deposited item including cash letter items, and each other instruction, order, electronic funds transfer or advice received for credit to the Account is credited subject to final payment. Wachovia decides in its sole discretion what process will be used to obtain final payment of an item and may use other banks in the process. Provisionality or finality of an electronic funds transfer will be governed by the rules of the funds transfer system used in executing such funds transfer.

## Setoff and Security Interest

If Correspondent ever owes Wachovia, acting in any capacity, money as a depositor, borrower, guarantor, judgment debtor or in connection with any trade payment or otherwise, including any obligation owed

to a financial institution acquired by Wachovia, and it becomes due, Wachovia has the right under the law (called "setoff") and under these Terms & Conditions to use the money from Correspondent's Account to pay the debt. If the debt and the Account are in different currencies, Correspondent agrees that Wachovia may use the funds in the Account to purchase the currency of the debt at the then spot rate to setoff. Wachovia may use the Account to pay the debt even if the withdrawal results in an interest penalty or the dishonor of checks. In the case of both the Correspondent's head office and its branch(es) maintaining deposits with Wachovia, both the Correspondent's head office and its branch(es) agree that Wachovia may use the money in their individual Accounts to satisfy any one of their obligations.

Correspondent grants Wachovia a continuing lien and security interest in and right of setoff against all of Correspondent's right, title and interest in and to all deposits and accounts with any Wachovia offices located anywhere in the world to secure payment of Correspondent's obligations to Wachovia acting in any capacity. The security interest and right of setoff granted by these Terms & Conditions are consensual and are in addition to any other security interest or right of setoff that Wachovia may have. To the extent any of the funds to be setoff are entitled to any exemption from execution, levy, attachment, garnishment, seizure or other legal or equitable process, then, to the maximum extent allowed by law, Correspondent hereby knowingly, affirmatively and unequivocally waives such exemption and consents to Wachovia's setoff against such funds as contemplated by these Terms & Conditions. Any pledge or assignment by Correspondent to third parties of deposits (including, without limitation, certificates of deposit) and other accounts for security purposes remains subject to Wachovia's right of setoff and security interest.

## Credit Interest

Regulation Q of the Federal Reserve Bank of the United States of America currently forbids payment of interest on demand deposits. Overnight investment of excess funds can be arranged within the parameters set forth below.

## Overnight Investment of Excess Funds

Under parameters set forth between Wachovia and Correspondent, excess funds may be invested offshore overnight in Eurodollars in Wachovia's Cayman Islands branch. Correspondent acknowledges that deposits in the Cayman Islands branch are not insured by the Federal Deposit Insurance Corporation; nor are the deposits insured by the United States Government, the United Kingdom Government or any agency thereof. Deposits are not payable nor guaranteed payable in the United States.

2.

## Debit Interest

Wachovia reserves the right to refuse to pay any item if it would result in an overdraft on the Account. However, Wachovia, acting in its sole discretion, may pay an item and create an overdraft and charge interest for such an overdraft in accordance with Wachovia's policy or in accordance with prior arrangements made between Wachovia and Correspondent.

Unless otherwise agreed in writing, Wachovia is under no obligation to permit any overdraft or to continue to permit any overdraft and may at any time require payment of an outstanding overdraft.

The amount of any overdraft which Wachovia permits to occur, i.e., the difference between the amount of the debit plus all applicable service charges or fees, if any, and the available balance in the Account, shall be due and payable immediately and interest shall accrue thereon until paid in full at a rate determined by Wachovia not to exceed the maximum lawful rate of interest. Correspondent authorizes Wachovia to charge the Account or any other accounts of Correspondent with Wachovia or to apply any other property of Correspondent in Wachovia's possession or in which Wachovia has a security interest to satisfy such overdraft and applicable interest.

## Payment Terms/Compensation Methods

*Rates and Payment Terms*
Payment for the services shall be at Wachovia's rates in effect from time to time as agreed upon by both Wachovia and Correspondent.

Correspondent's Account will be charged for services through Account Analysis, an automated system, which calculates charges for balance and fee-based account services. Payment will be made by Correspondent as mutually agreed, by either direct charges or compensating balances.

There are three basic options available to Correspondent in deciding how to compensate Wachovia for the services provided. These are described below:

*Balance Compensation*
Positive available balances, adjusted for reserves, would be valued at an earnings credit rate. The appropriate level of balances would be left in the Account by Correspondent at all times to cover the cost of services.

*Fee/Balance Compensation*
Wachovia will provide Correspondent with a comprehensive statement which includes volumes, prices and the total service

charge. The total service charge is reduced by the interest Wachovia earns on the available balances maintained in Correspondent's Account. This earnings credit is calculated monthly as follows:

$$\frac{\text{(Positive Available Balance — Reserve Requirement)} \times \text{Earnings Credit Rate X \# of Days in Month}}{\text{\# of Days in a Year}}$$

The earnings credit rate utilized in the calculation is a managed rate determined by Wachovia. This rate is market driven and allows Correspondent to receive a high earnings credit to offset service cost. If the earnings credit is less than the total service charge, the shortfall is billed to Correspondent's Account.

*Fee Compensation*
Wachovia offers a fee option for all services provided. With this option, Correspondent may pay for all services on a monthly basis. Wachovia will debit the Account.

For all options, charges are detailed in the Account Analysis Statement, which Correspondent will receive on a monthly basis.

# Electronic Transfers

## Authorization and Security Procedures

All payment orders will be transmitted to Wachovia in compliance with Security Procedures as set forth below established between Wachovia and Correspondent. Correspondent will disclose Security Procedures only to its authorized representative(s) and establish internal controls to protect them from unauthorized disclosure. Wachovia will change Security Procedures immediately at Correspondent's request if Correspondent knows or suspects that they have become known by unauthorized persons. Wachovia will be entitled to presume that all payment orders which comply with Security Procedures are being transmitted by authorized representatives of Correspondent and Wachovia shall be entitled to rely thereon. If Correspondent or any of the Correspondent's authorized representatives have reason to believe that a Security Procedure may have been learned by an unauthorized person, Correspondent agrees to notify Wachovia immediately.

The following Security Procedures will be used to verify that Correspondent is the originator of a payment order, or other communication requesting an amendment, cancellation or other action regarding a payment order for the communications systems listed on the next page:

3.

- For SWIFT, the SWIFT Authentication procedure in accordance with the SWIFT User Handbook as amended from time to time.
- For telex, the Wachovia test key or Correspondent's test key, as applicable.
- For PC and Web-based systems, the security procedure set forth in the applicable service agreement or service description between Wachovia and Correspondent.

Any other security procedures, including signature verification, that are not adequate under Article 4A of the Uniform Commercial Code of the State of New York should not be utilized by Correspondent. However, if Wachovia agrees to process payment orders that Correspondent delivers to Wachovia without using approved security procedures, Wachovia will not bear any responsibility or liability for any losses arising from processing such payment orders.

## Payment Orders

Correspondent may instruct that Wachovia debit Correspondent's Account and transfer funds for its own account, to other financial institutions, or pay third parties at other domestic or foreign financial institutions. If Wachovia receives a payment order from Correspondent to debit another account other than the Correspondent's own, Wachovia presumes that Correspondent has obtained the authorization to debit the account from the legal account holder and shall debit the account mentioned in the payment order. Payment orders may be transmitted to Wachovia in accordance with the terms set forth herein. Correspondent shall select and advise Wachovia of the means Correspondent will use of communicating payment orders, which may include SWIFT, telex and Wachovia's PC and Web-based systems.

## Execution of Payment Orders

Upon receipt of a payment order from Correspondent authenticated in accordance with the procedures contained herein, Wachovia is authorized to debit Correspondent's Account and transfer or pay funds upon value date. Wachovia is authorized to implement any instructions, including amendments and cancellations of prior payment orders, received (in accordance with the Security Procedures) according to Correspondent's initial payment order. Duplicate payment orders initiated by Correspondent may be acted upon by Wachovia without responsibility. Acceptance of payment orders is at Wachovia's sole discretion. Wachovia requests that Correspondent does not send payment orders more than 10 calendar days in advance. Unless otherwise instructed by Correspondent, Wachovia may use any means, intermediaries or funds transfer systems which may have operating rules governing the execution of payment orders to effect the transfer as Wachovia, in its sole discretion, shall determine. Wachovia may handle payment orders received from Correspondent and other customers in any order selected by Wachovia. Unless otherwise agreed, Wachovia is not responsible for any losses arising

from an execution of a payment order by a certain time of its funds transfer business day or for any losses arising from a conditional payment order.

## Cancellation and Amendment of Payment Orders

When Wachovia accepts a payment order, it cannot thereafter be cancelled or amended. Nonetheless, if Correspondent requests cancellation or amendment of an accepted payment order, Wachovia will attempt to cancel or amend, but this may require the consent of third parties.

## Payments in Currency

For orders of transfer of U.S. Dollars to a foreign country, the beneficiary's bank may elect to pay the beneficiary in foreign currency at the beneficiary bank's rate of exchange.

Payment orders in foreign currency are done at Wachovia's then current selling or buying market rate for wire transfers. If a payment order is cancelled or amended, any refund of currency resulting from these shall be in U.S. Dollars. Refunds of foreign currency orders shall be calculated at Wachovia's then current selling or buying rate for U.S. Dollars. Correspondent bears all risk of loss due to fluctuation in the rate of exchange. No transfer fee shall be refunded. Correspondent is responsible for any charges related to cancellation or amendment of U.S. Dollar and foreign currency payment orders.

## Cut-off Times

For same day delivery, payment orders must be received before the cut-off time for funds transfers on a business day as established by Wachovia from time to time. Payment orders or related requests received after the cut-off time or on a non-business day will be treated as received by Wachovia on Wachovia's next funds transfer business day. Wachovia will make reasonable efforts to execute all payment orders received prior to the cut-off deadlines.

## Advice of Funds Transfers

All debits and credits to the Account will appear on the SWIFT, PC, web, telex, courier or mail statements.

Optionally, Correspondent may request Wachovia to provide separate advices of debits/credits via SWIFT MT900 and MT910 messages, telex or mail.

## ACH

For ACH users, please refer to the Addendum to these Terms & Conditions, provided to Correspondent as a service description.

4.

# Check Services

## Check Disbursement Services

Check Disbursements drawn on the Account will be debited on the date the item is presented to Wachovia. Wachovia encourages Correspondent to order checks through Wachovia. If Correspondent prefers to use its own vendor, Wachovia will provide Correspondent with detailed instructions on the required formats. A sample of the checks must be sent to Wachovia for inspection prior to their usage. Checks failing to pass inspection must be reprinted.

It is strongly recommended that the checks drawn on Wachovia be fully MICR (Magnetic Ink Character Recognition) encoded and include MICR-printed serial numbers. When checks are MICR encoded, serial numbers will appear on mail and electronic statements to assist Correspondent in identifying stolen or fraudulent items and in performing account reconciliation. Wachovia cannot be responsible for delays in posting of any item that is not fully MICR encoded.

## Advice of Issuance

Unless Correspondent and Wachovia have expressly agreed in writing that this requirement does not apply to Correspondent's Account, Wachovia requires that Correspondent promptly notify it whenever certain checks or drafts (described below) drawn on the Account are issued. If a failure to notify Wachovia of an issuance of check/draft results in a loss, such loss shall be borne by Correspondent. This notification is required for Correspondent's protection and in order to assist Wachovia in determining whether the specified checks or drafts drawn on the Account and presented for payment are forged or altered.

Correspondent shall send to Wachovia an Advice of Issuance either by authenticated SWIFT MT110 or tested telex for all checks issued in the amount of US$5,000 or greater. Each Advice of Issuance must include all the following specific details about the check or draft being issued by Correspondent:

· The date of the check or draft;
· The currency amount of the check or draft;
· The name of the payee (i.e., beneficiary) indicated on the check or draft; and
· The check number or draft number indicated on the check or draft.

Checks or other debit items drawn on the Account may be returned by Wachovia unpaid for any reason that such items are normally returned, for example, insufficient funds, uncollected funds, levies or attachments or for any other reason permitted by law and applicable regulations. Wachovia may also return a check or draft if no appropriate Advice of Issuance was received. In the case of insufficient or uncollected

funds, Wachovia may at its sole discretion return the item or elect to pay such items and overdraw the Account. Such overdrafts are subject to debit interest. Wachovia may pay drafts drawn on Correspondent's Account in any order Wachovia may choose.

## Stop Payments

Correspondent may ask Wachovia to stop payment on checks drawn on Correspondent's Account if Wachovia has not paid the item. Correspondent can request stop payments on checks drawn on the Account by authenticated SWIFT message or by tested telex. To be effective, the stop payment request must provide the exact amount of the check, check number, payee and the full account number on which it is drawn. If the information Correspondent gives Wachovia is not correct or if Correspondent does not provide Wachovia reasonable information requested about the check, Wachovia will not be responsible to effect the stop payment.

Wachovia also cannot be responsible if Wachovia is not able to identify the proper check because: 1) Correspondent has issued more than one check with the same serial number or 2) Correspondent has generated its checks by computer or in any other manner which does not produce a MICR-encoded check number on the check.

Wachovia is entitled to a reasonable period of time within which to effect the stop payment order. For purposes of these Terms & Conditions, a "reasonable time" means until the end of the business day following the day on which the stop payment order was received by Wachovia. Wachovia is not liable for any checks paid against the Account until the stop payment is effected.

Stop payment orders are valid for six months unless Correspondent designates a longer period of time when placing the stop payment order. Correspondent may extend a stop payment order by notifying Wachovia via SWIFT or tested telex prior to the expiration of the existing stop payment order.

## USD Cash Letter

Wachovia agrees to receive USD Cash Letter shipments from Correspondent delivered to Wachovia at its designated offices. Items eligible for USD Cash Letter deposits include:

· U.S. Dollar commercial checks drawn on banks in the United States or Canada;
· U.S. Dollar bank drafts payable in the United States;
· Money orders issued by bank in the United States ;
· International Postal Money Orders issued by the U.S. Postal Service;
· U.S. Dollar Travelers Checks drawn on institutions in the United States.

5.

This service cannot be used to transport bank notes, coins or any type of negotiable securities. Items drawn on points outside of the United States should not be included in Cash Letter shipments, with the exception of U.S. dollar checks drawn on banks in Canada. All deposited items are subject to final payment.

*Availability of Funds*
For USD Cash Letters received prior to processing cut-off deadlines established by Wachovia, Correspondent will receive availability of all items in accordance with Wachovia's predetermined float availability assignments.

*Deposit Preparation*
Travelers Checks should be sorted into separate batches from all other acceptable items and deposited under separate deposit tickets. Items should be batched in lots of no more than 250 items with a separate tape listing for each. Batch totals should be listed on the pre-encoded Cash Letter deposit ticket, supplied by Wachovia; up to 3,000 checks may be deposited under one deposit ticket. An adding machine tape including batch amount total and account number must accompany each Cash Letter deposit. The total number of checks, for all batches, must also be recorded on the Cash Letter deposit ticket. Wachovia is not responsible for any loss related to cash letters for which deposit tickets are missing or improperly completed.

Correspondent must maintain appropriate records of the front and back of the check to enable prompt reconstruction of documents in the event of total loss in transit. Users of Wachovia's Cash Letter Service must be mindful that packages are exposed to the possibility of loss or damage.

Wachovia requires Correspondent to protect against unauthorized negotiation by properly endorsing all acceptable items specifically to the order of Wachovia Bank, National Association. The endorsement should be placed in black or dark ink on the back of each check so that the endorsement is wholly contained in the area 3.0 inches from the leading edge of the check and 1.5 inches from the trailing edge of the check. Optional information may be included provided the inclusion of such information does not interfere with the readability of the endorsement.

It is recommended that Correspondent include its account number and unique reference number within the endorsement of each check. If an alternate account number, other than the original depositing account, is to be used for return item processing, such instructions and the alternate account number must be included on the endorsement of each check. Wachovia shall use reasonable efforts to follow Correspondent's instructions in debiting returns to Correspondent's alternate account.

*Deliveries in Transit*
Unless prior arrangements have been made, Wachovia assumes no responsibility for Cash Letter packages with respect to pick-up or while en route to the designated check processing center. Wachovia is not responsible for the actions, omissions and/or negligence of the courier regarding failure to pick up the package or loss of the package or damage to its contents while in the possession of courier, or any late delivery or non-delivery of the package.

For the purpose of determining liabilities, Wachovia will not be deemed to have received or have any liability with respect to any item until the item has physically been received by Wachovia at the address of which we notify you from time to time.

If a Cash Letter shipment should be lost in transit between Correspondent and the receiving center for Wachovia, Wachovia agrees to provide Correspondent with provisional credit within 10 business days after its receipt of two legible copies (front and back) of each of the items which make up the lost remittances. Legible copies, properly indemnified, should be received by Wachovia not later than 45 calendar days after the original remittance(s) was/were lost. Wachovia will then, for a period of six months commencing on the date Correspondent's Account is provisionally credited, initiate an effort to collect on the copies of the original instruments. Correspondent will retain use of the full value of the remittances (subject to normal returns). At the end of the six month period, Wachovia will debit Correspondent's Account for the full value of any of the uncollected copies and will provide Correspondent with a list of all of the uncollected copies.

If Correspondent furnishes Wachovia with two legible copies of each item after the prescribed 45 calendar day period as described above, Wachovia, will attempt collection on the copies and pass credit due Correspondent on an item by item basis. After receipt of the copies, a collection effort will be made for a period of 60 calendar days at which time copies of files on any uncollected copies will be forwarded to Correspondent and Wachovia will close its files.

*Adjustments*
Cash Letters will be credited for the original amount. Errors, such as incorrectly listed or unlisted items, will be adjusted by debiting or crediting the Account under advice. Correspondent may elect to receive automatic SWIFT/telex advices for adjustments in any amount in addition to their inclusion on Correspondent's account statements.

Should an item be missing from Correspondent's remittance processed at Wachovia, Wachovia will notify Correspondent by telex or SWIFT. When an image of the missing item is available, Wachovia will credit Correspondent's Account and attempt to collect funds by entering the

image for collection and Wachovia will not charge the Correspondent's Account for a period of 60 calendar days after which Correspondent's Account will be charged pending any subsequent collection.

*Return Item Processing*
All items deposited by Correspondent with Wachovia which are returned unpaid for any reason will be returned to Correspondent as soon as possible. Wachovia will provide advice by SWIFT or telex of any unpaid item. Wachovia shall not redeposit any returned item under any circumstance in the Cash Letter Service. Correspondent's Account will be debited for the face value of the returned item, plus any applicable fees regardless of whether the Account has sufficient funds. Correspondent is liable for all returned items and drawee bank claims whether Correspondent's Account is open or has been closed.

## Final Credit Service

Wachovia provides a Final Credit Service under the terms of a separate agreement that can be provided to Correspondent upon request.

## Global Check Clearing

Wachovia provides Global Check Clearing services to act as Correspondent's clearing agent of foreign checks and drafts. Wachovia agrees to process foreign currency items drawn in the currency of the host country on a cash letter basis for USD equivalent credit to Correspondent's Account. Correspondent may also include USD items drawn on foreign countries in their Global Check Clearing deposit.

A list of currently eligible currencies and countries is provided at service implementation. The list of currencies accepted by Wachovia on a cash letter basis is subject to change without notice. Wachovia, at its sole discretion, may determine not to process any item submitted under the Global Check Clearing service.

Correspondent shall follow the deposit preparation procedures as defined under the "USD Cash Letter" section of this document using pre-printed Global Check Clearing deposit tickets that are provided by Wachovia.

Wachovia shall provide daily foreign exchange rates for each currency accepted under the Global Check Clearing service. Wachovia shall not be liable for the use of any incorrect rate listed on Correspondent's deposit ticket, or any fluctuation in the foreign exchange rate due to courier delays in transit of the deposit.

Any deposited item returned for any reason will be charged back to Correspondent's Account at Wachovia's selling rate of the foreign currency. Return items are subject to the rules and regulations of the country where the payor bank is located.

## USD and Foreign Check Collection

Items received for collection shall not be credited to Correspondent's Account unless and until Wachovia has received payment therefore unless otherwise agreed upon. Collection items may be returned in accordance with prevailing law. Wachovia shall, as agent for Correspondent, send such items through its customary collection channels. All fees associated with the collection of such items will be deducted from the proceeds of the transaction prior to credit to Correspondent's Account.

# Trade Services

## Letters of Credit

Wachovia provides letter of credit services in accordance with International Chamber of Commerce Publication Number 500, entitled: *Uniform Customs and Practice for Documentary Credits* ("*UCP500*"), and the International Standby Practices, International Chamber of Commerce Publication Number 590 or any subsequent revision or restatement thereof which may be adopted by the International Chamber of Commerce and accepted by Wachovia for use. Wachovia provides letter of credit services at its international processing centers in the U.S. and its overseas branch locations.

All letter of credit charges and associated assessments will be accumulated and charged to Correspondent's Account, unless otherwise indicated, on the date of payment/acceptance or at expiration. Communications will be via authenticated SWIFT, tested telex or original Letter of Credit mailed via courier authenticated by security procedures approved by Wachovia.

## Bank-to-Bank Reimbursements

Wachovia also provides reimbursement services in accordance with the International Chamber of Commerce Publication Number 525, entitled: *Uniform Rules for Bank to Bank Reimbursements under Documentary Credits* ("*URR525*"), or any subsequent revision or restatement thereof which may be adopted by the International Chamber of Commerce and accepted by Wachovia for use. Authorizations to reimburse (Authorizations) and requests for reimbursement (Claims) can be sent via authenticated SWIFT, tested telex, courier or through the mail.

Wachovia is not responsible for authenticating any Claim received via means other than authenticated SWIFT or tested telex. Correspondent agrees that Wachovia may act upon a Claim received by Wachovia via such other means (e.g. by mail, courier, unauthenticated SWIFT, untested telex) without any responsibility or liability on Wachovia's part for the authenticity of such Claim.

7.

## Documentary Collections

Wachovia acts as collecting agent for documentary collections. All documentary collections are subject to the International Chamber of Commerce Publication Number 522, entitled: *Uniform Rules for Collections ("URR522")*, or any subsequent revision or restatement thereof which may be as adopted by the International Chamber of Commerce and accepted by Wachovia for use.

Note: When any collection item is returned to Wachovia with a claim for refund because it bears an alteration, a forged or unauthorized endorsement or is otherwise not properly payable, Wachovia reserves the right to either charge Correspondent's Account for the amount of such claim or otherwise recover from Correspondent the amount Wachovia deems to be the liability due to such claim.

## Reimbursement Collections

Wachovia acts as agent for the purposes of presentation, tracing, and receipt of funds of documents and reimbursement claims under letters of credit in accordance with *URR525* and *URC522*.

Wachovia is not responsible for authenticating any reimbursement claim received via means other than authenticated SWIFT or tested telex. Correspondent agrees that Wachovia may act upon a claim received by Wachovia via such other means (e.g., by mail, unauthenticated SWIFT, untested telex) without any responsibility or liability on Wachovia's part for the authenticity of such claim.

## Other Cash Management Services

If Correspondent wishes to utilize Wachovia's other cash management services, Correspondent's selection and use of Wachovia's other cash management services are subject to these Terms & Conditions. The other cash management services are more fully described in separate service descriptions provided by Wachovia, both initially and at any time hereafter. Correspondent agrees that if any terms and conditions of the service descriptions conflict with the terms of these Terms & Conditions, the terms and conditions of the service description(s) shall control. Wachovia may change its operational procedures without amending these terms and conditions, upon notice to Correspondent. Wachovia has the right to modify services, require minimum balances or security, or terminate services in its sole discretion in the event that Correspondent breaches or fails to honor any provisions of these terms and conditions or there occurs a material adverse change in Correspondent's financial condition.

## Courier Services

Courier service is available to and from many countries to assure prompt and safe delivery in handling check remittances, US and foreign collections, and communications. Correspondent may prefer to make its own delivery arrangements.

Wachovia assumes no responsibility for packages with respect to pick-up or while en route including, but not limited to, security delays and customs clearance, or from Wachovia's designated operations center. Wachovia is not responsible for the actions, omissions and/or negligence of the courier with respect to failure to pick up the package or loss of the package or damage to its contents while in the possession of courier, or any late delivery or non-delivery of the package.

From time to time, it may be necessary for the courier to utilize alternative transportation methods. Wachovia, without liability on its part, reserves the right to authorize such action on a temporary basis without first consulting Correspondent and such action will not alter the limitation of Wachovia's liability as stated above.

## Miscellaneous

### Assignment of Terms & Conditions

These Terms & Conditions may be assigned by Wachovia in connection with a merger, deposit transfer or assumption, and to effect a setoff or realization upon collateral. Neither these Terms & Conditions nor an Account may be assigned or transferred by Correspondent, except in connection with a merger.

### Conflicts/Disputes Involving the Account

If Wachovia receives an actual or potential claim from a third party regarding Correspondent's Account, or conflicting instructions or claims from authorized signors, Wachovia may, at Wachovia's discretion and without liability to Correspondent, choose not to pay out any money from Correspondent's Account until Wachovia receives consistent instructions from all parties or a court order. Wachovia may also, without liability to Correspondent, close the Account and issue a check made payable to Correspondent and each authorized signor or Correspondent and each claimant, as Wachovia deems necessary, or Wachovia may interplead the funds into court. Correspondent agrees to reimburse Wachovia for any loss, costs or expenses including, without limitation, attorneys' reasonable fees and the costs of litigation (to the extent permitted by law) that Wachovia incurs as a result of any dispute involving Correspondent's Account, and Correspondent authorizes Wachovia to deduct any such loss, costs, or expenses from Correspondent's Account. This

8.

obligation includes any dispute between Correspondent and Wachovia involving the Account and situations where Wachovia becomes involved in any dispute between Correspondent and an authorized signor, another joint owner or a third party claiming an interest in the Account. It also includes any situation where Correspondent, an authorized signor, another joint owner or a third party takes action with respect to the Account that causes Wachovia, in good faith, to seek the advice of counsel, whether or not Wachovia actually becomes involved in a dispute.

## Confidentiality

Wachovia shall treat Correspondent's information with confidence and discretion, but absent any agreement specifically to the contrary, Wachovia and its affiliates reserve the right to exchange among themselves information about Correspondent and its Accounts, to disclose such information to its service providers and to report any relevant information to credit reporting agencies. Wachovia may be required to disclose such information as required by legal and regulatory process or to prevent illegal or fraudulent activities.

Correspondent and, by signing any authorization documentation, all authorized signers and authorized representatives, authorize Wachovia to record telephone or other conversations between them and Wachovia. All decisions to record conversations, and to preserve or destroy such recordings, shall be within Wachovia's sole discretion. Wachovia shall incur no liability by reason of its recording or not recording such conversations, or preserving or destroying such recordings. The authority granted by this provision will survive the termination of these Terms & Conditions or the closing of an Account.

## Termination

Correspondent or Wachovia may close the Account and terminate these Terms & Conditions, and modify or terminate any service at any time without advance notice. Correspondent will receive any finally collected and available balance in its Account within a reasonable period of time after it is closed. Wachovia may return unpaid any items presented on a closed Account. Obligations which by their nature would continue beyond the termination of these Terms & Conditions shall survive the termination of these Terms & Conditions and closing of the Account.

## Applicable Laws

These Terms & Conditions shall be governed by and construed in accordance with the laws and regulations of the United States and the State of New York, including (without limitation) Articles 3, 4, 4A and 5 of the Uniform Commercial Code and New York CLS Dr & Cr § 151, which are all incorporated herein by reference and made a part hereof. Accounts which are inactive for a specified period of time may be subject to escheat under state law. Accounts are subject to

attachment, levy, seizure and garnishment law. Correspondent hereby irrevocably submits to the jurisdiction of the courts of the Borough of Manhattan, New York City, in the State of New York or the federal courts located therein over any action or proceeding arising out of or relating to these Terms & Conditions and irrevocably agrees that all claims in respect of such action or proceeding may be heard or determined in such courts. No legal proceeding may be commenced against Wachovia hereunder unless Correspondent has given Wachovia timely notice and such legal proceeding is commenced within two years after the closing date of the statement covering the period in which the claim arose.

Accounts are also governed by applicable U.S. Federal Reserve Bank rules and its Operating Circulars, the rules of clearing houses and similar associations to which Wachovia may belong, funds transfer system rules, publications of organizations such as (without limitation) the International Financial Services Association, and the International Chamber of Commerce and general commercial bank practices applicable to the services provided in connection with the Account.

## Compliance with Law

Wachovia is a bank organized and existing under the laws of the United States. It intends to comply with all laws and regulations of the United States applicable to it in any of its locations, including without limitation the USA PATRIOT Act, the Trading with the Enemies Act, the International Emergency Powers Act, regulations of the United States Department of the Treasury and the Office of Foreign Assets Control and in its foreign locations to comply with all applicable laws of the host country. Correspondent acknowledges that Wachovia's compliance with laws to which it is subject may affect the types of transactions Correspondent may conduct with or through Wachovia and may require that Correspondent provide or certify information to Wachovia.

**USA PATRIOT Act Notice:** To help the U.S. government fight the funding of terrorism and money laundering activities, U.S. Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account.

## Waiver of Jury Trial

Correspondent and Wachovia each knowingly, voluntarily and intentionally waive any right that they may have to a trial by jury in any litigation in any way based upon, arising out of or related to these Terms & Conditions or the services provided hereunder or under any service description, or any course of conduct or course of dealing by the parties. This provision is a material inducement to Wachovia to provide the Account and the services referred to herein.

9.

## Invalidity of Contract Provisions

In the event any one or more of the provisions of these Terms & Conditions shall for any reason, including under any applicable statute or rule of law, be held to be invalid, illegal or unenforceable, the remaining provisions of these Terms & Conditions shall remain in full force and effect.

## Indemnification

Correspondent agrees to indemnify and hold Wachovia, its successors, assigns, correspondents, directors, officers, employees and agents harmless from and against any and all claims, losses, damages, liabilities and expenses of any nature, including legal expenses and attorneys fees: (1) suffered or incurred by Wachovia by reason of or pursuant to these Terms & Conditions, or the performance of services hereunder, (2) arising from any claim attributable to any act or omission taken by Wachovia based upon reliance on any individual indicated to be authorized to act on behalf of Correspondent in any document (or otherwise authorized by Correspondent) provided by Correspondent to Wachovia and (3) arising from any claim or demand based in whole or in part on an action or omission of Wachovia resulting from a request, direction or instruction from Correspondent. This indemnity will not be effective to relieve and indemnify Wachovia from and against its own gross negligence or willful misconduct. If Correspondent fails to pay any amount when due pursuant to any extension of credit granted in connection with Wachovia's delivery of any of the services described in these Terms & Conditions, unless the parties otherwise agree in writing, Correspondent shall pay interest on any overdue amount before and after judgment at a rate to be determined by Wachovia at its sole discretion.

## Liability

Wachovia's liability, if any, shall be limited to those actual damages which are the direct result of Wachovia's willful misconduct or gross negligence, which shall be determined in accordance with the commercial standards of the U.S. banking industry and applicable laws, rules and regulations. Wachovia is not responsible for any claim arising from non-payment of any item or for loss or delay in any clearing system unless it occurs as a result of willful misconduct or gross negligence by Wachovia or its employees. Damages with respect to electronic funds transfers will be limited to an amount equal to interest on the funds for each day the error or delay remains uncorrected at the applicable Federal Funds rate, i.e., the average of the Federal Funds rates published by the Federal Reserve Bank of New York for each of the calendar days for which interest is payable divided by 360, reduced by a percentage equal to Wachovia's reserve requirement on the Account. Wachovia may at its sole discretion

substitute in lieu of interest an "as of" adjustment method of compensation, i.e., recompute Correspondent's balances for account analysis purposes as if the error or delay had not occurred. If Wachovia is unable to recover all or any part of funds it erroneously transferred from a transferee who has no claim to them, Wachovia's liability will not exceed the amount of funds which Wachovia is unable to recover plus interest as aforesaid. Wachovia shall be subrogated to all rights of Correspondent against third parties and to any rights of a transferee against Correspondent in connection with any claim. In no event shall Wachovia be liable regardless of whether any claim is based on contract or tort, for any consequential, special or indirect losses or damages Correspondent may incur or suffer arising from or in connection with these Terms & Conditions, whether or not the likelihood or possibility of such losses or damages was known to Wachovia in advance.

Wachovia shall not be responsible for any loss or damage resulting from Acts of God, war, riots, terrorism, strikes, civil or industrial disturbance, malfunctions of equipment or other cause beyond Wachovia's control.

## Waiver

Wachovia may waive any of these Terms & Conditions but any such waiver shall apply only to the term or condition waived and only to that occasion and shall not constitute a waiver of any other term or condition.

## Legal Process

Correspondent irrevocably consents to the service of process by personal delivery or overnight courier or registered or certified airmail, postage prepaid, of copies of the summons and complaint or other process (which need be in the English language) to its office shown on its most recent account statement or to its agent for service of process in the United States. Nothing herein affects the right to serve process in any other manner permitted by law.

## Correspondent's Representations, Warranties and Covenants

Correspondent represents and warrants to Wachovia that: (1) All information, including financial information, whenever provided by Correspondent to Wachovia, shall be true, correct and complete. Information relating to Correspondent's financial condition accurately reflects Correspondent's financial condition as of the date(s) thereof; (2) Correspondent is not insolvent within the meaning of 11 USC Section 101 (32); (3) Correspondent is in compliance with all federal, state and local laws, including, all laws of the United States and any state thereof applicable to Correspondent's properties, operations,

10.

business and finances; (4) Correspondent is duly organized and in good standing under the laws of the jurisdiction of Correspondent's organization, and Correspondent has all powers, licenses, authorizations and approvals to operate Correspondent's business as now conducted;

(5) Correspondent will promptly notify Wachovia of the existence of any condition or event which may constitute a breach of or default under these Terms & Conditions; (6) Correspondent will promptly notify Wachovia in writing of (a) any change in Correspondent's financial condition or business; (b) any change in Correspondent's name, address or business structure, ownership or organization; and (c) any material litigation or regulatory action affecting Correspondent; (7) Upon Wachovia's request therefore, Correspondent will promptly deliver to Wachovia true and correct copies of Correspondent's annual report and such other information regarding Correspondent's business affairs and operations including, but not limited to, income statements, balance sheets and statements of cash flows.

## Entire Terms & Conditions

These Terms & Conditions and the documents to which it refers constitute Correspondent's and Wachovia's entire agreement and understanding and supersede all prior terms and conditions. These Terms & Conditions may not be changed orally.

## Use of Correspondent's Account

Correspondent's use of its Account with Wachovia shall constitute Correspondent's agreement to be bound by these Terms & Conditions.

# US Legal Holidays

**January 1**
New Year's Day
**January (Third Monday)**
Martin Luther King Day
**February (Third Monday)**
President's Day
**May (Last Monday)**
Memorial Day
**July 4**
Independence Day
**September (First Monday)**
Labor Day
**October (Second Monday)**
Columbus Day
**November 11**
Veteran's Day
**November (Fourth Thursday)**
Thanksgiving Day
**December 25**
Christmas Day

Business day means a calendar day other than a Saturday or a Sunday, or the dates identified as U.S. Legal Holidays above or any other day on which a U.S. National Bank is authorized or directed to close. If January 1, July 4, November 11 or December 25 falls on a Sunday, the next Monday is not a business day. If January 1 or December 25 falls on a Saturday, the preceding Friday is not a business day.

11.

# EXHIBIT E

JUDGE JONES

$\overline{Jones}$

# 07 CV 11230

Scott S. McKessy (SM-5479)
Casey D. Laffey (CL-1483)
REED SMITH LLP
599 Lexington Avenue
New York, New York 10022
Tel. (212) 521-5400
Fax. (212) 521-5450
Attorneys for Plaintiff
Wachovia Bank, National Association

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

WACHOVIA BANK, National Association,         :
                                             :          Civil Action No. ___
                    Plaintiff,               :
                                             :
        - against -                          :          **ORDER TO SHOW CAUSE**
                                             :
MAJAPARA CASA DE CAMBIO S.A. de C.V.,        :
                                             :
                    Defendants.              :
-----------------------------------------------------------------X

      Upon reading and filing the Declaration of Carlos A. Perez, dated December 13,

2007, the Declaration of Scott S. McKessy, dated December 13, 2007, and the exhibits

annexed thereto, the accompanying Memorandum of Law, the Complaint dated

December 14, 2007, and all the prior pleadings and proceedings had herein, and there

having been no prior motion for the relief requested herein; it is hereby

      **ORDERED**, that defendant Majapara Casa De Cambio S.A. de C.V.

("Majapara") show cause before this Court, in Courtroom _18B_ at the United States

Courthouse, 500 Pearl Street, New York, New York 10007, on the _21_ day of

December, 2007, at _10:00_ _am_, why an Order of attachment should not be entered in this

action, pursuant to Fed. R. Civ. P. 64, directing the United States Marshal, or other

appropriate Federal or State Law Enforcement Agent, to levy within his or her

jurisdiction upon such property in which Majapara has an interest and upon such debts

owing to Majapara as will satisfy $24,711,845.00, plus interest, costs, and the Marshal's

fees and expenses, including but not limited to, the monies being maintained and to be

maintained at the following bank accounts:

> Citibank, N.A.
> 399 Park Avenue
> New York, NY 10043
> (account number 36254838)
>
> JP Morgan Chase Bank, N.A.
> 270 Park Avenue
> New York, NY 10017
> (account number unknown)
>
> Bayerische Hypo- und Vereinsbank, AG
> 150 East 42nd St.
> New York, NY 10017
> (account number unknown)

along with such other and further relief as the Court may deem just, proper, or equitable.

**IT IS FURTHER ORDERED THAT,** pending the hearing and determination of

this motion, Majapara, shall be and hereby is enjoined and restrained from transferring,

selling, pledging, assigning or otherwise disposing of any of its assets.

**IT IS FURTHER ORDERED THAT,** Majapara shall produce a detailed list of

the aforementioned assets and debts, including a description and location of each asset

and debt owed to it, to plaintiff's counsel no later than three (3) business days after

service of this Order upon Majapara as set forth below.

**IT IS FURTHER ORDERED THAT,** pursuant to Fed. R. Civ. P. 64 and CPLR

§ 6212(b), Plaintiff shall be required to post a bond, security or undertaking in the

amount of $ *1,000,000.* within *7* days of execution of this Order.

*(one million dollars)*

**IT IS FURTHER ORDERED THAT,** service of a copy of this Order along with all the supporting papers via overnight mail and certified mail upon Majapara at its office located at Grecia No. 64, Colonia San Alvaro, Mexico City, C.P. 02090, Mexico, on or before December 15, 2007, be deemed good and sufficient service thereof.

**IT IS FURTHER ORDERED THAT,** Majapara shall serve answering papers, if any, so as to be received by plaintiff's counsel, Reed Smith LLP, 599 Lexington Avenue, New York, New York 10022, Attention: Scott S. McKessy, Esq. on or before December 18, 2007, by 3:00 p.m.

**IT IS FURTHER ORDERED THAT,** Plaintiff shall serve reply papers, if any, on or before December 19, 2007 by 5:00 pm upon Majapara.

Dated: New York, New York
       December 14, 2007

SO ORDERED:

_____
United States District Judge

ISSUED: _____

# EXHIBIT F

Scott S. McKessy (SM-5479)
Casey D. Laffey (CL-1483)
REED SMITH LLP
599 Lexington Avenue
New York, New York 10022
Tel. (212) 521-5400
Fax. (212) 521-5450
Attorneys for Plaintiff
Wachovia Bank, National Association

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
WACHOVIA BANK, National Association,                   :
                                                      :
                            Plaintiff,                :    07 Civ. 11230(BSJ)(RLE)
                                                      :
                       - against -                    :
                                                      :
CASA DE CAMBIO MAJAPARA S.A. de C.V.                  :
a/k/a MAJAPARA CASA DE CAMBIO S.A. de C.V.,           :
                                                      :
                            Defendants.               :
-------------------------------------------------------------------X

## CERTIFICATE OF SERVICE

I, **Casey D. Laffey**, hereby certify that on the 14th day of December 2007, I caused true and correct copies of the foregoing documents:

(a)    Summons in a Civil Action dated December 14, 2007;

(b)    Complaint dated December 14, 2007;

(c)    Civil Cover Sheet dated December 13, 2007;

(d)    Wachovia Bank, National Association's Statement Pursuant to Fed. R. Civ. P 7.1 dated December 13, 2007;

(e)    Individual Practices of Judge Barbara S. Jones;

(f)    Individual Practices of Magistrate Judge Ronald L. Ellis;

(g)    Order to Show Cause dated December 14, 2007;

(h)    Declaration of Carlos A. Perez dated December 13, 2007 with exhibits thereto;

(i)    Declaration of Scott S. McKessy dated December 13, 2007; and

(j)    Memorandum of Law in Support of Plaintiff's Application for a Temporary Restraining Order and Pre-Judgment Order of Attachment.

to be served upon:

**Case de Cambio Majapara S.A. de C.V.**
**a/k/a Majapara Casa de Cambio S.A. de C.V.**
Grecia No. 64
Colonia San Alvaro, Mexico City, C.P. 02090, Mexico

by: (i) depositing true copies thereof enclosed in a securely sealed, properly addressed wrapper into the custody of the overnight delivery service for overnight delivery; (ii) depositing true copies thereof enclosed in a securely sealed, properly addressed fully postpaid Registered Mail wrapper in an official depository under the exclusive care and custody of the United States Postal Service within the City, County and State of New York; and (iii) depositing true copies thereof enclosed in a securely sealed, properly addressed fully postpaid First Class Mail wrapper in an official depository under the exclusive care and custody of the United States Postal Service within the City, County and State of New York.

Dated:  December 17, 2007
　　　　New York, New York

Casey D. Laffey (CL-1483)

# EXHIBIT G

Track Shipments/FedEx Kinko's Orders

## Detailed Results

? Quick Help

| Tracking number | 852879165921 | Delivered to | Guard/Security Station |
| Signed for by | V.MARTINEZ | Service type | Priority Pak |
| Ship date | Dec 14, 2007 | Weight | 1.3 lbs |
| Delivery date | Dec 17, 2007 12:39 PM | | |
| Status | Delivered | | |
| Signature image available | No | | |

| Date/Time | | Activity | Location | Details |
|---|---|---|---|---|
| Dec 17, 2007 | 12:39 PM | Delivered | NAUCALPAN MX | |
| | 11:22 AM | On FedEx vehicle for delivery | NAUCALPAN MX | |
| Dec 15, 2007 | 10:02 PM | Delivery exception | NAUCALPAN MX | Package at station, arrived after courier dispatch |
| | 10:02 PM | At local FedEx facility | NAUCALPAN MX | |
| | 1:15 PM | Int'l shipment release | TOLUCA MX | |
| | 12:29 PM | In transit | TOLUCA MX | Package available for clearance |
| | 12:29 PM | At dest sort facility | TOLUCA MX | |
| | 2:37 AM | Departed FedEx location | MEMPHIS, TN | |
| | 1:03 AM | Arrived at FedEx location | MEMPHIS, TN | |
| Dec 14, 2007 | 11:56 PM | Departed FedEx location | NEWARK, NJ | |
| | 9:57 PM | Left origin | NEW YORK, NY | |
| | 8:53 PM | Picked up | NEW YORK, NY | |



Subscribe to tracking updates (optional)

Your Name: _____    Your E-mail Address: _____

| E-mail address | Language | Exception updates | Delivery updates |
|---|---|---|---|
| | English | ☒ | ☐ |
| | English | ☒ | ☐ |
| | English | ☒ | ☐ |
| | English | ☒ | ☐ |

Select format: ● HTML ○ Text ○ Wireless

Add personal message:

Not available for Wireless or non-English characters.

/0037/0250/00308E32Y4/5

**FedEx Express**

# International Air Waybill
For FedEx services worldwide

**1 From** Please print and press hard.

Date 12-14-07    Sender's FedEx Account Number 1979-1125-5

Sender's Name CASEY D LAFFEY    Phone 212 521-5400

Company REED SMITH LLP

Address 599 LEXINGTON AVE FL 28

City NEW YORK    State/Province NY    ZIP Postal Code 10022-0030

Country USA

**2 To**

Recipient's Name MAYAPSA CASA De Cambio SA de CV

Company

Address Grecia No. 64

Address Colonia San Alvaro

City Mexico City    State/Province Mexico

Country Mexico    ZIP Postal Code C.P. 02090

Recipient's Tax ID number for Customs purposes
e.g. GST/RFC/VAT/CNPJ/CUIT, etc. or CE# required

**3 Shipment Information**

Total Packages ___    Total Weight ___ lbs/kg

Commodity Description REQUIRED — court documents

**4 Express Package Service** Packages up to 150 lbs./68 kg

☐ FedEx Int'l. Priority
☐ FedEx Intl. First
☐ FedEx Int'l. Economy

**5 Packaging**
☐ FedEx Envelope
☒ FedEx Pak
☐ FedEx Box
☐ FedEx Tube
☐ FedEx 10kg Box
☐ FedEx 25kg Box
☐ Other

**6 Special Handling**
☐ HOLD at FedEx Location
☐ SATURDAY Delivery

**7a Payment** Bill transportation charges to:
☐ Sender Acct. No. in Section 1 will be billed.
☐ Recipient
☐ Third Party
☐ Credit Card
☐ Cash/Cheque

**7b Payment** Bill duties and taxes to:
☐ Sender Acct. No. in Section 1 will be billed.
☐ Recipient
☐ Third Party

**8 Your Internal Billing Reference** First 24 characters will appear on invoice.
882550 6000MM

**9 Required Signature**
Sender's Signature

For Completion Instructions, see back of fifth page.

FedEx Tracking Number 8528 7916 5921

**Questions? Visit our Web site at fedex.com.**

500    0402

# EXHIBIT H

Scott S. McKessy (SM-5479)
Casey Laffey (CL-1483)
Reed Smith LLP
599 Lexington Avenue
New York, New York 10022
Tel. (212) 521-5400
Fax. (212) 521-5450

Attorneys for Plaintiff Wachovia Bank, National Association

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :
WACHOVIA BANK, NATIONAL ASSOCIATION,                              :    07 Civ. 11230 (BSJ)(RLE)
                                                                  :
                Plaintiff,                                        :
                                                                  :
        - against -                                               :    **ORDER OF**
                                                                  :    **ATTACHMENT**
CASA DE CAMBIO MAJAPARA S.A. de C.V. a/k/a                         :
MAJAPARA CASA DE CAMBIO S.A. de C.V.,                             :
                                                                  :
                Defendant.                                        :
                                                                  :
------------------------------------------------------------------X

        Plaintiff Wachovia Bank, National Association ("Wachovia") having moved, by

Order to Show Cause dated December 14, 2007, and Order to Show Cause dated

December 17, 2007, pursuant to Fed. R. Civ. P. 64, and those motions having come on to

be heard and considered by the Court,

        Now, upon the reading and filing of the Summons and Complaint dated

December 14, 2007, the Amended Summons and Amended Complaint dated December

17, 2007, the Declaration of Carlos A. Perez dated December 13, 2007, the Declaration

of Scott S. McKessy dated December 13, 2007, the Declaration of Carlos A. Perez dated

December 16, 2007, the Declaration of Scott S. McKessy dated December 17, 2007,

along with all exhibits annexed thereto, the accompanying Memorandum of Law dated

December 13, 2007, and the motion having come on to be heard on December 21, 2007, and due deliberation having been had, and

It appearing from the Amended Complaint and Declarations submitted by Wachovia that Wachovia has a cause of action for a money judgment against defendant Casa De Cambio Majapara S.A. de C.V. a/k/a Majapara Casa de Cambio S.A. de C.V. ("Majapara") for $24,810,975.00 with interest from December 7, 2007, and that it is probable that Wachovia will succeed on the merits and recover that sum from Majapara exceeding all counterclaims of which Wachovia is aware, and it is further appearing that Wachovia is entitled to an order of attachment against the property of Majapara on the grounds that: (a) Majapara is a non-domiciliary foreign corporation not qualified to do business in the state under CPLR § 6201(1); and (b) Majapara intends to remove assets from Wachovia's reach with the intention of frustrating the enforcement of an eventual judgment in favor of Wachovia under CPLR § 6201(3); and that the amount to be secured by this order of attachment, including any interest, costs, and fees and expenses to be paid to the United States Marshal, or other appropriate Federal or State Law Enforcement Agent, totals $24,810,975 *(at least)* *to*, and that Wachovia has furnished the undertaking required by law.

Now, on motion of Wachovia, it is hereby,

**ORDERED** that Wachovia's motions, dated December 14, 2007 and December 17, 2007, are granted, and it is further

**ORDERED** that Wachovia's undertaking is fixed in the sum of $1,000,000.00, which all or part may be paid to Majapara for costs and damages, including reasonable attorney's fees, that Majapara may sustain by reason of the attachment if Majapara

recovers judgment or it is finally decided that Wachovia was not entitled to an attachment

of Majapara's property, and the balance of the undertaking is conditioned upon

Wachovia's payment to the United States Marshal, or other appropriate Federal or State

Law Enforcement Agent, all of his/her allowable fees, and it is further

   **ORDERED** that the United States Marshal, or other appropriate Federal or State *or by a licensed process server as retained by plaintiff's counsel*

Law Enforcement Agent shall levy within his/her jurisdiction, at any time before final

judgment, upon such property in which Majapara has an interest and upon such debts

owing to Majapara as will satisfy $ *at least* 24,810,975.00 the amount of Wachovia's

demand, together with probable interest, costs, and the fees owed to the United States

Marshal, or other appropriate Federal or State Law Enforcement Agent; including but not

limited to, the monies being maintained and to be maintained at the following banks:

   Citibank, N.A.
   399 Park Avenue
   New York, NY 10043
   (account number 36254838)

   JP Morgan Chase Bank, N.A.
   270 Park Avenue
   New York, NY 10017
   (account number unknown)

   Bayerische Hypo- und Vereinsbank, AG
   150 East 42nd St.
   New York, NY 10017
   (account number unknown)

   Deutsche Bank
   60 Wall Street
   New York, NY 10005
   (account number unknown)

   Standard Chartered Bank
   One Madison Avenue
   New York, NY 10010
   (account number unknown)

and it is further,

*but not less than*

**ORDERED** that pending the levy and seizure of an amount equal to

$24,810,975. by the United States Marshal, or other appropriate Federal or State

Law Enforcement Agent, Majapara shall be and hereby is enjoined and restrained from

transferring, selling, pledging, assigning or otherwise disposing of any of its assets.

**IT IS FURTHER ORDERED THAT**, service of a copy of this Order via

overnight mail and registered mail upon Majapara at its office located at Grecia No. 64,

Colonia San Alvaro, Mexico City, C.P. 02090, Mexico, on or before December 21, 2007,

be deemed good and sufficient service thereof.

Dated: New York, New York
       December 20, 2007

SO ORDERED:

United States District Judge

# EXHIBIT I

Scott S. McKessy (SM-5479)
Casey Laffey (CL-1483)
Reed Smith LLP
599 Lexington Avenue
New York, New York 10022
Tel. (212) 521-5400
Fax. (212) 521-5450

Attorneys for Plaintiff Wachovia Bank, National Association

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------X

WACHOVIA BANK, NATIONAL ASSOCIATION,                    :        07 Civ. 11230 (BSJ)(RLE)

                        Plaintiff,                      :

        - against -                                     :        **ORDER**

CASA DE CAMBIO MAJAPARA S.A. de C.V. a/k/a             :
MAJAPARA CASA DE CAMBIO S.A. de C.V.,                  :

                        Defendant.                      :

--------------------------------------------------------X

    Now, upon application by plaintiff Wachovia Bank, National Association

("Wachovia") on December 20, 2007, and upon reading this Court's Order of Attachment

dated December 20, 2007, it is

    **ORDERED** that Wachovia shall be entitled to serve Interrogatories upon any

bank, financial institution, or other third party (the "Garnishees") located in New York

for purposes of gathering information on any assets in the name of defendant Casa de

Cambio Majapara S.A. de C.V. a/k/a Majapara Casa de Cambio S.A. de C.V.

("Majapara") or any debts due and owing to Majapara.

    **IT IS FURTHER ORDERED** that responses to such Interrogatories are to be

served by the Garnishees so as to be received by counsel for Wachovia, Reed Smith LLP,

599 Lexington Avenue, New York, NY 10022, Attn: Scott S. McKessy, within three (3)

business days of Wachovia's personal service of such Interrogatories upon the

Garnishees.

**IT IS FURTHER ORDERED** that Wachovia shall be entitled to serve its First

Set of Interrogatories and First Request for the Production of Documents upon Majapara

by overnight mail, with responses to such discovery to be served so as to be received by

counsel for Wachovia within four (4) business days of Wachovia's service of such

discovery via overnight delivery upon Majapara.

Dated: New York, New York
        December 21, 2007

                              SO ORDERED:

                              _____
                              United States District Judge

# EXHIBIT J

**Office of the General Counsel**    388 Greenwich Street
17th Floor
New York, NY 10013



January 4, 2008

**Via Fax (212) 521-5450**
**And Overnight Mail**
Scott S. McKessy, Esq.
Reed Smith LLP
599 Lexington Avenue
New York, NY 10022

      Re:    Wachovia Bank, NA v. Casa de Cambio Majapara S.A. de C.V. a/k/a Majapara Casa de
             Cambio S.A. de C.V.
             <u>Case # 07 Civ. 11230 (BSJ) (RLE)</u>

Dear Mr. McKessy:

      Please accept this correspondence as a response to Plaintiff's Interrogatories, dated December 21,
2007, Directed to Third Party Garnishee Citibank N.A.

      Please be advised that Citibank N.A. maintains account number 36254838 in the name of Casa de
Cambio Majapara SA de C.V. As of yesterday, the adjusted available balance in this account was
$2,453.39.

      The daily adjusted available balances for the above account for the time period as requested,
December 14, 2007 to the present, is below.

| | |
|---|---|
| 12/14/07 | $ 9,611,625.47 |
| 12/15/07 | $ 9,611,625.47 |
| 12/16/07 | $ 9,611,625.47 |
| 12/17/07 | $14,524,695.14 |
| 12/18/07 | $    677,307.14 |
| 12/19/07 | $ 2,108,108.21 |
| 12/20/07 | $ 1,941,412.62 |
| 12/21/07 | $ 1,843,715.44 |
| 12/22/07 | $ 1,843,715.44 |
| 12/23/07 | $ 1,843,715.44 |

| | | |
|---|---|---|
| 12/24/07 | $ | 1,304,545.72 |
| 12/25/07 | $ | 1,304,545.72 |
| 12/26/07 | $ | 1,026,172.08 |
| 12/27/07 | $ | 869,483.07 |
| 12/28/07 | $ | 815,423.60 |
| 12/29/07 | $ | 815,423.60 |
| 12/30/07 | $ | 815,423.60 |
| 12/31/07 | $ | 708,970.71 |
| 01/01/08 | $ | 708,970.71 |
| 01/02/08 | $ | 2,453.39 |

Upon request, Citibank will provide a copy of the December 2007 statement for account number 36254838.

Further, upon information and belief, Citibank has not identified any other property in its possession, custody or control belonging to or in which Casa de Cambio Majapara SA de C.V. has an interest.

Thank you and do not hesitate to contact me should you wish to discuss further.

Very truly yours,

Rebecca J. Nelson
Office of the General Counsel

Tel 212-816-4416
Fax 646-688-1945
rebecca.j.nelson@citigroup.com

Scott S. McKessy (SM-5479)
Casey D. Laffey (CL-1483)
REED SMITH LLP
599 Lexington Avenue
New York, New York 10022
Tel. (212) 521-5400
Fax. (212) 521-5450
Attorneys for Plaintiff
Wachovia Bank, National Association

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
WACHOVIA BANK, National Association,                :
                                                    :        07 Civ. 11230 (BSJ)(RLE)
                              Plaintiff,            :
                                                    :
        - against -                                 :
                                                    :
CASA DE CAMBIO MAJAPARA S.A. de C.V. a/k/a:
MAJAPARA CASA DE CAMBIO S.A. de C.V.,              :
                                                    :
                              Defendant.            :
-------------------------------------------------------------------X

**PLAINTIFF'S COMPENDIUM OF EXHIBITS
IN OPPOSITION TO DEFENDANT'S MOTION TO VACATE
THE COURT'S PREJUDGMENT ORDER OF ATTACHMENT**

**Part II of III**

**REED SMITH LLP**
599 Lexington Avenue, 29th Floor
New York, New York  10022
(212) 521-5400

*Attorneys for Plaintiff
Wachovia Bank, National Association*

<u>EXHIBIT</u>

K.                    Defendant's December 2007 Citibank Account Statements

Dated:    New York, New York
          February 12, 2008

REED SMITH LLP

By: _____

Scott S. McKessy (SM-5479)
Casey D. Laffey (CL-1483)
599 Lexington Avenue
New York, New York 10022
Tel. (212) 521-5400
Fax. (212) 521-5450

*Attorneys for Plaintiff*
*Wachovia Bank, National Association*

# EXHIBIT K

Exhibit "K" is too voluminous to attach.  Available for inspection at the offices of Reed Smith LLP.

Scott S. McKessy (SM-5479)
Casey D. Laffey (CL-1483)
REED SMITH LLP
599 Lexington Avenue
New York, New York 10022
Tel. (212) 521-5400
Fax. (212) 521-5450
Attorneys for Plaintiff
Wachovia Bank, National Association

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

| | | |
|---|---|---|
| WACHOVIA BANK, National Association, | : | |
| | : | 07 Civ. 11230 (BSJ)(RLE) |
| Plaintiff, | : | |
| | : | |
| - against - | : | |
| | : | |
| CASA DE CAMBIO MAJAPARA S.A. de C.V. a/k/a: | | |
| MAJAPARA CASA DE CAMBIO S.A. de C.V., | : | |
| | : | |
| Defendant. | : | |

------------------------------------------------------------------X


**PLAINTIFF'S COMPENDIUM OF EXHIBITS
IN OPPOSITION TO DEFENDANT'S MOTION TO VACATE
THE COURT'S PREJUDGMENT ORDER OF ATTACHMENT**


**Part III of III**


**REED SMITH LLP**
599 Lexington Avenue, 29th Floor
New York, New York 10022
(212) 521-5400


*Attorneys for Plaintiff
Wachovia Bank, National Association*

EXHIBIT

L.              January 8, 2008 Order.

M.              Defendant's Asset Disclosures.

N.              January 12, 2008 e-mail from counsel for Plaintiff to counsel for
                Defendant.

O.              Defendant's December 13, 2007 letter to Plaintiff, along with
                certified translation.

P.              December 19, 2007 fax from JOM Corp. to Reed Smith LLP.

Q.              Excerpts of Financial Documents Submitted by Defendant in
                Connection With Illinois State Court action.

R.              December 5, 2007 letter from Carlos Perez.

S.              Defendant's January 2008 Notice.

Dated:     New York, New York
           February 12, 2008

                              REED SMITH LLP

                              By: _____
                                    Scott S. McKessy (SM-5479)
                                    Casey D. Laffey (CL-1483)
                              599 Lexington Avenue
                              New York, New York 10022
                              Tel. (212) 521-5400
                              Fax. (212) 521-5450

                              *Attorneys for Plaintiff*
                              *Wachovia Bank, National Association*

# EXHIBIT L

# ReedSmith

Reed Smith LLP
599 Lexington Avenue
New York, NY 10022-7650
+1 212 521 5400
Fax +1 212 521 5450

Scott S. McKessy
Direct Phone: 212.521.5421
Email: smckessy@reedsmith.com

January 7, 2008



**VIA FACSIMILE**

Honorable Barbara S. Jones
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street, Room 620
New York, New York 10007

Re:     Wachovia Bank, National Association v. Casa de Cambio Majapara S.A. de C.V. et al.,
        07 Civ. 11230 (BSJ)(RLE)

Dear Judge Jones:

My firm represents Wachovia Bank National Association ("Wachovia") in the above-referenced action. This past Friday afternoon, I was first contacted by the firm of Sperling & Slater who informed me that it would be appearing in this action on behalf of the defendant Majapara Casa de Cambio a/k/a Casa de Cambio Majapara. Majapara's counsel asked if Wachovia objected to a thirty-day extension of time to respond to the amended complaint, to which I indicated I needed to speak with my client and would revert. Before I had an opportunity to get back to Majapara's counsel regarding my client's position, its local counsel sent this Court a letter requesting an extension of time to respond to the complaint. Please be advised that Wachovia does not object to this extension of time.

Now that counsel has appeared in this action, however, Wachovia respectfully requests that Majapara's counsel acknowledge and represent that Majapara is complying with this Court's various orders of December 14th (as modified by this Court's Order of December 17th), December 20th and December 21st. Specifically, we request that Majapara be compelled to provide the information this Court ordered Majapara to produce in the December 14th Order (which was originally due on December 19th but which has never been supplied) no later than this Friday, January 11, 2008 (i.e. provide a detailed description, including location, of each asset and debt owed to Majapara).

Respectfully submitted,

*Application Granted. Majapara is directed to provide the requested information no later than 1/11/08.*

Scott S. McKessy

SO ORDERED,
Dated:

*Barbara S. Jones*
BARBARA S. JONES
U.S.D.J.

1/8/07

SSM/bt

cc:     All Counsel (via facsimile)

NEW YORK ♦ LONDON ♦ HONG KONG ♦ CHICAGO ♦ BEIJING ♦ LOS ANGELES ♦ WASHINGTON, D.C. ♦ SAN FRANCISCO ♦ PARIS ♦ PHILADELPHIA ♦ PITTSBURGH
OAKLAND ♦ MUNICH ♦ ABU DHABI ♦ PRINCETON ♦ NORTHERN VIRGINIA ♦ WILMINGTON ♦ BIRMINGHAM ♦ DUBAI ♦ CENTURY CITY ♦ RICHMOND ♦ GREECE

r e e d s m i t h . c o m

NYLIB-468497 1

# EXHIBIT M

**CASA DE CAMBIO MAJAPARA, SA DE CV**
**BANK BALANCE TO DECEMBER 31, 2007**
**(NATIONAL CURRENCY)**

| BANK | | ACCOUNT | BALANCE DEBIT | CREDIT |
|---|---|---|---|---|
| **CORPORATE** | | | | |
| BANCOMER NCE | 1 | 0442942933 | 44,424 | |
| BBV EXPENSES | 2 | 0150126306 | 314,234 | |
| BBV NCE | 3 | 0150126829 | 191,410 | |
| | | TOTAL AMOUNT | 550,068 | 0 |
| **MORELIA** | | | | |
| BANCOMER | 4 | 442943255 | 10,000 | |
| BANORTE | 5 | 877008029 | 7,931 | |
| BILBAO VIZCAYA | 6 | 0105315093 | 11,360 | |
| | | TOTAL AMOUNT | 29,291 | 0 |
| **GUADALAJARA** | | | | |
| BANCOMER GUADALAJARA | 7 | 442943069 | 2,191 | |
| BANORTE | 8 | 112010773 | 52,804 | |
| BANAMEX | 9 | 3210005235 | 80,045 | |
| INVERLAT | 10 | 5093252 | 93,602 | |
| BANCO DE COMERCIO INTERIOR | 11 | 2581116 | 9,504 | |
| BANAMEX | 12 | 432110786 | 7,710 | |
| | | TOTAL AMOUNT | 245,856 | 0 |

Majapara 0001

**CASA DE CAMBIO MAJAPARA, SA DE CV**
**BANK BALANCE TO DECEMBER 31, 2007**
**(NATIONAL CURRENCY)**

| BANK | | ACCOUNT | BALANCE DEBIT | CREDIT |
|------|---|---------|-------|--------|
| **COLIMA** | | | | |
| BBV BANCOMER | 13 | 0151516914 | 5,998 | |
| | | TOTAL AMOUNT | 5,998 | 0 |
| **VALLE ROJA** | | | | |
| BANCOMER | 15 | 0134538749 | 6,117 | |
| BANAMEX VALLE | 16 | 6095914223 | 171,032 | |
| | | TOTAL AMOUNT | 177,148 | 0 |
| **TLALNEPANTLA** | | | | |
| BANCOMER | 17 | 0442942917 | 146,612 | |
| BANAMEX | 18 | 183697701 | 3,074 | |
| BBV BANCOMER | 19 | 108111766 | 161,317 | |
| | | TOTAL AMOUNT | 311,003 | 0 |
| **AZUL** | | | | |
| BANCOMER (RETAIL) | 20 | 0442942909 | 94,022 | |
| BANAMEX | 21 | 2613664370 | 790 | |
| | | TOTAL AMOUNT | 94,813 | 0 |
| **HIDALGO** | | | | |

Majapara 0001

## CASA DE CAMBIO MAJAPARA, SA DE CV
## BANK BALANCE TO DECEMBER 31, 2007
## (NATIONAL CURRENCY)

| BANK | | ACCOUNT | DEBIT | BALANCE CREDIT |
|------|---|---------|-------|----------------|
| BBV BANCOMER TULANCINGO | 22 | 448246300 | 5,817 | |
| BBV BANCOMER IXMIQUILPAN | 23 | 448245347 | 5,942 | |
| BBV BANCOMER ZIMAPAN | 24 | 448245479 | 4,413 | |
| BBV BSNCOMER HUICHAPAN | 25 | 453158691 | 5,471 | |
| BBV BANCOMER TASQUILLO | 26 | 452875659 | 5,898 | |
| BBV BANCOMER ADMON | 27 | 448245339 | 5,005 | |
| BBV BANCOMER PACHUCA GRAL | 28 | 452920131 | 5,814 | |
| BBV BANCOMER APASEO | 29 | 453785610 | 4,934 | |
| BBV BANCOMER TECOZAUTLA | 31 | 134608720 | 5,853 | |
| BBV BANCOMER SN FELIPE GTO 2 | 32 | 141496050 | 0 | |
| BANORTE TAMAZUNCHALE | 33 | 27046266 | 0 | |
| BANORTE OJUELOS | 34 | 871009732 | 0 | |
| BBV BANCOMER TAMAZUNCHALE | 35 | 102843471 | 3,094 | |
| BBV BANCOMER QUERETARO | 36 | 104658191 | 4,116 | |
| BBV BANCOMER CHAPULHUACAN | 37 | 108870799 | 5,332 | |
| BBV BANCOMNER JACALA HGO. | 39 | 454752473 | 4,042 | |
| | | TOTAL AMOUNT | 65,731 | 0 |

| TREASURY OPERATIONS AND EXCHANGES | | | | |
|------|---|---------|-------|---|
| INVERLAT | 40 | 4570588 | 513,313 | |
| BANAMEX | 41 | 3746393 | 11,074 | |

Majapara 0001

**CASA DE CAMBIO MAJAPARA, SA DE CV**
**BANK BALANCE TO DECEMBER 31, 2007**
**(NATIONAL CURRENCY)**

| BANK | | ACCOUNT | DEBIT | BALANCE CREDIT |
|------|---|---------|------:|---------------:|
| BBV BANCOMER | 42 | 0442942925 | 143,860 | |
| BANORTE | 43 | 9660631 | 1,085,553 | |
| BANCOMER | 44 | 0442942992 | 3,850,504 | |
| BILBAO VIZCAYA | 45 | 0182765012 | 184,352 | |
| BANCO DEL BAJIO | 46 | 9706701014 | 71,434 | |
| BANCA AFIRME | 47 | 128404015 | 8,107,268 | |
| IXE BANCO S.A | 48 | 0011189347 | 7,928 | |
| BANCA MIFEL | 49 | 849201 | 177 | |
| BANAMEX | 50 | 118275696 | 0 | |
| BANCOMER HUB | 51 | 0147014597 | 4,881 | |
| BAJIO BRILLANTE | 52 | 3970671001 | 3,742 | |
| BANSI | 53 | 00097177066 | 49,957 | |
| BANSI EXECUTIVE | 54 | 00097183651 | 181,394 | |
| BANCO VE | 55 | 00000004774 | 2,416 | |
| BANORTE PAYMENTS | 56 | 0130082608 | 82,928 | |
| SCOTIA BANK PAYMENTS | 57 | 00103691934 | 23,760 | |
| BANAMEX TEF MAJUSA | 58 | 59724382 | 32,183 | |
| BANAMEX PAYMENTS | 59 | 701040 | 878,729 | |
| BANCO DE MEXICO SPEI | 60 | 612180000000000017 | 0 | |
| | | TOTAL AMOUNT | 15,235,452 | 0 |

Majapara 0001

## CASA DE CAMBIO MAJAPARA, SA DE CV
## BANK BALANCE TO DECEMBER 31, 2007
## (NATIONAL CURRENCY)

| BANK | | ACCOUNT | BALANCE DEBIT | BALANCE CREDIT |
|---|---|---|---|---|
| **VERDE** | | | | |
| BANCOMER | 61 | 0442942984 | 40,537 | |
| BANAMEX | 62 | 2615654631 | 728 | |
| | | TOTAL AMOUNT | 41,266 | 0 |
| **TLALNEPANTLA I** | | | | |
| BANCOMER | 63 | 442942976 | 157,905 | |
| | | TOTAL AMOUNT | 157,905 | 0 |
| **MINERVA** | | | | |
| BANCOMER | 65 | 442942968 | 152,844 | |
| BANAMEX | 66 | 5077293444 | 83,046 | |
| BBVA BANCOMER | 67 | 0150365319 | 35,203 | |
| | | TOTAL AMOUNT | 271,093 | 0 |
| **BAJIO** | | | | |
| BBV BANCOMER | 68 | 0454405285 | 1,151,528 | |
| BANAMEX BAJIO | 69 | 118312435 | 478,240 | |
| BANORTE | 70 | 596009492 | 2,069,409 | |
| BANCOMER HGO | 71 | 0101056077 | 62,613 | |
| INVERLAT | 73 | 4506357121 | 191,443 | |
| | | TOTAL AMOUNT | 3,953,233 | 0 |

Majapara 0001

## CASA DE CAMBIO MAJAPARA, SA DE CV
## BANK BALANCE TO DECEMBER 31, 2007
## (NATIONAL CURRENCY)

| BANK | ACCOUNT | | BALANCE DEBIT | BALANCE CREDIT |
|---|---|---|---|---|
| **GUADALUPE INN** | | | | |
| BBV BANCOMER | 74 | 0454516729 | 34,240 | |
| BANAMEX | 75 | 2615653821 | 4,635 | |
| | | TOTAL AMOUNT | 38,875 | 0 |
| **VERACRUZ** | | | | |
| BBV BANCOMER | 76 | 0132683768 | 2,169 | |
| BANAMEX | 77 | 3966670 | 102,212 | |
| | | TOTAL AMOUNT | 104,380 | 0 |
| **BOSQUES** | | | | |
| BANCOMER BOSQUES | 78 | 0100380946 | 3 | |
| BANCOMER TOLUCA | 79 | 0149332251 | 2 | |
| BANAMEX TOLUCA | 80 | 419821759 | 9,625 | |
| | | TOTAL AMOUNT | 9,630 | 0 |
| **VALLE AMARILLA** | | | | |
| BANCOMER AMARILLA BRANCH | 81 | 0442942895 | 5,696 | |
| BANAMEX AMARILLA BRANCH | 82 | 28302196269 | 9,919 | |

Majapara 0001

## CASA DE CAMBIO MAJAPARA, SA DE CV
## BANK BALANCE TO DECEMBER 31, 2007
## (NATIONAL CURRENCY)

| BANK | | ACCOUNT | BALANCE DEBIT | CREDIT |
|---|---|---|---|---|
| | | TOTAL AMOUNT | 15,616 | 0 |

| COLIMA CORPORATE | | | | |
|---|---|---|---|---|
| BANCOMER | 83 | 0442943174 | 3,564,019 | |
| BANORTE | 85 | 437007349 | 230,866 | |
| | | TOTAL AMOUNT | 3,794,884 | 0 |
| | | TOTAL | 25,102,241 | 0 |

### AMOUNTS SHOWING IN FINANCIAL STATEMENTS

| | | | | |
|---|---|---|---|---|
| NATIONAL BANKS NAT. CURRENCY | | | 25,102,241 | 0 |
| FOREIGN BANKS | | | 33,604,915 | 2,755,901 |
| | | TOTAL | 58,707,157 | 2,755,901 |

655,951,255.81

# CASA DE CAMBIO MAJAPARA, SA DE CV
## SALDO DE BANCOS AL 31 DICIEMBRE DE 2007
### (MONEDA NACIONAL)

| BANCO | | CUENTA | SALDOS DEUDOR | SALDOS ACREEDOR |
|---|---|---|---|---|
| **CORPORATIVO** | | | | |
| BANCOMER NCE | 1 | 0442942933 | 44,424 | |
| BBV GASTOS | 2 | 0150126306 | 314,234 | |
| BBV NCE | 3 | 0150126829 | 191,410 | |
| | | SUMA | 550,068 | 0 |
| **MORELIA** | | | | |
| BANCOMER | 4 | 442943255 | 10,000 | |
| BANORTE | 5 | 877008029 | 7,931 | |
| BILBAO VIZCAYA | 6 | 0105315093 | 11,360 | |
| | | SUMA | 29,291 | 0 |
| **GUADALAJARA** | | | | |
| BANCOMER GUADALAJARA | 7 | 442943069 | 2,191 | |
| BANORTE | 8 | 112010773 | 52,804 | |
| BANAMEX | 9 | 3210005235 | 80,045 | |
| INVERLAT | 10 | 5093252 | 93,602 | |
| BANCO DE COMERCIO INTERIOR | 11 | 2581116 | 9,504 | |
| BANAMEX | 12 | 432110786 | 7,710 | |
| | | SUMA | 245,856 | 0 |

# CASA DE CAMBIO MAJAPARA, SA DE CV
## SALDO DE BANCOS AL 31 DICIEMBRE DE 2007
### (MONEDA NACIONAL)

| BANCO | | CUENTA | SALDOS DEUDOR | SALDOS ACREEDOR |
|---|---|---|---|---|
| **COLIMA** | | | | |
| BBV BANCOMER | 13 | 0151516914 | 5,998 | |
| | | SUMA | 5,998 | 0 |
| **VALLE ROJA** | | | | |
| BANCOMER | 15 | 0134538749 | 6,117 | |
| BANAMEX VALLE | 16 | 6095914223 | 171,032 | |
| | | SUMA | 177,148 | 0 |
| **TLALNEPANTLA** | | | | |
| BANCOMER | 17 | 0442942917 | 146,612 | |
| BANAMEX | 18 | 183697701 | 3,074 | |
| BBV BANCOMER | 19 | 108111766 | 161,317 | |
| | | SUMA | 311,003 | 0 |
| **AZUL** | | | | |
| BANCOMER (MENUDEO) | 20 | 0442942909 | 94,022 | |
| BANAMEX | 21 | 2613664370 | 790 | |
| | | SUMA | 94,813 | 0 |
| **HIDALGO** | | | | |

**CASA DE CAMBIO MAJAPARA, SA DE CV**
**SALDO DE BANCOS AL 31 DICIEMBRE DE 2007**
**(MONEDA NACIONAL)**

| BANCO | | CUENTA | SALDOS | |
|-------|--|--------|--------|--|
| | | | DEUDOR | ACREEDOR |
| BBV BANCOMER TULANCINGO | 22 | 448246300 | 5,817 | |
| BBV BANCOMER IXMIQUILPAN | 23 | 448245347 | 5,942 | |
| BBV BANCOMER ZIMAPAN | 24 | 448245479 | 4,413 | |
| BBV BSNCOMER HUICHAPAN | 25 | 453158691 | 5,471 | |
| BBV BANCOMER TASQUILLO | 26 | 452875659 | 5,898 | |
| BBV BANCOMER ADMON | 27 | 448245339 | 5,005 | |
| BBV BANCOMER PACHUCA GRAL | 28 | 452920131 | 5,814 | |
| BBV BANCOMER APASEO | 29 | 453785610 | 4,934 | |
| BBV BANCOMER TECOZAUTLA | 31 | 134608720 | 5,853 | |
| BBV BANCOMER SN FELIPE GTO 2 | 32 | 141496050 | 0 | |
| BANORTE TAMAZUNCHALE | 33 | 27046266 | 0 | |
| BANORTE OJUELOS | 34 | 871009732 | 0 | |
| BBV BANCOMER TAMAZUNCHALE | 35 | 102843471 | 3,094 | |
| BBV BANCOMER QUERETARO | 36 | 104658191 | 4,116 | |
| BBV BANCOMER CHAPULHUACAN | 37 | 108870799 | 5,332 | |
| BBV BANCOMNER JACALA HGO. | 39 | 454752473 | 4,042 | |
| | | SUMA | 65,731 | 0 |

| TESORERÍA Y CAMBIOS | | | | |
|---------------------|--|---------|---------|--|
| INVERLAT | 40 | 4570588 | 513,313 | |
| BANAMEX | 41 | 3746393 | 11,074 | |

CASA DE CAMBIO MAJAPARA, SA DE CV
SALDO DE BANCOS AL 31 DICIEMBRE DE 2007
(MONEDA NACIONAL)

| | | | SALDOS | |
|---|---|---|---|---|
| BANCO | | CUENTA | DEUDOR | ACREEDOR |
| BBV BANCOMER | 42 | 0442942925 | 143,860 | |
| BANORTE | 43 | 9660631 | 1,085,553 | |
| BANCOMER | 44 | 0442942992 | 3,850,504 | |
| BILBAO VIZCAYA | 45 | 0182765012 | 184,352 | |
| BANCO DEL BAJIO | 46 | 9706701014 | 71,434 | |
| BANCA AFIRME | 47 | 128404015 | 8,107,268 | |
| IXE BANCO S.A | 48 | 0011189347 | 7,928 | |
| BANCA MIFEL | 49 | 849201 | 177 | |
| BANAMEX | 50 | 118275696 | 0 | |
| BANCOMER CONCENTRADORA | 51 | 0147014597 | 4,881 | |
| BAJIO BRILLANTE | 52 | 3970671001 | 3,742 | |
| BANSI | 53 | 00097177066 | 49,957 | |
| BANSI EJECUTIVA | 54 | 00097183651 | 181,394 | |
| BANCO VE | 55 | 0000004774 | 2,416 | |
| BANORTE PAGADORA | 56 | 0130082608 | 82,928 | |
| SCOTIA BANK PAGADORA | 57 | 00103691934 | 23,760 | |
| BANAMEX TEF MAJUSA | 58 | 59724382 | 32,183 | |
| BANAMEX PAGADORA | 59 | 701040 | 878,729 | |
| BANCO DE MEXICO SPEI | 60 | 612180000000000017 | 0 | |
| | | SUMA | 15,235,452 | 0 |

CASA DE CAMBIO MAJAPARA, SA DE CV
SALDO DE BANCOS AL 31 DICIEMBRE DE 2007
(MONEDA NACIONAL)

| BANCO | | CUENTA | SALDOS | |
|---|---|---|---|---|
| | | | DEUDOR | ACREEDOR |
| **VERDE** | | | | |
| BANCOMER | 61 | 0442942984 | 40,537 | |
| BANAMEX | 62 | 2615654631 | 728 | |
| | | SUMA | 41,266 | 0 |
| **TLALNEPANTLA I** | | | | |
| BANCOMER | 63 | 442942976 | 157,905 | |
| | | SUMA | 157,905 | 0 |
| **MINERVA** | | | | |
| BANCOMER | 65 | 442942968 | 152,844 | |
| BANAMEX | 66 | 5077293444 | 83,046 | |
| BBVA BANCOMER | 67 | 0150365319 | 35,203 | |
| | | SUMA | 271,093 | 0 |
| **BAJIO** | | | | |
| BBV BANCOMER | 68 | 0454405285 | 1,151,528 | |
| BANAMEX BAJIO | 69 | 118312435 | 478,240 | |
| BANORTE | 70 | 596009492 | 2,069,409 | |
| BANCOMER HGO | 71 | 0101056077 | 62,613 | |
| INVERLAT | 73 | 4506357121 | 191,443 | |
| | | SUMA | 3,953,233 | 0 |

# CASA DE CAMBIO MAJAPARA, SA DE CV
## SALDO DE BANCOS AL 31 DICIEMBRE DE 2007
### (MONEDA NACIONAL)

| | BANCO | CUENTA | SALDOS DEUDOR | SALDOS ACREEDOR |
|---|---|---|---|---|
| **GUADALUPE INN** | | | | |
| 74 | BBV BANCOMER | 0454516729 | 34,240 | |
| 75 | BANAMEX | 2615653821 | 4,635 | |
| | | SUMA | 38,875 | 0 |
| **VERACRUZ** | | | | |
| 76 | BBV BANCOMER | 0132683768 | 2,169 | |
| 77 | BANAMEX | 3966670 | 102,212 | |
| | | SUMA | 104,380 | 0 |
| **BOSQUES** | | | | |
| 78 | BANCOMER BOSQUES | 0100380946 | 3 | |
| 79 | BANCOMER TOLUCA | 0149332251 | 2 | |
| 80 | BANAMEX TOLUCA | 419821759 | 9,625 | |
| | | SUMA | 9,630 | 0 |
| **VALLE AMARILLA** | | | | |
| 81 | BANCOMER SUC. AMARILLA | 0442942895 | 5,696 | |
| 82 | BANAMEX SUC. AMARILLA | 28302196269 | 9,919 | |

# CASA DE CAMBIO MAJAPARA, SA DE CV
## SALDO DE BANCOS AL 31 DICIEMBRE DE 2007
### (MONEDA NACIONAL)

| BANCO | | CUENTA | SALDOS | |
|---|---|---|---|---|
| | | | DEUDOR | ACREEDOR |
| | | SUMA | 15,616 | 0 |
| **COLIMA CORPORATIVO** | | | | |
| BANCOMER | 83 | 0442943174 | 3,564,019 | |
| BANORTE | 85 | 437007349 | 230,866 | |
| | | SUMA | 3,794,884 | 0 |
| | | TOTAL | 25,102,241 | 0 |

## CIFRAS PRESENTADAS EN ESTADOS FINANCIEROS

| | | DEUDOR | ACREEDOR |
|---|---|---|---|
| BANCOS DEL PAÍS M.N. | | 25,102,241 | 0 |
| BANCOS DEL EXTRANJERO | | 33,604,915 | 2,755,901 |
| TOTAL | | **58,707,157** | **2,755,901** |

$55,951,255.81



**TRANSPERFECT**

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
MIAMI
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PORTLAND
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
SYDNEY
TOKYO
TORONTO

City of New York, State of New York, County of New York

I, Jessica Majestic, hereby certify that the following is, to the best of my knowledge, ability and belief, a true and accurate translation of the document 'Assets and Liabilities Majapara 001' from Spanish into English.

Jessica Majestic

Sworn to before me this
4th day of February 2008

Signature, Notary Public

PAUL D. RALSTON
Notary Public, State of New York
No. 01RA6023867
Qualified in Queens County
Commission Expires May 3. 20 11

Stamp, Notary Public

# EXHIBIT M

## CASA DE CAMBIO MAJAPARA, SA DE CV
### BANK BALANCE TO DECEMBER 31, 2007 (NATIONAL CURRENCY)

| FOREIGN BANKS | | ACCOUNT | BALANCE DEBTOR | BALANCE CREDITOR | CURRENCY | EXCHANGE TYPE | APPRAISED DEBTOR | APPRAISED CREDITOR |
|---|---|---|---|---|---|---|---|---|
| TREASURY OP. AND EXCHANGES | | | | | | | | |
| BANAMEX DLLS MEX | 1 | 2619260247 | 1,316,124.34 | | USD | 10.9188 | 14,370,607.63 | 0.00 |
| BANORTE | 2 | 103207789 | 42,770.77 | | USD | 10.9188 | 467,005.48 | 0.00 |
| WACHOVIA BANK | 3 | 192304201 | | 103,091.55 | USD | 10.9188 | 0.00 | 1,125,636.02 |
| BANCOMER DLLS MEX | 5 | 0442943107 | 139,985.15 | | USD | 10.9188 | 1,528,469.86 | 0.00 |
| HYPOVEREINS BANK | 7 | 805728213 | 0.00 | | USD | 10.9188 | 0.00 | 0.00 |
| BANCO DEL BAJIO | 8 | 3970670401 | 1,244.71 | | USD | 10.9188 | 13,590.74 | 0.00 |
| BANCA IXE | 9 | 90007212 | 4,693.88 | | USD | 10.9188 | 51,251.54 | 0.00 |
| HARRYS BANK | 11 | 2004919 | 109,622.71 | | USD | 10.9188 | 1,196,948.45 | 0.00 |
| ZIONS BANK | 13 | 227000148 | | 0.00 | USD | 10.9188 | 0.00 | 0.00 |
| CITY BANK NWE YORK | 16 | 36254838 | 708,970.71 | | USD | 10.9188 | 7,741,109.39 | 0.00 |
| ROYAL BANK OF CANADA | 17 | 0040951406995 | 183,766.41 | | USD | 10.9188 | 2,006,508.68 | 0.00 |
| ROYAL BANK OF CANADA | 18 | 3095911028 | 159,924.35 | | CND | 11.0545 | 1,767,883.73 | 0.00 |
| BANCO SABADELL | 19 | 03372001 | 42,522.70 | | GBP | 21.6454 | 920,420.85 | 0.00 |
| ABN AMOR BANK | 20 | N211252A65 | 18,490.41 | | CHF | 9.6677 | 178,759.74 | 0.00 |
| HYPOVEREINSBANK | 21 | 802836104 | 7,198.91 | | CHF | 9.6677 | 69,596.90 | 0.00 |
| HYPO BANK | 23 | 5803611035 | 0.00 | 101,724.97 | EUR | 16.0262 | 0.00 | 1,630,264.71 |
| BANCO SABADELL | 24 | 9033355149 | 36,589.50 | | EUR | 16.0262 | 586,390.64 | 0.00 |
| BANCOMER EUROS | 25 | 148323763 | 454.96 | | EUR | 16.0262 | 7,291.28 | 000 |
| CALYON FIBAS S/FRANCE | 26 | 0022145022 4 | 114,939.75 | | EUR | 16.0262 | 1,842,047.4ⁿ | 0.00 |
| | | | **2,887,309.26** | **204,815.52** | | | **32,747,882.32** | **2,755,900.73** |
| | | | | 2,682,492.74 | | | | |

**GUADALAJARA**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| BANCO BILBAO VIZCAYA | 27 | 0190954799 | 51,567.47 | | USD | 10.9188 | 563,054.89 | 0.00 |
| BANAMEX | 28 | 3219000279 | 13,409.21 | | USD | 10.9188 | 146,412.48 | 0.00 |
| BANCO DE COMERCIO INT. | 29 | 2581728 | 143.62 | | USD | 10.9188 | 1,568.16 | 0.00 |
| BANCRECER | 30 | 134870700 0 | 3,752.75 | | USD | 10.9188 | 40,975.53 | 0.00 |
| SUBTOTAL | | | **68,873.05** | **0.00** | | | **752,011.1** | **0.00** |
| | | | | | | | 68,873.05 | |

Page 1 of 2

Majapara 0002

## CASA DE CAMBIO MAJAPARA, SA DE CV
## BANK BALANCE TO DECEMBER 31, 2007
### (NATIONAL CURRENCY)

| | ACCOUNT | BALANCE DEBTOR | BALANCE CREDITOR | CURRENCY | EXCHANGE TYPE | APPRAISED DEBTOR | APPRAISED CREDITOR |
|---|---|---|---|---|---|---|---|
| **COLIMA** | | | | | | | |
| BANCOMER 31 | 042943166 | 7,272.58 | | USD | 10.9188 | 79,407.85 | 0.00 |
| SUBTOTAL | | 7,272.58 | 0.00 | | | 79,407.85 | 0.00 |
| | | 7,272.58 | | | | | |
| **FOREIGN BANKS** | | | | | | | |
| **MINERVA** | | | | | | | |
| BANCOMER 32 | 442943077 | 0.00 | | USD | 10.9188 | 0.00 | 0.00 |
| SUBTOTAL | | 0.00 | 0.00 | | | 0.00 | 0.00 |
| | | 0.00 | | | | | |
| **BAJIO** | | | | | | | |
| BANCOMER 33 | 454405315 | 2,005.30 | | USD | 10.9188 | 21,895.47 | 0.00 |
| BANORTE MTY 34 | 103839408 | 340.58 | | USD | 10.9188 | 3,718.72 | 0.00 |
| SUBTOTAL | | 2,345.88 | 0.00 | | | 25,614.19 | 0.00 |
| | | 2,345.88 | | | | | |
| TOTAL | | 2,965,800.77 | 204,816.52 | | | 33,604,915.42 | 2,755,900.73 |

Majapara 0002

## CASA DE CAMBIO MAJAPARA, SA DE CV
## SALDO DE BANCOS AL 31 DICIEMBRE DE 2007
### (MONEDA EXTRANJERA)

| BANCOS DEL EXTRANJERO TESORERIA Y CAMBIOS | | CUENTA | SALDOS DEUDOR | ACREEDOR | DIVISA | TIPO DE CAMBIO | VALORIZADO DEUDOR | ACREEDOR |
|---|---|---|---|---|---|---|---|---|
| BANAMEX DLLS MEX | 1 | 2619260247 | 1,316,134.34 | | USD | 10.9188 | 14,370,607.63 | 0.00 |
| BANORTE | 2 | 103207789 | 42,770.77 | | USD | 10.9188 | 467,005.48 | 0.00 |
| WACHOVIA BANK | 3 | 192304201 | | 103,091.55 | USD | 10.9188 | 0.00 | 1,125,636.02 |
| BANCOMER DLLS MEX | 5 | 0442943107 | 139,985.15 | | USD | 10.9188 | 1,528,469.86 | 0.00 |
| HYPOVEREINS BANK | 7 | 805728213 | 0.00 | | USD | 10.9188 | 0.00 | 0.00 |
| BANCO DEL BAJIO | 8 | 3970670401 | 1,244.71 | | USD | 10.9188 | 13,590.74 | 0.00 |
| BANCA IXE | 9 | 90007212 | 4,693.88 | | USD | 10.9188 | 51,251.54 | 0.00 |
| HARRYS BANK | 11 | 2004919 | 109,622.71 | | USD | 10.9188 | 1,196,948.45 | 0.00 |
| ZIONS BANK | 13 | 227000148 | | 0.00 | USD | 10.9188 | 0.00 | 0.00 |
| CITY BANK NWE YORK | 16 | 36254838 | 708,970.71 | | USD | 10.9188 | 7,741,109.39 | 0.00 |
| ROYAL BANK OF CANADA | 17 | 004095140069995 | 183,765.41 | | USD | 10.9188 | 2,006,508.68 | 0.00 |
| ROYAL BANK OF CANADA | 18 | 3095911028 | 159,924.35 | | CND | 11.0545 | 1,767,883.73 | 0.00 |
| ABN SABADELL | 19 | 03377001 | 42,522.70 | | GBP | 21.6454 | 920,420.85 | 0.00 |
| ABN AMOR BANK | 20 | N21252A65 | 18,490.41 | | CHF | 9.6677 | 178,759.74 | 0.00 |
| HYPOVEREINSBANK | 21 | 802836104 | 7,198.91 | | CHF | 9.6677 | 69,596.90 | 0.00 |
| HYPO BANK | 23 | 5803611035 | 0.00 | 101,724.97 | EUR | 16.0262 | 0.00 | 1,630,264.71 |
| BANCO SABADELL | 24 | 9033355149 | 36,589.50 | | EUR | 16.0262 | 586,390.64 | 0.00 |
| BANCOMER EUROS | 25 | 148323763 | 454.96 | | EUR | 16.0262 | 7,291.28 | 0.00 |
| CALYON FIBAS S/FRANCIA | 26 | 0221450224 | 114,939.75 | | EUR | 16.0262 | 1,842,047.42 | 0.00 |
| SUBTOTAL | | | 2,887,309.26 | 204,816.52 | | | 32,747,882.32 | 2,755,900.73 |

2,682,492.74

| GUADALAJARA | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| BANCO BILBAO VIZCAYA | 27 | 0190954799 | 51,567.47 | | USD | 10.9188 | 563,054.89 | 0.00 |
| BANAMEX | 28 | 3219000279 | 13,409.21 | | USD | 10.9188 | 146,412.48 | 0.00 |
| BANCO DE COMERCIO INT. | 29 | 2581728 | 143.62 | | USD | 10.9188 | 1,568.16 | 0.00 |
| BANCRECER | 30 | 134870700 | 3,752.75 | | USD | 10.9188 | 40,975.53 | 0.00 |
| SUBTOTAL | | | 68,873.05 | 0.00 | | | 752,011.1 | 0.00 |

68,873.05

| COLIMA | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| BANCOMER | 31 | 0442943166 | 7,272.58 | | USD | 10.9188 | 79,407.85 | 0.00 |

Majapara 0002

## CASA DE CAMBIO MAJAPARA, SA DE CV
## SALDO DE BANCOS AL 31 DICIEMBRE DE 2007
### (MONEDA EXTRANJERA)

| BANCOS DEL EXTRANJERO | CUENTA | SALDOS DEUDOR | SALDOS ACREEDOR | DIVISA | TIPO DE CAMBIO | VALORIZADO DEUDOR | VALORIZADO ACREEDOR |
|---|---|---|---|---|---|---|---|
| | SUBTOTAL | 7,272.58 | 0.00 | | | 79,407.85 | 0.00 |
| MINERVA | | | 7,272.58 | | | | |
| BANCOMER | 32 | | | | | | |
| | 42943077 | | | | | | |
| | SUBTOTAL | 0.00 | 0.00 | | | 0.00 | 0.00 |
| | | | 0.00 | | | | |
| BAJIO | | | | | | | |
| BANCOMER | 33 | 2,005.30 | | USD | 10.9188 | 21,895.47 | 0.00 |
| | 45440531S | | | | | | |
| BANORTE MTY | 34 | 340.58 | | USD | 10.9188 | 3,718.72 | 0.00 |
| | 103839408 | | | | | | |
| | SUBTOTAL | 2,345.88 | 0.00 | | | 25,614.19 | 0.00 |
| | | | 2,345.88 | | | | |
| TOTAL | | 2,965,800.77 | 204,816.52 | | | 33,604,915.42 | 2,755,900.73 |

Page 2 of 2



**TRANSPERFECT**

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
MIAMI
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PORTLAND
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
SYDNEY
TOKYO
TORONTO
WASHINGTON DC

City of New York, State of New York, County of New York

I, Jessica Majestic, hereby certify that the following is, to the best of my knowledge, ability and belief, a true and accurate translation of the document 'Assets and Liabilities Majapara 002' from Spanish into English.

Jessica Majestic

Sworn to before me this
4th day of February 2008

Signature, Notary Public

PAUL D. RALSTON
Notary Public, State of New York
No. 01RA6023867
Qualified in Queens County
Commission Expires May 3. 2011

Stamp, Notary Public

Majapara 0003

## "ANALYSIS ON THE DISTRIBUTION OF FINANCIAL RESOURCES"
### DATE OF REPORT ON CLOSING OF OPERATIONS TO DECEMBER 31, 2007

| ITEM | AMOUNTS IN NAT. CURRENCY | |
|---|---|---|
| | PARTIAL | TOTAL |
| | | 17,971,390 |
| **CASH FLOW** | | |
| NATIONAL CURRENCY | 4,182,343 | |
| CURRENCIES | 13,590,691 | |
| GOLD AND SILVER | 198,356 | |
| | | 55,951,256 |
| **BANKS** | | |
| NATIONAL CURRENCY | 25,102,241 | |
| FOREIGN CURRENCY | 30,849,015 | |
| SBC BANCOMER MEX | 0 | 0 |
| **INVESTMENTS** | | |
| NATIONAL CURRENCY | | |
| FOREIGN CURRENCY | | |
| | | 0 |
| **REMITTANCES (sent to)** | | |
| NATIONAL BANKS | 0 | |
| FOREIGN BANKS | 0 | |
| **REMITTANCES (sent to)** | | 65,513 |
| CANADA | 6,000 | |
| | | 1,205,749 |
| **IMMEDIATE COLLECTION DOCUMENTS** | | |
| NATIONAL CURRENCY | 148 | |
| FOREIGN CURRENCY | 1,205,601 | |

Majapara 0003

# "ANALYSIS ON THE DISTRIBUTION OF FINANCIAL RESOURCES"
## DATE OF REPORT ON CLOSING OF OPERATIONS TO DECEMBER 31, 2007

| ITEM | AMOUNTS IN NAT. CURRENCY | |
| --- | --- | --- |
| | PARTIAL | TOTAL |
| 110,415.12 | | |
| TRANSFERS PENDING RECEIPT | | |
| TRANSACTIONS PENDING RECEIPT | | |
| OTHERS (SPECIFY ITEM) | | |
| TOTAL LIQUID ASSETS | | 75,193,908 |
| TLALNEPANTLA USD DEBTORS | 6,155,144 | 67,206,788 |
| QUERETARO USD DEBTORS | 1,599,106 | 17,460,316 |
| BANKS NAT. CURRENCY BRANCHES PENDING ENTRIES (RECEIVABLES) | | 50,000,000 |
| OTHER ASSETS | | 134,667,104 |
| FIXED ASSETS | | 57,626,608 |
| LESS: | | |
| DRAFTS IN TRANSIT | | |
| USD BANKS | 15,755,593 | 172,032,173 |
| EUR BANK | 488,418 | 7,827,477 |
| CND BANK | 102,510 | 1,133,197 |
| GBP BANK | 4,342 | 93,988 |
| CHF BANK | 25,124 | 242,891 |
| CHECKS DRAWN ON USD BANKS | | |

Majapara 0003

## "ANALYSIS ON THE DISTRIBUTION OF FINANCIAL RESOURCES"
### DATE OF REPORT ON CLOSING OF OPERATIONS TO DECEMBER 31, 2007

| ITEM | AMOUNTS IN NAT. CURRENCY | |
| --- | --- | --- |
| | PARTIAL | TOTAL |
| *CHECKS DRAWN ON NATIONAL BANKS* | | |
| *DOCUMENTS SOLD ON CONSIGNMENT* | | |
| *TRANSFERS TO CLIENTS PENDING PAYMENT* | USD 12,602,739.52 | 137,606,792 |
| *WACHOVIA BANK* | USD 22,000,000 | 240,213,600 |
| *ZIONS BANK 1,650,000 DOLLARS* | USD 1,650,000 | 18,016,020 |
| *OTHERS (SPECIFY ITEM)* | | |
| *Payment to personnel* | | 40,000,000 |
| **TOTAL IMMEDIATE OBLIGATIONS** | | **617,166,139** |
| MARGIN OR (SHORTAGE OF RESOURCES) NATIONAL CURRENCY | | -349,678,520 |

## "ANALISIS DE LA DISTRIBUCIÓN DE RECURSOS FINANCIEROS"
### FECHA DEL REPORTE AL CIERRE DE OPERACIONES DEL 31 DE DICIEMBRE DE 2007

| CONCEPTO | IMPORTES M.N. | |
|---|---|---|
| | PARCIAL | TOTAL |
| **CAJA** | | 17,971,390 |
| MONEDA NACIONAL | 4,182,343 | |
| DIVISAS | 13,590,691 | |
| ORO Y PLATA | 198,356 | |
| | | |
| **BANCOS** | | 55,951,256 |
| MONEDA NACIONAL | 25,102,241 | |
| MONEDA EXTRANJERA | 30,849,015 | |
| SBC BANCOMER MEX | 0 | 0 |
| | | |
| **INVERSIONES** | | |
| MONEDA NACIONAL | | |
| MONEDA EXTRANJERA | | |
| **REMESAS(enviadas a)** | | 0 |
| BANCOS DEL PAIS | 0 | |
| BANCOS DEL EXTRANJERO | 0 | |
| | | |
| **REMESAS(enviadas a)** | | |
| CANADA | 6,000 | 65,513 |
| | | |
| **DOCTOS. DE COBRO INMEDIATO** | | 1,205,749 |
| MONEDA NACIONAL | 148 | |
| MONEDA EXTRANJERA | 1,205,601 | |

## "ANALISIS DE LA DISTRIBUCIÓN DE RECURSOS FINANCIEROS"
### FECHA DEL REPORTE AL CIERRE DE OPERACIONES DEL 31 DE DICIEMBRE DE 2007

| CONCEPTO | IMPORTES M.N. | |
|---|---|---|
| | PARCIAL | TOTAL |
| 110,415.12 | | |
| *TRANSFERENCIAS PENDIENTES DE RECIBIR* | | |
| *OPERACIONES PENDIENTES DE RECIBIR* | | |
| *OTROS (ESPECIFICAR CONCEPTO)* | | |
| TOTAL RECURSOS LIQUIDOS | | 75,193,908 |
| *DEUDORES TLALNEPANTLA USD* | 6,155,144 | 67,206,788 |
| *DEUDORES QUERETARO USD* | 1,599,106 | 17,460,316 |
| *PARTIDAS PENDIENTES BANCOS SUCS MN (POR COBRAR)* | | 50,000,000 |
| *OTROS ACTIVOS* | | *134,667,104* |
| *ACTIVOS FIJOS* | | *57,626,608* |
| MENOS: | | |
| *GIROS EN TRANSITO* | | |
| *BANCOS USD* | 15,755,593 | 172,032,173 |
| *BANCO EUR* | 488,418 | 7,827,477 |
| *BANCO CND* | 102,510 | 1,133,197 |
| *BANCO GBP* | 4,342 | 93,988 |
| *BANCO CHF* | 25,124 | 242,891 |
| *CHEQUES A CARGO DE BANCOS USD* | | |

## "ANALISIS DE LA DISTRIBUCIÓN DE RECURSOS FINANCIEROS"
### FECHA DEL REPORTE AL CIERRE DE OPERACIONES DEL 31 DE DICIEMBRE DE 2007

| CONCEPTO | IMPORTES M.N. | |
|---|---|---|
| | PARCIAL | TOTAL |
| CHEQUES A CARGO DE BANCOS DEL PAIS | | |
| DOCTOS. VENDIDOS A CONSIGNACION | | |
| TRANSFERENCIAS PENDIENTES DE PAGO A CLIENTES | USD 12,602,739.52 | 137,606,792 |
| WACHOVIA BANK | USD 22,000,000 | 240,213,600 |
| ZIONS BANK 1,650,000 DOLARES | USD 1,650,000 | 18,016,020 |
| OTROS (ESPECIFICAR CONCEPTO) Luiquidacion personal | | 40,000,000 |
| TOTAL OBLIGACIONES INMEDIATAS | | 617,166,139 |
| MARGEN O (FALTANTE DE RECURSOS) MONEDA NACIONAL | | 3491,678,920 |



**TRANSPERFECT**

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
MIAMI
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PORTLAND
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
SYDNEY
TOKYO
TORONTO
VANCOUVER

City of New York, State of New York, County of New York

I, Jessica Majestic, hereby certify that the following is, to the best of my knowledge, ability and belief, a true and accurate translation of the document 'Assets and Liabilities Majapara 003' from Spanish into English.

Jessica Majestic

Sworn to before me this
4th day of February 2008

Signature, Notary Public

PAUL D. RALSTON
Notary Public, State of New York
No. 01RA6023867
Qualified in Queens County
Commission Expires May 3, 20 ᑌ

Stamp, Notary Public

Majapara 0004

<u>**Víctor Modesto Chávez Castro, Architect**</u>
Appraiser

## MAJAPARA APPRAISALS UPDATE

**Casa de Cambio Majapara, S.A. de C.V.**

As requested, the value of the properties appraised in April 2006 has been updated in accordance with the characteristics of each property and each location in particular.

| Location | Property | Current value |
|---|---|---|
| 1. Lago Margarita 38, Granada Miguel Hidalgo District, Mexico, F.D. | Lot | $ 7,706,853 |
| 2. Lago Margarita 16, Granada Miguel Hidalgo District, Mexico, F.D. | Building site | $24,300,276 |
| 3. Juárez 117, Centro Colima, Col. | Building site | $4,815,393 |
| 4. Pino Suárez 166, Centro Morelia, Mich. | Building site | $5,527,435 |
| 5. Av. López Mateos 157, Centro Tecomán, Col. | Building site | $804,358 |
| 6. Sor Juana Inés de la Cruz 18, offices 103 and 104 and parking bays 42, 43, 45, 48 and 51, Centro Tlalnepantla, Mexico State, Zip Code 54000 | Building site | $2,549,742 |
| 7. Grecia 64, San Alvaro, Atzcapotzalco District, Zip Code 02090 | Building site | $7,038,017 |
| 8. Guayaquil 2746, Providencia Guadalajara, Jal. | Building site | $4,884,534 |
| | | $57,626,608 |

This update is issued for all pertinent purposes.

Mexico, F.D., February 9, 2007

Víctor Chavez Castro, Architect
Appraiser
[signature]

Rodríguez Saro 127 P.H.
Tel.: 55 34 67 94 – Mobile: 555 105 6765
E-mail: gamburin@igo.com.mx



Arq. Víctor Modesto Chávez Castro

Perito Valuador

Majapara 0004

# ACTUALIZACION DE AVALUOS DE MAJAPARA

**Casa de Cambio Majapara, S. A. de C. V.**

Conforme a su solicitud, se ha actualizado el valor de los inmuebles valuados en Abril de 2006, de acuerdo a las consideraciones de cada inmueble y de cada plaza en particular.

|   | Ubicación | Inmueble | Valor actual |
|---|-----------|----------|--------------|
| 1 | Lago Margarita 38, col. Granada<br>Deleg. Miguel Hidalgo, México, D. F. | Terreno | $ 7,706,853 |
| 2 | Lago Margarita 16, col. Granada<br>Deleg. Miguel Hidalgo, México, D. F. | Construcción | $ 24,300,276 |
| 3 | Juárez 117, col. Centro<br>Colima, Col. | Construcción | $ 4,815,393 |
| 4 | Pino Suárez 166, col. Centro<br>Morelia, Mich. | Construcción | $ 5,527,435 |
| 5 | Av. López Mateos 157, col. Centro<br>Tecomán, Col. | Construcción | $ 804,358 |
| 6 | Sor Juana Inés de la Cruz 18, oficinas 103 y 104 y<br>cajones de estacionamiento 42, 43, 45, 48 y 51<br>col. Centro<br>Tlalnepantla, Edo. De Méx. C. P. 54000 | Construcción | $ 2,549,742 |
| 7 | Grecia 64, col. San Alvaro<br>Deleg. Atzcapotzalco, C. P. 02090 | Construcción | $ 7,038,017 |
| 8 | Guayaquil 2746, col. Providencia<br>Guadalajara, Jal. | Construcción | $ 4,884,534 |
|   |   |   | $ 57,626,608 |

Se expide la presente actualización para los efectos a que haya lugar.

México, D. F., 9 de febrero de 2007

Arq. Víctor Chávez Castro
Perito Valuador

Rodríguez Saro 127 P. H. º
Tel. 55 34 67 94 º Móvil: 555 105 6765
E-mail: gamburin@igo.com.mx


**TRANSPERFECT**

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
MIAMI
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PORTLAND
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
SYDNEY
TOKYO
TORONTO

City of New York, State of New York, County of New York

I, Jessica Majestic, hereby certify that the following is, to the best of my knowledge, ability and belief, a true and accurate translation of the document 'Assets and Liabilities Majapara 004' from Spanish into English.

Jessica Majestic

Sworn to before me this
4th day of February 2008

Signature, Notary Public

PAUL D. RALSTON
Notary Public, State of New York
No. 01RA6023867
Qualified in Queens County
Commission Expires May 3, 2011

Stamp, Notary Public

# EXHIBIT N

**McKessy, Scott S.**

| | |
|---|---|
| **From:** | McKessy, Scott S. |
| **Sent:** | Saturday, January 12, 2008 5:36 PM |
| **To:** | 'LBraganca@sperling-law.com' |
| **Cc:** | McKessy, Scott S. |
| **Subject:** | Re: Wachovia v. Majapara - Documents Sent January 11, 2008 to Wachovia Counsel |

Dear Lisa -- thank you for your response. I am in the process of compiling all of the documents supplied to the court and will be forwarding them to your in short order. Included in that production will be affidavits of service for all of the documents served upon Majapara as well. You will see that these documents confirm Majapara received notice of the New York hearing -- which you confirmed in our conversation wherein you told me that Majapara actually showed up to court the afternoon of December 21st for a hearing (which the Court moved up to Thursday, December 20th).

Also, please confirm for me that your client is in full compliance with the Orders issued from this Court. I look forward to that confirmation by close of business on Monday.

Regards

Scott

----- Original Message -----
From: Lisa Braganca <LBraganca@sperling-law.com>
To: McKessy, Scott S.
Sent: Fri Jan 11 21:37:17 2008
Subject: Wachovia v. Majapara - Documents Sent January 11, 2008 to Wachovia Counsel

To:      Scott S. McKessy, Reed Smith LLP

From:    Celiza P. Braganca, Sperling & Slater, P.C.

Date:    January 11, 2008 (8:35 p.m. Central Time)

Re:      Wachovia v Majapara

Dear Scott:

Without waiving any arguments as to the authority of either the U.S. District Court for the SDNY or the Illinois State Court to order Majapara to produce information or any objections we may have to your interrogatories and document requests, I hereby provide to you information about the assets and liabilities of Majapara.

You have mentioned in our previous conversations that there is no question that Majapara received notice of the hearings in the Illinois State Court action and the SDNY action. I would appreciate your providing me with any documentation you have of delivery of the notice provided to Majapara (such as FedEx delivery records or fax confirmation sheets).

Also, I do not see anything on the docket for the SDNY action documenting the change in the date of hearing on the Order

1

to Show Cause. It was originally noticed for December 21, 2007, but was actually held one day earlier on December 20, 2007. Please provide any proof of service that you provided to the Court and any documentation you have that notice was given to Majapara that the hearing date had been changed to December 20.

Thank you.

Lisa Braganca

-----Original Message-----
From: McKessy, Scott S. [mailto:SMcKessy@ReedSmith.com]
Sent: Friday, January 11, 2008 6:23 PM
To: Lisa Braganca
Subject: Wachovia v. Majapara (SDNY)

Lisa - pursuant to the Court's order, today was the last day for Majapara to provide me with a list (by description and location) of all of its assets. You have not provided the court-directed information and your client is, once again, violating the Court's order.

Scott McKessy

* * *

2

# EXHIBIT O

[Letterhead]
Majapara
Exchange Bank

Mexico City, December 13, 2007

Main office
[Contact information]

[List of branch offices]

**Carlos A. Perez**
**Managing Director**
**Wachovia Bank, N.A.**

Dear Carlos:

I would like to confirm the main points of the phone conversation we had today:

1.  MAJAPARA acknowledges the debt it owes Wachovia and is doing everything it can to pay that debt as quickly as possible.
2.  That debt originated from the unexpected cancelation of the operating lines that Wachovia provided MAJAPARA for many years.  A reasonable time period would have allowed us to replace the lines provided by Wachovia with lines from another bank.
3.  The lines that Wachovia provided MAJAPARA were in turn provided to MAJAPARA's clients.  We are recovering those funds, but our clients, in turn, need a reasonable time period to replace those lines.
4.  We understand that it is undesirable for Wachovia to have that debt, and we are prepared to guarantee it with MAJAPARA shares (we would even consider the option of capitalizing the debt).
5.  MAJAPARA is a leader in the field of PLD, and the bank has more than 15,000 clients and more than 500 employees.  It has a market value of approximately $70,000,000 [source: 70,0000,000] so it is more than capable of guaranteeing the debt owed Wachovia.
6.  Together we need to find a win-win solution for Wachovia and MAJAPARA.  The business could lose market value if Wachovia takes actions that impede MAJAPARA's operations.  Shut down, the business would only be worth $10 million, leading to losses for both Wachovia and MAJAPARA.

We appreciate your understanding of the inconveniences that have arisen, and we reiterate our desire to work together to find a prompt solution to this problem.

Sincerely

[signature]

Jorge Ortiz Muñoz
CEO

[illegible]
ISO
9001: 2000 certified

Our Clients' Honesty
Sets Us Apart

Dec-17-07  07:03pm  From-LEGAL DIVISION FUNB          7043630353        T-697  P.02/02  F-803



Mexico D.F. a 13 de diciembre de 2007.

Carlos A. Perez
Managing Director
Wachovia Bank, N.A.

Estimado Carlos:

Me permito confirmarte los principales puntos expresados en nuestra conversación telefónica de hoy:

1.- MAJAPARA reconoce el adeudo que tiene con Wachovia y esta haciendo todo lo necesario para liquidarlo a la mayor brevedad posible.

2.- El origen del adeudo es la cancelación intempestiva de las líneas de operación que durante años Wachovia concedió a MAJAPARA. Un plazo razonable nos hubiera permitido sustituir las líneas de Wachovia por la de algún otro banco.

3.- La líneas que Wachovia otorgaba a MAJAPARA eran a su vez otorgadas a los clientes de MAJAPARA. Estamos recuperando esos recursos, pero los clientes a su vez requieren un plazo razonable para sustituir sus líneas.

4.- Entendemos que para Wachovia es incómodo tener esas partidas en deudores y estamos en disposición de garantizar el adeudo con acciones de MAJAPARA (incluso se puede considerar la opción de capitalizar el adeudo).

5.- MAJAPARA es una institución líder en PLD con mas de 15,000 clientes y mas de 500 empleados, su valor de mercado es de aproximadamente 70'0000,000 de dólares por lo que garantiza sobradamente el adeudo con Wachovia.

6.- Es necesario encontrar juntos una solución ganar-ganar para Wachovia y MAJAPARA. El negocio puede perder su valor de mercado si Wachovia emprende acciones tendientes a impedir la operación de MAJAPARA. El negocio cerrado valdría solamente 10 millones de dólares, con el consiguiente quebranto tanto para Wachovia como para MAJAPARA.

Agradecemos su comprensión por los inconvenientes causados y reiteramos nuestra disposición para encontrar juntos una pronta solución a este problema.

Atentamente

Jorge Ortiz Muñoz
CEO





**TRANSPERFECT**

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
MIAMI
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PORTLAND
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
SYDNEY
TOKYO

City of New York, State of New York, County of New York

I, Anne Lutz, hereby certify that the document "December 13, 2007 letter from Jorge Ortiz Munoz to Carlos A. Perez" is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

Anne Lutz

Sworn to before me this
January 21, 2008

Signature, Notary Public

PAUL D. RALSTON
Notary Public, State of New York
No. 01RA6023867
Qualified in Queens County
Commission Expires May 3, 2011

Stamp, Notary Public

# EXHIBIT P



8684 Ave. de la Fuente, Suite 16
San Diego, CA 92154

## FAX COVER SHEET

No. of pages including cover sheet: 3

December 19, 2007

**To:**    Reed Smith LLP, (212)-521-5450

**From:**    PRISCILLA NJUGUNA, Compliance Officer, JOM Corp.

**Re:**    **Wachovia Bank, North America vs. Majapara, JOM Corp.
(U.S. District Court for the Southern District of New York)
hearing scheduled for Friday**

**Notes:**

Please forward the enclosed letter to the attorney handling the case captioned above to forward to Wachovia.

Please call me if you have any questions.

**Phone 619.661.5232    Fax 619.661.5277    Fax 1.877.566.3291**
priscillanjuguna@jomcorporation.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*PRIVATE AND CONFIDENTIAL \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Aviso Legal: Este mensaje y sus anexos son privados y confidenciales, si usted recibe este mensaje por error del remitente, le agradeceremos ignorarlo y eliminar el mensaje y sus anexos, así como evitar su copia y difusión.
Legal Warning: This message and its attachments are confidential.  If you have received this message by mistake, please ignore it and destroy it and its attachments and do not copy or distribute any of its contents.



**MAS: MAJAPARA SERVICES**
www.jomcorporation.com
**JOM CORP.**

8684 Av. De La Fuente, Suite 16
San Diego, CA 92154

December 18, 2007

Attn: Mark Treanor
Senior Executive Vice President
and General Counsel
Wachovia Corporation
301 South College Street Suite 4000
One Wachovia Center
Charlotte, North Carolina 28288-0013

## RE: LITIGATION INVOLVING MAJAPARA OF MEXICO IN WHICH JOM CORP. IS NAMED AS CO-DEFENDANT

Dear Mr. Treanor:

This letter is being written by JOM Corporation of Texas to elaborate on its relationship with MAJAPARA of Mexico and establish that it is an entirely separate entity from MAJAPARA of Mexico and thus cannot rightly be named in litigation concerning MAJAPARA of Mexico.

### JOM Corp. Background

JOM Corp. of Texas (JOM Corp.) is an incorporated and registered money service business (MSB) that began its operations in 1998 as three independent companies:

1) JOM Corp. of Illinois incorporated in January 27, 1998, operating in California and Illinois;
2) JOM Corp. of New Mexico incorporated in August 31, 1998, operating in New Mexico and South Carolina; and
3) JOM Corp. of Texas, operating in Texas, Arizona, North Carolina, Arkansas and Oklahoma.

In 2005 JOM Corporation of New Mexico merged with JOM Corp. of Texas. In January of 2005, to enhance transparency, clear governance, and a lineal corporate structure, JOM Corp. of Illinois was rendered inactivate and its operations in California were suspended (originally licensed in California since July 2001) in anticipation of being sold. However, the company did not sell and opted to re-organize leading to the appointment of Luis V. Echeverria as President and Chief Executive Officer of JOM Corporation.

In April 2005 JOM Corp. re-applied for a Money Transmitter License in California and established its corporate headquarters in San Diego. In addition, JOM Corporation of Illinois merged with JOM Corporation of Texas in 2006. On January 20, 2006, the State of California granted JOM Corp. license number 2241 with permission to operate as a money remitter in California. Administrative functions have since been centralized in San Diego and operational functions have been centralized in Mexico City.

As a money service business, ninety five percent of JOM Corp.'s customer base is for money transmissions to beneficiaries in Mexico. The remaining five percent of our customer beneficiary base is distributed among beneficiaries in the Caribbean, Central America and South America specifically

1



transmissions to Colombia, Costa Rica, the Dominican Republic, Ecuador, El Salvador, Guatemala, Honduras, Mexico, Nicaragua, Panama, and Peru.

JOM Corp. has wholly owned branches in Arizona, Illinois, South Carolina and Texas. In addition, JOM Corp does business through agents in Arkansas, Florida, North Carolina and New Mexico. During 2007, JOM Corp. has worked with approximately 221 domestic agents who at the last count were reduced to approximately 195 agents based on the currently active agents. Most agent relationships are terminated for low production, failure to promptly deposit funds, and other business related reasons.

JOM Corp. works with eight (8) correspondent paymasters, referred to in Spanish as "pagadurias". Paymasters are generally large financial institutions with multiple branches and affiliates that provide payment services for JOM Corp. customers throughout the Caribbean, Central America, South America and Mexico. Our paymasters include Reciba Network, Casa de Cambio MAJAPARA, Bancomer, Transnetwork, Intermex and Bansefi. In addition, JOM Corp. works with more than one hundred smaller generally independently owned correspondent paying agents referred to in Spanish as "convenios" which are located throughout Mexico.

JOM Corporation originally formed as a Texas Corporation in 1998. Currently, Mr. Jorge Ortiz owns 100 percent of the corporate shares. The executive officers are Jorge Ortiz, Chairman of the Board and Treasurer; Luis V. Echeverria, President and Chief Executive Officer; and Teresa Trucci, Secretary of the Board of Directors.

## JOM CORP. OF TEXAS' OPERATIONS IN ILLINOIS

JOM Corp. is a licensed under the Illinois Transmitters of Money Act under License Number MT 114. Please see the attached copy of the 2007 license. The license renewal for 2008 has not yet been received from the State of Illinois Department of Financial and Professional Regulation Division of Financial Institutions. Attached please also find copies of JOM Corp.'s licenses or Certificates of Authority from Arizona, Arkansas, California, Florida, North Carolina, South Carolina, and Texas.

JOM Corp. branches and agencies in Illinois receive money from customers in trust to be remitted to their beneficiaries in the countries that JOM Corp. remits money to. In turn, JOM Corp. branches and agents deposit customer funds into JOM Corp.'s Harris Bank via Automated Clearing House (ACH) deposits to reimburse JOM Corp. for the funds it remits to beneficiaries in anticipation of the ACH transfers. The total number of money transmissions in Illinois in November 2007 were 1936 resulting in a principal amount held in trust from our customers of $743,888. In addition, JOM Corp. has ACH deposits at Harris Bank from money transmissions in states other than Illinois with this account serving as JOM Corp.'s main concentration and clearing institution. The approximate total of JOM Corp.'s ACH operations is $2,400,000 per month accounting for 40 percent of JOM Corp.'s total transactions.

Because ninety five percent of JOM Corp.'s beneficiaries are in Mexico, JOM Corp. purchases pesos from MAJAPARA in Mexico to pay Mexican beneficiaries of Illinois customers in their local currency. JOM Corp. pays MAJAPARA in dollars from the funds that JOM Corp. agents and branches have deposited in JOM Corp.'s Harris Bank account. Accordingly, JOM Corp. has used the funds deposited



JOM Corp. of Texas

**MAS; MAJAPARA SERVICES**
www.jomcorporation.com

8684 Av. De La Fuente, Suite 16
San Diego, CA 92154

into its Harris Bank account to pay for pesos purchased from MAJAPARA by making wire transfers to MAJAPARA's Wachovia account.

With the exception of the common ownership of MAJAPARA and JOM Corp. by Jorge Ortiz, the Chairman of JOM Corp.'s Board of Directors, and JOM Corp.'s daily purchase of pesos from MAJAPARA, JOM Corp. is a wholly independent corporation. There are no common operations, no commingled funds, no shared transactions and/or governance of these two separate legal entities.

By naming JOM Corp. as co-defendant in a case Wachovia Bank, North America, has with MAJAPARA, you are drawing in an independent corporation into another company's litigation. JOM Corp. concentrates forty percent of the funds held in trust from our customers in our Harris Bank account. By freezing JOM Corp.'s Harris Bank account, Wachovia is causing JOM Corp.'s operations to cease which has resulted in irreparable damage to our business. JOM Corp. considers Wachovia's actions against JOM Corp. to be unfounded, irresponsible, and very serious.

Accordingly, because JOM Corp. has no shared responsibilities, no inter-company operations other than the payment for pesos, no shared lines of credit, no shared expenses, and no inter-company accounting with MAJAPARA all legal matters affecting MAJAPARA must be resolved exclusively with MAJAPARA and cannot be resolved either in law or in equity at JOM Corp.'s expense. We demand that Wachovia and Harris Bank immediately cease their actions against JOM Corp.'s Harris Bank account and that Wachovia immediately advise Harris Bank of the true relationship between JOM Corp. and MAJAPARA to repair JOM Corp.'s relationship with Harris Bank. Given the enormous damage already inflicted on JOM Corp. because of Wachovia's actions, we demand the immediate removal of the freeze on JOM Corp.'s account to prevent complete irreversibility of the damage already done.

Should you require further clarification of the matters discussed above, please contact the undersigned at your earliest convenience.

Thank you for your time.

Sincerely,

Luis V. Echeverria
President and Chief Executive Officer
JOM Corp.

Encls.

# EXHIBIT Q

# JOM CORPORATION

Financial Statements
For the Year Ended
May 31, 2007
And
Independent Auditors' Report

Exhibit D

JOM CORPORATION
Financial Statements
May 31, 2007

## TABLE OF CONTENTS

| Page | Description |
|------|-------------|
| 1 | Independent Auditors' Report |
| 2-3 | Balance Sheets |
| 4 | Statements of Operations |
| 5 | Statements of Shareholders' Equity |
| 6 | Statements of Cash Flows |
| 7-11 | Notes to Financial Statements |

# GJD Guerrero, Jimenez, Diaz & Co. LLP

A Certified Public Accounting Firm

## INDEPENDENT AUDITORS' REPORT

To the Board of Directors
JOM Corporation

We have audited the accompanying statement of financial position of JOM Corporation as of May 31, 2007, and the related statements of operations, shareholders' equity and cash flows for the year then ended. These financial statements are the responsibility of the Organization's management. Our responsibility is to express an opinion on these financial statements based upon our audit. The financial statements of JOM Corporation as of May 31, 2006 were audited by other auditors whose report is dated September 28, 2006, expressed an unqualified opinion on those statements.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of JOM Corporation as of May 31, 2007, and the results of its operations and its cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.

Guerrero, Jimenez, Diaz & Co. LLP
San Diego, California

August 27, 2007

-1-

JOM CORPORATION
Balance Sheets
May 31, 2007 and 2006

ASSETS

|  | 2007 | 2006 |
|---|---|---|
| **CURRENT ASSETS:** | | |
| Cash and Certificate of Deposit | $ 1,513,753 | $ 1,036,360 |
| Accounts Receivable - agents | 616,020 | 649,675 |
| (net of allowance for doubtful | | |
| accounts of $19,773 for 2007) | | |
| Other Receivable | 1,668 | 1,000 |
| Remittances in Transit | 177,063 | 170,849 |
| Notes Receivable | - | - |
| Prepaid Expenses | 2,076 | 250 |
| Prepaid Security | - | - |
| Total Current Assets | 2,310,580 | 1,858,134 |
| | | |
| **FIXED ASSETS:** | | |
| Property & Equipment - Net | 755,752 | 221,523 |
| | | |
| **OTHER ASSETS** | | |
| Deferred Tax Asset | 91,300 | - |
| Note Receivable | 164,356 | - |
| Organizational costs (net) | 105,697 | 109,697 |
| Bonds | 59,820 | 24,657 |
| Security Deposits | 13,243 | 8,368 |
| Goodwill | 37,945 | 33,232 |
| Total Other Assets | 472,361 | 175,954 |
| | | |
| **TOTAL ASSETS** | $ 3,538,693 | $ 2,255,611 |

See accompanying notes and Accountants Report.

-2-

JOM CORPORATION
Balance Sheets
May 31, 2007 and 2006

LIABILITIES & CAPITAL

|  | | 2007 | | 2006 |
|---|---|---|---|---|
| **Current Liabilities** | | | | |
| Due to Majapara & Paymasters | $ | 827,836 | $ | 326,479 |
| Commissions Payable to Agents | | 63,775 | | 38,761 |
| Commissions Payable to Paymaster | | 66,508 | | 140,726 |
| Due to ECE Services | | 14,387 | | - |
| Remittances in Transit | | 177,063 | | 170,849 |
| Income Tax Payable | | 766 | | - |
| Equipment Lease Payable | | - | | 14,353 |
| Total Current Liabilities | | 1,150,335 | | 691,168 |
| | | | | |
| **Stockholder's Equity** | | | | |
| Common stock - $1 par value; authorized 100,000 shares, 85,000 shares issues and outstanding | | 85,000 | | 50,000 |
| Paid-in-capital | | 4,603,510 | | 2,568,510 |
| Accumulated deficit | | (2,300,152) | | (1,054,067) |
| Total Stockholder's Equity | | 2,388,358 | | 1,564,443 |
| | | | | |
| **Total Liabilities & Capital** | $ | 3,538,693 | $ | 2,255,611 |

See accompanying notes and Accountants Report.

-3-

## JCM CORPORATION
Statements of Operations
For the Years Ended May 31, 2007 and 2006

|  | 2007 | 2006 |
|---|---|---|
| Total Revenues | $ 3,378,147 | $ 2,957,280 |
| Cost of Revenues | 1,494,089 | 1,600,147 |
| Gross Profit | 1,884,058 | 1,357,133 |
| General and Administrative Expenses | 1,655,581 | 1,277,651 |
| OPERATING INCOME (LOSS) | 228,477 | 79,482 |
| Other Income & (Expenses) | | |
| Depreciation Expense | (48,915) | (18,862) |
| Amortization Expense | (20,000) | (865) |
| Interest Income | 610 | - |
| Interest Expense | (1,972) | (1,689) |
| Gain (Loss) on asset disposal | | 1,500 |
| Total Other Income & (Expenses) | (70,277) | (19,916) |
| NET INCOME (LOSS) BEFORE TAXES | 158,200 | 59,566 |
| Corporate income tax (expense) benefit | 88,300 | - |
| NET INCOME | $ 246,500 | $ 59,566 |

See accompanying notes and Accountants Report.

-4-

**JOM CORPORATION**
Statements of Shareholders' Equity
For the Years Ended May 31, 2007 and 2006

| | Common Stock | | Additional Paid-In Capital | | Accumulated Deficit | | Total |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | |
| Balance at May 31, 2005 | 50,000 | $  50,000 | $  1,598,928 | $ | (1,113,633) | $ | 535,295 |
| Additional Paid-in Capital | | | 969,582 | | | | 969,582 |
| Net Income | | | | | 59,566 | | 59,566 |
| Balance at May 31, 2006 | 50,000 | 50,000 | 2,568,510 | | (1,054,067) | | 1,564,443 |
| Merger with JOM-Illinois | 35,000 | 35,000 | 2,035,000 | | (1,492,585) | | 577,415 |
| Net Income | | | | | 246,500 | | 246,500 |
| Balance at May 31, 2007 | 85,000 | $  85,000 | $  4,603,510 | $ | (2,300,152) | $ | 2,388,358 |

See accompanying notes and Accountants Report.

-5-

JOM CORPORATION
Statements of Cash Flows
For the Years Ended May 31, 2007 and 2006

|  | 2007 | 2006 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Net Income | $        246,500 | $        59,566 |
| Adjustments to reconcile net income to net | | |
| cash provided by (used in) operating activities: | | |
| Depreciation | 48,915 | 18,862 |
| Amortization | 20,000 | 865 |
| | | |
| Changes in operating assets and liabilites: | | |
| (Increase) decrease in accounts receivable | 33,655 | (483,240) |
| Increase in Income Tax Payable | 766 | - |
| Decrease in prepaid employee loans | - | 765 |
| (Increase) decrease in other receivable, prepaid expenses | | |
| and bond receivable | (37,657) | 9,090 |
| Decrease in accounts receivable - non-trade | - | 188,139 |
| Increase in accounts receivable - non current | (164,356) | - |
| Increase in deposits | (4,875) | (2,068) |
| Increase in Goodwill | (4,713) | (22,136) |
| Increase in Organizational Cost | (16,000) | (87,329) |
| Increase in Deferred Tax Asset | (91,300) | - |
| Increase (decrease) in accounts payable and commissions payable | 466,540 | 274,296 |
| Decrease in payroll taxes payable | - | (8,282) |
| Net Cash Provided by (Used In) Operating Activities | 497,475 | (51,472) |
| | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | |
| Purchase of Property and Equipment | (583,144) | (106,741) |
| Net Assets Merged | 577,415 | - |
| Net Cash Provided by (Used In) Investing Activites | (5,729) | (106,741) |
| | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | |
| (Payments) | - | - |
| Proceeds from lease payable | (14,353) | 14,353 |
| Proceeds from additional paid-in-capital | - | 969,582 |
| Net Cash Provided by (Used In) Financing Activities | (14,353) | 983,935 |
| | | |
| **Net Increase (Decrease) in Cash** | 477,393 | 825,722 |
| | | |
| **Cash at Beginning of Year** | 1,036,360 | 210,638 |
| | | |
| **Cash at End of Year** | $    1,513,753 | $    1,036,360 |

Supplemental Disclosure of Cash Flow Information:
Cash paid during the year
Interest          $1,972
Taxes             3,363
See accompanying notes and Accountants Report.

-6-

**JOM Corporation**
Notes to Financial Statements
May 31, 2007 and 2006

## NOTE 1 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Organization and Business Activity

JOM Corporation (the 'Company') is a Texas corporation formed on June 16, 1997. The company was formed to operate as a facilitator in money transfer services throughout the world. Currently the company is licensed with the State of California, Arizona, Arkansas, Florida, Kansas, North Carolina, Oklahoma, Texas, New Mexico, South Carolina, and Illinois to engage in the business of receiving money for the purpose of transmitting the same or its equivalent to recipients in foreign countries. The Company merged, on June 2, 2006, its business with a related entity, JOM Corporation of Illinois, which is licensed to transact the same business in the state of Illinois.

The company targets the Latin communities throughout the U.S. and contracts with convenience stores, markets, check cashing stores, etc. within these communities to be points of sale locations (POS) for its services. The intended recipients, or beneficiaries, are then able to receive the funds throughout Latin America through financial institutions, pharmacies, convenience stores, and other points of payment (POP).

### Basis of Accounting
The Company's financial statements are prepared using the accrual method of accounting

### Use of Estimates
In preparing the Company's financial statements in accordance with accounting principles generally accepted in the United States of America, management is required to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reported periods. Actual results could differ from those estimates.

### Revenue Recognition
The Company derives revenues primarily through transaction fees charged to consumers on the sale of money transfers, and through foreign currency exchange transactions. Transaction fees and foreign currency exchange transactions are recognized in the period the transactions occur.

### Cash and Cash Equivalents
The Company considers all highly liquid investments with maturity of three months or less when purchased to be cash equivalents.

### Property and Equipment
Property and equipment are recorded at cost, less accumulated depreciation. Depreciation is calculated using the straight-line method over the estimated useful life of five or seven years.

### Goodwill
Goodwill is at fair value and is subject to an annual impairment test and if determined impaired, is written down to fair value.

-7-

NOTE 1 – Continued:

**Income Taxes**
Current income tax expense is the amount of income taxes expected to be payable for the current year. A deferred income tax asset or liability is computed for the expected future impact of differences between the financial reporting and tax bases of assets and liabilities, as well as the expected future tax benefit to be derived from tax loss and credit carryforwards. Deferred income tax expense is generally the net change during the year in the deferred income tax asset or liability. Valuation allowances are established when necessary to reduce deferred tax assets to amounts more likely than not to be realized. The effect of tax rate changes is reflected in income during the period such changes are enacted.

**Advertising**
The Company follows the policy of charging the costs of advertising to expense as incurred. The amounts incurred for the year ended on May 31, 2007 and 2006, were $16,689 and $16,812, respectively.

**Reclassifications**
Certain reclassifications were made to May 31, 2006 numbers in order to make it comparable to May 31, 2007

**NOTE 2 – DEPOSITS**
The Company also has security deposits with its landlords in the amount of $9,829. The Company has several offices and point of sale locations throughout the United States and these leases require security deposits for the lease contracts.

**NOTE 3 – REMITTANCES IN TRANSIT**
The balance in this account represents the average daily balance of funds which are in transit to the ultimate beneficiary and is offset by a corresponding liability.

**NOTE 4 – PROPERTY AND EQUIPMENT**
Property and equipment, at cost, are as follows:

|                              | 2007       | 2006       |
|------------------------------|------------|------------|
| Building and Land            | $431,180   | $   -0-    |
| Office and Other Equipment   | 341,251    | 174,836    |
| Leasehold improvements       | 144,094    | 102,223    |
| Total Property and Equipment | 916,525    | 277,059    |
| Less accumulated depreciation| (160,773)  | (55,535)   |
| Property and Equipment – Net | $755,752   | $221,523   |

Depreciation expense was $48,915 and $18,862 for the year ended on May 31, 2007 and 2006, respectively.

NOTE 4 – Continued:

The Company periodically evaluates the net realizable value of long-lived assets, including software and equipment, relying on a number of factors including operating results, business plans, economic projections and anticipated future cash flows.

## NOTE 5 – NOTE RECEIVABLE

The Company entered into settlement agreements with two of its agents for remittances received from customers and not deposited into the Company's accounts.

One of the agreements calls for the balance to be paid with the commissions earned by the agent.

The other agreement stipulates that the Company will use space inside the agent's premises to carry on the Company's business for a four year term. The use of the space will offset the receivable balance.

## NOTE 6 – CAPITAL LEASE PAYABLE

The Company leased computer equipment though Dell Financial Leasing. These leases are treated as purchases of equipment (capital lease) per Generally Accepted Accounting Principles. The current balance on these contracts, at May 31, 2006, totaled $14,353. There is no balance at May 31, 2007.

## NOTE 7 – FOREIGN CURRENCY

Foreign exchange transactions gain of $982,341 is reflected in the current financial statements as part of revenue. This is the result of a difference between the sale and the purchase prices of the foreign currency that is executed for customers.

## NOTE 8 – RELATED PARTY DISCLOSURES

The Company's shareholders are also shareholders in a Mexican corporation named Casa de Cambio Majapara, S.A. de C.V. (Majapara). The Company contracts with Majapara to facilitate the payment of funds to the recipients in Mexico. The Company expensed commissions for services provided by Majapara for $147,987 and $164,461, for the years ended May 31, 2007 and 2006, respectively.

The Company entered into a contract for consulting services with InterAmerican Investment Group (InterAmerican) on February 15, 2005 for a 5 year period or until terminated by either party as provided in the contract. InterAmerican is owned by the Company's President and CEO. The Company paid $161,000 and $103,167 to InterAmerican for consulting services for the years ended May 31, 2007 and 2006, respectively.

ECE Services (ECE) is a Mexican Corporation that is owned by the Company's shareholders. ECE mainly provides services to the Company's headquarters, agents and branches. The Company expensed $111,074 and $145,935 for the years ended May 31, 2007 and 2006, respectively.

The balance due to ECE at May 31, 2007 and 2006 was $14,387 and $0, respectively.

-9-

## NOTE 9 – INCOME TAXES

Deferred income taxes are comprised of the following:

|  | May 31, | |
|  | 2007 | 2006 |
| Estimated Deferred Tax Asset | $201,500 | $205,575 |
| Valuation Allowance | (110,200) | (205,575) |
|  | $ 91,300 | $ -0- |

The Company has a Net Operating Loss (NOL) carryforward of approximately $905,000 to offset future taxable income. These NOL carryforwards expire on various dates beginning in 2024. The foregoing NOL results in an estimated deferred tax asset of $201,500. Due to economic uncertainties and limited earnings history a valuation allowance was applied against the deferred tax asset.

The provision for income taxes consists of the following:

|  | Year Ended May 31, | |
|  | 2007 | 2006 |
| Current Tax Expense |  |  |
| Federal | $ -0- | $ -0- |
| State | 3,000 | -0- |
|  | $ 3,000 | $ -0- |
| Deferred Tax Expense/Benefit |  |  |
| Federal | $(91,300) | $ -0- |
| State | -0- | -0- |
|  | $(91,300) | $ -0- |
| Total Provision for Income Taxes | $(88,300) | $ -0- |

The difference between the Company's provision for income taxes and the amount for income tax determined by applying the applicable federal statutory income tax rate to pretax income can result primarily from state income taxes and permanent differences.

## NOTE 10 – MERGER WITH JOM ILLINOIS

The Company entered into a Stock Purchase Agreement with JOM Corporation of Illinois as of June 1, 2006. The purchase was made by issuing 35,000 of the Company's shares. The amounts merged into the Company are as follows:

| Cash | $181531 | Accounts Payable | $ 103,403 |
| Accounts Receivable – Agents | 439,726 | Remittance in Transit | 56,183 |
| Remittances in Transit | 56,183 | Common Stock | 35,000 |
| Prepaid Expenses | 2,273 | Paid-in Capital | 2,035,000 |
| Property & Equipment – Net | 39,488 | Accumulated Deficit | (1,492,585) |
| Other Assets | 17,800 |  |  |
|  | $737,001 |  | $ 737,001 |

## NOTE 11 – COMMITMENTS AND CONTINGENCIES

### Lease

As of May 31, 2007, the Company leased office space in other states under non-cancellable operating leases.  Future minimum lease payments are as follows:

| Year Ending May 31 | Amount |
|---|---|
| 2008 | $21,944 |
| 2009 | 15,661 |
| | $37,605 |

# EXHIBIT R

Wachovia Bank, N.A.
International Division
Wachovin Financial Center
200 South Biscayne Blvd., 12" Floor
FL6079
Miami, FL 33131



**WACHOVIA**

December 6, 2007

Casa de Cambio Majapara S.A. de C.V.
Lago Margarita No. 16
Colonia Granada
C.P. 11520
México, D.F.

Attention: Carlos Acosta

Dear Mr. Acosta:

As part of the ongoing review and re-evaluation of our long-term global strategy, Wachovia
Bank, National Association ("Wachovia") has determined to cease providing correspondent
banking services to exchange companies outside the United States.   It is with sincere regret that
I must advise you that effective January 4, 2008 (the "Termination Date") Wachovia will close
out all business relationships with Casa de Cambio Majapara S.A. de C.V.(hereinafter "you" or
"your").

Wachovia and I wish to thank you for your loyalty during our business relationship and wish you
continued commercial success.

You receive some or all of the below products and services, to the extent these apply to your
current business with Wachovia, we wish to advise you of the following:

Cash letters and checks sent for Final Credit Service or Collection received after December 13,
2007 will be returned. Checks presented for payment (against your account) during the period
from the date of this letter up to the Termination Date ("Interim Period") will be paid up to the
amount of the collected funds available in your account. Any checks presented after the
Termination Date will be returned, "account closed".  This notice also includes drafts and checks
drawn under any controlled disbursement arrangement with Wachovia. So that your customers
encounter minimal impact, we strongly urge you to cease drawing drafts effective immediately
but in any event to stop this activity as quickly as possible. Your existing credit lines with
Wachovia have been cancelled. Any current outstanding utilized credit will remain in place until
it has come to maturity.  Wachovia does not waive any rights, however, to demand payment in
the event of an event of default or other event that permits Wachovia to demand early payment.

Outgoing funds transfers will be honored up until December 27, 2007 however Wachovia
suggests you begin to redirect activity as soon as possible in order avoid any confusion. Please
refrain from making any further deposits and funds transfers after this date.

Bulk Cash deposits will not be accepted or collected after December 20, 2007.

Pursuant to Wachovia's Terms and Conditions for Global Financial Institutions, you will receive any finally collected and available balance in your Wachovia account(s) within a reasonable period of time after the account(s) is closed. Your representative will work with you during the Interim Period to determine outstanding drafts, checks, wires, etc. that would require funds in your accounts for payment. This will enable Wachovia to have a good estimate of the amount to hold in the account pending item presentation and payment.

After a reasonable time, any funds remaining in your account will be forwarded to you in the form of an official check at the address of record or, if you prefer, via wire transfer. Please advise us, as soon as possible, regarding your preference for final payout of remaining balances.

As a result of this closure notification, Wachovia respectfully requests that you immediately remove all references to it as a correspondent service provider from your website or other external communications.

Should you have any questions, you may contact me at (305) 7896902.

Sincerely,

Carlos A. Perez
Managing Director
Americas Group
Global Financial Institutions and Trade Services

# EXHIBIT S



CASA DE CAM
MAJAPA

**A NUESTRA ESTIMADA CLIENTELA**

**CASA DE CAMBIO MAJAPARA OTORGA A
USTEDES PLENA GARANTÍA DE QUE HARA
CABAL CUMPLIMIENTO DE LAS
OBLIGACIONES QUE MANTIENE CON
USTEDES Y EN TIEMPO QUE
NATURALMENTE SE EMPEÑARÁ QUE SERÁ
EL MAS BREVE.**

**DEBIDO A CAUSAS DE FUERZA MAYOR
AJENAS A ESTA INSTITUCIÓN
ESTAMOS TEMPORALMENTE EN
IMPOSIBILIDAD DE ATENDERLOS
PERSONALMENTE RESPECTO A SUS
OPERACIONES PENDIENTES POR LO QUE
PARA SEGUIRLOS ATENDIENDO LES
ROGAMOS DIRIGIRSE A:**

**LIC. PEDRO PATRICIO TORRES MARCO
LIC. JOSE VICTOR RODRÍGUEZ**

**TELEFONOS: (55) 5511-6063 Y 5511-4346
HORARIO LUNES A VIERNES DE 9:00 A 14:00
HRS.**

OFICINA MATRIZ
LAGO MARGARITA NC
COL. GRANADA 115
MÉXICO D.F.

AGUASCALIENTES
AGUASCALIENTES

BAJA CALIFORNIA
TIJUANA
ENSENADA

COAHUILA
SALTILLO

COLIMA
COLIMA
MANZANILLO

DISTRITO FEDERA
BOSQUES
GUADALUPE INN
MINERVA
VALLE

ESTADO DE MÉXIC
METEPEC
TLALNEPANTLA

GUANAJUATO
CELAYA
IRAPUATO
LEÓN

JALISCO
GUADALAJARA

MICHOACÁN
LÁZARO CÁRDENAS
MORELIA

NUEVO LEÓN
MONTERREY

PUEBLA
PUEBLA

QUERETARO
QUERÉTARO

SAN LUIS POTOSI
SAN LUIS POTOSÍ

SONORA
HERMOSILLO

TAMAULIPAS
ALTAMIRA
TAMPICO

VERACRUZ
VERACRUZ
CORDOBA

YUCATÁN
MÉRIDA



ISO
9001,
2000

"LA HONESTIDA
NUESTROS CLIE
NOS DISTING