Scott S. McKessy (SM-5479)
Casey D. Laffey (CL-1483)
REED SMITH LLP
599 Lexington Avenue
New York, New York 10022
Tel. (212) 521-5400
Fax. (212) 521-5450
Attorneys for Plaintiff
Wachovia Bank, National Association

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

WACHOVIA BANK, National Association,  :
                                      :    07 Civ. 11230 (BSJ)(RLE)
                        Plaintiff,    :
                                      :
          - against -                 :    **DECLARATION**
                                      :    **OF SCOTT S. MCKESSY**
CASA DE CAMBIO MAJAPARA S.A. de C.V. a/k/a  :
MAJAPARA CASA DE CAMBIO S.A. de C.V.,  :
                                      :
                        Defendant.    :
-------------------------------------------------------------X

     I, SCOTT S. MCKESSY, hereby declare under penalty of perjury, pursuant to 28

U.S.C. § 1746, that the following is true and correct:

     1.     I am a member of the law firm of Reed Smith LLP, attorneys for

Wachovia Bank, National Association ("Wachovia"), the plaintiff in this action.  I submit

this Declaration in opposition to the motion of defendant Casa de Cambio Majapara S.A.

de C.V. a/k/a Majapara Casa de Cambio S.A. de C.V. ("Majapara") to transfer this action

to the Northern District of Illinois.

     2.     In its moving papers Majapara argued that this case should be transferred

to the Northern District of Illinois.  But Majapara did not provide any evidence, through

affidavits or otherwise, to show that the factors relevant to a motion to transfer weigh in

favor of such a transfer.  For that reason, Majapara has not met its burden and its motion

should be denied. Just as important, Majapara's motion should be denied because a transfer of this matter to Illinois would not serve the interests of justice.

3.    Indeed, in what appears to be a back-door attempt to undermine this Court's orders, Majapara seeks to transfer this case to the Federal District Court in the Northern District of Illinois. But if a transfer were granted, this Court's Order of Attachment would fall because this Court would lose jurisdiction to enforce its orders and to adjudicate the pending Contempt Motion, and Wachovia would no longer be able to attach any of Majapara's assets remaining here in New York. Given that Majapara has already violated this Court's orders in relation to the attachment proceedings, such a result would severely prejudice Wachovia's rights and, in return, would reward Majapara's contemptible behavior.

4.    Nevertheless, in order to meet the needs of the parties, for purposes of judicial economy, and to protect Wachovia's rights with regard to the Order of Attachment, Wachovia respectfully requests that, in lieu of a transfer, the Court stay the New York action in favor of letting discovery and trial of the parties' claims proceed in the Illinois court. Any adjudication on the merits in the Illinois action, of course, will be binding in the New York action. But, more importantly, a stay would not affect the Court's ability to continue to enforce its orders and would allow the Court to rule on Majapara's Motion to Vacate the Order of Attachment and Wachovia's Motion for Contempt. Thus, unlike a transfer, a stay would serve the interests of justice.

5.    On March 4, 2008, I offered Majapara's counsel to stay this action in lieu of transferring it. She initially accepted stating it seemed to satisfy all of Majapara's goals for making this motion. She then informed me she would not agree.

2

6.      Annexed hereto as Exhibit A is a true and correct copy of Plaintiff's Amended Complaint in this action dated December 17, 2007.

7.      Annexed hereto as Exhibit B is a true and correct copy of Majapara's Amended Answer and Counterclaims in this action dated February 27, 2008.

8.      Annexed hereto as Exhibit C is a true and correct copy of Majapara's Amended Answer and Counterclaims in the related Illinois action dated February 27, 2008.

9.      Annexed hereto as Exhibit D is a true and correct copy of the Declaration of Carlos Perez dated December 13, 2007 submitted in support of Plaintiff's application for a prejudgment order of attachment in this action.

10.     Annexed hereto as Exhibit E is a true and correct copy the weekly flight schedule from Miami, Florida to New York, New York and from Miami, Florida to Chicago, Illinois as reported on www.oag-flights.com.

11.     Annexed hereto as Exhibit F is a true and correct copy of Plaintiff's Complaint in the related Illinois action dated December 17, 2007.

12.     Annexed hereto as Exhibit G is a true and correct copy of Plaintiff's Memorandum of Law in Support of its Motion for an Order Declaring Defendant in Contempt of Court dated February 11, 2008.

13.     Annexed hereto as Exhibit H is a true and correct copy of the Declaration of Carlos A. Perez dated February 11, 2008 submitted in opposition to Majapara's Motion to Vacate the Court's Order of Attachment.

14.     Annexed hereto as Exhibit I is a true and correct copy of the Declaration of Andrew Gross dated February 11, 2008 submitted in opposition to Majapara's Motion

to Vacate the Court's Order of Attachment.

      15.    Annexed hereto as Exhibit J is a true and correct copy of the Declaration of Scott S. McKessy dated February 12, 2008 submitted in opposition to Majapara's Motion to Vacate the Court's Order of Attachment.

## Conclusion

**WHEREFORE,** for the foregoing reasons and those set forth in the accompanying Memorandum of Law, Majapara's motion to transfer should be denied, along with such other and further relief as the Court deems just, proper, and equitable. Executed this 5th day of March, 2008.

                                        SCOTT S. MCKESSY

# EXHIBIT A

Scott S. McKessy (SM-5479)
Casey Laffey (CL-1483)
Reed Smith LLP
599 Lexington Avenue
New York, New York 10022
Tel. (212) 521-5400
Fax. (212) 521-5450

# ORIGINAL

Attorneys for Plaintiff Wachovia Bank, National Association

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

WACHOVIA BANK, NATIONAL ASSOCIATION,

                Plaintiff,

    - against -

CASA DE CAMBIO MAJAPARA S.A. de C.V a/k/a
MAJAPARA CASA DE CAMBIO S.A. de C.V.,

                Defendant.

-------------------------------------------------------------------X

07 Civ. 11230 (BSJ)(RLE)

**AMENDED COMPLAINT**

      Plaintiff, Wachovia Bank, National Association ("Wachovia"), by its attorneys, Reed

Smith LLP, as and for its complaint against the defendant Case de Cambio Majapara S.A. de

C.V. a/k/a Majapara Casa de Cambio S.A. de C.V. ("Majapara"), alleges as follows:

## PRELIMINARY STATEMENT

      1.     This action arises from Majapara's misappropriation of over $38 million (US$) of

Wachovia's money relating to a series of foreign exchange spot transactions between the parties.

Foreign exchange spot transactions, due to their frequency, the speed at which the transactions

are agreed and closed, and the manner in which funds are simultaneously exchanged, are

founded upon trust. Majapara, however, abused that trust -- a trust that was established through

years of currency trading with Wachovia -- to plunder more than $38 Million from Wachovia.

And this is not a mere renege on a multi-million dollar transaction wherein Majapara returned

Wachovia's property when it realized it could not complete the foreign currency exchange.

Subsequent conversations with Majapara make apparent that it never intended to honor its

commitments but, instead, had decided to wrongfully keep Wachovia's money and abscond with

it. In these after-the-fact conversations, Majapara admitted to Wachovia that it was illiquid, that

it had engaged in illicit activities in relation to its foreign exchange transactions and threatened

that, if Wachovia took any steps to enforce its rights, Wachovia's judgment would be

uncollectible. Through this action, Wachovia seeks a judgment against Majapara, in an amount

not less than $24,711,845.00, plus prejudgment interest.

## VENUE/JURISDICTION

2.      This Court has personal jurisdiction over Majapara pursuant to CPLR §§ 301 and

302(a) as Majapara has been transacting business in this State since 2000, the transactions being

sued upon herein occurred in the State of New York, and defendant breached the parties'

agreement here in New York by failing to wire the required funds, as agreed, to Wachovia's New

York account. Defendant has also contractually agreed to be sued in this jurisdiction.

3.      Venue in this district is proper under 28 U.S.C. § 1391(a).

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1332 because this action involves a controversy that exceeds $75,000, exclusive of interests and

costs, and involves a citizen of a State and a citizen of a foreign state.

## PARTIES

5.      Wachovia is a national banking association, organized under the laws of the

United States, with its principal place of business in Charlotte, North Carolina. Wachovia

maintains offices in New York.

6.      Upon information and belief, Majapara is a Mexican corporation with its principal

place of business in Mexico City, Mexico.

## FACTS COMMON TO ALL COUNTS

**The Majapara Relationship With Wachovia**

7.      In the late 1990's, Majapara and First Union National Bank ("First Union"), a predecessor to Wachovia, agreed to enter into foreign exchange transactions together.  In these transactions, Majapara would agree to purchase from First Union a certain amount of one currency in exchange for Majapara selling to First Union a certain amount of another currency at the applicable exchange rate.

8.      In order to facilitate Majapara and First Union entering into these currency exchange transactions, on or about April 6, 2000, Majapara and First Union entered into a First Union Online FX Subscription Agreement (the "FX Subscription Agreement"), a copy of which is attached hereto as Exhibit A.  Pursuant to the FX Subscription Agreement, Majapara was permitted to execute foreign exchange transactions electronically with First Union through First Union's foreign exchange website.  This, however, was not the exclusive method for the parties to enter into these foreign exchange spot transactions.  This FX Subscription Agreement is governed by New York law.  See Exhibit A, ¶ 6.

9.      Effective April 1, 2002, Wachovia merged into and under the charter of First Union with the resulting title of Wachovia Bank, National Association.  As a result of the merger, First Union changed its name to Wachovia Bank, National Association.

10.      In some of the foreign exchange transactions between Majapara and Wachovia, Wachovia would deliver currency to Majapara on the same day that Majapara transferred another currency into a Majapara account held at Wachovia's New York Branch ("Majapara NY Account").  Wachovia would then debit the currency from the Majapara NY Account.  The authorization for this procedure was documented in a December 10, 2003 letter (in Spanish)

from Majapara to Wachovia Bank, a copy of which is attached as Exhibit B, which reads (as

translated into English): "In relation to the transactions done with yourselves through Online

FX; we authorize you to debit and credit our account number NY2000192304201 held with

yourselves." In or about March 2006, Majapara signed a Debit and Netting Agreement that gave

Wachovia the same authority to credit and debit the same Majapara NY Account held at

Wachovia's New York Branch. A copy of this document is attached as Exhibit C.

**The Foreign Exchange Transactions At Issue**

11.      On or about December 5, 2007, Majapara and Wachovia agreed to a series of

seven (7) transactions, all of which were to settle on December 7, 2007, whereby Wachovia

would deliver an aggregate 26 million Euros to Majapara and Majapara would deliver an

aggregate $38,132,700 to Wachovia. In a departure from the process described in paragraph 10

above, on these transactions, Majapara agreed to transfer dollars directly to a Wachovia account

located in New York. Six (6) of the transactions were executed on Wachovia's foreign exchange

internet website. One (1) of the transactions was executed over the telephone. Copies of the

confirmations for these transactions are attached hereto as Exhibit D.

12.      Pursuant to these seven (7) foreign exchange agreements, on December 7, 2007,

Wachovia delivered 26 million Euros to Majapara. Majapara failed to deliver the agreed upon

$38,132,700.00 to Wachovia, as required, on December 7, 2007.

13.      On or about December 11, 2007, the General Director of Majapara admitted that

Majapara had been obligated to provide the agreed upon currency to Wachovia.

14.      Wachovia was able to secure $13,420,155, which was in Majapara's accounts at

Wachovia, but has not been able to recover the remaining amount Wachovia is owed. Some of

the amount recovered represents conditional credit that may be subject to reduction by reason of

return of the items (in this case, checks) for which this credit was given (<u>see</u> Paragraph 15 below).

15.     Majapara also maintains five (5) U.S. dollar accounts at Wachovia.  As to each of these accounts, Wachovia has contingent residual exposure to cover returned items in the federal check clearing program.  Majapara is obligated to reimburse Wachovia for these amounts, but has now stated it is unable to and will not meet its financial obligations.  This liability has averaged $3.3 million per month for the last several months.

16.     By opening an account at Wachovia, Majapara agreed to Wachovia's Terms & Conditions for Global Financial Institutions, which, under its terms, is governed by and construed in accordance with the laws of New York and pursuant to which, Majapara agreed to submit to the jurisdiction of the courts located in Manhattan, New York.

### <u>COUNT I</u>

### <u>(Breach of Contract)</u>

17.     Plaintiff realleges and reincorporates the allegations in Paragraphs 1 through 16.

18.     As set forth above, Wachovia entered into a series of currency exchange agreements with Majapara.

19.     Majapara breached those agreements by failing to deliver the currency as agreed upon by the parties.

20.     Wachovia has fulfilled its obligations under the agreements.

21.     As a result of Majapara's breaches, Wachovia has suffered damage in the amount of not less than $24,711,845.00, plus interest.

## COUNT II

### (Promissory Estoppel – Alternate Count)

22.     Plaintiff realleges and reincorporates the allegations in Paragraphs 1 through 16.

23.     In the event it is found that no oral or written contract existed between Majapara and Wachovia in relation to the seven (7) foreign exchange spot transactions at issue here, equity requires Majapara to pay Wachovia not less than $24,711,845.00 in return for accepting currency from Wachovia.

24.     Majapara promised to deliver certain currency to Wachovia in return for Wachovia delivering certain currency to Majapara.

25.     In reliance on Majapara's agreement to deliver certain currency to Wachovia, Wachovia delivered approximately $38 million worth of currency to Majapara.

26.     Wachovia has requested the funds from Majapara.

27.     To date Majapara has not provided the required currency to Wachovia.

28.     Wachovia, however, has been able to obtain certain Majapara funds and offset the amount owed by $13,420,155.00 (subject to reduction for the reasons set forth in Paragraph 14 of the recitals above).

29.     Wachovia has no adequate remedy at law.

30.     As a result, Majapara has been unjustly enriched to the detriment of Wachovia.

## COUNT III

### (Unjust Enrichment – Alternate Count)

31.     Plaintiff realleges and reincorporates the allegations in Paragraphs 1 through 16.

32.     In the event it is found that no oral or written contract existed between Majapara and Wachovia in relation to the seven (7) foreign exchange transactions at issue here, equity

would still require Majapara to pay Wachovia an amount not less than $24,711,845.00 in return for accepting currency from Wachovia.

33.     Majapara promised to deliver certain currency to Wachovia in return for Wachovia delivering certain currency to Majapara.

34.     In reliance on Majapara's agreement to deliver certain currency to Wachovia, Wachovia delivered approximately $38 million worth of currency to Majapara.

35.     Majapara did not deliver any currency to Wachovia.

36.     Wachovia, however, has been able to obtain certain Majapara funds and offset the amount owed by $13,420,155.00 (subject to reduction for the reasons set forth in Paragraph 14 of the recitals above).

37.     Wachovia requested that Majapara deliver the currency it is owed.

38.     To date, Majapara has neither delivered the required currency to Wachovia, nor returned return the currency Wachovia sent to it.

39.     Majapara has unjustly retained this benefit to the detriment of Wachovia.

40.     Majapara's retention of this benefit violates fundamental principles of justice, equity and good conscience.

41.     Wachovia has no adequate remedy at law.

## COUNT IV

### (Fraud)

42.     Plaintiff realleges and reincorporates the allegations in Paragraphs 1 through 16.

43.     As set forth above, on or about December 5, 2007 Majapara and Wachovia entered into a series of seven (7) currency exchange transactions.

44.    Pursuant to the parties' agreement, in exchange for the receipt of 26 million Euros from Wachovia, Majapara agreed to deliver $38,132,700 to Wachovia.

45.    Upon information and belief, at the time Majapara entered into the December 5, 2007 agreement it knew it was illiquid and insolvent and incapable of performing its obligations under the parties' agreement.

46.    Notwithstanding its knowledge, Majapara represented to Wachovia that it would deliver $38,132,700.00 (US$) to Wachovia to settle the transactions.  Upon information and belief, at the time of the transaction, Majapara knew it would not deliver the required currency and was acting under a present intent to deceive Wachovia and abscond with its funds.  Its representations to Wachovia were false and materially misleading.

47.    Majapara's fraudulent intent was confirmed in conversations Wachovia subsequently had with representatives of Majapara.

48.    For example, on or about December 13, 2007, Carlos A. Perez, a Managing Director of Wachovia, spoke with Jorge Ortiz, the Chairman and CEO of Majapara by telephone, and Mr. Ortiz acknowledged that Majapara, prior to settlement of the transactions, knew that it was experiencing "a liquidity crisis."

49.    When Mr. Perez confronted Mr. Ortiz concerning the transaction and the illegality of Majapara's actions, Mr. Ortiz responded, "I recognize that I have done something that is not permitted."

50.    Overall, due to Majapara's "liquidity crisis" and other impermissible activities relating to its currency transactions, Majapara did not have sufficient funds to complete the exchange with Wachovia.  Majapara nonetheless accepted Wachovia's funds, knowing that it would be incapable of repaying the funds to Wachovia.

51.    Majapara then claimed to have used some or all of the Wachovia funds to engage in impermissible lending transactions and otherwise dissipated the assets received from Wachovia, all the while failing to fulfill its immediate obligations to transfer over $38 million to Wachovia.

52.    Wachovia entered into the transactions and delivered 26 million Euros to Majapara in reasonable reliance upon Majapara's representations that it was going to deliver the requisite currency.

53.    As a result of Majapara's fraud, Wachovia has been damaged in an amount to be determined at trial, but not less than $24,711,845.00.

## COUNT V

### (Breach of Contract/Anticipatory Breach)

54.    Plaintiff realleges and reincorporates the allegations in Paragraphs 1 through 16.

55.    As set forth above, Majapara also maintains five (5) US dollar accounts at Wachovia. Under these accounts, Wachovia has contingent residual exposure to cover returned items in the federal check clearing program -- this contingent liability is a continuing concern.  In this regard, Wachovia is entitled to immediate reimbursement from Majapara for the amounts Wachovia is required to pay out.

56.    Over the last several months, this liability has averaged $3.3 million per month.

57.    So far this month, Wachovia has already had to cover certain residual liabilities for which Majapara, in breach of its agreements with Wachovia, has not reimbursed Wachovia. As a result, Majapara breached the parties' agreement and is indebted to Wachovia.

58.    Additionally, Majapara has already stated to Wachovia that it is illiquid and unable to satisfy its obligations owed to Wachovia.  Accordingly, Majapara has anticipatorily

breached its agreements with Wachovia by stating it will not be immediately reimbursing Wachovia for these obligations now or when they come due.

59.    Wachovia has performed all of its obligations under its agreements with Majapara.

60.    Consequently, Wachovia has been damaged by Majapara's breach of the parties' agreement and will continue to be damaged by Majapara's anticipatory breach of the parties' agreement in an amount to be determined at trial.

**WHEREFORE,** Plaintiff demands judgment as follows:

(i)    On the First, Second, Third, and Fourth Causes of Action, monetary damages in an amount to be determined at trial, but not less than $24,711,845.00, plus prejudgment interest;

(ii)    On the Fifth Cause of Action, monetary damages in an amount to be determined at trial, plus prejudgment interest;

(iii)    An award of costs, expenses and attorneys fees attendant to this action; and

(iii)    Such other further and different relief as this Court deems just and proper.

Dated:    New York, New York
         December 17, 2007

REED SMITH LLP

By: _____
      Scott S. McKessy (SM-5479)
      Casey Laffey (CL-1483)
      599 Lexington Avenue
      New York, NY 10022
      (212) 521-5400

*Attorneys for Plaintiff*
*Wachovia Bank, National Association*

10

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| WACHOVIA BANK, N.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 07 Civ. 11230 (BSJ)(RLE) |
| v. | ) | |
| | ) | **AMENDED ANSWER and** |
| CASA de CAMBIO MAJAPARA | ) | **COUNTERCLAIMS** |
| S.A. de C.V. a/k/a MAJAPARA CASA | ) | |
| de CAMBIO S.A. de C.V., | ) | |
| | ) | TRIAL BY JURY REQUESTED |
| Defendant. | ) | |

Defendant Casa de Cambio Majapara S.A. de C.V. ("Majapara"), by its attorneys

Tannenbaum Helpern Syracuse & Hirschtritt LLP, for its amended answer and counterclaims to

the Amended Complaint filed by Plaintiff, Wachovia Bank, N.A. ("Wachovia"), sets forth as

follows:

## PRELIMINARY STATEMENT

1.      Majapara denies the allegations contained in Paragraph 1 of the Amended

Complaint.

## VENUE/JURISDICTION

2.      Majapara denies the allegations contained in Paragraph 2 of the Amended

Complaint.

3.      Majapara denies the allegations contained in Paragraph 3 of the Amended

Complaint.

4.      Majapara admits the allegations contained in Paragraph 4 of the Amended

Complaint.

## PARTIES

5.      Majapara admits the allegations in Paragraph 5. Furthermore, Majapara states

Wachovia also maintains offices in many other locations, including Miami, Chicago and a

representative office in Mexico City.

6.      Majapara admits the allegations in Paragraph 6.

## FACTS COMMON TO ALL COUNTS

### The Majapara Relationship With Wachovia

7.      For over ten years, Majapara has been doing business with Wachovia and its

predecessor, First Union. As part of the business relationship Majapara had credit available

through overdraft privileges, the ability to submit unlimited remittance to Wachovia for

processing among others (collectively the "operating facilities"). These operating facilities had

existed for many years.

Majapara denies the remaining allegations of this Paragraph 7.

8.      After years of doing business with First Union, First Union developed an online

website through which FX transactions could be placed. In order to use its new website, First

Union asked Majapara to sign the First Union Online FX Subscription Agreement ("Online FX

Agreement"). The Online FX Agreement does not purport to set terms relating to FX

transactions beyond online transactions. Those terms were what they had always been between

Majapara and First Union. By its own terms, the Online FX Agreement limited its application to

the use of the First Union website to place FX transaction orders. While the Online FX

Agreement provides that First Union reserves the right without notice to modify, suspend,

discontinue, or terminate the FX website or revoke any customer's access, it expressly states that

2

the parties' rights and obligations concerning online and other transactions shall not be impaired or otherwise affected by such actions.

Majapara denies the remaining allegations of Paragraph 8 of the Amended Complaint.

9.     Because Majapara is without sufficient knowledge or information to form a belief as to the truth of these allegations, Majapara denies the allegations of Paragraph 9 of the Amended Complaint.

10.     Majapara admits that it signed and sent the two documents attached to Wachovia's Amended Complaint as Exhibits B and C, but does not believe they are complete documents and denies Wachovia's characterization of the documents. Exhibit B (the 2003 letter) deals exclusively with the use of one particular bank account in connection with online FX transactions. It provides that Majapara will use one particular account at Wachovia for the processing of its FX transactions with Wachovia. The same is true of Exhibit C (the March 2006 agreement). Neither Exhibit B nor Exhibit C contains terms specifically governing FX transactions. Majapara denies the remaining allegations contained in Paragraph 10 of the Amended Complaint.

**The Foreign Exchange Transactions At Issue**

11.     Majapara admits the allegations contained in the first sentence of Paragraph 11 of the Amended Complaint. Majapara denies that the transactions were a departure from the parties' ordinary dealings, Majapara denies the remaining allegations of Paragraph 11 of the Amended Complaint.

12.     Majapara placed FX transaction orders on December 5, 2007.  Wachovia

delivered 26 million Euros to Majapara. Because of Wachovia's breach of its contract with Majapara, Wachovia prevented Majapara from being able to make its payment to Wachovia on December 7. Majapara denies the remaining allegations of Paragraph 12 of the Amended Complaint.

13.    Majapara denies the allegations contained in Paragraph 13 of the Amended Complaint.

14.    Majapara admits that Wachovia seized approximately $13.4 million that was in Majapara's accounts at Wachovia, but denies that Wachovia had any right to "secure" those funds or to "recover" any amounts purportedly "owed." Majapara denies the remaining allegations contained in Paragraph 14 of the Amended Complaint.

15.    Majapara admits that it maintained five accounts with Wachovia, but denies the remaining allegations of Paragraph 15 of the Amended Complaint.

16.    The Wachovia Terms and Conditions do not purport to set out the rights and obligations of parties to FX transactions. Thus, Majapara denies the allegations contained in Paragraph 16 of the Amended Complaint.

## COUNT I

### (Breach of Contract)

17.    Majapara incorporates its response to Paragraphs 1-16 above.

18.    On each business day for many years, Majapara would enter into millions of dollars of FX transactions with Wachovia. Each of those individual transactions took place in the context of the overall contractual relationship between Wachovia and Majapara. That contractual relationship is evidenced by the course of dealing between the parties over many years and the ordinary custom and practice in the foreign exchange business. On the basis of that

4

contractual relationship, Majapara reasonably believed that should Wachovia decide to terminate

Majapara's operating facilities, Wachovia would provide reasonable notice so that Majapara

would have time to move its business to another bank.  Wachovia breached its contractual duty

to Majapara by terminating Majapara's operating facilities without cause and without providing

Majapara any advance notice whatsoever.  Wachovia's breach caused significant disruption to

Majapara's business because Majapara was left with no advance notice during which it could

arrange for a substitute bank. Except as so stated, Majapara denies the allegations contained in

Paragraph 18 of the Amended Complaint.

     19.     Majapara denies the allegations contained in Paragraph 19 of the Amended

Complaint.

     20.     Majapara denies the allegations contained in Paragraph 20 of the Amended

Complaint.

     21.     Majapara denies the allegations contained in Paragraph 21 of the Amended

Complaint.

### COUNT II

### (Promissory Estoppel – Alternate Count)

     22.     Majapara incorporates its response to paragraphs 1-16 above.

     23.     Majapara denies the allegations contained in Paragraph 23 of the Amended

Complaint.

     24.     On December 5, when Majapara placed the orders for the FX transactions,

Majapara had every intention and expectation that these transactions would take place just as

they had for more than ten years.  Wachovia would provide Majapara with one currency, and

Majapara would provide Wachovia with the other one or two days later.  Wachovia's later

5

improper cancellation of Majapara's operating facilities, however, frustrated Majapara's intention and expectation. Majapara denies the remaining allegations contained in Paragraph 24 of the Amended Complaint.

25.     Majapara admits that Wachovia delivered approximately $38 million worth of currency to Majapara, but denies that Wachovia did so in reliance upon Majapara's agreement to delivery certain currency to Wachovia.  Majapara denies the remaining allegations of Paragraph 25 of the Amended Complaint.

26.     Wachovia demanded that the funds be paid in full immediately. By virtue of its own actions, Wachovia had no right to demand payment from Majapara on December 7. Accordingly, Majapara denies the allegations contained in Paragraph 26 of the Amended Complaint.

27.     Majapara has not paid because Wachovia breached its agreement with Majapara and took actions that frustrated Majapara's ability to pay. Accordingly, Majapara denies the allegations contained in Paragraph 27 of the Amended Complaint.

28.     Majapara admits that Wachovia seized approximately $13.4 million that was in Majapara's accounts at Wachovia, but denies that Wachovia had any right to "obtain" these funds, or to "offset" any remaining amount purportedly "owed." Majapara accordingly denies the allegations of Paragraph 28 of the Amended Complaint.

29.     Majapara denies the allegations contained in Paragraph 29 of the Amended Complaint.

30.     Majapara denies the allegations contained in Paragraph 30 of the Amended Complaint.

## COUNT III

### (Unjust Enrichment – Alternate Count)

31.     Majapara incorporates its response to Paragraphs 1-16 above.

32.     Majapara denies the allegations contained in Paragraph 32 of the Amended

Complaint.

33.     On December 5, when Majapara placed the orders for the FX transactions,

Majapara had every intention and expectation that these transactions would take place just as

they had for more than ten years: Wachovia would provide Majapara with one currency, and

Majapara would provide Wachovia with the other one or two days later. Wachovia's improper

cancellation of Majapara's operating facilities later that same day, however, frustrated

Majapara's intention and expectation. Accordingly, Majapara denies the allegations contained in

Paragraph 33 of the

Amended Complaint.

34.     Majapara denies the allegations contained in Paragraph 34 of the Amended

Complaint.

35.     Majapara has not paid because of Wachovia's breach of its agreement with

Majapara and the actions taken by Wachovia that frustrated Majapara's ability to pay.

Accordingly, Majapara denies the allegations contained in Paragraph 35 of the Amended

Complaint.

36.     Majapara admits that Wachovia seized approximately $13.4 million that was in

Majapara's account at Wachovia, but denies that Wachovia had any right to "obtain" these funds, or to "offset" any remaining amount purportedly "owed." Accordingly, Majapara denies the allegations contained in Paragraph 36 of the Amended Complaint.

37.    Wachovia demanded that the funds be paid in full immediately. By virtue of its own actions, Wachovia had no right to demand payment from Majapara on December 7. Accordingly, Majapara denies the allegations contained in Paragraph 37 of the Amended Complaint.

38.    Majapara has not paid because Wachovia breached its agreement with Majapara and taken actions that frustrate Majapara's ability to. Majapara denies the allegations contained in Paragraph 38 of the Amended Complaint.

39.    Majapara denies the allegations contained in Paragraph 39 of the Amended Complaint.

40.    Majapara denies the allegations contained in Paragraph 40 of the Amended Complaint.

41.    Majapara denies the allegations contained in Paragraph 41 of the Amended Complaint.

**COUNT IV**

**(Fraud)**

42.    Majapara incorporates its response to paragraphs 1-16 above.

43.    Majapara placed orders for FX transaction on December 5, 2007 in reliance upon its longstanding contractual relationship and course of dealing with Wachovia. Wachovia accepted those orders knowing that later that day Wachovia was going to terminate Majapara's

operating facilities. Except as so stated, Majapara denies the allegations contained in Paragraph 43 of the Amended Complaint.

44.    Majapara placed orders for FX transaction on December 5, 2007 in reliance upon its longstanding contractual relationship and course of dealing with Wachovia. Wachovia accepted those orders knowing that later that day Wachovia was going to terminate Majapara's operating facilities. Except as so stated, Majapara denies the allegations contained in Paragraph 44 of the Amended Complaint.

45.    Majapara placed orders for FX transaction on December 5, 2007 in reliance upon its longstanding contractual relationship and course of dealing with Wachovia. Wachovia accepted those orders knowing that later that day Wachovia was going to terminate Majapara's operating facilities. Thus, at the time Majapara placed its December 5 orders with Wachovia, Majapara had no knowledge that Wachovia would later terminate its operating facilities. Except as so stated, Majapara denies the allegations contained in Paragraph 45 of the Amended Complaint.

46.    Majapara denies the allegations contained in Paragraph 46 of the Amended Complaint.

47.    Majapara denies the allegations contained in Paragraph 47 of the Amended Complaint.

48.    Majapara denies the allegations contained in Paragraph 48 of the Amended Complaint.

49.    Majapara denies the allegations contained in Paragraph 49 of the Amended Complaint.

50.    Majapara denies the allegations contained in Paragraph 50 of the Amended

Complaint.

51.     Majapara denies the allegations contained in Paragraph 51 of the Amended

Complaint.

52.     Majapara denies the allegations contained in Paragraph 52 of the Amended

Complaint.

53.     Majapara denies the allegations contained in Paragraph 53 of the Amended

Complaint.

## COUNT V

### (Breach of Contract/Anticipatory Breach)

54.     Majapara incorporates its response to paragraphs 1-16 above.

55.     Majapara admits that it maintained five accounts with Wachovia, but denies the

remaining allegations in Paragraph 55 of the Amended Complaint.

56.     Because Majapara is without sufficient knowledge or information to form a belief

as to the truth of these allegations, Majapara denies the allegations in Paragraph 56 of the

Amended Complaint.

57.     Because Majapara is without sufficient knowledge or information to form a belief

as to the truth of these allegations, Majapara denies the allegations in Paragraph 57 of the

Amended Complaint.

58.     Majapara denies the allegations contained in Paragraph 58 of the Amended

Complaint.

59.     Majapara denies the allegations contained in Paragraph 59 of the Amended

Complaint.

60.     Majapara denies the allegations contained in Paragraph 60 of the Amended

Complaint.

## ADDITIONAL AND AFFIRMATIVE DEFENSES

### First Affirmative Defense

61.    Majapara incorporates by reference its Counterclaims in this matter.  By reason of the matters set forth therein and the wrongs Wachovia has committed against Majapara – including Wachovia's breach of its contractual duties, obtaining a wrongful injunction and wrongful attachments - Wachovia is due no recovery here and its Complaint should be dismissed.

### Second Affirmative Defense

62.    Wachovia's claims against Majapara are barred in whole or in part by the doctrine of estoppel.  Wachovia induced Majapara to give it most of Majapara's business, including through the extension of the operating facilities, from which Wachovia earned substantial fees over many years.  Wachovia is estopped from claiming damages because (a) it was Wachovia's termination of Majapara's operating facilities without cause and without notice that caused Majapara to be unable to pay Wachovia on December 7, and (b) it was Wachovia's false accusations of fraud and theft (in order to obtain attachments and an injunction) that destroyed Majapara's business.

### Third Affirmative Defense

63.    Wachovia's claims against Majapara are barred in whole or in part by the doctrine of unclean hands.  Wachovia induced Majapara to give it most of Majapara's business, including through the extension of the operating facilities, from which Wachovia earned substantial fees over many years.  Wachovia's termination of Majapara's operating facilities without cause and

without notice caused Majapara to be unable to pay Wachovia on December 7, and Wachovia's false accusations of fraud and theft (in order to obtain attachments and an injunction) destroyed Majapara's business.

**Fourth Affirmative Defense**

64.    Wachovia's claims against Majapara are barred in whole or in part by Wachovia's failure to mitigate its damages.  As a result of Wachovia's false accusations of fraud and theft, Majapara's business was destroyed, causing Majapara to be unable to pay Wachovia for the outstanding FX transactions.

**Fifth Affirmative Defense**

65.    Wachovia's claims against Majapara are barred in whole or in part by the doctrine of duress.  Wachovia induced Majapara to give it most of Majapara's business, by among other things, the extension of the operating facilities from which Wachovia earned substantial fees. Wachovia knew that Majapara was dependent on these operating facilities.   Wachovia's termination of Majapara's operating facilities – without cause and without notice – left Majapara unable to pay Wachovia on December 7, and Wachovia's false accusations of fraud and theft (in order to obtain attachments and an injunction) caused Majapara's business to be destroyed.

**Sixth Affirmative Defense**

66.    Wachovia's claims against Majapara are barred in whole or in part because this Court lacks personal jurisdiction over Majapara.

**Seventh Affirmative Defense**

67.    Wachovia's claims against Majapara are barred due to insufficiency of process.

Majapara hereby reserves the right to amend this Answer and Counterclaims to include additional defenses as they become known to Majapara.

## COUNTERCLAIMS

### Introduction and Nature of the Case

66.     As a result of Wachovia's unwarranted and wrongful actions, Majapara's entire business has been destroyed and over 600 Majapara employees are out of work.

67.     After having done business with Majapara for over ten years, Wachovia, without cause and without advance notice, terminated all operating credit facilities extended to Majapara.

68.     Less than ten days after this termination, Wachovia filed two lawsuits against Majapara seeking *ex parte* prejudgment attachments and an injunction.  Wachovia knew that in such *ex parte* proceedings the Courts would necessarily have to trust Wachovia to make full and fair disclosure of all facts material to the Courts because – of course – Majapara would not be there.  Wachovia took this opportunity, instead, to withhold material facts from the Court, assuring that the Courts would grant Wachovia the injunction and attachments that it sought.

69.     Although Wachovia claimed that Majapara had not paid it $38 million that it owed for certain foreign exchange transactions, Wachovia did not disclose to the Courts the reason Majapara could not pay – because Wachovia had terminated Majapara's operating facilities without cause and without notice.  Wachovia did not disclose to the Courts that just months earlier it had induced Majapara to move business Majapara was doing with Harris Bank to Wachovia.  Wachovia did not disclose to the Courts information showing that the withdrawals of funds by Majapara from its Wachovia account – withdrawals that Wachovia claimed were intended to frustrate any attempts by Wachovia to collect its debt – were, in fact, done in the ordinary course of Majapara's business.

70.     Wachovia breached its contractual duties to Majapara, tortiously interfered with Majapara's relations with other banks, and then wrongfully obtained an injunction and

13

attachments from two Courts. Wachovia's actions not only violate the law, but also fundamental principles of justice, equity, and good conscience. For the substantial losses Majapara has suffered at the hands of Wachovia, Majapara seeks redress including an award of compensatory damages, and punitive damages which are definitely warranted in this case.

**Parties, Jurisdiction, and Venue**

71.     Counterplaintiff Majapara began operations as foreign exchange bureau (casa de cambio) in 1989 and had grown by December 2007 to have over 600 employees and offices throughout Mexico. Majapara has no offices outside of Mexico. Its principal place of business is in Mexico City, Mexico.

72.     Upon information and belief, Counterdefendant Wachovia is a national banking association with its principal place of business in North Carolina and various offices in the U.S. and abroad, including New York, Illinois, and Mexico City.

73.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, and 12 U.S.C. § 632, in that this is a suit (i) of a civil nature at common law or in equity to which Wachovia, which is organized under the laws of the United States, is a party; and (ii) arising out of transactions involving international or foreign banking, or out of other international or foreign financial operations, and as such is deemed to arise under the laws of the United States. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, in that this is a civil action where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between a citizen of a State and a citizen or subject of a foreign state. This Court also has pendent jurisdiction over these counterclaims.

**General Allegations**

74.    Majapara has operated as a foreign exchange bureau (casa de cambio) in Mexico since 1989. Majapara's business grew from a 17 person office to over 600 employees by December 2007.

75.    Majapara is subject to the regulation of the Mexican banking authorities. In accordance with Mexican law, Majapara engaged in FX transactions and the purchase and sale of items like bill payment orders, checks, and drafts in foreign currencies. Pursuant to Mexican law, Majapara was authorized to enter into transactions for the purchase and sale of these items that would settle up to two days later. Thus, Majapara would accept checks drawn on U.S. banks from its customers and provide cash to the customers the same day. Then Majapara would electronically transmit those checks to Wachovia. Wachovia would credit Majapara's account for those checks on the same day. Wachovia would then negotiate the check via the US Interbank Clearing System or other method.

76.    Majapara has endeavored to operate the highest quality business operations possible. As such, in 2004 Majapara voluntarily subjected itself and its anti-money laundering processes to the scrutiny of outside auditors in order to obtain ISO 9001 certification. Majapara had an independent accreditation organization conduct an audit of those processes for effectiveness and conformance to the rigorous standards of ISO 9001:2000. As a result of this audit, Majapara obtained the ISO 9001 certification.

**Majapara's Course of Dealing with Wachovia**

77.    Majapara had a longstanding business relationship with Wachovia going back more than ten years. In addition to Wachovia's longstanding practice of providing a day or two of float to Majapara in connection with FX transactions, Wachovia also provided Majapara with

operating lines of credit, overdraft privileges, and the ability to process unlimited remittances. These "operating facilities" had been in place for many years.

78.    While these operating facilities were not memorialized in writing, Wachovia knew that Majapara was dependent upon them and that terminating them without notice would be damaging to Majapara's business.

79.    In February 2007, Wachovia induced Majapara to transfer to Wachovia certain business that it had previously been doing with Harris Bank.  At that time, Majapara cleared remittances through Harris Bank as well as Wachovia.  Wachovia sought to earn the fees that Majapara had previously been paying to Harris Bank for its clearing services.  Thus, Wachovia sought a meeting with Majapara in Mexico City at which Wachovia representatives requested that Majapara transfer the Harris Bank clearing business to Wachovia.  Majapara agreed.  Over the next few months, Majapara transferred to Wachovia virtually all of the business it had been doing with Harris Bank.

80.    Majapara would never have agreed to Wachovia's request if it believed that Wachovia could give Majapara absolutely no advance notice that it was terminating Majapara's operating facilities.  Majapara reasonably believed that Wachovia was obligated to provide such notice by their longstanding course of dealing.

**Wachovia's Reaction to Bad Publicity**

81.    Some time later, Wachovia was the subject of embarrassing press reports that it had been doing business with certain businesses engaged in laundering the proceeds of the illegal drug trade.  A November 15, 2007 Forbes article, entitled "Banking on Drugs," reported that a Wachovia customer, Casa de Cambio Puebla ("Puebla") was linked to a business jet carrying tons of cocaine that crashed in September in Mexico.  Puebla also was linked to the purchase of

16

another plane carrying tons of cocaine that was seized by Mexican officials a year earlier. Puebla is not related in any way to Majapara.

82.     Upon information and belief, Wachovia decided to cease doing business with businesses outside the U.S. as a reaction to embarrassing press reports of Wachovia's dealings with Puebla.

**Wachovia Terminates Majapara Without Cause and Without Notice**

83.     Late in the day on December 5, 2007, Majapara was visited by Carlos Perez and Juanita Gomez of Wachovia who hand delivered a letter informing Majapara that Wachovia's operating facilities were terminated.   These operating facilities were being terminated without cause.  As the letter from Carlos Perez stated:

> [a]s part of the ongoing review and re-evaluation of our long-term global strategy, Wachovia Bank, National Association ("Wachovia") has determined to cease providing correspondent banking services to exchange companies outside the United States. . . . Wachovia and I wish to thank you for your loyalty during our business relationship and wish you continued commercial success.

(attached hereto as Exhibit A)  The letter then informed Majapara that "your existing credit lines with Wachovia have been cancelled.  Any current outstanding utilized credit will remain in place until it has come to maturity."  In case there was any doubt, Mr. Perez made it clear – Majapara's operating facilities were terminated effective immediately.  Majapara pleaded with Mr. Perez to continue its operating facilities for a short time in order to give Majapara time to arrange for a substitute bank, but he refused.

**After Termination, Majapara Scrambles to Deal With
Dire Situation, Yet Pays Almost $40 Million to Wachovia**

84.     In an effort to deal with this situation, Majapara began contacting other banks

seeking a substitute for the operating facilities that Wachovia had just terminated. Majapara also approached other foreign exchange bureaus seeking to negotiate operating alliances or the sale of lines of Majapara's business.

85.    Not surprisingly, Majapara rapidly began experiencing liquidity problems that continued to worsen over the next few days. Despite the fact that Wachovia had caused Majapara's liquidity problems, Majapara paid to Wachovia almost $40 million to settle FX transactions the day after receiving this devastating news.

86.    Despite its best efforts, Majapara lacked sufficient funds to be able to settle the approximately $38 million in FX transactions that Wachovia had entered into with Majapara on December 5 – before Wachovia delivered its devastating news. At the time Majapara entered into those transactions, Majapara had no idea that Wachovia was going to terminate its operating facilities later that day. At the time Wachovia accepted Majapara's orders for these transactions, however, Wachovia would have known this.

87.    Over the next few days, Majapara continued trying to line up a substitute for Wachovia. Banks that Majapara approached required time to obtain information about Majapara in order to present the information to the bank credit committees and otherwise obtain necessary approvals. Majapara contacted other Mexican foreign exchange bureaus in an effort to enter into operating alliances or to sell them certain lines of business.

88.    On December 13, Majapara's CEO, Jorge Ortiz Muñoz telephoned Wachovia's Carlos Perez to again ask him to continue Majapara's operating facilities until the company could make substitute arrangements. Mr. Ortiz informed Mr. Perez that Majapara was doing everything possible to pay Wachovia, but that Majapara was having difficulty dealing with the abrupt cancellation of its longstanding operating facilities. Mr. Ortiz informed Mr. Perez that

reasonable notice would have enabled Majapara to replace Wachovia's operating facilities with another bank. Finally, Mr. Ortiz offered to provide Wachovia with security for the debt. Mr. Perez did not agree. Mr. Ortiz summarized his conversation with Mr. Perez in a December 13 letter that he sent to Mr. Perez. (attached hereto as Exhibit B)

**Wachovia's Misrepresentations to the Court**

89.    The next day, December 14, Wachovia filed an action in this Court seeking emergency *ex parte* prejudgment relief including an attachment of Majapara's bank accounts and an injunction. Wachovia simultaneously filed an action in Illinois state court seeking an *ex parte* attachment (attached as Exhibit C).

90.    In order to obtain relief from this Court, Wachovia submitted a complaint (attached as Exhibit D), memorandum of law (attached as Exhibit E), and sworn declarations of Wachovia's Carlos Perez and attorney Scott McKessy (attached as Exhibit F and G, respectively). On the basis of those submissions, the Court entered the December 14 Order to Show Cause, which included an injunction against Majapara. (attached as Exhibit H)

91.    In the Declaration of Mr. McKessy filed by Wachovia with the Court, Mr. McKessy stated under oath that expedited *ex parte* relief was being sought "because of the likelihood that, if notified of the instant application before hand, defendant Majapara Casa De Cambio S.A. de C.V. ("Majapara") will dissipate or transfer assets which are the subject of this application." Mr. McKessy also stated under oath that Majapara had "absconded with over $38 million" of Wachovia's funds and had made a "threat" to make itself judgment proof and frustrate any attempt by Wachovia to collect.

92.    Mr. McKessy's declaration failed to disclose to the Court that Wachovia had without cause and without notice terminated Majapara operating facilities. His declaration failed

19

to disclose the almost $40 million that Majapara paid to Wachovia on December 6 – the day after

Majapara's operating facilities were terminated. These are material facts of which Mr. McKessy

knew or reasonably should have ascertained before filing Wachovia's request for emergency

relief and should have disclosed these facts to the Court in his declaration.

93.    In the Declaration of Mr. Perez that Wachovia filed with the Court, Mr. Perez

stated under oath that Majapara had reneged on its transactions and "absconded with Wachovia's

money." Mr. Perez stated under oath that Majapara knew of its liquidity crisis before the closing

of the December 5 FX transactions. Mr. Perez stated that Majapara had "engaged in illegal loans

in relation to its foreign exchange transactions." Finally, Mr. Perez stated that "based upon [his

December 13] conversation [with Mr. Ortiz], it is my belief that Majapara engaged in fraud...."

94.    Mr. Perez's declaration failed to disclose to the Court the reason Majapara had not

been able to pay Wachovia on time – that Wachovia *caused* Majapara's liquidity crisis by

terminating its operating facilities without cause and without advance notice *after* Majapara had

placed the December 5 FX transactions. Mr. Perez's declaration failed to disclose to the Court

that the day after getting this devastating news, Majapara paid to Wachovia almost $40 million.

These are material facts of which Mr. Perez knew or reasonably should have known and should

have disclosed to the Court in his declaration.

95.    After years of doing business with Majapara, Mr. Perez knew or reasonably

should have known that Majapara was not engaged in any illegality. Since Wachovia had been

providing millions of dollars of credit to Majapara for years, it is difficult to believe that

Wachovia did not know Majapara's business.

96.    Wachovia's memorandum of law, upon which the Court expressly relied in

entering its December 14 Order to Show Cause, misrepresented to the Court that Majapara had "caused itself" to go out of business. Wachovia knew that it had terminated Majapara's operating facilities on December 5 without cause and without any advance notice. Wachovia knew that months earlier it had induced Majapara to move even more of its business to Wachovia. As a result, Wachovia knew or reasonably should have known that this statement simply was not true.

97.     Wachovia's memorandum of law contains additional materially misleading statements ostensibly made in order to induce the Court to enter the temporary restraining order it sought. In its memorandum of law, Wachovia represented to the Court that Majapara had "already attempted to remove certain funds from its Wachovia accounts." Wachovia knew or should have known that any transfers of funds into or out of Majapara's accounts were done in the ordinary course of Majapara's business. Nevertheless, Wachovia made false and materially misleading statements to the Court in order to lead the Court to believe that Majapara was attempting to move assets beyond Wachovia's reach. Moreover, Wachovia knew that it was not entitled to a TRO or preliminary injunction because an inability to collect a money judgment does not satisfy the requisite of irreparable harm.

98.     Wachovia's complaint is rife with misrepresentations and fails to disclose the material facts set forth above. In the complaint, Wachovia accuses Majapara of fraud because **"at the time Majapara entered into the December 5, 2007 agreement, it knew it was illiquid and insolvent and incapable of performing its obligations under the parties' agreement."** (emphasis added) Wachovia could not have believed this to be true when it knew that the genesis of Majapara's liquidity crisis was Wachovia's termination of Majapara's operating facilities.

21

Therefore, Wachovia knew or reasonably should have known at the time it made this statement that it was not true.

99.    Thus Wachovia induced the Court to enter the Order to Show Cause providing that "Majapara, shall be and hereby is enjoined and restrained from transferring, selling, pledging, assigning or otherwise disposing of any of its assets." (attached hereto as Exhibit H) The Order to Show Cause was based solely upon representations that Wachovia made to the Court.

100.    The Order of Attachment entered by the Court on December 20 was based upon the same materially false and misleading representations made by Wachovia to the Court in support of the Order to Show Cause and was entered without adequate notice to Majapara. (attached hereto as Exhibit I)

101.    Wachovia made substantially the same false and misleading representations to the Circuit Court of Cook County Illinois in order to induce it to grant an order of attachment. (attached hereto as Exhibit J)

**Wachovia Disseminates Orders**
**Obtained Through Misrepresentations to Courts**

102.    After Wachovia induced this Court and the Illinois state court to enter Orders against Majapara that Wachovia knew or reasonably should have known were based upon false statements, Wachovia then embarked upon a course of disseminating those Orders to others. Wachovia disseminated this Court's Orders and the Orders of the Illinois state court along with other materials to banks including Harris Bank, Citibank, JP Morgan Chase, Deutsche Bank, Standard Chartered, Bayerische Hypo- und Vereins Bank AG, Wells Fargo, and the Royal Bank of Canada. Because Wachovia obtained these Orders on the basis of sworn declarations and

22

other statements that it knew or reasonably should have known were false and misleading, Wachovia knew that it was not entitled to the Orders. Thus, Wachovia was not privileged to disseminate these Orders to the banks nor was the dissemination of the Orders done in furtherance of Wachovia's legitimate interests in pursuing its interests in litigation. Wachovia's dissemination of these Orders was wrongful and the severe damage such dissemination caused to Majapara's reputation and ability to continue as a foreign exchange bureau was in no way justified.

103.    Upon information and belief, Wachovia repeated the misleading statements in the documents filed with the Court to other foreign exchange bureaus and banks in Mexico in order to interfere with Majapara's efforts to obtain alternative financing, to interfere with Majapara's efforts to enter into operating alliances with other foreign exchange businesses, and/or to interfere with Majapara's efforts to sell certain lines of business. Wachovia's interference was malicious, unlawful, and not undertaken for any legitimate purpose or to advance any legitimate interest of Wachovia. As a result of Wachovia's interference, banks and foreign exchange bureaus with whom Majapara had been negotiating abandoned all discussions with Majapara.

104.    Upon information and belief, shortly after filing its cases, Wachovia made substantially the same false and misleading statements made in the documents filed with the Court to banking regulators in Mexico, in order to induce the regulators to take action against Majapara.

105.    Shortly after Wachovia initiated this action and the Illinois state court action, the affidavit of Carlos Perez was published on an internet website. On February 13, 2008 another website reported facts from documents filed with the Court on February 11. Upon information and belief, Wachovia has excessively and impermissibly published these court filings. Upon

information and belief Wachovia or others acting on its behalf have made substantially the same false and misleading statements made in the documents filed with the Court to the media in order to induce the media to publish such statements.

## COUNT I

### Breach of Contract

106.     Majapara incorporates paragraphs 66 through 105 above as if fully set forth herein.

107.     As set forth above, for many years Wachovia and Majapara had a contractual relationship whereby Wachovia provided operating facilities to Majapara.     That contractual relationship is evidenced by the course of dealing between the parties over many years.

108.     Wachovia owed Majapara a contractual duty to provide Majapara with reasonable notice that Wachovia was terminating its operating facilities so that Majapara would have time to make substitute arrangements.

109.     Wachovia breached its contractual duty to Majapara by terminating the operating facilities without cause and without providing Majapara any advance notice whatsoever.

110.     Majapara suffered significant damages as a result of Wachovia's breach.

WHEREFORE, Majapara respectfully requests that this Court:

a.     enter judgment in its favor;

b.     award Majapara compensatory damages, including interest as allowed by law;

c.     award Majapara its costs and fees as allowed by law; and

d.     award Majapara such other and further relief as the Court may deem just and proper.

## COUNT II

### Wrongful Injunction

111.     Majapara incorporates paragraphs 66 through 110 above as if fully set forth

herein.

112.     On December 14 and 20, 2007, Wachovia obtained injunctive relief against

Majapara from this Court.  Because Wachovia obtained these injunctions by making false and

misleading statements to this Court, and Majapara was not provided with an opportunity to be

heard on December 20, 2007, it was never entitled to such injunctive relief.

113.     Wachovia knowingly or recklessly made false and misleading statements to this

Court, including the following:

> - Majapara engaged in fraud because "at the time Majapara entered into the December 5,
> 2007 agreement, it knew it was illiquid and insolvent and incapable of performing its
> obligations under the parties' agreement;"
>
> - Majapara engaged in fraud because it did not intend to repay Wachovia for the
> December 5 FX transactions;
>
> - Majapara engaged in fraud because Majapara was engaged in illegal and illicit lending
> activities in violation of Mexican law;
>
> - Majapara had tried to move funds from the account it had with Wachovia as part of an
> effort to place its assets beyond the reach of Wachovia in order to frustrate Wachovia's
> ability to collect on any judgment.

114.     Wachovia knew or reasonably should have known that these statements were false

and materially misleading because Wachovia knew facts to the contrary, including the following:

> - Wachovia caused Majapara's liquidity crisis by terminating Majapara's operating
> facilities *after* Majapara had placed the December 5 FX transactions;
>
> - Despite its abrupt termination by Wachovia, Majapara still paid Wachovia almost $40
> million the very next day to settle FX transactions;

25

- Majapara was unable to settle the remaining $38 million of FX transactions because of Wachovia's abrupt termination of Majapara's operating facilities;

- The purported "lending" that Majapara engaged in was authorized by Mexican law, and Wachovia knew it because it was Wachovia who processed the millions of dollars of remittances for Majapara every day.

115.     Thus, Wachovia knew or reasonably should have known that the statements made in paragraph 113 above were materially false and misleading.

116.     Wachovia failed to give appropriate notice to Majapara of the hearing and return date for Wachovia's Order to Show Cause, which unbeknownst to Majapara, was heard by the Court on Thursday, December 20, 2007 at 3:30 PM.

117.     Wachovia made the false and misleading statements in paragraph 113 above in order to induce this Court to grant Wachovia *ex parte* prejudgment relief, including attachment of Majapara's bank accounts and an injunction. This Court expressly relied upon Wachovia's false and misleading statements in deciding to enter orders, including this Court's Order to Show Cause and Order of Attachment.

118.     Wachovia falsely represented to this Court that it would suffer irreparable injury if the injunction sought in its TRO motion was not granted despite knowing that its claim for purely money damages was insufficient to satisfy this requirement.

119.     As a result, Wachovia knew or reasonably should have known that it was not entitled to the injunction it obtained on December 14 and on December 20.

120.     As a result, Majapara suffered severe damages.

WHEREFORE, Majapara respectfully requests that this Court:

a.     enter judgment in its favor;

b.     award Majapara compensatory and punitive damages, including interest as allowed by law;

c.     award Majapara its costs and fees as allowed by law; and

d.     award Majapara such other and further relief as the Court may deem just and proper.

## COUNT III

### Wrongful Attachment

121.    Majapara incorporates paragraphs 66 through 120 above as if fully set forth herein.

122.    On December 20, 2007, Wachovia obtained an Order of Attachment from this Court. On December 14, Wachovia obtained an order of attachment from the Illinois state court. Because Wachovia obtained these attachment orders by making false and misleading statements to this Court and the Illinois state court, it was never entitled to such relief.  As set forth in Count II above, Wachovia knowingly or recklessly made false and misleading statements to this Court and the Illinois state court, as set forth in paragraph 113 above.

123.    Wachovia knew or reasonably should have known that these statements were false and materially misleading because Wachovia knew facts to the contrary, including those facts set forth in paragraph 114.

124.    Thus, Wachovia knew or reasonably should have known that the statements made in paragraph 113 above were materially false and misleading.

125.    Wachovia made the false and misleading statements in paragraph 113 above in order to induce this Court and the Illinois state court to grant Wachovia *ex parte* prejudgment relief, including attachment of Majapara's bank accounts.  This Court and the Illinois state court

27

expressly relied upon Wachovia's false and misleading statements in deciding to enter orders, including this Court's Order to Show Cause and Order of Attachment.

126.    As a result, Majapara suffered damages.

WHEREFORE, Majapara respectfully requests that this Court:

a.    enter judgment in its favor;

b.    award Majapara compensatory and punitive damages, including interest as allowed by law;

c.    award Majapara its costs and fees as allowed by law; and

d.    award Majapara such other and further relief as the Court may deem just and proper.

## COUNT IV

### Tortious Interference with Contract

127.    Majapara incorporates paragraphs 66 through 126 above as if fully set forth herein.

128.    Wachovia knew that although Majapara had most of its business with Wachovia, it also had relationships and contracts with other banks and financial institutions. Moreover, Wachovia knew that Majapara had relationships and contracts with its customers in Mexico.

129.    On information and belief, Wachovia maliciously and for improper purposes made accusations that Majapara was engaged in fraud and theft on information and belief Wachovia made those false accusations to banks including Harris Bank, Citibank, JP Morgan Chase, Deutsche Bank, Standard Chartered, Bayerische Hypo- und Vereinsbank AG, Wells

28

Fargo, and the Royal Bank of Canada. On information and belief, Wachovia maliciously and for improper purposes made these false and misleading statements to customers of Majapara.

130.    As a result of Wachovia's wrongful interference, Majapara's relationship with it customers and with banks with which it did business has been damaged.

WHEREFORE, Majapara respectfully requests that this Court:

a.    enter judgment in its favor;

b.    award Majapara compensatory and punitive damages, including interest as allowed by law;

c.    award Majapara its costs and fees as allowed by law; and

d.    award Majapara such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Majapara hereby demands trial by jury for all claims so triable as of right.

Dated: New York, New York
        February 27, 2008                    Respectfully submitted,

                                             TANNENBAUM HELPERN
                                             SYRACUSE & HIRSCHTRITT LLP

                                             By:  ___/s/ Vincent J. Syracuse_____
                                                  Vincent J. Syracuse
                                                  David A. Pellegrino
                                                  George F. du Pont

                                                  900 Third Avenue
                                                  New York, NY  10022
                                                  Tel:  (212) 508-6743
                                                  Fax:  (212) 202-7516

                                                  SPERLING & SLATER, P.C.
                                                  55 West Monroe Street, Suite 3200
                                                  Chicago, Illinois  60603
                                                  Tel:  (312) 641-3200
                                                  Fax:  (312) 641-6492

                                                  *Counsel for Defendant Casa De Cambio*
                                                  *Majapara S.A. de C.V.*

[826964-2]

# EXHIBIT C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| WACHOVIA BANK, N.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 08 CV 170 |
| v. | ) | |
| | ) | Honorable Amy J. St. Eve |
| | ) | |
| CASA de CAMBIO | ) | **AMENDED** |
| MAJAPARA S.A. de C.V., | ) | **ANSWER and COUNTERCLAIMS** |
| a/k/a MAJAPARA CASA | ) | |
| de CAMBIO S.A. de C.V. and | ) | |
| JOM CORPORATION OF | ) | |
| ILLINOIS, | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants, | ) | |
| and | ) | |
| | ) | |
| Harris N.A., a National Association, | ) | |
| | ) | |
| Garnishee. | ) | |

Defendant Casa de Cambio Majapara S.A. de C.V. ("Majapara"), by its attorneys Sperling & Slater, P.C., for its amended answer and counterclaims to the Complaint filed by Plaintiff, Wachovia Bank, N.A. ("Wachovia"), states as follows:

### PRELIMINARY STATEMENT

1.  This action arise from Majapara's misappropriation of over $38 million (US$) of Wachovia's money relating to a series of foreign exchange spot transactions between the parties. Foreign exchange spot transactions, due to their frequency, the speed at which the transactions are agreed and closed, and the manner in which funds are simultaneously exchanged, are founded upon trust. Majapara, however, abused that trust – a trust that was established through years of currency trading with Wachovia – to plunder more than $38 Million from Wachovia.

**Response:**    As a result of Wachovia's unwarranted and wrongful actions, Majapara's entire business has been destroyed and over 600 Majapara employees are out of work.

1

After having done business with Majapara for over ten years, Wachovia, without cause and without advance notice, terminated all operating credit facilities extended to Majapara.

Less than ten days after this termination, Wachovia filed two lawsuits against Majapara seeking *ex parte* prejudgment attachments and an injunction. Wachovia knew that in such *ex parte* proceedings the Courts would necessarily have to trust Wachovia to make full and fair disclosure of all facts material to the Courts because – of course – Majapara would not be there. Wachovia took this opportunity, instead, to withhold material facts from the Court, assuring that the Courts would grant Wachovia the injunction and attachments that it sought.

Although Wachovia claimed that Majapara had not paid it $38 million that it owed for certain foreign exchange transactions, Wachovia did not disclose to the Courts the reason Majapara could not pay – because Wachovia had terminated Majapara's operating facilities without cause and without notice. Wachovia did not disclose to the Courts that just months earlier it had induced Majapara to move business Majapara was doing with Harris Bank to Wachovia. Wachovia did not disclose to the Courts information showing that the withdrawals of funds by Majapara from its Wachovia account – withdrawals that Wachovia claimed were intended to frustrate any attempts by Wachovia to collect its debt – were, in fact, done in the ordinary course of Majapara's business.

Wachovia breached its contractual duties to Majapara, tortiously interfered with Majapara's relations with other banks, and then wrongfully obtained an injunction and attachments from two Courts. Wachovia's actions not only violate the law, but also fundamental principles of justice, equity, and good conscience. For the substantial losses Majapara has suffered at the hands of Wachovia, Majapara seeks redress including an award of compensatory damages, and punitive damages which are definitely warranted in this case.

2

Majapara denies the remaining allegations of this paragraph.

2.    Majapara's action was not a mere renege on a multi-million dollar transaction wherein Majapara returned Wachovia's property when it realized it could not complete the foreign currency exchange. Subsequent conversations with Majapara make apparent that it never intended to honor its commitments but, instead, had decided to wrongfully keep Wachovia's money and abscond with it. In these after-the-fact conversations, Majapara admitted to Wachovia that it was illiquid, that it had engaged in illicit activities in relation to its foreign exchange transactions and threatened that, if Wachovia took any steps to enforce its rights, Wachovia's judgment would be uncollectible. Through this action for breach of contract, promissory estoppel, unjust enrichment, fraud, and alter ego liability, Wachovia seeks a judgment against Majapara and JOM Corporation of Illinois (as alter ego of Majapara) for $24,711,845.00 (the amount of Wachovia's loss less offsets currently obtained), plus prejudgment interest and costs.

**Response:**    See response to paragraph 1.

## PARTIES AND JURISDICTION

3.    Wachovia is a national banking association, with its principal place of business in Charlotte, North Carolina. Wachovia has offices in Illinois.

**Response:**  Admitted.  Wachovia also maintains offices in many other locations, including Miami, New York, and Mexico City.

4.    Upon information and belief, Majapara is a Mexican corporation with its principal place of business in Mexico City, Mexico.  Upon information and belief, Defendant Majapara utilizes a bank account at a Chicago branch of Harris N.A. to transact business and it transacts business in Illinois on a continuous and systematic basis.  Further, upon information and belief, Defendant Majapara transacts business on a continuous and systematic basis through an alter ego, Defendant JOM Corporation of Illinois ("JOM"), which is or was an Illinois corporation with its principal place of business at 3506 W. 26th Street in Chicago, Illinois.

**Response:** Majapara admits that it is a Mexican business with offices throughout Mexico.  Majapara's main office is located in Mexico City.  In all other respects, Majapara denies the allegations of this paragraph.  JOM Corporation of Illinois ("JOM Illinois") ceased to exist on or about December 29, 2006.

3

5. Upon information and belief, JOM voluntarily dissolved on or about December 29, 2006, but still transacts business. Upon information and belief, JOM transacts business as Majapara.

**Response:** Majapara admits that JOM Illinois ceased to exist on or about December 29, 2006 when it voluntarily dissolved and was merged into JOM Corporation. In all other respects, Majapara denies the allegations of this paragraph.

6. Upon information and belief, Garnishee Harris N.A. ("Harris Bank") is an Illinois national banking association with its principal place of business in Chicago, Illinois.

**Response:** Because Majapara has insufficient knowledge or information to form a belief as to the truth of this allegation, Majapara denies the allegations of this paragraph.

7. Jurisdiction is appropriate in this case pursuant to 735 ILCS 5/2-209.

**Response:** Denied.

8. Venue is appropriate in this case pursuant to 735 ILCS 5/2-101 because Defendant JOM is an Illinois corporation who, upon information and belief, has or had its principal place of business in Cook County and part of the transactions herein arose in Cook County.

**Response:** Denied.

## FACTS COMMON TO ALL COUNTS

### The Majapara Relationship With Wachovia

9. In the late 1990's Majapara and First Union National Bank ("First Union"), a predecessor to Wachovia, agreed to enter into foreign exchange transactions together. In these transactions, Majapara would agree to purchase from First Union a certain amount of one currency in exchange for Majapara selling to First Union a certain amount of another currency at the applicable exchange rate.

**Response:** For over ten years, Majapara has been doing business with Wachovia and its predecessor, First Union. As part of that business relationship, Majapara had credit available through overdraft privileges, the ability to submit unlimited remittances to Wachovia for

processing among others (collectively the "operating facilities"). These operating facilities had existed for many years.

Majapara denies the remaining allegations of this paragraph.

10. In order to facilitate Majapara and First Union entering into these currency exchange transactions, on or about April 6, 2000, Majapara and First Union entered into a First Union Online FX Subscription Agreement (the "FX Subscription Agreement"), a copy of which is attached hereto as Exhibit A. Pursuant to the FX Subscription Agreement, Majapara was permitted to execute foreign exchange transactions electronically with First Union through First Union's foreign exchange website. This, however, was not the exclusive method for the parties to enter into these foreign exchange spot transactions.

**Response:** After years of doing business with First Union, First Union developed an online website through which FX transactions could be placed. In order to use its new website, First Union asked Majapara to sign the First Union Online FX Subscription Agreement ("Online FX Agreement"). The Online FX Agreement does not purport to set terms relating to FX transactions beyond online transactions. Those terms were what they had always been between Majapara and First Union. By its own terms, the Online FX Agreement limited its application to the use of the First Union website to place FX transaction orders. While the Online FX Agreement provides that First Union reserves the right without notice to modify, suspend, discontinue, or terminate the FX website or revoke any customer's access, it expressly states that the parties' rights and obligations concerning online and other transactions shall not be impaired or otherwise affected by such actions.

Majapara denies the remaining allegations of this paragraph.

11. Effective April 1, 2002, Wachovia merged into and under the charter of First Union with the resulting title of Wachovia Bank, National Association. As a result of the merge, First Union changed its name to Wachovia Bank, National Association. As a result of the merger, the FX Subscription Agreement was assigned to Plaintiff Wachovia.

**Response:** Because Majapara is without sufficient knowledge or information to form a belief as

the truth of the allegations in this paragraph, Majapara denies those allegations.

### The Foreign Exchange Transactions At Issue

12. On or about December 5, 2007, Majapara and Wachovia agreed to a series of seven (7) transactions, all of which were to settle on December 7, 2007, whereby Wachovia would deliver an aggregate 26 million Euros to Majapara and Majapara would deliver in aggregate $38,132,700 to Wachovia. These transactions required Majapara to transfer dollars directly to a Wachovia account located in New York. Six (6) of the transactions were executed on Wachovia's foreign exchange internet website. One (1) of the transactions was executed over the telephone. Copies of the confirmations for these transactions are attached hereto as Exhibit B.

**Response:**    Majapara admits the allegations of the first sentence of paragraph 12.  Majapara

denies the remaining allegations of this paragraph.

13. Pursuant to these seven (7) foreign exchange agreement, on December 7, 2007, Wachovia delivered 26 million Euros to Majapara. Majapara failed to deliver the agreed upon $38,132,700.00 to Wachovia, as required, on December 7, 2007.

**Response:**  Majapara placed FX transaction orders on December 5, 2007.  Wachovia delivered

26 million Euros to Majapara.  Because of Wachovia's breach of its contract with Majapara,

Wachovia prevented Majapara from being able to make its payment to Wachovia on December

7.  Majapara denies the remaining allegations of this paragraph.

14. On or about December 13, 2007, the General Director of Majapara admitted that Majapara had been obligated to provide the agreed upon currency to Wachovia.

**Response:**  Denied.

15. Despite its failure to pay Wachovia for the over $38 million worth of Euros that Wachovia sent to Majapara, Majapara tried to place additional trades with Wachovia on December 7, 2007, knowing that it could not cover additional trades or its existing obligation to deliver the dollars. Wachovia was able to stop such additional trades from being executed.

**Response:**  Denied.

6

16. Moreover on December 11, 2007, after refusing to pay Wachovia over $38 million for the exchange, Majapara sought to drain an account held at Wachovia by attempting to transfer over $9 million out of the account.

**Response:** Denied.

17. By opening an account at Wachovia, Majapara agreed to Wachovia's Terms & Conditions for Global Financial Institutions, which, under its terms, grants Wachovia setoff rights. See Terms and Conditions attached hereto as Exhibit C. Through its setoff rights, Wachovia was able to secure $13, 420, 155, which came into Majapara's accounts at Wachovia, but has not been able to recover the remaining amount Wachovia is owed. Some of the amount recovered represents conditional credit that may be subject to reduction by reason of return of the items (in this case, checks) for which this credit was given (see next Paragraph).

**Response:** Majapara states that the Wachovia Terms and Conditions do not purport to cover FX transactions. Answering further, Majapara admits that Wachovia seized approximately $13.4 million that was in Majapara's accounts at Wachovia, but denies that Wachovia had any right to "secure" those funds or to "recover" any amounts purportedly "owed." Majapara denies the remaining allegations of this paragraph.

18. Majapara also maintains five (5) U.S. dollar accounts with Wachovia. As to each of these accounts, Wachovia has contingent residual exposure to cover returned items in the federal check clearing program. Majapara is obligated to reimburse Wachovia for these amounts, but has now stated it is unable to and will not meet its financial obligations. This liability has averaged $3.3 million per month for the last several months.

**Response:** Majapara admits that it maintained five accounts with Wachovia. Majapara denies the remaining allegations of this paragraph.

**JOM Is The Alter Ego of Majapara**

19. JOM is or was an Illinois corporation which, upon information and belief, had its principal place of business in Chicago, Illinois.

**Response:** Denied. JOM Corporation of Illinois ("JOM Illinois") transacted business in Illinois until it was dissolved on or about December 29, 2006. That dissolution took place long before

7

any of the events which are the subject of Wachovia's lawsuits. JOM Illinois was merged into JOM Corporation, a Texas corporation with its principal place of business in California.

    20. Illinois Secretary of State records show that JOM was voluntarily dissolved on or about December 29, 2006. A copy of the Secretary of State records is attached hereto as Exhibit D.

**Response:** JOM Illinois transacted business in Illinois until it was dissolved on or about December 29, 2006. Majapara denies the remaining allegations of this paragraph.

    21. Upon information and belief, JOM and Majapara have common officers and/or directors.

**Response:** Denied. JOM Illinois no longer exists, so it no longer has any officers or directors.

    22. Upon information and belief, "JOM" stands for "Jorge Ortiz Munos," who is Majapara's Chairman and CEO.

**Response:** Majapara admits that Jorge Ortiz is Majapara's Chairman and CEO. J-O-M are Mr. Ortiz's initials. Majapara denies the remaining allegations of this paragraph.

    23. Upon information and belief, JOM and Majapara have one or more common owners and/or JOM is a subsidiary of Majapara.

**Response:** Majapara admits that Jorge Ortiz is a shareholder of Majapara and also a shareholder of JOM Corporation. Majapara denies the remaining allegations of this paragraph.

    24. According to the Illinois Secretary of State records, JOM used the Assumed Name of "Majapara-Chicago."

**Response:** Majapara admits that JOM Illinois would from time to time use the trade name of Majapara in its business because of its value in the marketplace. JOM Illinois did this with Majapara's permission. JOM Illinois did not hold itself out as Majapara.

    25. Although JOM was dissolved approximately a year ago, upon information and belief, it is still engaging in business.

**Response:** Denied.

26. In fact, in October and November 2007, JOM (a dissolved corporation according to Illinois Secretary of State records) transferred $5,615,666 from its Harris Bank account (entitled, upon information and belief, "JOM Corp of Illinois DBA Majapara-Chicago) directly to a Majapara account at Wachovia.

**Response:**     Denied. After JOM Illinois was merged into JOM Corporation, Harris Bank and others were notified and the proper filings were made with the Illinois Secretary of State. After the merger, JOM Corporation commenced using the Harris Bank account that had been opened by and previously used by JOM Illinois.

Harris Bank did not update its internal records to reflect that the account now was owned by JOM Corporation. JOM Corporation used the account at Harris Bank for its own business transactions with a number of different counterparties, including Majapara. JOM Corporation had a business relationship with Majapara whereby Majapara would provide certain services to JOM Corporation and JOM Corporation would pay for those services. In providing those services, JOM Corporation was authorized to use the name of Majapara or "MAS" because it was a valuable trade name. Although JOM Corporation did not do business as Majapara, it did use the trade name of Majapara.

27. Documentation reflecting one such recent transfer from JOM to Majapara is attached at Exhibit E.

**Response:**     Denied. JOM Corporation routinely paid transaction fees to Majapara for payment for money transfers remitted through Majapara paymasters. JOM Corporation also routinely purchased pesos from Majapara, among others.

28. Upon information and belief, JOM is an alter ego of Majapara and JOM's assets, accordingly, can be utilized to satisfy Majapara's debts to Wachovia.

**Response:**     Denied.

## COUNT I
### (Breach of Contract)

29. Plaintiff realleges and reincorporates the allegations in Paragraphs 1 through 28.

**Response:** Majapara incorporates its responses to paragraphs 1 through 28 above.

30. As set forth above, Wachovia entered into a series of currency exchange agreements with Majapara.

**Response:** On each business day for many years, Majapara would enter into millions of dollars of FX transactions with Wachovia. Each of those individual transactions took place in the context of the overall contractual relationship between Wachovia and Majapara. That contractual relationship is evidenced by the course of dealing between the parties over many years and the custom and practice in the foreign exchange business. On the basis of that contractual relationship, Majapara reasonably believed that should Wachovia decide to terminate Majapara's operating facilities, Wachovia would provide reasonable notice so that Majapara would have time to move its business to another bank. Wachovia breached its contractual duty to Majapara by terminating Majapara's operating facilities without cause and without providing Majapara any advance notice whatsoever. Wachovia's breach caused significant disruption to Majapara's business because Majapara was left with no advance notice during which it could arrange for a substitute bank for its business. Except as so stated, Majapara denies the allegations contained in this paragraph.

31. Majapara breached those agreements by failing to deliver the currency as agreed upon by the parties.

**Response:** Denied.

32. Wachovia has fulfilled its obligations under the agreements.

**Response:** Denied.

10

33. As a result of Majapara's breaches, Wachovia has suffered damage in the amount of not less than $24,711,845.00, plus interest, plus the amount of any contingent residual exposure as set forth in Paragraph 18 above.

**Response:** Denied.

## COUNT II
### (Promissory Estoppel – Alternate Count)

34. Plaintiff realleges and reincorporates the allegations in Paragraph 1 through 28.

**Response:** Majapara incorporates its responses to paragraphs 1 through 28 above.

35. In the event it is found that no oral or written contract exist between Majapara and Wachovia in relation to the seven (7) foreign exchange spot transactions at issue here, equity intervenes, creating the necessary consideration to support an agreement requires Majapara to pay Wachovia not less than $24,711,845.00 in return for accepting currency from Wachovia.

**Response:** Denied.

36. Majapara promised to deliver certain currency to Wachovia in return for Wachovia delivering certain currency to Majapara.

**Response:** On December 5, when Majapara placed the orders for the FX transactions, Majapara had every intention and expectation that these transactions would take place just as they had for more than ten years. Wachovia would provide Majapara with one currency and Majapara would provide Wachovia with the other one or two days later. Wachovia's later improper cancellation of Majapara's operating facilities however, frustrated Majapara's intention and expectation. Majapara denies all other allegations in this paragraph.

37. In reliance to Majapara's agreement to deliver certain currency to Wachovia, Wachovia delivered approximately $38 million worth of currency to Majapara.

**Response:**     Majapara admits that Wachovia delivered approximately $38 million worth of currency to Majapara, but denies that Wachovia did so in reliance upon Majpara's agreement to deliver certain currency to Wachovia. Majapara denies all other allegations of this paragraph.

11

38. Wachovia has requested the funds from Majapara.

**Response:**  Wachovia demanded that the funds be paid in full immediately. By virtue of its own actions, Wachovia had no right to demand payment from Majapara on December 7.

39. To date Majapara has not provided the required currency to Wachovia.

**Response:**  Majapara has not paid because Wachovia breached its agreement with Majapara and took actions that frustrated Majapara's ability to pay.  Majapara denies the allegations contained in this paragraph.

40. Wachovia, however, has been able to obtain certain Majapara funds and offset the amount owed by $13,420,155.00 (subject to reduction for the reasons set forth in Paragraph 14 of the recitals above).

**Response:**  Majapara admits that Wachovia seized approximately $13.4 million that was in Majapara's accounts at Wachovia, but denies that Wachovia had any right to "obtain" these funds, or to "offset" any remaining amount purportedly "owed." Majapara denies the remaining allegations of this paragraph.

41. Wachovia has no adequate remedy at law.

**Response:**  Denied.

42. As a result, Majapara has been unjustly enriched to the detriment of Wachovia.

**Response:**  Denied.

## COUNT III
### (Unjust Enrichment – Alternate Count)

43. Plaintiff realleges and reincorporate the allegations in Paragraphs 1 through 28.

**Response:**     Majapara incorporates its responses to paragraphs 1 through 28 above.

44. In the event it is found that no oral or written contracts existed between Majapara and Wachovia in relation to the seven (7) foreign exchange transactions at issue here, equity would still require Majapara to pay Wachovia an amount not less than $24,711,845.00 in return for accepting currency from Wachovia.

**Response:** Denied.

45. Majapara promised to deliver certain currency to Wachovia in return for Wachovia delivering certain currency to Majapara.

**Response:** On December 5, when Majapara placed the orders for the FX transactions, Majapara had every intention and expectation that these transactions would take place just as they had for more than ten years: Wachovia would provide Majapara with one currency, and Majapara would provide Wachovia with the other one or two days later. Wachovia's improper cancellation of Majapara's operating facilities later that same day, however, frustrated Majapara's intention and expectation. Accordingly, Majapara denies the allegations contained in this paragraph.

46. In reliance on Majapara's agreement to deliver certain currency to Wachovia, Wachovia delivered approximately $38 million worth of currency to Majapara.

**Response:** Denied.

47. Majapara did not deliver any currency to Wachovia.

**Response:** Majapara has not paid because of Wachovia's breach of its agreement with Majapara, and the actions taken by Wachovia that frustrated Majapara's ability to pay. Accordingly, Majapara denies the allegations contained in this paragraph.

48. Wachovia, however, has been able to obtain certain Majapara funds and offset the amount owed by $13,420,155.00 (subject to reduction for the reasons set forth in Paragraph 14 of the recitals above).

**Response:** Majapara admits that Wachovia seized approximately $13.4 million that was in Majapara's account at Wachovia, but denies that Wachovia had any right to "obtain" these funds, or to "offset" any remaining amount purportedly "owed". Accordingly, Majapara denies the allegations contained in this paragraph.

49. Wachovia requested that Majapara deliver the currency it is owed.

13

**Response:** Wachovia demanded that the funds be paid in full immediately. By virtue of its own actions, Wachovia had no right to demand payment from Majapara on December 7. Accordingly, Majapara denies the allegations contained in this paragraph.

50. To date, Majapara has neither delivered the required currency to Wachovia, nor returned return the currency Wachovia sent to it.

**Response:** Denied.

51. Majapara has unjustly retained this benefit to the detriment of Wachovia.

**Response:** Denied.

52. Majapara's retention of this benefit violates fundamental principles of justice, equity and good conscience.

**Response:** Denied.

53. Wachovia has no adequate remedy at law.

**Response:** Denied.

## COUNT IV
### (Fraud)

54. Plaintiff realleges and reincorporates the allegations in Paragraph 1 through 28.

**Response:** Majapara incorporates its responses to paragraphs 1 through 28 above.

55. As set forth above, on or about December 5, 2007 Majapara and Wachovia entered into series of seven (7) currency exchange transactions.

**Response:** Majapara placed orders for FX transactions on December 5, 2007 in reliance upon its longstanding contractual relationship and course of dealing with Wachovia. Wachovia accepted those orders knowing that later that day Wachovia was going to terminate Majapara's operating facilities. Except as so stated, Majapara denies the allegations contained in this paragraph.

56. Pursuant to the parties' agreements, in exchange for the receipt of 26 million Euros from Wachovia, Majapara agreed to deliver $38,132,700.00 to Wachovia.

14

**Response:** Majapara placed orders for FX transactions on December 5, 2007 in reliance upon its longstanding contractual relationship and course of dealing with Wachovia. Wachovia accepted those orders knowing that later that day Wachovia was going to terminate Majapara's operating facilities. Except as so stated, Majapara denies the allegations contained in this paragraph.

57. Upon information and belief, at the time Majapara entered into the December 5, 2007 agreement it knew it was illiquid and insolvent and incapable of performing its obligations under the parties' agreement.

**Response:** Majapara placed orders for FX transactions on December 5, 2007 in reliance upon its longstanding contractual relationship and course of dealing with Wachovia. Wachovia accepted those orders knowing that later that day Wachovia was going to terminate Majapara's operating facilities. Thus, at the time Majapara placed its December 5 orders with Wachovia, Majapara had no knowledge that Wachovia would later terminate its operating facilities. Except as so stated, Majapara denies the allegations contained in this paragraph.

58. Notwithstanding its knowledge, Majapara represented to Wachovia that it would deliver $38,132,700.00 (US$) to Wachovia to settle the transactions. Upon information and belief, at the time of the transaction, Majapara knew it would not deliver the required currency and was acting under a present intent to deceive Wachovia and abscond with its funds. Its representations to Wachovia were false and materially misleading. In forwarding the funds to Majapara, Wachovia had the right to rely on Majapara's representation

**Response:** Denied.

59. Majapara's fraudulent intent was confirmed in conversations Wachovia subsequently had with representatives of Majapara.

**Response:** Denied.

60. For example, on or about December 13, 2007, Carlos A. Perez, a Managing Director of Wachovia, spoke with Jorge Ortiz, the Chairman and CEO of Majapara by telephone, and Mr. Ortiz acknowledged that Majapara, prior to settlement of the transactions, knew that it was experiencing "a liquidity crisis." Mr. Ortiz stated that

Majapara had received Wachovia's Euros and lent the money to third parties. When Mr. Perez confronted Mr. Ortiz concerning the transaction and the illegality of Majapara's actions, as a Casa de Cambio, under Mexican law Majapara is not permitted to make loans, Mr. Ortiz responded, "I recognize that I have done something that is not permitted."

**Response:** Denied.

61. Due to Majapara's "liquidity crisis" and other impermissible activities relating to its currency transactions, Majapara did not have sufficient funds to complete the exchange with Wachovia. Majapara nonetheless accepted Wachovia's funds, knowing that it would be incapable of repaying the funds to Wachovia.

**Response:** Denied.

62. Majapara then claimed to have used some or all of the Wachovia funds to engage in impermissible lending transactions and otherwise dissipated the assets received from Wachovia, all the while failing to fulfill its immediate obligations to transfer over $38 million to Wachovia.

**Response:** Denied.

63. Wachovia entered into the transactions and delivered 26 million Euros to Majapara in reasonable reliance upon Majapara's representations that it was going to deliver the requisite currency.

**Response:** Denied.

64. As a result of Majapara's fraud, Wachovia has been damaged in an amount to be determined at trial, but not less than $24,711,845.00.

**Response:** Denied.

## COUNT V
### (Breach of Contract/Anticipatory Breach)

65. Plaintiff realleges and reincorporates the allegations in Paragraph 1 through 28.

**Response:** Majapara incorporates its responses to paragraphs 1 through 28 above.

66. As set forth above, Majapara also maintains five (5) US dollar accounts at Wachovia. Under these accounts, Wachovia has contingent residual exposure to cover returned items in the federal check clearing program – this contingent liability is continuing

16

concern. In this regard, Wachovia is entitled to immediate reimbursement from Majapara for the amounts Wachovia is required to pay out.

**Response:**   Majapara admits that it maintained five accounts with Wachovia, but denies the remaining allegations contained in this paragraph.

67. Over the last several months, this liability has averaged $3.3 million per month.

**Response:**  Because Majapara has no knowledge or information upon which to admit or deny this allegation, Majapara must deny it.

68. So far this month, Wachovia has already had to cover certain residual liabilities for which Majapara, in breach of its agreements with Wachovia, has not reimbursed Wachovia. As a result, Majapara breached the parities' agreement and is indebted to Wachovia.

**Response:**  Because Majapara has no information upon which to admit or deny the allegations of this paragraph, Majapara must deny them.

69. Additionally, Majapara has already stated to Wachovia that it is illiquid and unable to satisfy its obligations owed to Wachovia. Accordingly, Majapara has anticipatorily breached its agreement with Wachovia by stating it will not be immediately reimbursing Wachovia for these obligations now or when they come due.

**Response:** Denied.

70. Wachovia has performed all of its obligations under its agreements with Majapara.

**Response:** Denied.

71. Consequently, Wachovia has been damaged by Majapara's breach of the parties' agreement and will continue to be damaged by Majapara's anticipatory breach of the parties' agreement in an amount to be determined at trial.

**Response:** Denied.

## COUNT VI
### (Alter Ego Liability Against JOM)

72. Plaintiff realleges and reincorporates the allegations in Paragraph 1 through 28.

17

**Response:**     Majapara incorporates its responses to paragraphs 1 through 28 above.

73. Upon information and belief, there is such a unity of interest and ownership between Majapara and JOM that the separate corporate personalities should not longer be recognized.

**Response:**     Denied.

74. Adherence to the fiction of separate corporate existence would sanction fraud or promote injustice upon creditors, such as Wachovia.

**Response:**     Denied.

75. Upon information and belief, JOM is the alter ego of Majapara.

**Response:**     Denied.

76. As the alter ego of Majapara, JOM is liable for Wachovia for Majapara's liability to Wachovia under this Complaint.

**Response:**     Denied.

## ADDITIONAL AND AFFIRMATIVE DEFENSES

### First Defense

Majapara incorporates by reference its Counterclaims in this matter. By reason of the matters set forth therein and the wrongs Wachovia has committed against Majapara – including Wachovia's breach of its contractual duties, obtaining a wrongful injunction and wrongful attachments – Wachovia is due no recovery here and its Complaint should be dismissed.

### Second Defense

Wachovia's claims against Majapara are barred in whole or in part by the doctrine of estoppel. Wachovia induced Majapara to give it most of Majapara's business by, among other things, the extension of the operating facilities from which Wachovia earned substantial fees over many years. Wachovia is estopped from claiming damages because (a) it was Wachovia's

18

termination of Majapara's operating facilities without cause and without notice that caused Majapara to be unable to pay Wachovia on December 7, and (b) it was Wachovia's false accusations of fraud and theft (in order to obtain attachments and an injunction) that destroyed Majapara's business.

## Third Defense

Wachovia's claims against Majapara are barred in whole or in part by the doctrine of unclean hands. Wachovia induced Majapara to give it most of Majapara's business by, among other things, the extension of the operating facilities from which Wachovia earned substantial fees. Wachovia's termination of Majapara's operating facilities without cause and without notice caused Majapara to be unable to pay Wachovia on December 7, and Wachovia's false accusations of fraud and theft (in order to obtain attachments and an injunction) that destroyed Majapara's business.

## Fourth Defense

Wachovia's claims against Majapara are barred in whole or in part by Wachovia's failure to mitigate its damages. As a result of Wachovia's false accusations of fraud and theft, Majapara's business was destroyed, causing Majapara to be unable to pay Wachovia for the outstanding FX transactions.

## Fifth Defense

Wachovia's claims against Majapara are barred in whole or in part by the doctrine of duress. Wachovia induced Majapara to give it most of Majapara's business, among other things, the extension of the operating facilities from which Wachovia earned substantial fees. Wachovia knew that Majapara was dependent on these operating facilities. Wachovia's termination of Majapara's operating facilities - without cause and without notice - left Majapara unable to pay

Wachovia on December 7, and Wachovia's false accusations of fraud and theft in order to obtain attachments and an injunction caused Majapara's business to be destroyed.

**Sixth Defense**

Wachovia's claims against Majapara are barred in whole or in part because this Court lacks personal jurisdiction over Majapara.

**Seventh Defense**

Wachovia's claims against Majapara are barred due to insufficiency of process.

Majapara hereby reserves the right to amend this Answer and Counterclaims to include additional defenses as they become known to Majapara.

**COUNTERCLAIMS**

**Introduction and Nature of the Case**

1.    As a result of Wachovia's unwarranted and wrongful actions, Majapara's entire business has been destroyed and over 600 Majapara employees are out of work.

2.    After having done business with Majapara for over ten years, Wachovia, without cause and without advance notice, terminated all operating credit facilities extended to Majapara.

3.    Less than ten days after this termination, Wachovia filed two lawsuits against Majapara seeking *ex parte* prejudgment attachments and an injunction.  Wachovia knew that in such *ex parte* proceedings the Courts would necessarily have to trust Wachovia to make full and fair disclosure of all facts material to the Courts because – of course – Majapara would not be there.  Wachovia took this opportunity, instead, to withhold material facts from the Court, assuring that the Courts would grant Wachovia the injunction and attachments that it sought.

20

4.  Although Wachovia claimed that Majapara had not paid it $38 million that it owed for certain foreign exchange transactions, Wachovia did not disclose to the Courts the reason Majapara could not pay – because Wachovia had terminated Majapara's operating facilities without cause and without notice. Wachovia did not disclose to the Courts that just months earlier it had induced Majapara to move business Majapara was doing with Harris Bank to Wachovia. Wachovia did not disclose to the Courts information showing that the withdrawals of funds by Majapara from its Wachovia account – withdrawals that Wachovia claimed were intended to frustrate any attempts by Wachovia to collect its debt – were, in fact, done in the ordinary course of Majapara's business.

5.  Wachovia breached its contractual duties to Majapara, tortiously interfered with Majapara's relations with other banks, and then wrongfully obtained an injunction and attachments from two Courts. Wachovia's actions not only violate the law, but also fundamental principles of justice, equity, and good conscience. For the substantial losses Majapara has suffered at the hands of Wachovia, Majapara seeks redress including an award of compensatory damages, and punitive damages which are definitely warranted in this case.

**Parties, Jurisdiction, and Venue**

6.  Counterplaintiff Majapara began operations as foreign exchange bureau (casa de cambio) in 1989 and had grown by December 2007 to have over 600 employees and offices throughout Mexico. Majapara has no offices outside of Mexico. Its principal place of business is in Mexico City, Mexico.

7.  Upon information and belief, Counterdefendant Wachovia is a national banking association with its principal place of business in North Carolina and various offices in the U.S. and abroad, including New York, Illinois, and Mexico City.

21

8. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, and 12 U.S.C. § 632, in that this is a suit (i) of a civil nature at common law or in equity to which Wachovia, which is organized under the laws of the United States, is a party; and (ii) arising out of transactions involving international or foreign banking, or out of other international or foreign financial operations, and as such is deemed to arise under the laws of the United States. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, in that this is a civil action where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between a citizen of a State and a citizen or subject of a foreign state. This Court also has pendent jurisdiction over these counterclaims.

**General Allegations**

9. Majapara has operated as a foreign exchange bureau (casa de cambio) in Mexico since 1989. Majapara's business grew from a 17 person office to over 600 employees by December 2007.

10. Majapara is subject to the regulation of the Mexican banking authorities. In accordance with Mexican law, Majapara engaged in FX transactions and the purchase and sale of items like bill payment orders, checks, and drafts in foreign currencies. Pursuant to Mexican law, Majapara was authorized to enter into transactions for the purchase and sale of these items that would settle up to two days later. Thus, Majapara would accept checks drawn on U.S. banks from its customers and provide cash to the customers the same day. Then Majapara would electronically transmit those checks to Wachovia. Wachovia would credit Majapara's account for those checks on the same day. Wachovia would then negotiate the check via the US Interbank Clearing System or other method.

11.    Majapara has endeavored to operate the highest quality business operations possible. As such, in 2004 Majapara voluntarily subjected itself and its anti-money laundering processes to the scrutiny of outside auditors in order to obtain ISO 9001 certification. Majapara had an independent accreditation organization conduct an audit of those processes for effectiveness and conformance to the rigorous standards of ISO 9001:2000. As a result of this audit, Majapara obtained the ISO 9001 certification.

**Majapara's Course of Dealing with Wachovia**

12.    Majapara had a longstanding business relationship with Wachovia going back more than ten years. In addition to Wachovia's longstanding practice of providing a day or two of float to Majapara in connection with FX transactions, Wachovia also provided Majapara with operating lines of credit, overdraft privileges, and the ability to process unlimited remittances. These "operating facilities" had been in place for many years.

13.    While these operating facilities were not memorialized in writing, Wachovia knew that Majapara was dependent upon them and that terminating them without notice would be damaging to Majapara's business.

14.    In February 2007, Wachovia induced Majapara to transfer to Wachovia certain business that it had previously been doing with Harris Bank. At that time, Majapara cleared remittances through Harris Bank as well as Wachovia. Wachovia sought to earn the fees that Majapara had previously been paying to Harris Bank for its clearing services. Thus, Wachovia sought a meeting with Majapara in Mexico City at which Wachovia representatives requested that Majapara transfer the Harris Bank clearing business to Wachovia. Majapara agreed. Over the next few months, Majapara transferred to Wachovia virtually all of the business it had been doing with Harris Bank.

15.    Majapara would never have agreed to Wachovia's request if it believed that Wachovia could give Majapara absolutely no advance notice that it was terminating Majapara's operating facilities. Majapara reasonably believed that Wachovia was obligated to provide such notice by their longstanding course of dealing.

**Wachovia's Reaction to Bad Publicity**

16.    Some time later, Wachovia was the subject of embarrassing press reports that it had been doing business with certain businesses engaged in laundering the proceeds of the illegal drug trade. A November 15, 2007 Forbes article, entitled "Banking on Drugs," reported that a Wachovia customer, Casa de Cambio Puebla ("Puebla") was linked to a business jet carrying tons of cocaine that crashed in September in Mexico. Puebla also was linked to the purchase of another plane carrying tons of cocaine that was seized by Mexican officials a year earlier. Puebla is not related in any way to Majapara.

17.    Upon information and belief, Wachovia decided to cease doing business with businesses outside the U.S. as a reaction to embarrassing press reports of Wachovia's dealings with Puebla.

**Wachovia Terminates Majapara Without Cause and Without Notice**

18.    Late in the day on December 5, 2007, Majapara was visited by Carlos Perez and Juanita Gomez of Wachovia who hand delivered a letter informing Majapara that Wachovia's operating facilities were terminated. These operating facilities were being terminated without cause. As the letter from Carlos Perez stated:

> [a]s part of the ongoing review and re-evaluation of our long-term global strategy, Wachovia Bank, National Association ("Wachovia") has determined to cease providing correspondent banking services to exchange companies outside the United States. . . . Wachovia and I wish to thank you for your loyalty during our business relationship and wish you continued commercial success.

(attached hereto as Exhibit A) The letter then informed Majapara that "your existing credit lines with Wachovia have been cancelled. Any current outstanding utilized credit will remain in place until it has come to maturity." In case there was any doubt, Mr. Perez made it clear – Majapara's operating facilities were terminated effective immediately. Majapara pleaded with Mr. Perez to continue its operating facilities for a short time in order to give Majapara time to arrange for a substitute bank, but he refused.

**After Termination, Majapara Scrambles to Deal With**
**Dire Situation, Yet Pays Almost $40 Million to Wachovia**

19.     In an effort to deal with this situation, Majapara began contacting other banks seeking a substitute for the operating facilities that Wachovia had just terminated. Majapara also approached other foreign exchange bureaus seeking to negotiate operating alliances or the sale of lines of Majapara's business.

20.     Not surprisingly, Majapara rapidly began experiencing liquidity problems that continued to worsen over the next few days. Despite the fact that Wachovia had caused Majapara's liquidity problems, Majapara paid to Wachovia almost $40 million to settle FX transactions the day after receiving this devastating news.

21.     Despite its best efforts, Majapara lacked sufficient funds to be able to settle the approximately $38 million in FX transactions that Wachovia had entered into with Majapara on December 5 – before Wachovia delivered its devastating news. At the time Majapara entered into those transactions, Majapara had no idea that Wachovia was going to terminate its operating facilities later that day. At the time Wachovia accepted Majapara's orders for these transactions, however, Wachovia would have known this.

22.     Over the next few days, Majapara continued trying to line up a substitute for Wachovia. Banks that Majapara approached required time to obtain information about Majapara

in order to present the information to the bank credit committees and otherwise obtain necessary approvals. Majapara contacted other Mexican foreign exchange bureaus in an effort to enter into operating alliances or to sell them certain lines of business.

23.     On December 13, Majapara's CEO, Jorge Ortiz Muñoz telephoned Wachovia's Carlos Perez to again ask him to continue Majapara's operating facilities until the company could make substitute arrangements. Mr. Ortiz informed Mr. Perez that Majapara was doing everything possible to pay Wachovia, but that Majapara was having difficulty dealing with the abrupt cancellation of its longstanding operating facilities. Mr. Ortiz informed Mr. Perez that reasonable notice would have enabled Majapara to replace Wachovia's operating facilities with another bank. Finally, Mr. Ortiz offered to provide Wachovia with security for the debt. Mr. Perez did not agree. Mr. Ortiz summarized his conversation with Mr. Perez in a December 13 letter that he sent to Mr. Perez. (attached hereto as Exhibit B)

**Wachovia's Misrepresentations to the Courts**

24.     The next day, December 14, Wachovia filed an action in the U.S. District Court for the Southern District of New York ("New York District Court") seeking emergency *ex parte* prejudgment relief including an attachment of Majapara's bank accounts and an injunction. Wachovia simultaneously filed an action in Circuit Court of Cook County, Illinois ("Illinois state court") seeking an *ex parte* attachment (attached as Exhibit C).

25.     In order to obtain relief from the New York District Court, Wachovia submitted a complaint (attached as Exhibit D), memorandum of law (attached as Exhibit E), and sworn declarations of Wachovia's Carlos Perez and attorney Scott McKessy (attached as Exhibit F and G, respectively). On the basis of those submissions, the Court entered the December 14 Order to Show Cause, which included an injunction against Majapara. (attached as Exhibit H)

26.    In the Declaration of Mr. McKessy filed by Wachovia with the Court, Mr. McKessy stated under oath that expedited *ex parte* relief was being sought "because of the likelihood that, if notified of the instant application before hand, defendant Majapara Casa De Cambio S.A. de C.V. ("Majapara") will dissipate or transfer assets which are the subject of this application." Mr. McKessy also stated under oath that Majapara had "absconded with over $38 million" of Wachovia's funds and had made a "threat" to make itself judgment proof and frustrate any attempt by Wachovia to collect.

27.    Mr. McKessy's declaration failed to disclose to the Court that Wachovia had without cause and without notice terminated Majapara operating facilities. His declaration failed to disclose the almost $40 million that Majapara paid to Wachovia on December 6 – the day after Majapara's operating facilities were terminated. These are material facts of which Mr. McKessy knew or reasonably should have ascertained before filing Wachovia's request for emergency relief and should have disclosed these facts to the Court in his declaration.

28.    In the Declaration of Mr. Perez that Wachovia filed with the Court, Mr. Perez stated under oath that Majapara had reneged on its transactions and "absconded with Wachovia's money." Mr. Perez stated under oath that Majapara knew of its liquidity crisis before the closing of the December 5 FX transactions. Mr. Perez stated that Majapara had "engaged in illegal loans in relation to its foreign exchange transactions." Finally, Mr. Perez stated that "based upon [his December 13] conversation [with Mr. Ortiz], it is my belief that Majapara engaged in fraud...."

29.    Mr. Perez's declaration failed to disclose to the Court the reason Majapara had not been able to pay Wachovia on time – that Wachovia *caused* Majapara's liquidity crisis by terminating its operating facilities without cause and without advance notice *after* Majapara had placed the December 5 FX transactions. Mr. Perez's declaration failed to disclose to the Court

27

that the day after getting this devastating news, Majapara paid to Wachovia almost $40 million. These are material facts of which Mr. Perez knew or reasonably should have known and should have disclosed to the Court in his declaration.

30.     After years of doing business with Majapara, Mr. Perez knew or reasonably should have known that Majapara was not engaged in any illegality. Since Wachovia had been providing millions of dollars of credit to Majapara for years, it is difficult to believe that Wachovia did not know Majapara's business.

31.     Wachovia's memorandum of law, upon which the Court expressly relied in entering its December 14 Order to Show Cause, misrepresented to the Court that Majapara had "caused itself" to go out of business. Wachovia knew that it had terminated Majapara's operating facilities on December 5 without cause and without any advance notice. Wachovia knew that months earlier it had induced Majapara to move even more of its business to Wachovia. As a result, Wachovia knew or reasonably should have known that this statement simply was not true.

32.     Wachovia's memorandum of law contains additional materially misleading statements ostensibly made in order to induce the Court to enter the temporary restraining order it sought. In its memorandum of law, Wachovia represented to the Court that Majapara had "already attempted to remove certain funds from its Wachovia accounts." Wachovia knew or should have known that any transfers of funds into or out of Majapara's accounts were done in the ordinary course of Majapara's business. Nevertheless, Wachovia made false and materially misleading statements to the Court in order to lead the Court to believe that Majapara was attempting to move assets beyond Wachovia's reach. Moreover, Wachovia knew that it was not

entitled to a TRO or preliminary injunction because an inability to collect a money judgment does not satisfy the requisite of irreparable harm.

33.    Wachovia's complaint is rife with misrepresentations and fails to disclose the material facts set forth above.  In the complaint, Wachovia accuses Majapara of fraud because **"at the time Majapara entered into the December 5, 2007 agreement, it knew it was illiquid and insolvent and incapable of performing its obligations under the parties' agreement."** (emphasis added) Wachovia could not have believed this to be true when it knew that the genesis of Majapara's liquidity crisis was Wachovia's termination of Majapara's operating facilities. Therefore, Wachovia knew or reasonably should have known at the time it made this statement that it was not true.

34.    Thus Wachovia induced the Court to enter the Order to Show Cause providing that "Majapara, shall be and hereby is enjoined and restrained from transferring, selling, pledging, assigning or otherwise disposing of any of its assets."  (attached hereto as Exhibit H) The Order to Show Cause was based solely upon representations that Wachovia made to the Court.

35.    The Order of Attachment entered by the Court on December 20 was based upon the same materially false and misleading representations made by Wachovia to the Court in support of the Order to Show Cause and was entered without adequate notice to Majapara. (attached hereto as Exhibit I)

36.    Wachovia made substantially the same false and misleading representations to the Illinois state court in order to induce it to grant an order of attachment.  (attached hereto as Exhibit J)

**Wachovia Disseminates Orders**
**Obtained Through Misrepresentations to Courts**

37.    After Wachovia induced the New York District Court and the Illinois state court to enter Orders against Majapara that Wachovia knew or reasonably should have known were based upon false statements, Wachovia then embarked upon a course of disseminating those Orders to others.  Wachovia disseminated the New York District Court's Orders and the Orders of the Illinois state court along with other materials to banks including Harris Bank, Citibank, JP Morgan Chase, Deutsche Bank, Standard Chartered, Bayerische Hypo- und Vereins Bank AG, Wells Fargo, and the Royal Bank of Canada.  Because Wachovia obtained these Orders on the basis of sworn declarations and other statements that it knew or reasonably should have known were false and misleading, Wachovia knew that it was not entitled to the Orders.  Thus, Wachovia was not privileged to disseminate these Orders to the banks nor was the dissemination of the Orders done in furtherance of Wachovia's legitimate interests in pursuing its interests in litigation.  Wachovia's dissemination of these Orders was wrongful and the severe damage such dissemination caused to Majapara's reputation and ability to continue as a foreign exchange bureau was in no way justified.

38.    Upon information and belief, Wachovia repeated the misleading statements in the documents filed with the Court to other foreign exchange bureaus and banks in Mexico in order to interfere with Majapara's efforts to obtain alternative financing, to interfere with Majapara's efforts to enter into operating alliances with other foreign exchange businesses, and/or to interfere with Majapara's efforts to sell certain lines of business.  Wachovia's interference was malicious, unlawful, and not undertaken for any legitimate purpose or to advance any legitimate interest of Wachovia.  As a result of Wachovia's interference, banks and foreign exchange bureaus with whom Majapara had been negotiating abandoned all discussions with Majapara.

39.    Upon information and belief, shortly after filing its cases, Wachovia made substantially the same false and misleading statements made in the documents filed with the Courts to banking regulators in Mexico, in order to induce the regulators to take action against Majapara.

40.    Shortly after Wachovia initiated the New York District Court action and the Illinois state court action, the affidavit of Carlos Perez was published on an internet website. On February 13, 2008 another website reported facts from documents filed with the Court on February 11. Upon information and belief, Wachovia has excessively and impermissibly published these court filings. Upon information and belief Wachovia or others acting on its behalf have made substantially the same false and misleading statements made in the documents filed with the Court to the media in order to induce the media to publish such statements.

## COUNT I
### Breach of Contract

41.    Majapara incorporates paragraphs 1 through 40 above as if fully set forth herein.

42.    As set forth above, for many years Wachovia and Majapara had a contractual relationship whereby Wachovia provided operating facilities to Majapara.    That contractual relationship is evidenced by the course of dealing between the parties over many years.

43.    Wachovia owed Majapara a contractual duty to provide Majapara with reasonable notice that Wachovia was terminating its operating facilities so that Majapara would have time to make substitute arrangements.

44.    Wachovia breached its contractual duty to Majapara by terminating the operating facilities without cause and without providing Majapara any advance notice whatsoever.

45.    Majapara suffered significant damages as a result of Wachovia's breach.

WHEREFORE, Majapara respectfully requests that this Court:

a.    enter judgment in its favor;

b.    award Majapara compensatory, including interest as allowed by law;

c.    award Majapara its costs and fees as allowed by law; and

d.    award Majapara such other and further relief as the Court may deem just and proper.

### COUNT II
### Wrongful Injunction

46.    Majapara incorporates paragraphs 1 through 45 above as if fully set forth herein.

47.    On December 17, 2007, Wachovia obtained injunctive relief against JOM Corporation of Illinois from the Illinois state court. On December 14 and 20, 2007, Wachovia obtained injunctive relief against Majapara from the New York District Court. Because Wachovia obtained these injunctions by making false and misleading statements to the Courts, and Majapara was not provided with an opportunity to be heard on December 20, 2007, it was never entitled to such injunctive relief.

48.    Wachovia knowingly or recklessly made false and misleading statements to the Courts, including the following:

- Majapara engaged in fraud because "at the time Majapara entered into the December 5, 2007 agreement, it knew it was illiquid and insolvent and incapable of performing its obligations under the parties' agreement;"

- Majapara engaged in fraud because it did not intend to repay Wachovia for the December 5 FX transactions;

- Majapara engaged in fraud because Majapara was engaged in illegal and illicit lending activities in violation of Mexican law;

- Majapara had tried to move funds from the account it had with Wachovia as part of an effort to place its assets beyond the reach of Wachovia in order to frustrate Wachovia's ability to collect on any judgment.

32

49.    Wachovia knew or reasonably should have known that these statements were false and materially misleading because Wachovia knew facts to the contrary, including the following:

- Wachovia caused Majapara's liquidity crisis by terminating Majapara's operating facilities *after* Majapara had placed the December 5 FX transactions;

- Despite its abrupt termination by Wachovia, Majapara still paid Wachovia almost $40 million the very next day to settle FX transactions;

- Majapara was unable to settle the remaining $38 million of FX transactions because of Wachovia's abrupt termination of Majapara's operating facilities;

- The purported "lending" that Majapara engaged in was authorized by Mexican law, and Wachovia knew it because it was Wachovia who processed the millions of dollars of remittances for Majapara every day.

50.    Thus, Wachovia knew or reasonably should have known that the statements made in paragraph 48 above were materially false and misleading.

51.    Wachovia failed to give appropriate notice to Majapara of the hearing and return date for Wachovia's Order to Show Cause, which unbeknownst to Majapara, was heard by the Court on Thursday, December 20, 2007 at 3:30 PM.

52.    Wachovia made the false and misleading statements in paragraph 48 above in order to induce the Courts to grant Wachovia *ex parte* prejudgment relief, including attachment of Majapara's bank accounts and an injunction. The Illinois state court and the New York District Court expressly relied upon Wachovia's false and misleading statements in deciding to enter orders granting prejudgment relief.

53.    Wachovia falsely represented to the Courts that it would suffer irreparable injury if the injunctions sought were not granted despite knowing that its claims for purely money damages was insufficient to satisfy this requirement.

33

54.    As a result, Wachovia knew or reasonably should have known that it was not entitled to the injunctive relief it obtained from the Illinois state court and the New York District Court.

55.    As a result, Majapara suffered severe damages.

WHEREFORE, Majapara respectfully requests that this Court:

a.    enter judgment in its favor;

b.    award Majapara compensatory and punitive damages, including interest as allowed by law;

c.    award Majapara its costs and fees as allowed by law; and

d.    award Majapara such other and further relief as the Court may deem just and proper.

## COUNT III
### Wrongful Attachment

56.    Majapara incorporates paragraphs 1 through 55 above as if fully set forth herein.

57.    Because Wachovia obtained these attachment orders by making false and misleading statements to the Illinois state court and the New York District Court, it was never entitled to such relief.  On December 14, Wachovia obtained an order of attachment from the Illinois state court. On December 20, 2007, Wachovia obtained an Order of Attachment from the New York District Court. As set forth in Count II above, Wachovia knowingly or recklessly made false and misleading statements to the Illinois state court and the New York District Court.

58.    Wachovia knew or reasonably should have known that these statements were false and materially misleading because Wachovia knew facts to the contrary, including those facts set forth in paragraph 49.

34

59.    Thus, Wachovia knew or reasonably should have known that the statements made in paragraph 48 above were materially false and misleading.

60.    Wachovia made the false and misleading statements in paragraph 48 above in order to induce the Illinois state court and the New York District Court to grant Wachovia *ex parte* prejudgment relief, including attachment of Majapara's bank accounts. The Illinois state court and the New York District Court expressly relied upon Wachovia's false and misleading statements in deciding to enter orders granting prejudgment relief.

61.    As a result, Majapara suffered damages.

WHEREFORE, Majapara respectfully requests that this Court:

a.    enter judgment in its favor;

b.    award Majapara compensatory and punitive damages, including interest as allowed by law;

c.    award Majapara its costs and fees as allowed by law; and

d.    award Majapara such other and further relief as the Court may deem just and proper.

## COUNT IV
### Tortious Interference with Contract

62.    Majapara incorporates paragraphs 1 through 61 above as if fully set forth herein.

63.    Wachovia knew that although Majapara had most of its business with Wachovia, it also had relationships and contracts with other banks and financial institutions. Moreover, Wachovia knew that Majapara had relationships and contracts with its customers in Mexico.

64.    On information and belief, Wachovia maliciously and for improper purposes

made accusations that Majapara was engaged in fraud and theft.  On information and belief
Wachovia made those false accusations to banks including Harris Bank, Citibank, JP Morgan
Chase, Deutsche Bank, Standard Chartered, Bayerische Hypo- und Vereinsbank AG, Wells
Fargo, and the Royal Bank of Canada.  On information and belief, Wachovia maliciously and for
improper purposes made these false and misleading statements to customers of Majapara.

65.     As a result of Wachovia's wrongful interference, Majapara's relationship with its
customers and with banks with which it did business has been damaged.

WHEREFORE, Majapara respectfully requests that this Court:

a.     enter judgment in its favor;

b.     award Majapara compensatory and punitive damages, including interest as
allowed by law;

c.     award Majapara its costs and fees as allowed by law; and

d.     award Majapara such other and further relief as the Court may deem just and
proper.

## JURY DEMAND

Majapara hereby demands trial by jury for all claims so triable as of right.

Dated:  February 27, 2008

Respectfully submitted,
Casa de Cambio Majapara S.A. de C. V.

_____/s/ Celiza P. Bragança_____
One of Its Attorneys

Celiza P. Bragança
Thomas D. Brooks
Sperling & Slater, P.C.
55 W. Monroe
Suite 3200
Chicago, IL  60603
(312) 641-3200
(312) 641-6492 (fax)

36

## CERTIFICATE OF SERVICE

I, Celiza P. Bragança, an attorney, hereby certify that a true and correct copy of the foregoing **Amended Answer and Counterclaims** has been served upon:

Barry S. Rosen
Michael D. Richman
Michael S. Leib
REED SMITH, LLP
10 S. Wacker Drive
Chicago, Illinois 60606-7507

By electronic case filing this 27th day of February, 2008.

___/s/ Celiza P. Bragança_____

# EXHIBIT D

Scott S. McKessy (SM-5479)
Casey D. Laffey (CL-1483)
REED SMITH LLP
599 Lexington Avenue
New York, New York 10022
Tel. (212) 521-5400
Fax. (212) 521-5450
Attorneys for Plaintiff
Wachovia Bank, National Association

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
WACHOVIA BANK, National Association,      :

           Plaintiff,      :

    - against -      :        Civil Action No. __

                     :

MAJAPARA CASA DE CAMBIO S.A. de C.V.,      :

          Defendants.      :
------------------------------------------------------------X

## DECLARATION OF CARLOS A. PEREZ

Carlos A. Perez, declares as follows:

1.    I am the Managing Director, Americas Group, Global Financial Institutions & Trade Services for Wachovia Bank, National Association ("Wachovia"). I am fully familiar with the facts set forth herein, and submit this declaration pursuant to 28 U.S.C. §1746, in support of Wachovia's instant application for the award of a pre-judgment attachment and temporary restraints.

## <u>Introduction</u>

2.    This is a case that arises out of foreign exchange spot transactions involving more than $70 million (US$) in currency being exchanged between Wachovia and defendant Majapara Casa De Cambio S.A. de C.V. ("Majapara"). The gist of the transaction was that Wachovia would deliver to Majapara 26 million Euros and in exchange Majapara would deliver more than $38 million (US$) to Wachovia's account here in New York. Wachovia delivered the 26 million Euros to Majapara's account, but Majapara never delivered the $38-plus million (US$) to

Wachovia. Not only did Majapara renege on the agreed upon transactions, but it then absconded with Wachovia's money. Thereafter, Majapara admitted to Wachovia that it was now illiquid, that it has engaged in illegal loans in relation to its foreign exchange transactions, and if Wachovia took any steps to enforce their rights, Wachovia would not recover a single dollar. As a result, Wachovia now commences this action to recover the money wrongfully taken by Majapara, as well as make the instant application for pre-judgment attachment of certain Majapara assets believed to be located here in New York.

3.     The instant application should be granted because Majapara is a non-domiciliary, has admitted it is illiquid, engaged in inappropriate business activities, and indicated that if Wachovia commences any action Majapara will ensure Wachovia will not be able to recover upon its judgment. Plus, there is an exceedingly strong likelihood that Wachovia will succeed on its claims herein: the deal was to exchange currencies – Wachovia did; Majapara did not.

### Foreign Currency Exchanges

4.     Wachovia provides a platform for its customers to trade foreign currencies.  The amounts swapped are usually in significant amounts and the off-setting exchanges are done simultaneously. Foreign Exchange contracts are trading contracts that involve minimum documentation.  It is the nature of foreign exchange contracts that each counterparty must transmit funds trusting the other to do so simultaneously.  Such contracts therefore involve a great deal of trust on each side.  A party to a foreign exchange transaction who fails to settle as required is thereby rendered untrustworthy and not deemed suitable for further transactions of this nature. Should such information become public, this party would be unable to engage in such transactions with any substantial institution.  Given that foreign exchange is the foundation of Majapara's business, it would not have defaulted under its contract absent substantial economic difficulties, and its default is likely to spell its doom.

- 2 -

## The Majapara Relationship With Wachovia

5.     Majapara is a Mexican corporation and does not maintain any offices in New York. Majapara is in the business of retail and wholesale foreign exchange.

6.     In the late 1990's, Majapara and First Union National Bank ("First Union") (a predecessor to Wachovia) agreed to enter into foreign exchange transactions. As mentioned above, in these transactions, Majapara would agree to purchase from First Union a certain amount of one currency in exchange for Majapara selling to First Union an equivalent amount of another currency at the applicable exchange rate.

7.     In order to facilitate these exchange transactions, on or about April 6, 2000, Majapara and First Union entered into a First Union Online FX Subscription Agreement ("FX Subscription Agreement"), a copy of which is attached to the Complaint as Exhibit A. Pursuant to this FX Subscription Agreement, Majapara was permitted to execute foreign exchange transactions with First Union electronically through First Union's foreign exchange website. The FX Subscription Agreement was not the parties' exclusive method for entering into foreign exchange transactions.

8.     In 2002, First Union and Wachovia merged.

9.     In some of the foreign exchange transactions between Majapara and Wachovia, Wachovia would deliver currency to Majapara to an account designated by Majapara. On that same day, Majapara would transfer the agreed upon counter-currency into a Majapara account maintained by Wachovia in New York (the "Majapara NY Account"). Upon the opening of the Majapara NY Account, Wachovia's Terms & Conditions For Global Financial Institutions ("Wachovia's Terms & Conditions"), amongst other documents, governed all of the parties'

business relationships and dealings.  A copy of Wachovia's Terms & Conditions is annexed
hereto as Exhibit A.

      10.     Wachovia would then debit the currency from the Majapara NY Account.  The
authorization for this procedure was documented in a December 10, 2003 letter, in Spanish, from
Majapara to Wachovia.  A copy of which is attached to the Complaint as Exhibit B.  I speak and
read Spanish fluently and the note translates as:  "In relation to the transactions done with
yourselves through Online FX; we authorize you to debit and credit our account number
NY2000192304201 held with yourselves."

      11.     In or about March 2006, Majapara signed a Debit and Netting Agreement that
gave Wachovia the same authority to credit and debit the same Majapara Account.  A copy of
this document is attached to the Complaint as Exhibit C.

<u>The Foreign Exchange Transactions At Issue</u>

      12.     On or about December 5, 2007, Majapara and Wachovia agreed to do a series of
seven (7) transactions, all of which were to be settled on December 7, 2007.  Six (6) of those
transactions were executed on Wachovia's foreign exchange internet website.  One (1) of the
transactions was executed through an interface system operated by Reuters to which both
Majapara and Wachovia have access.  A copy of wire transfer confirmations for each of these
transactions is attached to the Complaint as Exhibit D.  As detailed on those confirmations,
Majapara was to deliver all of the counter-currency (US$) into its Majapara NY Account.
Wachovia was to then simply debit that New York account.

      13.     Pursuant to the parties' agreement, the seven (7) foreign exchange transactions
were to close on December 7, 2007.  Accordingly, on December 6, 2007, Wachovia sent
30,300,000 Euros, $112,900.03 and 7,000 Swiss Francs to Majapara's account in Munich,

Germany. Even though they had just entered into the deals the prior day (December 5, 2007),
Majapara did not deliver the agreed upon $38,737,100, 127,000 Swiss Francs and $6,218.90 to
Wachovia, as required, so that the transactions could settle on December 7, 2007.

14.    To date, Majapara has not transferred any amount owed pursuant to these
exchange transactions.

15.    On December 11, 2007, however, as was its right under Wachovia's Terms &
Conditions, Wachovia was able to secure, as an offset to the debt owed, $9,460,000 Majapara
attempted to transfer out of Wachovia to a Majapara account located in Citibank in New York.
Accordingly, the total debt owed by Majapara to Wachovia is reduced based upon this offset.
Wachovia was also able to secure an additional $3,960,155.00 in offset funds against the amount
owed by Majapara. The total debt owed from those transactions is $24,711.845.00.

**Majapara Is Illiquid And Intends to Frustrate Wachovia's Recovery Herein**

16.    After Majapara defaulted, my department made contact with Majapara to demand
payment and to get an explanation why it did not pay Wachovia as it was required to do. On
Thursday, December 13, 2007, at approximately 9:52 am Eastern, I spoke by telephone with
Jorge Ortiz, Majapara's Chairman and CEO. I know Mr. Ortiz well and have met with him and
spoken to him many times. I was joined in the telephone call by Juanita Gomez, a Vice
President in my group who is our Mexico representative.

17.    I asked Mr. Ortiz in our call what Majapara did with Wachovia's money. Mr.
Ortiz acknowledged and admitted that Majapara was obligated to provide the agreed upon
currency to Wachovia and owed Wachovia over $30 million. He then stated that Majapara had
received Wachovia's Euros and used them for other purposes because it was experiencing "a
liquidity crisis."

- 5 -

18.    I then asked him if he lent the money to third parties. He said "yes." I said, "That's not legal." He said: "I recognize that we have done something that is not permitted" -- Majapara is a Mexican "Casa de Cambio," a company in the business of currency exchange, such as exchanging Mexican pesos for dollars, and as such, under Mexican law, is not permitted to make loans.

19.    I then asked Mr. Ortiz when Majapara would be able to repay Wachovia. He said that he "needed time to collect the money from others who he had lent Wachovia's money to." He said Majapara "would need two months to collect." Based on this conversation, it is my belief that Majapara engaged in a fraud with respect to the foreign exchange spot transactions Majapara engaged in with Wachovia. Due to its "liquidity crisis," Majapara did not have sufficient funds to complete the exchange with Wachovia and to engage in the other lending or other activities.

20.    Based upon Majapara's recent statements, it knew of its condition prior to the Wachovia transactions closing, but, nonetheless, accepted Wachovia's funds, knowing that it would not have the funds to repay Wachovia at the close. Majapara then used Wachovia's funds to engage in illegal lending transactions and otherwise dissipated the assets received from Wachovia, all the while failing to fulfill its immediate obligations to transfer over $38 million to Wachovia.

21.    Mr. Ortiz told me that if Wachovia took legal action against Majapara, Wachovia would end up with nothing.

**New York Bank Accounts**

22.    Being the relationship manager for Majapara, I am aware of a bank account Majapara maintains (or did maintain) at Citibank located in New York City. The account

- 6 -

number is 36254838. I also have a good faith belief that Majapara maintains (or maintained) bank accounts at other banks in New York as well. Those banks are JP Morgan Chase and Bayerische Hypo- und Vereinsbank, AG.

### Undertaking

23.    Wachovia stands ready to secure a bond (or any other acceptable undertaking to the Court) in an amount set by this Court. Wachovia respectfully requests that the amount of any undertaking be set upon identification of the actual amount to be attached and then in a reasonable amount.

24.    No prior application for the relief requested herein has been made to this or any Court

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 13th day of December, 2007.

Carlos A. Perez



ELENA PEREZ CAPIRO
MY COMMISSION # DD 705363
EXPIRES: August 15, 2011
Bonded Thru Notary Public Underwriters

# EXHIBIT E



# Miami
# To New York

**Wednesday, March 05, 2008**

### Who flies there direct?

| Airline | Alliance | Sun 2 | Mon 3 | Tue 4 | Wed 5 | Thu 6 | Fri 7 | Sat 8 | Duration |
|---|---|---|---|---|---|---|---|---|---|
| American Airlines | OneWorld | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 2:49 |
| Continental Airlines | SkyTeam | 5 | 5 | 5 | 5 | 5 | 5 | 6 | 2:55 |
| Delta Air Lines | SkyTeam | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 3:02 |

### Who flies there connecting?

| Airline | Alliance | Sun 2 | Mon 3 | Tue 4 | Wed 5 | Thu 6 | Fri 7 | Sat 8 | Duration |
|---|---|---|---|---|---|---|---|---|---|
| AirTran Airways | | 0 | 0 | 0 | 3 | 3 | 3 | 3 | 4:39 |
| American Airlines | OneWorld | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 4:10 |
| American Airlines US Airways | | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 4:34 |
| Delta Air Lines | SkyTeam | 2 | 3 | 3 | 3 | 3 | 3 | 2 | 4:57 |
| US Airways | StarAlliance | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4:32 |

### Who also markets direct codeshare flights on this route?

| Airline | Alliance | Sun 2 | Mon 3 | Tue 4 | Wed 5 | Thu 6 | Fri 7 | Sat 8 | Duration |
|---|---|---|---|---|---|---|---|---|---|
| Turkish Airlines | | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2:55 |

Search     Print

^ Top of Page     OAG Worldwide Limited 2006 All Rights Reserved     Cookie Policy | Privacy Policy | Term



# Miami
# To Chicago

**Wednesday, March 05, 2008**

| Who flies there direct? | | Sun 2 | Mon 3 | Tue 4 | Wed 5 | Thu 6 | Fri 7 | Sat 8 | |
| Airline | Alliance | Sun 2 | Mon 3 | Tue 4 | Wed 5 | Thu 6 | Fri 7 | Sat 8 | Duration |
|---|---|---|---|---|---|---|---|---|---|
| AirTran Airways | | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 3:08 |
| American Airlines | OneWorld | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 3:15 |

| Who flies there connecting? | | | | | | | | | |
| Airline | Alliance | Sun 2 | Mon 3 | Tue 4 | Wed 5 | Thu 6 | Fri 7 | Sat 8 | Duration |
|---|---|---|---|---|---|---|---|---|---|
| AirTran Airways | | 0 | 0 | 0 | 2 | 2 | 2 | 1 | 4:32 |
| American Airlines | OneWorld | 2 | 2 | 2 | 2 | 2 | 2 | 1 | 4:49 |
| American Airlines United Airlines | | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 5:15 |
| Northwest Airlines | SkyTeam | 2 | 2 | 2 | 2 | 1 | 1 | 1 | 5:15 |
| US Airways | StarAlliance | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 5:15 |
| US Airways United Airlines | | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 5:22 |

| Who also markets direct codeshare flights on this route? | | | | | | | | | |
| Airline | Alliance | Sun 2 | Mon 3 | Tue 4 | Wed 5 | Thu 6 | Fri 7 | Sat 8 | Duration |
|---|---|---|---|---|---|---|---|---|---|
| All Nippon Airways | StarAlliance | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 3:26 |
| Turkish Airlines | | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 3:20 |
| United Airlines | StarAlliance | 3 | 2 | 2 | 2 | 2 | 2 | 3 | 3:26 |
| US Airways | StarAlliance | 3 | 2 | 2 | 2 | 2 | 2 | 3 | 3:26 |

# EXHIBIT F

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION**

| | |
|---|---|
| WACHOVIA BANK, NATIONAL ASSOCIATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2007L13958 |
| | ) |
| CASA DE CAMBIO MAJAPARA S.A. de C.V., | ) |
| a.k.a. Majapara Casa de Cambio S.A. de C.V., | ) |
| and JOM CORPORATION OF ILLINOIS | ) |
| | ) |
| Defendants, | ) |
| | ) |
| Harris N.A., a National Association, | ) |
| | ) |
| Garnishee. | ) |

## COMPLAINT

Plaintiff Wachovia Bank, N.A. ("Wachovia") brings this action against Defendants Casa de Cambio Majapara S.A. de C.V. a.k.a. Majapara Casa De Cambio S.A. de C.V. ("Majapara") and JOM Corporation of Illinois ("JOM"). As grounds therefore, Plaintiff states as follows:

## PRELIMINARY STATEMENT

1.     This action arises from Majapara's misappropriation of over $38 million (US$) of Wachovia's money relating to a series of foreign exchange spot transactions between the parties. Foreign exchange spot transactions, due to their frequency, the speed at which the transactions are agreed and closed, and the manner in which funds are simultaneously exchanged, are founded upon trust. Majapara, however, abused that trust -- a trust that was established through years of currency trading with Wachovia -- to plunder more than $38 Million from Wachovia.

2.     Majapara's action was not a mere renege on a multi-million dollar transaction wherein Majapara returned Wachovia's property when it realized it could not complete the foreign currency exchange. Subsequent conversations with Majapara make it apparent that

Majapara never intended to honor its commitments but, instead, had decided to wrongfully keep Wachovia's money and abscond with it. In these after-the-fact conversations, Majapara admitted to Wachovia that, at the time it accepted Wachovia's funds, Majapara was illiquid, that it had engaged in illicit activities in relation to its foreign exchange transactions, and threatened that, if Wachovia took any steps to enforce its rights, Wachovia's judgment would be uncollectible. Through this action for breach of contract, promissory estoppel, unjust enrichment, fraud, and alter ego liability, Wachovia seeks a judgment against Majapara and JOM Corporation of Illinois (as alter ego of Majapara) for $24,711,845 (the amount of Wachovia's loss less offsets currently obtained), plus prejudgment interest and costs.

## PARTIES AND JURISDICTION

3.    Plaintiff Wachovia is a national banking association with its principal place of business in Charlotte, North Carolina. Wachovia has offices in Illinois.

4.    Upon information and belief, Defendant Majapara is a Mexican corporation with its principal place of business in Mexico City, Mexico. Upon information and belief, Defendant Majapara utilizes a bank account at a Chicago branch of Harris N.A. to transact business and it transacts business in Illinois on a continuous and systematic basis. Further, upon information and belief, Defendant Majapara transacts business on a continuous and systematic basis through an alter ego, Defendant JOM Corporation of Illinois ("JOM"), which is or was an Illinois corporation with its principal place of business at 3506 W. 26th Street in Chicago, Illinois.

5.    Upon information and belief, JOM voluntarily dissolved on or about December 29, 2006, but still transacts business. Upon information and belief, JOM transacts business as Majapara.

6.    Upon information and belief, Garnishee Harris N.A. ("Harris Bank") is an Illinois

-2-

national banking association with its principal place of business in Chicago, Illinois.

7.    Jurisdiction is appropriate in this case pursuant to 735 ILCS 5/2-209.

8.    Venue is appropriate in this case pursuant to 735 ILCS 5/2-101 because Defendant JOM is an Illinois corporation who, upon information and belief, has or had its principal place of business in Cook County and part of the transactions herein arose in Cook County.

## FACTS COMMON TO ALL COUNTS

### The Majapara Relationship With Wachovia

9.    Starting in or about 1998, Majapara and First Union National Bank ("First Union"), a predecessor to Wachovia, agreed to enter into foreign exchange transactions together.  In these transactions, Majapara would agree to purchase from First Union a certain amount of one currency in exchange for Majapara selling to First Union an equivalent amount of another currency at the applicable exchange rate.

10.    In order to facilitate Majapara and First Union entering into these currency exchange transactions, on or about April 6, 2000, Majapara and First Union entered into a First Union Online FX Subscription Agreement (the "FX Subscription Agreement"), a copy of which is attached hereto as Exhibit A.  Pursuant to the FX Subscription Agreement, Majapara was permitted to execute foreign exchange transactions with First Union electronically through First Union's foreign exchange website.  This, however, was not the exclusive method for the parties to enter into foreign exchange spot transactions.

11.    Effective April 1, 2002, Wachovia merged into and under the charter of First Union with the resulting title of Wachovia Bank, National Association.  As a result of the merger, First Union changed its name to Wachovia Bank, National Association.  As a result of the merger, the FX Subscription Agreement was assigned to Plaintiff Wachovia.

– 3 –

**The Foreign Exchange Transactions At Issue**

12.    On or about December 5, 2007, Majapara and Wachovia agreed to a series of seven (7) transactions, all of which were to settle on December 7, 2007, whereby Wachovia would deliver an aggregate of 26 million Euros to Majapara and Majapara would deliver an aggregate of $38,132,700 to Wachovia.  These transactions required Majapara to transfer dollars directly to Wachovia at a Wachovia-owned New York account.  Six (6) of the transactions were executed on Wachovia's foreign exchange internet website.  One (1) of the transactions was executed over the telephone.  Copies of the confirmations for these transactions are attached hereto as Exhibit B.

13.    Pursuant to these seven (7) foreign exchange agreements, on December 7, 2007, Wachovia sent 26 million Euros to Majapara.  Majapara failed to deliver the agreed upon $38,132,700.00 to Wachovia, as required, on December 7, 2007.

14.    On or about December 13, 2007, the General Director of Majapara admitted that Majapara is obligated to provide the agreed upon currency to Wachovia.

15.    Despite its failure to pay Wachovia for the over $38 million worth of Euros that Wachovia sent to Majapara, Majapara tried to place additional trades with Wachovia on December 7, 2007, knowing that it could not cover such additional trades or its existing obligation to deliver the dollars.  Wachovia was able to stop such additional trades from being executed.

16.    Moreover, on December 11, 2007, after refusing to pay Wachovia over $38 million for the exchange, Majapara sought to drain an account held at Wachovia by attempting to transfer over $9 million out of that account.

17.   By opening an account at Wachovia, Majapara agreed to Wachovia's Terms & Conditions for Global Financial Institutions, which, under its terms, grants Wachovia setoff rights.  See Terms and Conditions, attached hereto as Exhibit C.  Through its setoff rights, Wachovia was able to secure $13,420,155, which came into Majapara's accounts at Wachovia, but has not been able to recover the remaining amount Wachovia is owed.  Some of the amount recovered represents conditional credit that may be subject to reduction by reason of return of items (in this case, checks) for which this credit was given (see next Paragraph).

18.   Majapara also maintains five (5) U.S. dollar accounts at Wachovia.  As to each of these accounts, Wachovia has contingent residual exposure to cover returned items in the federal check clearing program.  Majapara is obligated to reimburse Wachovia for these amounts, but has now stated it is unable to and will not meet its financial obligations.  This liability has averaged $3.3 million per month for the last several months.

**JOM Is The Alter Ego Of Majapara**

19.   JOM is or was an Illinois corporation which, upon information and belief, had its principal place of business in Chicago, Illinois.

20.   Illinois Secretary of State records show that JOM was voluntarily dissolved on or about December 29, 2006.  A copy of the Secretary of State records is attached hereto as Exhibit D.

21.   Upon information and belief, JOM and Majapara have common officers and/or directors.

22.   Upon information and belief, "JOM" stands for "Jorge Ortiz Munoz," who is Majapara's Chairman and CEO.

- 5 –

23.    Upon information and belief, JOM and Majapara have one or more common owners and/or JOM is a subsidiary of Majapara.

24.    According to the Illinois Secretary of State records, JOM used the Assumed Name of "Majapara-Chicago."

25.    Although JOM was dissolved approximately a year ago, upon information and belief, it is still engaging in business.

26.    In fact, in October and November 2007, JOM (a dissolved corporation according to Illinois Secretary of State records) transferred $5,615,666 from its Harris Bank account (entitled, upon information and belief, "JOM Corp of Illinois DBA Majapara-Chicago) directly to a Majapara account at Wachovia.

27.    Documentation reflecting one such recent transfer from JOM to Majapara is attached at Exhibit E.

28.    Upon information and belief, JOM is an alter ego of Majapara and JOM's assets, accordingly, can be utilized to satisfy Majapara's debts to Wachovia.

## COUNT I

### (Breach of Contract Against Majapara)

29.    Plaintiff realleges and reincorporates the allegations in Paragraphs 1 through 28.

30.    As set forth above, Wachovia entered into a series of currency exchange agreements with Majapara.

31.    Majapara breached those agreements by failing to deliver the currency as agreed upon by the parties.

32.    Wachovia has fulfilled its obligations under the agreements.

33.    As a result of Majapara's breaches, Wachovia has suffered damage in the amount of not less than $24,711,845.00, plus interest, plus the amount of any contingent residual exposure as set forth in Paragraph 18 above.

## COUNT II

### (Promissory Estoppel Against Majapara – Alternate Count)

34.    Plaintiff realleges and reincorporates the allegations in Paragraphs 1 through 28.

35.    In the event it is found that no oral or written contract existed between Majapara and Wachovia in relation to the seven (7) foreign exchange spot transactions at issue here, equity intervenes, creating the necessary consideration to support an agreement requiring Majapara to pay Wachovia not less than $24,711,845 in return for accepting currency from Wachovia.

36.    Majapara promised to deliver certain currency to Wachovia in return for Wachovia delivering certain currency to Majapara.

37.    In reliance on Majapara's agreement to deliver certain currency to Wachovia, Wachovia delivered approximately $38 million worth of currency to Majapara.

38.    Wachovia has requested the funds from Majapara.

39.    To date Majapara has not provided the required currency to Wachovia.

40.    Wachovia, however, has been able to obtain certain Majapara funds and offset the amount owed by $13,420,155 (subject to reduction for the reasons set forth in Paragraph 18 above).

41.    Wachovia has no adequate remedy at law.

42.    As a result, Majapara has been unjustly enriched to the detriment of Wachovia.

## COUNT III

### (Unjust Enrichment Against Majapara – Alternate Count)

43.  Plaintiff realleges and reincorporates the allegations in Paragraphs 1 through 28.

44.  In the event it is found that no oral or written contract existed between Majapara and Wachovia in relation to the seven (7) foreign exchange transactions at issue here, equity would still require Majapara to pay Wachovia an amount not less than $24,711,845 in return for accepting currency from Wachovia.

45.  Majapara promised to deliver certain currency to Wachovia in return for Wachovia delivering certain currency to Majapara.

46.  In reliance on Majapara's agreement to deliver certain currency to Wachovia, Wachovia delivered approximately $38 million worth of currency to Majapara.

47.  Majapara did not deliver any currency to Wachovia.

48.  Wachovia, however, has been able to obtain certain Majapara funds and offset the amount owed by $13,420,155 (subject to reduction for the reasons set forth in Paragraph 18 above).

49.  Wachovia requested that Majapara deliver the currency it is owed.

50.  To date, Majapara has neither delivered the required currency to Wachovia, nor returned return the currency Wachovia sent to it.

51.  Majapara has unjustly retained this benefit to the detriment of Wachovia.

52.  Majapara's retention of this benefit violates fundamental principles of justice, equity and good conscience.

53.  Wachovia has no adequate remedy at law.

## COUNT IV

### (Fraud Against Majapara)

54.   Plaintiff realleges and reincorporates the allegations in Paragraphs 1 through 28.

55.   As set forth above, on or about December 5, 2007, Majapara and Wachovia entered into a series of seven (7) currency exchange transactions.

56.   Pursuant to the parties' agreement, in exchange for the delivery of 26 million Euros from Wachovia, Majapara agreed to deliver $38,132,700 (US$) to Wachovia.

57.   Upon information and belief, at the time Majapara entered into the December 5, 2007 agreement and at the time it accepted Wachovia's funds, it knew it was illiquid and insolvent and incapable of performing its obligations under the parties' agreement.

58.   Notwithstanding its knowledge, Majapara represented to Wachovia that it would deliver $38,132,700.00 (US$) to Wachovia to settle the transactions.  Upon information and belief, at the time of the transactions, Majapara knew it would not deliver the required currency and was acting under a present intent to deceive Wachovia and abscond with its funds.  Its representations to Wachovia were false and materially misleading.  In forwarding the funds to Majapara, Wachovia had the right to rely on Majapara's representations.

59.   Majapara's fraudulent intent was confirmed in conversations Wachovia subsequently had with representatives of Majapara.

60.   For example, on or about December 13, 2007, Carlos A. Perez, a Managing Director of Wachovia, spoke with Jorge Ortiz Munoz, the Chairman and CEO of Majapara by telephone, and Mr. Ortiz acknowledged that Majapara, prior to settlement of the transactions, knew that it was experiencing "a liquidity crisis."  Mr. Ortiz stated that Majapara had received Wachovia's Euros and lent the money to third parties.  When Mr. Perez confronted Mr. Ortiz

- 9 -

concerning the transaction and the illegality of Majapara's actions since, as a Casa de Cambio, under Mexican law Majapara is not permitted to make loans, Mr. Ortiz responded, "I recognize that I have done something that is not permitted."

61.    Due to Majapara's "liquidity crisis" and other impermissible activities relating to its currency transactions, Majapara did not have sufficient funds to complete the exchange with Wachovia.    Majapara nonetheless accepted Wachovia's funds, knowing that it would be incapable of repaying the funds to Wachovia.

62.    Majapara then claimed to have used some or all of the Wachovia funds to engage in impermissible lending transactions and otherwise dissipated the assets received from Wachovia, all the while failing to fulfill its immediate obligation to transfer over $38 million to Wachovia.

63.    Wachovia entered into the transactions and delivered 26 million Euros to Majapara in reasonable reliance upon Majapara's representations that it was going to deliver the requisite currency.

64.    As a result of Majapara's fraud, Wachovia has been damaged in an amount to be determined at trial, but not less than $24,711,845.

## COUNT V

### (Breach of Contract/Anticipatory Repudiation  Against Majapara)

65.    Plaintiff realleges and reincorporates the allegations in Paragraphs 1 through 28.

66.    As set forth above, Majapara maintains five (5) US dollar accounts at Wachovia. Under these accounts, Wachovia has contingent residual exposure to cover returned items in the federal check clearing program -- this contingent liability is a continuing concern.  In this regard, Wachovia is entitled to immediate reimbursement from Majapara for the amounts Wachovia is required to pay out.

67.   Over the last several months, this liability has averaged $3.3 million per month.

68.   So far this month, Wachovia has already had to cover certain residual liabilities for which Majapara, in breach of its agreements with Wachovia, has not reimbursed Wachovia.  As a result, Majapara breached the parties' agreement and is indebted to Wachovia.

69.   Additionally, Majapara has already stated to Wachovia that it is illiquid and unable to satisfy its obligations owed to Wachovia.  Accordingly, Majapara has anticipatorily breached and/or repudiated its agreements with Wachovia by stating it will not be immediately reimbursing Wachovia for these obligations now or when they come due.

70.   Wachovia has performed all of its obligations under its agreements with Majapara.

71.   Consequently, Wachovia has been damaged by Majapara's breach of the parties' agreement and will continue to be damaged by Majapara's anticipatory breach of the parties' agreement in an amount to be determined at trial.

<u>**COUNT VI**</u>

<u>**(Alter Ego Liability Against JOM)**</u>

72.   Plaintiff realleges and reincorporates the allegations in Paragraphs 1 through 28.

73.   Upon information and belief, there is a such unity of interest and ownership between Majapara and JOM that the separate corporate personalities should no longer be recognized.

74.   Adherence to the fiction of separate corporate existence would sanction fraud or promote injustice upon creditors, such as Wachovia.

75.   Upon information and belief, JOM is the alter ego of Majapara.

76.   As the alter ego of Majapara, JOM is liable to Wachovia for Majapara's liability to Wachovia under this Complaint.

**WHEREFORE**, Plaintiff respectfully requests judgment in its favor and against Defendants Majapara and JOM and for an order as follows:

(i)     On the First, Second, Third, and Fourth Causes of Action, monetary damages in an amount to be determined at trial, but not less than $24,711,845.00, plus prejudgment interest;

(ii)     On the Fifth Cause of Action, monetary damages in an amount to be determined at trial, plus prejudgment interest;

(iii)     On the Sixth Cause of Action, monetary damages, plus prejudgment interest, against JOM under Counts One through Five to the same extent as Majapara as the alter ego of Majapara;

(iv)     Punitive damages in connection with the Fraud account against both defendants;

(v)     An award of costs, expenses and attorneys' fees attendant to this action; and

(vi)     Such other and further relief as this Court deems just and proper.

Dated: December 17, 2007

Respectfully submitted,
*WACHOVIA BANK, N.A.*
Plaintiff,

By: _____
One of Its Attorneys

Barry S. Rosen
Michael D. Richman
Michael S. Leib
REED SMITH, LLP
10 S. Wacker Drive
Chicago, Illinois 60606-7507
(312) 207-1000
Firm I.D. # 43456
Attorneys for Plaintiff

- 12 –

# EXHIBIT G

Scott S. McKessy (SM-5479)
Casey D. Laffey (CL-1483)
REED SMITH LLP
599 Lexington Avenue
New York, New York 10022
Tel. (212) 521-5400
Fax. (212) 521-5450
Attorneys for Plaintiff
Wachovia Bank, National Association

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

WACHOVIA BANK, National Association,          :
                                              :      07 Civ. 11230 (BSJ)(RLE)
                    Plaintiff,                :
                                              :
          - against -                         :
                                              :
CASA DE CAMBIO MAJAPARA S.A. de C.V. a/k/a:
MAJAPARA CASA DE CAMBIO S.A. de C.V.,         :
                                              :
                    Defendant.                :
-------------------------------------------------------------------X


**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT
OF ITS MOTION FOR AN ORDER DECLARING
<u>DEFENDANT IN CONTEMPT OF COURT</u>**


**REED SMITH LLP**
599 Lexington Avenue, 29th Floor
New York, New York 10022
(212) 521-5400

*Attorneys for Plaintiff*
*Wachovia Bank, National Association*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ...................................................................................... 2

    A.  The Allegations of Wachovia's Complaint.................................................. 2

    B.  This Court's Orders.................................................................................... 3

    C.  Majapara's Notice of the Orders and the Court's Restraints ...................... 4

    D.  Majapara's Citibank Account ..................................................................... 5

    E.  Majapara's Disclosure Requirements .......................................................... 5

ARGUMENT ........................................................................................................ 7

<u>POINT I</u>
THE COURT SHOULD HOLD MAJAPARA IN CIVIL CONTEMPT
OF ITS DECEMBER 14, 2007 AND JANUARY 8, 2008 ORDERS....................... 7

    A.  The Court's Orders Are Clear and Unambiguous........................................ 7

    B.  The Proof of Majapara's Non-Compliance is Clear and Convincing............ 9

       1.  Non-Compliance With the Temporary Restraints ...................... 9

       2.  Non-Compliance With the Disclosure Orders ......................... 10

    C.  Majapara Has Not Diligently Attempted to Comply in a Reasonable Manner ............ 11

<u>POINT II</u>
THE COURT SHOULD GRANT MONETARY AND
OTHER RELIEF TO COMPENSATE WACHOVIA FOR MAJAPARA'S
PAST VIOLATIONS AND TO ENSURE FUTURE COMPLIANCE ..................... 12

CONCLUSION.................................................................................................... 14

## TABLE OF AUTHORITIES

Page

### CASES

Apex Oil Co. v. The Belcher Co. of New York, Inc., 855 F.2d 1009 (2d Cir. 1988)............. 11, 12

Clissuras v. City University of New York, 2005 U.S. Dist. LEXIS 31200
    (S.D.N.Y. Nov. 30, 2005) ............................................................................. 8, 13

JSC Foreign Economic Association Technostroyexport v. Int'l Dev.
    & Trade Services, Inc., 2006 U.S. Dist. LEXIS 25884 (S.D.N.Y. Apr. 28, 2006)..... 7, 8, 11, 12

Levin v. Tiber Holding Corp., 277 F.3d 243 (2d Cir. 2002) ........................................ 9

N.Y. State Nat'l Org. for Women v. Terry, 886 F.2d 1339 (2d Cir. 1989) ................................ 7, 8

Panix Promotions, Ltd. v. Lexis, 2004 WL 421937 (S.D.N.Y. Mar. 5, 2007) .............................. 12

Paramedics Electromedicina Comercial, Ltda v. GE Medical Systems Information
    Technologies, Inc., 369 F.3d 645 (2d Cir. 2004) ............................................. 1, 7, 12

SEC v. Northshore Asset Management, LLC, 2006 U.S. Dist. LEXIS 39255
    (S.D.N.Y. June 14, 2006)................................................................................. 13

U2 Home Entertainment, Inc. v. Hong Wei Int'l Trading, Inc., 2005 U.S. Dist.
    LEXIS 14790 (S.D.N.Y. May 3, 2005) ..................................................... 7, 11, 12

### STATUTES & RULES

18 U.S.C. § 401(3) ............................................................................................. 7

CPLR § 6210............................................................................................................. 8

Fed. R. Civ. Pro. 26(g)(1)-(2) ..................................................................................... 11

## PRELIMINARY STATEMENT

Plaintiff Wachovia Bank, National Association ("Wachovia" or "Plaintiff") submits this Memorandum of Law in support of its instant application for an order declaring defendant Casa de Cambio Majapara S.A. de C.V. a/k/a Majapara Casa de Cambio S.A. de C.V. ("Majapara") in contempt of this Court's Orders, dated December 14, 2007 and January 8, 2008.

> *[P]ersons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed,*
>
>           \*       \*       \*
>
> *It is a matter of respect for the judicial process.*[1]

Unfortunately, Majapara's lack of obedience and lack of respect for this Court's orders is exactly why Wachovia is now forced to make this motion. Wachovia seeks to hold Majapara in contempt of this Court's orders of December 14, 2007 and January 8, 2008 for disobedience of this Court's prohibitions against the transfer of assets out of one of if its accounts located here in New York City, as well as for Majapara's repeated failure to provide Wachovia with a list of all of its assets and their respective locations.

As the Court is aware, on December 14, 2007, this Court issued a temporary restraining order prohibiting Majapara from transferring any of its assets pending the hearing and determination of Wachovia's application for prejudgment attachment.[2] During the time period while the temporary restraints were in place, however, Wachovia has learned that, in direct contravention of this Court's order, more than $60 million was transferred out of Majapara's Citibank account here in New York.

As this Court is also aware, by order dated December 14, 2007 and by order dated January 8, 2008, this Court *twice* required Majapara to provide Wachovia with a list identifying

---

[1]     Paramedics Electromedicina Comercial, Ltda v. GE Medical Systems Information Technologies, Inc., 369 F. 3d 645, 655 (2d Cir. 2004) (emphasis supplied).

[2]     The Court granted that application on December 20, 2007.

all of Majapara's assets and their respective location. Majapara completely ignored the

December 14 mandate and then provided only a partial disclosure in response to the January 8

mandate. No wonder Majapara did not certify even its partial disclosure of assets as required by

the Federal Rules of Civil Procedure and, thereafter, refused to represent that it was in

compliance with this Court's orders.

This conduct should not be condoned and the instant application for contempt granted for

the following reasons:

> This Court's orders were clear and unambiguous as to what it required of Majapara: they prohibited the transfer of assets and required full disclosure of all of Majapara's assets.

> The proof that Majapara has not complied with this Court's orders is clear and convincing: documents produced by Citibank establish that more than $60 million in funds were transferred out of Majapara's account between December 17 and December 20; and Majapara's own documents, plus others, establish that Majapara is concealing information and not providing a full disclosure of its assets.

> Majapara has not diligently attempted to comply with this Court's orders in a reasonable manner. There is simply no evidence that Majapara took *any* steps to comply with this Court's mandate prohibiting transfer of assets, nor that any effort went into making sure it fully complied with its obligation to disclose all of its assets – in fact, Majapara refused to respond to Wachovia's request that it represent that it was complying with this Court's orders.

## STATEMENT OF FACTS

A.    **The Allegations of Wachovia's Complaint**

This case arises out of foreign exchange spot transactions whereby Wachovia agreed to

deliver 26 million Euros to Majapara in exchange for Majapara delivering more than $38 million

(US$) to Wachovia. Amended Complaint, ¶¶ 1, 11-12. A copy of the Amended Complaint is

annexed as Exhibit B to the accompanying Compendium of Exhibits.[3] Specifically, Wachovia

---

[3]    All references to exhibits herein shall be to those exhibits annexed to and incorporated in the accompanying Compendium of Exhibits.

delivered 26 million Euros to Majapara's account as agreed, but Majapara never delivered the

$38-plus million (US$) to Wachovia – Majapara then absconded with Wachovia's money. Id.

Majapara admits that it owes Wachovia this money. See Exh. A. Accordingly, Wachovia

commenced the within action against Majapara for breach of various agreements and for fraud.

Amended Complaint (Exh. B), ¶¶ 17-53.

**B.    This Court's Orders**

On the same day that Wachovia commenced the within action, Wachovia also made an

application to this Court, brought by Order to Show Cause, for an order granting it prejudgment

attachment of Majapara's assets. Declaration of Scott S. McKessy dated February 11, 2008

("McKessy Decl.") ¶¶ 3, 10. The Court signed that order on December 14, 2007 and set a

hearing date for the application for an order of attachment (the "December 14 Order"). See Exh.

C. Included in the December 14 Order was a clear prohibition against Majapara transferring any

of its assets pending a hearing and determination of Wachovia's application:

> IT IS FURTHER ORDERED THAT, pending the hearing and determination of this motion, Majapara, shall be and hereby is enjoined and restrained from transferring, selling, pledging, assigning or otherwise disposing of any of its assets.

Id. In this regard, the December 14 Order specifically referenced the Majapara account (by

account number) held at Citibank here in New York. Id. The December 14 Order also required

Majapara to disclose all of its assets no later than three (3) business days after service of the

December 14 Order:

> IT IS FURTHER ORDERED THAT, Majapara shall produce a detailed list of the aforementioned assets and debts, including a description and location of each asset and debt owed to it, to plaintiff's counsel no later than (3) business days after service of this Order upon Majapara as set forth below.

Id.

At the hearing on Wachovia's application for prejudgment attachment, this Court issued an order granting that application (the "December 20 Order"). See Exh. D. The Court then issued a further order, on December 21, 2007, authorizing Wachovia to serve interrogatories upon third parties regarding assets the third parties may possess belonging to Majapara (the "December 21 Order"). See Exh. E. That same day, Wachovia served a set of interrogatories upon Citibank pursuant to the December 21 Order. See Exh. F.

Thereafter, on January 8, 2008, by endorsed letter (the "January 8 Order"), this Court again ordered Majapara to make a full disclosure of all of its assets as required pursuant to the Court's December 14 Order:

> Application Granted. Majapara is directed to provide [a detailed description, including location, of each asset and debt owed to Majapara] no later than 01/11/08.

See Exh. G.

## C.    Majapara's Notice of the Orders and the Court's Restraints

On December 14, pursuant to the Court's Order, Wachovia served a copy of the December 14 Order, along with the underlying papers and pleadings, upon Majapara via overnight delivery, registered mail, and first class mail. See Exh. H. As detailed by the FEDEX tracking receipt, Majapara received the December 14 Order, as well as other court papers, on December 17, 2007. See Exh. I.

In fact, Majapara's Chicago counsel (Celiza Braganca), represented that Majapara had a representative in the Southern District Courthouse on the afternoon of Friday, December 21, 2007. McKessy Decl. ¶ 16. Indeed, Majapara's recent filing with this Court confirms Majapara's claims that it was here on that date. If true, this means Majapara had notice and actual knowledge of this Court's December 14 Order.

-4-

**D.    Majapara's Citibank Account**

In response to Wachovia's service of interrogatories upon Citibank, pursuant to the December 21 Order, Citibank provided a letter response, dated January 4, 2008, which detailed the closing-day's balance for the Majapara account located at Citibank as well as Majapara's December 2007 account statement. See Exhs. K and L.  As detailed in the responses, the Majapara account held at Citibank here in New York has been steadily drained of funds since December 17, 2007.  Id.

As of the close-of-business on December 17, 2007, there was a balance of more than $14.5 million in that account.  Id.  As of the close-of-business on December 20, 2007, there was less than $2 million.  Id.  And these figures do not even take into account the fact that tens of millions of additional dollars flowed in *and out* of that account during this time period.  See Exh. L.  This window of time (December 17th through December 20th), however, is the time period in which Majapara was prohibited from allowing its assets to be transferred out of its Citibank account pursuant to this Court's December 14 Order.

As a result, instead of having been able to attach funds sufficient to satisfy Wachovia's claim in excess of $24 million, Wachovia is left with an account that, as of January 2, 2008, had less than $2,500 – if even that remains.  Id.  Indeed, during the time period of December 17, 2007 through December 20, 2007 – the period covered by the December 14 Order – more than $60 million flowed out of this account.  Id.

**E.    Majapara's Disclosure Requirements**

The December 14 Order also provided, and was clear in its mandate, that Majapara provide Wachovia, within three business days after service of the December 14 Order, a detailed list of all of its assets and where they are located.  See Exh. C.  Despite having received this directive on December 17, 2007, Majapara never complied with that order.  McKessy Decl. ¶ 24.

-5-

Indeed, not until this Court issued a *second* order, dated January 8th, directing Majapara to provide this information, did Majapara purport to produce the required information. Upon review of these "disclosures", however, the information provided is blatantly insufficient. McKessy Decl. ¶¶ 25-27; Exh. M. To begin with, none of the assets disclosed identify their location. Id. A Mexican corporation may hold US$ denominated accounts in Mexico: consequently, the location of the assets listed on document "Majapara 0004" can be located almost anywhere. McKessy Decl. ¶ 29. Moreover, the list of Majapara bank accounts is incomplete. For example, as detailed in the Amended Complaint, Majapara has five accounts with Wachovia (Amended Complaint ¶¶ 15, 55): "Majapara 0004" only identifies one of Majapara's Wachovia accounts. See Exh. M.

And, Majapara failed to disclose other assets as well. For example, Majapara, in its letter of December 13th, states that Majapara has extended credit to a number of third parties. See Exh. A. Majapara, however, has not listed, nor identified, any of these entities or these receivables in its disclosures. Additionally, in the letter from JOM Corp. (Mr. Ortiz's company), JOM Corp. claimed that it made significant purchases of currency from Majapara. See Exh. J. Indeed, JOM Corp. submitted documents in connection with the Illinois action that represented that, as of May 31, 2007, JOM Corp. owed Majapara up to $827,836.[4] See Exh. N. Majapara has not disclosed these (or these types of) accounts receivable either.

---

[4]     JOM Corp.'s balance sheet indicates that "Majapara & Paymasters" is owed $827,836. Exh. N.

## ARGUMENT

## POINT I

## THE COURT SHOULD HOLD MAJAPARA IN CIVIL CONTEMPT OF ITS DECEMBER 14, 2007 AND JANUARY 8, 2008 ORDERS

District courts have the power to impose fines, imprisonment, or both, for violation of its orders. 18 U.S.C. § 401(3). "It is a matter of respect for the judicial process." Paramedics Electromedicina Comercial, Ltda v. GE Medical Systems Information Technologies, Inc., 369 F.3d 645, 655 (2d Cir. 2004). Specifically, a party may be held in civil contempt for failure to comply with a court order if: (1) the order is clear and unambiguous; (2) the proof of noncompliance is clear and unambiguous; and (3) the contemnor has not diligently attempted to comply in a reasonable manner. Id. at 655; JSC Foreign Economic Association Technostroyexport v. Int'l Dev. & Trade Services, Inc., 2006 U.S. Dist. LEXIS 25884, at *6 (S.D.N.Y. Apr. 28, 2006); U2 Home Entertainment, Inc. v. Hong Wei Int'l Trading, Inc., 2005 U.S. Dist. LEXIS 14790, at *16–17 (S.D.N.Y. May 3, 2005). The party moving for such relief "need not [establish] that the violation was willful." Paramedics Electromedicina Comercial, Ltda, 369 F.3d at 655. Here, this Court's orders were unambiguous in their mandates, the proof of Majapara's violation of these orders is clear, and Majapara has not made reasonable and diligent efforts to comply with the Court's order.

## A.    The Court's Orders Are Clear and Unambiguous

A clear and unambiguous order is "specific and definite enough to apprise those within its scope of the conduct that is being proscribed." JSC Foreign Economic Association Technostroyexport, 2006 U.S. Dist. LEXIS 25884, at *7; U2 Home Entertainment, Inc., 2005 U.S. Dist. LEXIS 14790, at *17 (citing N.Y. State Nat'l Org. for Women v. Terry, 886 F.2d

1339, 1352 (2d Cir. 1989)).  The December 14 Order and January 8 Order were clear and

unambiguous in their mandates.

First, as authorized by CPLR § 6210, the December 14 Order contained clear prohibitions

against Majapara, pending a hearing and determination of Wachovia's attachment application,

from, *inter alia*, transferring any of its assets:

> IT IS FURTHER ORDERED THAT, pending the hearing and
> determination of this motion, Majapara, shall be and hereby is
> enjoined and restrained from transferring, selling, pledging,
> assigning or otherwise disposing of any of its assets.

Exh. C.  Indeed, the December 14 Order, which *specifically referenced* the Majapara Citibank

account (by account number), located here in New York, is clear and unambiguous.  See, e.g.,

JSC Foreign Economic Association Technostroyexport, 2006 U.S. Dist. LEXIS 25884, at *6–7

(holding order of attachment preventing "sale, transfer, or disposition" of defendant's assets to

be clear and unambiguous).

Second, the December 14 Order also required Majapara to disclose all of its assets no

later than three (3) business days after service of the December 14 Order.  Id.  The Court's

January 8 Order, issued after Majapara failed to comply with the December 14 Order, gave

Majapara a second chance to comply with this directive and again directed Majapara to provide

the required information mandated by the December 14 Order no later than January 11, 2008.

See Exh. G.  Again, this Court's directions were clear and unambiguous as to what Majapara was

required to provide to Wachovia.  Clissuras v. City University of New York, 2005 U.S. Dist.

LEXIS 31200, at *2, 7 (S.D.N.Y. Nov. 30, 2005) (holding permanent injunction enjoining and

restraining defendant from continuing to prosecute claims in federal court against the defendants

clear and unambiguous).

**B.      The Proof of Majapara's Non-Compliance is Clear and Convincing**

In order to establish that proof of non-compliance of a court order is clear and convincing, the movant must put forth "a quantum of proof adequate to demonstrate a 'reasonable certainty' that a violation occurred." Levin v. Tiber Holding Corp., 277 F.3d 243, 250 (2d Cir. 2002).  Here, the documentary evidence demonstrates beyond "reasonable certainty" that Majapara has violated two of this Court's directives: (a) allowing the transfer of more than $60 million out of its Citibank account despite its knowledge of this Court's prohibition against any such transfers during the relevant time period; and (b) repeated failures to provide full disclosure of its assets.

**1.      Non-Compliance With the Temporary Restraints**

The December 14 Order prohibited Majapara from transferring any of its assets during the time period from December 17, 2007 (the date Majapara received notice of the December 14 Order) through and including December 20, 2007 (the date the attachment order was granted).  Documents produced by Citibank, however, establish that Majapara's Citibank account, located here in New York, has been steadily drained of funds since December 17, 2007.  See Exh. K.  For example, as of the close-of-business on December 17, 2007, there was a balance of more than $14.5 million in that account, while as of the close-of-business on December 20, 2007, there was less than $2 million.  Id.  But these figures do not accurately reflect the volume of funds that Majapara allowed to flow out of that account during this four-day window of time.  Indeed, a review of Majapara's Citibank December 2007 account statement reveals that more than $60 million flowed out of Majapara's account in violation of this Court's December 14 Order's

prohibitions. See Exh. L. And what makes this conduct even more egregious is the fact that the Citibank account number was specifically identified in the December 14 Order.[5]

### 2.    **Non-Compliance With the Disclosure Orders**

Both the December 14 Order and the January 8 Order required Majapara to provide Wachovia with a full disclosure of its assets. And even though there is only scant documentary evidence available at this point in time, this evidence establishes that Majapara has failed to provide a full disclosure of its assets as this Court has **twice** directed. Specifically, notwithstanding this Court's explicit order to provide Wachovia, within three business days of December 17, 2007, a detailed list of all of its assets and where they are located, Majapara never complied. McKessy Decl. ¶ 24. Indeed, it was not until after this Court issued a *second* order, on January 8, 2008, directing Majapara to, once again, provide this information that Majapara purported to produce the required information.

After reviewing these documents, Wachovia discovered that the information provided was blatantly insufficient. See Exh. M. To begin with, none of the assets disclosed identify their location. A Mexican corporation may hold USD$ denominated accounts in Mexico. Consequently, the location of the assets listed on document "Majapara 0004" can be located almost anywhere. McKessy Decl. ¶ 26. Also, the list of Majapara's bank accounts is incomplete. Majapara has five accounts with Wachovia (Amended Complaint ¶¶ 15, 55): "Majapara 0004," however, only discloses a single account with Wachovia. See Exh. M. What other undisclosed accounts has Majapara chosen to omit from its list of assets?

And Majapara has failed to disclose other assets as well. For example, Majapara, in its letter of December 13th, states that Majapara has extended credit to a number of third parties.

---

[5]       Indeed, the transfer of funds out of Majapara's New York account continued through at least January 2, 2008, when there was less than $2,500 in that account. Id.

-10-

See Exh. A ("The lines that Wachovia provided MAJAPARA were in turn provided to

MAJAPARA's clients. We are recovering those funds. . . ."). Majapara, however, has not listed

nor identified these entities or these receivables in its "disclosures". Additionally, in the letter

from JOM Corp., JOM Corp. claimed that it makes significant purchases of currency from

Majapara. See Exh. J (". . . JOM Corp. purchases pesos from Majapara in Mexico to pay

Mexican beneficiaries of Illinois customers in their local currency"). Indeed, JOM Corp.

submitted documents in connection with the Illinois State Court action that represented that

during 2007, JOM Corp. owed Majapara as much as $827,836. See Exh. N. Where is the

disclosure of this account receivable? Or the disclosure of these types of accounts receivable?

And these are just the omitted assets Wachovia is able to uncover at this early stage of the

litigation. What else is Majapara hiding?

     In light of this documentary evidence, Majapara's non-compliance of the December 14

Order and January 8 Order is clear and convincing. JSC Foreign Economic Association

Technostroyexport, 2006 U.S. Dist. LEXIS 25884, at *7–8 (finding defending in civil contempt

for violating order of attachment); U2 Home Entertainment, Inc., 2005 U.S. Dist. LEXIS 14790,

at *17 (holding defendants in civil contempt for violating permanent injunction).

**C.**   **Majapara Has Not Diligently Attempted to Comply in a Reasonable Manner**

     Finally, Majapara has not shown any reasonable and diligent attempts to comply with this

Court's orders. As noted above, Majapara has not only violated this Court's order preventing the

transfer of its assets, but it has also violated multiple directives of this Court ordering it to

disclose its assets. To begin with, Federal Rule of Civil Procedure 26(g) mandates certification

for "[e]very discovery request, response or objection." Fed. Civ. Pro. 26(g)(1)-(2). This

requirement is strict and the standard of care is objective. See, e.g., Apex Oil Co. v. The Belcher

Co. of New York, Inc., 855 F.2d 1009, 1015 (2d Cir. 1988). Majapara's "asset disclosures" were not certified.

But, to make matters worse, on January 12, 2008, after having received Majapara's purported "asset disclosures," Wachovia requested that Majapara confirm that it was in full compliance with this Court's orders. See McKessy Decl. ¶ 29; Exh. O. To date, Majapara has chosen to ignore that request and remain silent as to Majapara's compliance with this Court's orders. Id. Wachovia now knows why. See, e.g., JSC Foreign Economic Association Technostroyexport, 2006 U.S. Dist. LEXIS 25884, at *16 (noting that repeated violations of Court order evidences the defendant's willfulness); U2 Home Entertainment, Inc., 2005 U.S. Dist. LEXIS 14790, at *19 (same).

## POINT II

### THE COURT SHOULD GRANT MONETARY AND OTHER RELIEF TO COMPENSATE WACHOVIA FOR MAJAPARA'S PAST VIOLATIONS AND TO ENSURE FUTURE COMPLIANCE

"The imposition of civil contempt sanctions may serve dual purposes: to secure future compliance with court orders and to compensate the party that has been wronged." Paramedics Electromedicina Comercial, Ltda, 369 F.3d at 657. Accord Panix Promotions, Ltd. v. Lexis, 2004 WL 421937, at *2–3 (S.D.N.Y. Mar. 5, 2007). "The Court has broad discretion to fashion sanctions to coerce compliance with its orders and compensate [a plaintiff] for [a defendant's] noncompliance." U2 Home Entertainment, Inc., 2005 U.S. Dist. LEXIS 14790, at *20. Accord Paramedics Electromedicina Comercial, Ltda, 369 F.3d at 657.

Here, damages are needed to compensate Wachovia for its loss of security. Majapara should be directed, pending resolution of this action, to deposit into Court an amount sufficient to satisfy Wachovia's claims against Majapara. See JSC Foreign Economic Association Technostroyexport, 2006 U.S. Dist. LEXIS 25884, at *20 (ordering defendant to "purge her

-12-

contempt" by turning over assets transferred in violation of order of attachment).  Wachovia should also be awarded its reasonable attorney's fees incurred in making the instant application. See Clissuras, 2005 U.S. Dist. LEXIS 31200, at *7 (granting plaintiffs compensatory damages and attorney's fees); SEC v. Northshore Asset Management, LLC, 2006 U.S. Dist. LEXIS 39255, at *8–9 (S.D.N.Y. June 14, 2006) (same).

Additionally, to ensure that Majapara has not transferred any other assets in violation of the Court's orders, Majapara should be required to: (a) provide a full and complete verified disclosure of all of its assets (including, but not limited to, its accounts receivables), along with copies of Majapara's audited and unaudited financial statements covering the last six months (including, but not limited to, whatever financial statements Majapara used, in connection with its pending motion to vacate, claiming to have been a $90 million going-concern as of December 31, 2007); (b) provide all documents relating to the Euros transferred pursuant to the underlying spot transactions (including, but not limited to, the names, addresses and account numbers of each entity or individual that received any of the Euros transferred in connection with the underlying spot transactions); (c) produce Jorge Ortiz Munoz, at the offices of Reed Smith, 599 Lexington Avenue, New York, New York, for immediate deposition regarding Majapara's assets, financial condition, conduct since December 14, 2007, and efforts Majapara made to comply with this Court's orders; and (d) for such other, further, and different relief as this Court deems just and proper.

## **CONCLUSION**

For the foregoing reasons and those set forth in the accompany McKessy Declaration,

Wachovia's motion should be granted in its entirety, along with such other, further, and different

relief as the Court deems just, proper, and equitable.

Dated:    New York, New York
          February 11, 2008

REED SMITH LLP

By: _____
        Scott S. McKessy
        Casey D. Laffey
    599 Lexington Avenue
    New York, New York 10022
    Tel. (212) 521-5400
    Fax. (212) 521-5450

*Attorneys for Plaintiff*
*Wachovia Bank, National Association*

-14-

# EXHIBIT H

Scott S. McKessy (SM-5479)
Casey D. Laffey (CL-1483)
REED SMITH LLP
599 Lexington Avenue
New York, New York 10022
Tel. (212) 521-5400
Fax. (212) 521-5450
Attorneys for Plaintiff
Wachovia Bank, National Association

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
WACHOVIA BANK, National Association,          :
                                              :
                      Plaintiff,              :      07 Civ. 11230 (BSJ)(RLE)
                                              :
          - against -                         :
                                              :
CASA DE CAMBIO MAJAPARA S.A. de C.V. a/k/a:
MAJAPARA CASA DE CAMBIO S.A. de C.V.,         :
                                              :
                      Defendant.              :
-------------------------------------------------------------X

## DECLARATION OF CARLOS A. PEREZ

Carlos A. Perez, declares as follows:

1.      I am the Managing Director, Americas Group, Global Financial Institutions &
Trade Services for Wachovia Bank, National Association ("Wachovia"). I am fully familiar with
the facts set forth herein, and submit this declaration pursuant to 28 U.S.C. §1746, in opposition
to Casa de Cambio Majapara S.A. de C.V. a/k/a Majapara Casa De Cambio S.A. de C.V.'s
("Majapara") instant application to, *inter alia*, vacate the Order of Attachment issued by this
Court on December 20, 2007.

### Introduction

2.      As stated in my previous declaration to this Court, this is a case that arises out of
foreign exchange spot transactions wherein Majapara agreed to deliver to Wachovia more than
$38 million (US$) in exchange for Majapara delivering to Wachovia 26 million Euros.
Wachovia transferred the Euros; Majapara, however, did not transfer the U.S. Dollars and then

absconded with Wachovia's Euros. Majapara refused to return the Euros, and then proceeded to come up with differing stories on when, if ever, it would pay Wachovia.

3.      Consequently, Wachovia commenced this action to protect its rights and, in connection with this action, sought an order of attachment seeking to attach assets Wachovia believed Majapara had in New York.  It is my understanding that this Court granted that application and now Majapara seeks to vacate that order by claiming this Court was not provided with all of the relevant facts.

4.      This is simply not true.  Indeed, the purported "factual" picture Majapara attempts to paint in its papers is misleading in certain parts, untrue in others, but, in any event, wholly unsupported by anyone with knowledge of the relevant events.

5.      Moreover, based upon Majapara's conduct in transferring a significant amount of its funds out of Wachovia's reach, including transferring funds out of Majapara's Citibank account in New York in violation of this Court's prohibitions, the order of attachment was well deserved and Wachovia's fear that Majapara would remove funds from Wachovia's reach justified.

## Majapara's Relationship With Wachovia

6.      Majapara had several accounts with Wachovia, as well as engaged in foreign exchange spot transactions with Wachovia.  Foreign exchange spot transactions are to be settled within 48 hours and the settlement of those transactions is to be the exchange of the bought/sold currencies between the parties on the settlement date.  Pursuant to the parties' FX Agreement, Wachovia was under no obligation to transfer the outgoing bought currency until after confirmation of receipt of the incoming sold currency.  It is within Wachovia's sole discretion, however, to transfer the outgoing bought currency prior to confirmation of receipt of the incoming sold currency.  For those transactions, banks, like Wachovia, establish settlement limits

- 2 -

(which establish daily limits on the volume of transactions in which an entity may engage) in order to manage settlement risk (the amount of bought currency the bank will transfer prior to confirming receipt of the sold currency). This is why, in order to set settlement limits and assess settlement risk, Wachovia required Majapara to provide statements regarding Majapara's financial health and well-being. These financial representations are to induce Wachovia to continue to transact business with Majapara.

7.    Accordingly, settlement limits are established by banks to address, among other things, the risk inherent in transactions (like foreign exchange transactions) in which fund transfers are intended to occur on the same day but, due to the logistics of such arrangements and in order to honor its commitments to its customers, the bank may find it necessary to release funds into the system before it can confirm that it has actually received funds from its counterparty.

8.    In this regard, when the sold currency is Euros, a bank usually sends out the bought currency in the morning of the settlement date. Wachovia, again like other banks, may not be able to determine with certainty the receipt of the incoming sold currency until the day after the settlement date. This delay is inherent in the system of electronic transfers and is one of the reasons for the establishment of settlement limits.

9.    The driving reason for this procedure is operational. Wachovia engages in thousands of these transactions on a daily basis and employs an automated reconciliation program to process the confirmations. To reconcile this volume of transactions manually would require an incredible amount of man-hours. Accordingly, each day, the European banks provide Wachovia with a SWIFT 950 (containing data regarding the prior day's transactions) to allow for this automated reconciliation. Again, this delay in confirming an entity's "cover" of its intra-day obligations is considered the settlement risk. There is no charge or fee imposed upon Majapara, or any other foreign exchange customer of the bank, for Wachovia to incur this settlement risk.

- 3 -

There is no applicable interest rate; there is no agreement requiring Wachovia to incur this risk in this respect; this is a discretionary risk to which Wachovia may or may not choose to be exposed on any given transaction.

## December 5th Meeting With Majapara

10.    In December 2007, Wachovia decided to cease providing correspondent banking services to exchange companies outside the United States and went about notifying thirteen Casas de Cambio in Mexico and 50 other entities worldwide about this cessation of services. In this regard, Wachovia prepared a form letter to be delivered to these entities. This form letter listed a number of services that would be ending, but not all services listed in this letter applied to all customers.

11.    Majapara was one of the Casas de Cambio I visited the afternoon of December 5, 2007 to inform it of Wachovia's decision. The letter I provided to Majapara during that meeting, which is substantially in the same form as the letters provided to the other entities notified, is annexed hereto as Exhibit R. And while the December 5th form letter delivered to Majapara references "credit lines," this, again, was a mere form letter and included a laundry list of potential services that could be affected and not a recitation of the services each entity did, in fact, receive.

12.    I visited at least two other Casa de Cambios on December 5th before I visited with Mr. Jorge Ortiz Munoz at the offices of Majapara. During my meeting with Majapara, I gave Mr. Ortiz the letter and explained Wachovia's decision. As more fully detailed in the accompanying declaration of Andrew Gross, the cessation of services described in the December 5th form letter, however, did not cut-off Majapara from doing any further spot transactions with Wachovia, it just meant Wachovia would no longer incur any settlement risk in connection with those spot transactions and would transfer the sold currency only after the bought currency had been confirmed received by Wachovia – as set forth in the parties' FX Agreement.

- 4 -

13.    And, as the accompanying declaration of Andrew Gross explains, the spot transactions Majapara entered into on or before December 5, 2007, were not subject to these new restrictions. There simply was no "abrupt cancellation of operating lines" as Majapara now claims. Indeed, the entire basis of Majapara's business is the international transfer of funds and it is well aware of the mechanics and logistics of such transfers. So Majapara's mischaracterization, in its motion papers, of the nature of its relationship with Wachovia is all the more difficult to understand.

### December 13 Communications

14.    I have been informed that on December 10, 2007 (the Monday after Majapara defaulted), Wachovia's back office services contacted Majapara regarding the December 5th spot transactions and was told that the missing payment would be arriving shortly. No payment was received.

15.    Thereafter, my department contacted Majapara to demand payment and to get an explanation why Majapara did not pay Wachovia as it was required to do. The morning of Thursday, December 13, 2007, I spoke by telephone with Mr. Ortiz. I asked him what Majapara did with Wachovia's money. As I stated in my prior declaration, Mr. Ortiz acknowledged and admitted that Majapara was obligated on its debt to Wachovia and owed Wachovia for the December 5th spot transactions. Mr. Ortiz then stated that Majapara had received Wachovia's Euros and used them for other purposes because Majapara was experiencing "a liquidity crisis."

16.    This was the first I had heard of this and Mr. Ortiz explained that this liquidity crisis was caused because Majapara had been improperly lending money. I note that Majapara now blames Wachovia for its claimed "liquidity crisis" and apparently claims that it is permissible for it, a Mexican Casa de Cambio, to lend money. Neither of these new claims, however, has merit. First, none of the other twelve Mexican Casas de Cambio or 50 other entities worldwide that received the same December 5th form letter were unable to settle a

foreign exchange spot transaction with Wachovia due to Wachovia's cessation of services. Second, from my reading of the Mexican statute annexed to Majapara's motion papers, nothing in that provision states a Casa de Cambio may lend money: I do not recall any of the financial statements Majapara supplied to Wachovia or Majapara's Mexican regulator's (to the extent they are available to the public) disclosing the existence of any of these "loans."

17.     I then asked Mr. Ortiz when Majapara would repay Wachovia. He said Majapara needed "two months" to collect the loans Majapara made and that, in lieu of payment, he would transfer to Wachovia two-thirds ownership of Majapara. Mr. Ortiz valued Majapara at $70,000,000 as a going concern to value the shares for such a proposition – this valuation, however, was wholly unsupported and ridiculously high given Majapara's then current financial condition. I declined this "offer" for several reasons, but primarily because something did not smell right with Majapara's business and its finances (*i.e.* Majapara admitted it was improperly issuing loans; Majapara's sudden and inexplicable dire financial straits, despite having provided Wachovia financial statements indicating it was a sound and financially healthy company). I simply did not want to get myself or Wachovia involved in whatever Majapara had gotten itself into. I note that Majapara's motion papers now claim that Majapara was worth $90 million, at the end of 2007, as a going concern. This statement seems a little disingenuous given Majapara's other "statements" and may explain why no one from Majapara – not even Mr. Rousseau, Majapara's Treasurer who submitted the lone declaration – was able to attest to such a valuation.

18.     I then asked Mr. Ortiz when Majapara would repay Wachovia. He said Majapara needed "two months" to collect the loans Majapara made and that he would provide Wachovia with two-thirds of the shares in Majapara as security in the meantime. But given the fact that it was improper for Majapara to have issued loans in the first place, the fact that Majapara refused to return any of Wachovia's Euros, the fact that Majapara was in such dire financial straits, so suddenly and inexplicably, despite the financial statements Majapara provided to Wachovia, the

fact that Mr. Ortiz's claim of Majapara being worth $70 million as  a going concern was completely unsupportable, this delay tactic by Majapara was not acceptable and I told him that.

19.    Regardless, Wachovia then received a letter from Mr. Ortiz, dated December 13, 2007, wherein he confirmed Majapara's liability to Wachovia.  But in the short time between when our telephone conversation ended and Mr. Ortiz wrote his letter, Majapara had already backed away from its claim to repay in "two months" and took the new position that it would try to repay sometime in the indefinite future.

20.    The letter then claimed that the purported "liquidity" issue was caused by Wachovia's "abrupt cancellation of operating lines."  There is no explanation of the "liquidity" issue in the December 13th letter, nor in Majapara's present motion papers.  Moreover, no where in its papers does Majapara explain how this mysterious issue could arise only after December 5th and not before – other than Majapara's bare unsupported claim that Wachovia caused it. Indeed, if Majapara was experiencing "liquidity" issues after receiving a $38 million windfall by absconding with Wachovia's money, what was its true financial condition prior to receiving this misappropriated windfall?

21.    And, as more fully detailed in the accompanying declaration of Andrew Gross, Wachovia did not abruptly cancel anything.  Indeed, Wachovia continued to enter into foreign exchange spot transactions with Majapara after December 5th, but, for those transactions settling *after* December 7, 2007, Wachovia did not incur any settlement-risk exposure – meaning, as per the parties' written agreement, the sold currency had to be received by Wachovia before it would transfer out the bought currency.

22.    But what Majapara attempts to have this Court overlook is that the December 5th spot transactions between Wachovia and Majapara were to be settled on December 7, 2007, with Wachovia being exposed to settlement risk.  Accordingly, the only difference between the

- 7 -

settlement of the December 5th spot transactions and all prior spot transactions was that Majapara appears not to have intended to pay Wachovia for the December 5th spot transactions.

23.    Finally, Majapara's motion papers intimate that the parties had an agreement that Wachovia was going to allow Majapara an undefined amount of time within which to repay Wachovia. This is not supported by either the December 5th form letter or the December 13th letter, not true and contrary to my explicit conversation with Mr. Ortiz.

24.    But the bigger questions Majapara never answers are: Where are the Euros it took? Where are the US$ that Majapara was supposed to deliver to Wachovia? Where is the listing of this more than $38 million windfall on the purported "complete" listing of assets Majapara was to provide to Wachovia pursuant to Court orders?

25.    And despite Majapara's attempts to confuse the issues in this action, the basis of this dispute is quite simple. Majapara, whose business consisted almost entirely of currency exchange and transfer, who routinely exchanged hundreds of millions of dollars a day, who was extensively familiar with the customs, practices, and duties of participants in this daily process, accepted exchange currency from Wachovia, all the while apparently fully aware, prior to the settlement date, that it was not going to pay Wachovia and understanding that Wachovia would send its funds before it discovered what Majapara intended to do.

### Majapara's Account At Wachovia

26.    Majapara also tries to paint a picture that it had been steadily depositing funds into its account at Wachovia after December 11, 2007. This is not true. First Majapara makes no claim that it intended funds to be deposited therein nor that it, in fact, was the depositor of those funds. And, second, two large deposits made into the account on December 11, 2007, appear to have been by mistake because as soon as they hit, Majapara attempted to transfer them

out of the account using electronic means. And when that did not work, it then called Wachovia and requested immediate transfer of the money out of the account.

### Majapara's Business

27.     On January 29, 2008, a Wachovia employee was dispatched to the offices of Majapara located in Mexico City in order to deliver a document Majapara had requested. When the messenger arrived, he noticed that furniture was being moved out of the premises and was informed that Majapara was closed. On the door of Majapara's offices was a notice, written in Spanish (I am fluent in Spanish), that translates as follows:

TO OUR CUSTOMERS

CASA DE CAMBIO MAJAPARA FULLY GUARANTEES YOU THAT IT WILL HONOR THE
OBLIGATIONS THAT IT HAS WITH YOU IN THE BRIEFEST POSSIBLE TIME.

DUE TO FORCE MAJEURE REASONS NOT ATTRIBUTABLE TO THIS CORPORATION, WE ARE
TEMPORARY UNABLE TO PERSONALLY ASSIST YOU WITH RESPECT TO PENDING TRANSACTIONS, THEREFORE IN ORDER TO CONTINUE ASSISTING YOU, PLEASE CONTACT:

PEDRO PATRICIO TORRES MARCO
JOSE VICTOR RODRIGUEZ

TELEPHONES: (55) 55116063 AND 55114346
BUSINESS HOURS: MONDAY TO FRIDAY FROM 9:00 TO 14:00.

A copy of the original notice is annexed hereto as Exhibit S.

- 9 -

**Majapara's Purported Counterclaim**

28.     Majapara also indicates that it will be asserting counterclaims against Wachovia based upon Wachovia's conduct.  While Majapara's papers do not set forth the basis for asserting any counterclaims, based upon the facts under this action, Wachovia denies that any such counterclaims will have any merit.

**Conclusion**

29.     Based upon Majapara's conduct, Wachovia's Order of Attachment is appropriate, should be maintained, and the instant application denied in all respects.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed this _11_th day of February, 2008.

Carlos A. Perez

- 10 -

# EXHIBIT I

Scott S. McKessy (SM-5479)
Casey D. Laffey (CL-1483)
REED SMITH LLP
599 Lexington Avenue
New York, New York 10022
Tel. (212) 521-5400
Fax. (212) 521-5450
Attorneys for Plaintiff
Wachovia Bank, National Association

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
WACHOVIA BANK, National Association,    :
                                        :        07 Civ. 11230 (BSJ)(RLE)
            Plaintiff,                  :
                                        :
        - against -                     :
                                        :
CASA DE CAMBIO MAJAPARA S.A. de C.V. a/k/a:
MAJAPARA CASA DE CAMBIO S.A. de C.V.,   :
                                        :
            Defendant.                  :
-----------------------------------------------------------------X

### DECLARATION OF ANDREW GROSS

Andrew Gross, declares as follows:

1.    I am the Head of Global Foreign Exchange for Wachovia Bank, National Association ("Wachovia"). I am fully familiar with the facts set forth herein, and submit this declaration pursuant to 28 U.S.C. §1746, in opposition to Casa de Cambio Majapara S.A. de C.V. a/k/a Majapara Casa De Cambio S.A. de C.V.'s ("Majapara") instant application to, *inter alia*, vacate the Order of Attachment issued by this Court on December 20, 2007.

### Foreign Exchange Spot Transactions

2.    I have been involved with Foreign Exchange Spot transactions for 23 years and am intimately familiar with how the industry, including Mexican Casas de Cambio, transact business. A Casa de Cambio, like Majapara, has customers with currency needs. A Casa de Cambio will act as an intermediary for a client that is in need of one currency and has Dollars or a second currency to exchange. In this regard, the Casa de Cambio would enter into Foreign

NYLIB-3983474.1

Exchange Spot transactions with a bank, like Wachovia, to fulfill the customer's needs. Those transactions must settle within two business days – in most cases a settlement beyond two business days is no longer considered a spot transaction and no longer a transaction in which a Casa de Cambio may enter.

3.    If the Casa de Cambio has a client in need of Euros, the client would transfer the U.S. Dollars (it may be other currencies) to the Casa de Cambio. The Casa de Cambio is then supposed to exchange the currency with the bank and then forward on the Euros (or whichever currency was requested) to its client. Indeed, pursuant to Majapara's FX Agreement, Wachovia is under no obligation to transfer the outgoing bought currency until after confirmation of receipt of the incoming sold currency. Wachovia, in its sole discretion, however, may transfer the outgoing bought currency prior to confirmation of receipt of the incoming sold currency. Under those circumstances, Wachovia establishes settlement limits on the volume of transactions in which an entity may engage to manage settlement risk (the amount of bought currency the bank will transfer prior to confirming receipt of the sold currency).

4.    Accordingly, settlement limits address the risk inherent in transactions (like foreign exchange transactions) in which fund transfers are intended to occur on the same day but, due to the logistics of such arrangements, the bank may find it necessary to release funds into the system before it can confirm that it has actually received funds from its counterparty.

5.    Banks that do not wish to incur any settlement-risk exposure settle the transaction by waiting to release the outgoing currency until receipt of the incoming currency's receipt is confirmed from the Casa de Cambio. This requires more effort as the transactions have to be performed manually.

**<u>Majapara</u>**

6.     As more fully detailed in the accompanying declaration of Carlos Perez, in December 2007, Wachovia decided to cease providing correspondent banking services to exchange companies outside of the United States. Majapara was one of the foreign exchange companies notified of this cessation of services. The cessation of services, however, was neither immediate, nor abrupt. Indeed, after December 5, 2007, Majapara could (and, in fact, did) enter into additional foreign exchange spot transactions with Wachovia.

7.     For spot transactions entered into <u>after</u> December 5, 2007, Wachovia would no longer incur any settlement risk and required the incoming sold currency to be confirmed received before Wachovia would transfer the outgoing bought currency.

8.     For the December 5th spot transactions underlying this action, however, Wachovia still exercised its discretion and incurred settlement risk with respect to Majapara: meaning, Wachovia transferred the outgoing bought currency, as per Majapara's instructions, prior to Wachovia confirming receipt of the incoming sold current. There was nothing different about the settlement of the December 5th spot transactions than all prior transactions.

9.     Consequently, if Majapara had been engaging in proper foreign exchange transactions, there would be no "liquidity" issue due to Wachovia's cessation of services. This is especially true for the transactions Majapara requested on December 5th as those were to proceed in the same manner as every other transaction Majapara had with Wachovia.

10.     Again, there was simply no abrupt termination of any "operating lines" nor could Wachovia's conduct have caused a "liquidity" crisis for a Casa de Cambio that engaged in proper business – none of the other twelve Mexican Casas de Cambio, nor other 50 entities worldwide were unable to settle foreign exchange spot transactions with Wachovia as a result of Wachovia's cessation of services.

- 3 -

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this _11_th day of February, 2008.


Andrew Gross

- 4 -

# EXHIBIT J

Scott S. McKessy (SM-5479)
Casey D. Laffey (CL-1483)
REED SMITH LLP
599 Lexington Avenue
New York, New York 10022
Tel. (212) 521-5400
Fax. (212) 521-5450
Attorneys for Plaintiff
Wachovia Bank, National Association

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

WACHOVIA BANK, National Association,                    :
                                                       :     07 Civ. 11230 (BSJ)(RLE)
                          Plaintiff,                   :
                                                       :
                       - against -                    :     **DECLARATION**
                                                       :     **OF SCOTT S. MCKESSY**
CASA DE CAMBIO MAJAPARA S.A. de C.V. a/k/a             :
MAJAPARA CASA DE CAMBIO S.A. de C.V.,                  :
                                                       :
                          Defendant.                  :
------------------------------------------------------------X

     I, SCOTT S. MCKESSY, hereby declare under penalty of perjury, pursuant to 28

U.S.C. § 1746, that the following is true and correct:

    1.    I am a member of the law firm of Reed Smith LLP, attorneys for

Wachovia Bank, National Association ("Wachovia"), the plaintiff in this action.  I submit

this Declaration in opposition to the motion of defendant Casa de Cambio Majapara S.A.

de C.V. a/k/a Majapara Casa de Cambio S.A. de C.V. ("Majapara") to, *inter alia*, vacate

this Court's order of attachment dated December 20, 2008.

### Introduction

    2.    This is a simple case where two entities agreed to exchange equal amounts

of currency:  Wachovia did; Majapara did not; and Majapara then refused to return

Wachovia's money.  As a result, Wachovia commenced the within action and sought and

obtained an order for prejudgment attachment. Majapara now comes before this Court telling a story that Majapara (not Wachovia) is the victim of Majapara's misappropriation of $38-plus million of Wachovia's money. Consequently, Majapara now seeks to have this Court's order of attachment vacated. But this attempt to recast Majapara as the victim is as misplaced as is it unsupported, and, accordingly, Majapara's instant motion should be denied for various reasons.

3.     *First*, Majapara's instant motion is completely unsupported. While its memorandum of law recites pages and pages of purported "facts" upon which Majapara bases its motion, virtually none of those "facts" are supported by any proof. And the solitary two-page client declaration that Majapara does submit in connection with its motion, does not challenge any of Wachovia's factual allegations but is submitted solely to attach documents that have nothing to do with the instant action. In essence, Majapara complains that this Court was not provided with all of the relevant facts and then does not provide this Court with any relevant facts. Without proof, Majapara's motion should not even be considered by this Court.

4.     *Second*, Majapara's initial moving papers established two grounds for this Court to grant prejudgment attachment of Majapara's assets, and this Court's order of attachment was granted on each separate basis. Majapara's present motion, however, only challenges one of those grounds. So even assuming Majapara's motion has merit (which it does not), the order of attachment was still well-issued.

5.     *Third*, the only relevant facts not previously before this Court are the facts that Majapara has violated numerous mandates from this Court. In short, since this action was commenced, Majapara has failed to disclose all of its assets and where they are

2

located (in violation of this Court's December 14 and January 8 orders), allowed tens of millions of dollars to be removed from Majapara's account here in New York (also in violation of that Court's December 14 order), and refused to represent that it is in compliance with this Court's orders.

6.    *Fourth*, Majapara does not claim to have suffered any damages as a result of the issuance of any of this Court's orders.  To begin with, Majapara never claims to have conducted itself in accordance with the terms of this Court's orders, and does not provide this Court with any proof of any damage.  Despite this lack of harm, Wachovia posted a $1 million bond in connection with the order of attachment, but has not successfully attached any of Majapara's assets within this jurisdiction – primarily due to Majapara's efforts to frustrate any such attachment.  Based upon these facts, however, Majapara now makes the incredible complaint that the bond should be increased 90 fold! There is simply no basis – let alone a rational one – for Majapara's demand.

7.    *Fifth*, the order of prejudgment attachment obtained from this Court is not extraterritorial and has not been served upon any entity that is not located here in New York.

8.    *Sixth*, Majapara provides this Court with no basis for demanding Wachovia deposit approximately $14 million into Court.  Indeed, as is unchallenged by Majapara, Wachovia exercised this right as per the Terms and Conditions governing Majapara's accounts.

## Factual Background

9.    Majapara is a Mexican corporation, does not maintain any offices in New York, and is in the business of retail and wholesale foreign exchange.  See Declaration of

3

Carlos Perez, dated December 13, 2007 ("Perez December Decl.") ¶ 5 (previously submitted to this Court in connection with Wachovia's December 14, 2007 Order to Show Cause), a copy of which is annexed to the accompanying Compendium of Exhibits as Exhibit A.[1]

10.     In the late 1990's, Majapara and First Union National Bank ("First Union") (a predecessor to Wachovia) agreed to enter into foreign exchange transactions. Perez December Decl. (Exh. A), ¶ 6. Majapara would agree to purchase from First Union a certain amount of one currency in exchange for Majapara selling to First Union an equivalent amount of another currency at the applicable exchange rate. Id. In order to facilitate these exchange transactions, on or about April 6, 2000, Majapara and First Union entered into a First Union Online FX Subscription Agreement ("FX Subscription Agreement"), a copy of which is annexed as Exhibit B.

11.     In 2002, First Union and Wachovia merged. Perez December Decl. (Exh. A), ¶ 8.

12.     Majapara also held a number of other accounts with Wachovia. Amended Complaint ¶ 15; a copy of which is annexed as Exhibit C. Upon the opening of Majapara's New York account, Majapara agreed that Wachovia's Terms & Conditions For Global Financial Institutions ("Wachovia's Terms & Conditions"), amongst other documents, governed all of the parties' business relationships and dealings. Perez December Decl. (Exh. A), ¶ 9. A copy of Wachovia's Terms & Conditions is annexed as Exhibit D.

---

[1]     All exhibits will be annexed to the accompanying Compendium of Exhibits.

13.    On or about December 5, 2007, Majapara and Wachovia agreed to do a series of seven (7) transactions, all of which were to be settled on December 7, 2007. Perez December Decl. (Exh. A), ¶ 12.

14.    Pursuant to the parties' agreement, the seven (7) foreign exchange transactions were to close on December 7, 2007. Id. ¶ 13. Wachovia transferred its half of the currency exchange. Id. Majapara did not deliver its half. Id.

15.    On December 11, 2007, however, as was its right under Wachovia's Terms & Conditions, Wachovia was able to secure, as an offset to the debt owed, $9,460,000 Majapara attempted to transfer out of Wachovia to a Majapara account located in Citibank in New York. Id. ¶ 15. Accordingly, the total debt owed by Majapara to Wachovia is reduced based upon this offset. Wachovia also was able to secure an additional $3,960,155.00 in offset funds against the amount owed by Majapara. Id.

### Procedural History

16.    On Friday, December 14, 2007, Wachovia commenced the within action against Majapara. See Exh. C. At that same time, Wachovia made an application to this Court, brought by Order to Show Cause, for a prejudgment order of attachment. The Court signed that order, set December 21, 2007 as the return date for that application and issued a temporary restraining order prohibiting Majapara, pending the hearing and determination of Wachovia's application for an order of attachment, from transferring any of its assets (the "December 14 Order"). A copy of the December 14 Order is annexed as Exhibit E.

5

17.    Included in the December 14 Order was a clear prohibition against

Majapara, pending a hearing and determination of Wachovia's application, from, *inter*

*alia*, transferring any of its assets:

> IT IS FURTHER ORDERED THAT, pending the hearing
> and determination of this motion, Majapara, shall be and
> hereby is enjoined and restrained from transferring, selling,
> pledging, assigning or otherwise disposing of any of its
> assets.

18.    The December 14 Order also specifically referenced the Majapara account

(by account number) held by Citibank here in New York.  The December 14 Order

further required Majapara to disclose all of its assets to Wachovia no later than three (3)

business days after service of the December 14 Order.

19.    The December 14th Order, as well as certain other court papers, were

received by Majapara on December 17th.  Copies of the Certificate of Service and

FEDEX tracking receipt are annexed as Exhibits F and G, respectively.  Upon the hearing

date of the order of attachment, which was advanced by this Court to December 20th, the

Court, by order dated December 20, 2007 ("December 20 Order"), granted Wachovia's

application.  A copy of the December 20 Order is annexed as Exhibit H.

20.    The next day, this Court issued an order, dated December 21, 2007,

providing for, *inter alia*, expedited third-party discovery ("December 21 Order").  A copy

of the December 21 Order is annexed as Exhibit I.  Pursuant to the December 21 Order,

Wachovia served interrogatories upon Citibank here in New York City.  In response to

those interrogatories, Citibank provided a letter detailing the closing-day balances for the

Majapara account at Citibank from December 14, 2007 through January 2, 2007, as well

as produced Majapara's December 2007 Account Statement.  Copies of the January 4

Letter and December 2007 Account Statement are annexed as Exhibits J and K.

21.    The December 14th order also required Majapara to provide a detailed list of all of its assets.  It never did.  This Court then, by endorsed letter, dated January 8, 2008, again directed Majapara to make this disclosure pursuant to the Court's prior directive ("January 8 Order").  A copy of the January 8 Order is annexed as Exhibit L.  While Majapara eventually provided certain documentation, Wachovia discovered that Majapara failed to provide a full disclosure of all of its assets.  A copy of Majapara's "disclosures" is annexed hereto as Exhibit M.

22.    Indeed, on January 12, 2008, Wachovia requested that Majapara represent that it was in full compliance with this Court's orders.  A copy of this request is annexed as Exhibit N.  To date, however, Majapara has failed to provide Wachovia with any such representation – the reason why, unfortunately, is now clear.

23.    Majapara now moves to vacate the December 20 Order.

### Majapara's Instant Motion Is Unsupported

24.    Majapara's present motion claims that it is being made so that the Court can have before it all of the relevant facts that Wachovia did not disclose to this Court.

25.    This is an odd theory upon which Majapara now proceeds as it does not refute, with any proof, the facts Wachovia established in its initial moving papers, it does not provide any proof for virtually any "fact" that purportedly supports its motion, and does not present this Court with any proof of relevant facts not previously disclosed by Wachovia.

26.    To begin with, in Wachovia's initial moving papers it established that circumstances existed that indicated Majapara committed a fraud upon Wachovia.  Perez December Decl. (Exh. A), ¶¶ 12-15.  Majapara offers no testimony to refute this.

7

Majapara also offers no proof to refute the fact that it intended to frustrate Wachovia's collection of a judgment. Id. ¶¶16-21. Moreover, as more fully detailed in the accompanying Declarations of Carlos Perez and Andrew Gross, most of Majapara's unsupported "facts" are directly rebuffed.

27.    Next, Majapara's motion papers are almost entirely devoid of any proof – and the scant proof it does supply is mostly irrelevant to the instant action. For example, Majapara provides this Court with documents which it contends demonstrate it paid Wachovia for spot transactions. Declaration of Miguel Meza Rousseau at Exhs. A and B. But the spot transactions to which Majapara refers have nothing to do with the present dispute. Majapara also annexes a Mexican statute claiming (again, without any evidentiary foundation) that this provision permits Majapara to lend money. Id. at Exh. E. A simple read of the statute reveals that the provision supplied grants no such authorization.

28.    Finally, of the handful of facts Majapara supplies that have evidentiary support and are relevant, Wachovia previously disclosed them to this Court. For example, Majapara claims that Wachovia did not reveal that Majapara had been doing business with Wachovia for years (Df. Br. at p. 8); did not reveal that Majapara had offered to repay Wachovia (Id.); and did not reveal that Majapara conceded liability for the spot transactions (Id. at p. 5). But the fact is, Wachovia disclosed each of these facts to this Court in Wachovia's initial moving papers: Wachovia established that it had been doing business with Majapara since 2002 (Exh. A, ¶¶ 7-9); divulged that Majapara conceded liability (Id. ¶ 17); and disclosed that Majapara claimed it might be able to

8

repay the debt in two months. (Id. ¶ 19). There is simply no merit to Majapara's instant application.

29.    The instant motion should be denied for its complete failure of proof.

### The Order of Attachment Was Well Founded

30.    On December 20, 2007, this Court granted Wachovia's application for prejudgment attachment based upon the papers filed in connection with its Order to Show Cause dated December 14, 2007.

31.    As set forth in Wachovia's initial moving papers, there were two separate statutory grounds for this Court to award Wachovia prejudgment attachment. And this Court granted the December 20 order upon both grounds:

> Wachovia is entitled to an order of attachment against the property of Majapara on the grounds that: (a) Majapara is a non-domiciliary foreign corporation not qualified to do business in the state under CPLR § 6201(1); and (b) Majapara intends to remove assets from Wachovia's reach with the intention of frustrating the enforcement of an eventual judgment in favor of Wachovia under CPLR § 6201(3).

Exh. H.

32.    Indeed, as established in Wachovia's initial moving papers, as well as in its present papers in opposition to the instant motion, both statutory bases are established:

- Majapara is a non-domiciliary residing without the state (Perez December Decl. ¶ 5);

- Majapara is a foreign corporation not qualified to do business in New York (Id.);

- Majapara's financial condition poses a significant risk of enforcement of a future judgment – Majapara contends it is illiquid (Perez December Decl. ¶ 17), appears to be having issues paying its customers (Perez Dec. ¶ 27) and is going out of business (Df. Br. at p. 6);

- Majapara's conduct demonstrates its intent to frustrate enforcement of a future judgment – Majapara has failed to disclose all of its assets and where they are located (Exh.

9

M), all the while allowing more than $60 million to be drained from its account here in New York, in the days immediately preceding this Court's attachment hearing, in violation of this Court's clear and unambiguous prohibitions from doing so (Exhs. J and K).

### The Only Relevant Facts Not Previously Before This Court Only Re-confirm That Attachment Was Appropriate

33.    Again, Majapara brings its instant motion upon the theory that this Court was not provided with all of the relevant facts. But the only relevant facts not previously before this Court only re-confirm that attachment was warranted. In this regard, since Majapara received this Court's December 14 Order on December 17, it refused to comply with this Court's clear prohibitions and allowed more than $60 million to flow out of Majapara's Citibank account here in New York. See Exhs. J and K.

34.    Additionally, the December 14 Order required Majapara to provide Wachovia with a detailed list of all of its assets and where they are located. See Exh. E. Despite having received this directive on December 17, 2007, Majapara never complied with this order.

35.    Indeed, not until this Court issued the January 8 Order directing Majapara, once again, to provide this information, did Majapara purport to produce the required information. Upon review of these "disclosures", however, the information provided is blatantly insufficient. See Exh. M.

36.    In this regard, none of the assets disclosed identify their location. I am informed that a Mexican corporation may hold US$ denominated accounts in Mexico: consequently, the location of the assets listed on document "Majapara 0004" can be located in New York, Mexico, or elsewhere. Also, the list of bank accounts is incomplete. For example, as detailed in the Amended Complaint, Majapara has five accounts with Wachovia (Amended Complaint (Exh. C) ¶¶ 15, 55): "Majapara 0004"

10

only indicates Majapara has one with Wachovia. What other undisclosed accounts has Majapara chosen to omit from its list of assets?

37.    Further, where is the disclosure of Majapara's assets other than bank accounts and real property? For example, Majapara, in its letter of December 13th, states that Majapara has extended credit to a number of third parties. A copy of the December 13 Letter is annexed as Exhibit O. Where is the listing and identification of any of these entities or these receivables? Additionally, in the letter from JOM Corp. (Jorge Ortiz Munoz's company), dated December 19, 2007, JOM Corp. claimed that it made significant purchases of currency from Majapara. A copy of JOM Corp.'s letter is annexed as Exhibit P. Indeed, JOM Corp. submitted documents in connection with the Illinois State Court action that represented that during 2007, JOM Corp. owed Majapara as much as $827,836. Copies of the relevant filings are annexed as Exhibit Q. Where is there any disclosure of this account receivable?

38.    And these are just the items Wachovia is able to show now (without any discovery from Majapara).

39.    On January 12, 2008, after having received Majapara's purported "asset disclosures," Wachovia requested that Majapara confirm that it was in full compliance with this Court's orders. See Exh. N. To date, Majapara has chosen to ignore that request and remains silent as to Majapara's compliance with this Court's orders.

40.    Wachovia now knows why and has made a motion to hold Majapara in contempt of this Court's December 14 Order and January 8 Order.

11

## Majapara Has No Damages

41.    Majapara also argues that the amount of the bond posted ($1 million) should be increased *90 fold* because $1 million is inadequate to cover damages suffered by Majapara as a result of attaching property here in New York. Again, Majapara's argument is without any factual basis.

42.    First, Majapara offers no proof that is has suffered any damages as a result of this Court's December 20 Order. Indeed, how could it. Wachovia has not been able to attach any assets here due, primarily, to the fact that Majapara violated multiple court orders by refusing to disclose the identity and location of all of its assets and by removing more that $60 million from this jurisdiction just before the attachment hearing.

43.    Next, Majapara's claim to have been a $90 million going-concern, as of December 31, 2007, is completely unsupported. Majapara provides no proof of this financial valuation or EBITDA multiplier, even though it submitted a declaration from its Treasurer. This figure also conflicts with Mr. Ortiz's going-concern valuation of Majapara of $70 million as of December 13, 2007. See Exh. P. Apparently, Majapara's value has increased by more than $20 million since Wachovia commenced this action.

## The Order of Attachment Was Never Served Outside of New York

44.    Majapara also claims that the December 20 Order should be vacated because it is extraterritorial. This is simply not the case. The December 20 Order was never served outside of the State of New York. Indeed, Wachovia did not use the December 20 Order to attach funds at Harris Bank in Illinois. Wachovia commenced a separate action there for that attachment.

### Wachovia Exercised Its Contractual Right of Setoff

45.    Majapara also demands that Wachovia place the approximate $14 million

in setoff into Court.  There is no factual basis for this demand.  Indeed, there cannot be as

Wachovia exercised its right of setoff as per the parties' agreement governing Majapara's

account.  The Terms and Conditions specifically provides:

> If [Majapara] ever owes Wachovia, acting in any capacity,
> money as a depositor, borrower, guarantor, judgment
> debtor or in connection with any trade payment or
> otherwise, . . . and it becomes due, Wachovia has the right
> under the law (called "setoff") owed under these Terms &
> Conditions to use the money from [Majapara's} Account to
> pay the debt.

Exh. D.

46.    This is not challenged by Majapara.

### Conclusion

**WHEREFORE,** for the foregoing reasons and those set forth in the

accompanying Perez Declaration, Gross Declaration, and Memorandum of Law,

Majapara's motion should be denied in its entirety and this Court's temporary restraints

and order of attachment should be affirmed, along with such other and further relief as

the Court deems just, proper, and equitable.

Executed this 12th day of February, 2008.

_____

SCOTT S. MCKESSY

13